IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

OTSUKA PHARMACEUTICAL CO., LTD., )
)
Plaintiff, )
) C.A. No. 21-900(RGA)
v. )
) TRIAL VOLUME I
LUPIN LIMITED and LUPIN )
PHARMACEUTICALS, INC., )
)
Defendants. )

J. Caleb Boggs Courthouse
844 North King Street
Wilmington, Delaware

Monday, December 18, 2023
8:30 a.m.
Bench Trial

BEFORE: THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNELL LLP
BY: JEREMY A. TIGAN, ESQUIRE

-and-

VENABLE LLP
BY: JOHN D. MURNANE, ESQUIRE
BY: JOSHUA I. ROTHMAN, ESQUIRE
BY: BECKY E. STEEPHENSON, ESQUIRE
BY: ZACHARY L. GARRETT, ESQUIRE
BY: STEPHEN KRACHIE, ESQUIRE
BY: CAMILLE H. MANGIARATTI, ESQUIRE

For the Plaintiff

APPEARANCES CONTINUED:

RICHARDS LAYTON & FINGER, P.A.
BY: FREDERICK L. COTTRELL, III, ESQUIRE
BY: ALEXANDRA M. EWING, ESQUIRE

-and-

KNOBBE MARTENS OLSON & BEAR, LLP
BY: WILLIAM R. ZIMMERMAN, ESQUIRE
BY: JARED BUNKER, ESQUIRE
BY: CAROL PITZEL CRUZ, ESQUIRE
BY: MATTHEW FRIEDRICHS, ESQUIRE

For the Defendants

*** PROCEEDINGS ***

08:04:27

08:04:27 DEPUTY CLERK: All rise. Court is now in session. The Honorable Richard G. Andrews presiding.

08:22:30 THE COURT: All right. Good morning, everyone. Please be seated. Let's get started. The opening statement from the Plaintiff, maybe?

08:33:38 MR. MURNANE: Your Honor, may I approach?

08:33:48 THE COURT: Sure.

08:34:03 MR. GARRETT: Good morning, Your Honor. Zach Garrett here on behalf of Plaintiff Otsuka. We are joined today by four client representatives, three from Japan. We have Masaaki Sobe, head of IP; he's joined by his colleagues, Shinya Hirata Kazuyuki Yokota. And then from Otsuka U.S. we have Jack Lin, senior director of IP.

08:34:32 Your Honor, this is an ANDA litigation related to Otsuka's Jynarque product. Jynarque is the first and

remains the only FDA-approved treatment for autosomal dominant polycystic kidney disease, also known as ADPKD. It's a devastating hereditary disease that leads to kidney failure. The active ingredient in Jynarque is tolvaptan.

Otsuka discovered tolvaptan, and then in the early 1990s they began investigating its potential to treat several different diseases. At the time, Otsuka had the ability to synthesize small amounts of tolvaptan, known as bench scale.

Otsuka knew that if they were ever going to market a tolvaptan product, they would need a process for synthesizing large amounts of tolvaptan in a highly pure form. And that's where the patents-in-suit come in, the '730 patent and the '735 patent. The patents disclose the inventor's efforts to develop industrial-scale processes for obtaining highly pure tolvaptan.

For example, the patents have a section titled "Industrial Applicability." And in that section it states: "According to the process of the present invention, the Compound 10 or a salt thereof can be obtained in a high yield and high purity. The industrial applicability section also states the methods of the present invention are suitable for the production of the Compounds 1, 4, and 10, and their salts on an industrial scale.

Now, Your Honor, Compound 10 includes tolvaptan.

08:36:13 And Compounds 1 and 4 include intermediates of tolvaptan.
08:36:18 Now, these are just two examples in the patent. The patent
08:36:22 is full of disclosures about the industrial-scale synthesis
08:36:26 of tolvaptan, highly pure tolvaptan.

08:36:30 Now, the work underlying these patents-in-suit,
08:36:34 it took place over many years, from the early 1990s into the
08:36:41 2000s. In this litigation, we've narrowed the claims to
08:36:44 focus on certain discoveries; in particular, the asserted
08:36:50 claims relate to the purity of tolvaptan.

08:36:54 Now, early on, Otsuka realized it was very
08:36:58 difficult to purify tolvaptan. And one of the inventors,
08:37:03 Fujita, he discovered the presence of an impurity that was
08:37:08 particularly difficult to purify. That impurity is shown on
08:37:13 the screen. It's known as the dechlorinated impurity.
08:37:17 Sometimes it's called the dehalogenated impurity. You'll
08:37:21 see it called the dechloro impurity.

08:37:25 After discovering the presence of this
08:37:28 hard-to-purify impurity, Fujita then discovered an
08:37:32 unexpected solution. Now, the synthetic route for
08:37:36 tolvaptan, it includes a number of steps. The last step is
08:37:42 the reduction of a ketone which we see here on the slide on
08:37:47 the left, using a hydrogenating agent to arrive at
08:37:54 tolvaptan.

08:37:54 Through experimentation, Fujita found that the
08:37:59 dechlorinated impurity could be avoided by limiting the

amount of hydrogenating agent that was used in this last step. There is no clear reason why this works, Your Honor. But it does.

Even Lupin's ANDA documents explain that the dechlorinated impurity is difficult to remove and that it's generated by the presence of an excess amount of hydrogenating agent.

And, Your Honor, you'll see tolvaptan here on the right. The dechlorinated impurity is identical to tolvaptan, except it's missing the chlorine atom.

Now, before Otsuka made this discovery, the dechlorinated impurity was not known. How difficult it was to purify the dechlorinated impurity was not known. And the solution for avoiding the dechlorinated impurity was not known. All those were Otsuka discoveries.

And armed with this newly acquired information, Otsuka was able to go on and obtain large amounts of highly pure tolvaptan. And there is no dispute that the claimed inventions are used to synthesize the tolvaptan that is sold in Jynarque today.

There are seven asserted claims. I'll briefly introduce those, beginning with the '730 patent. On the left here is Claim 1 of the '730 patent, on the right we have a summary. The '730 patent is product-by-process claims, Your Honor. And Claim 1 covers highly pure

08:39:44 tolvaptan, which means the purity is greater than
08:39:47 99.5 percent, produced by a particular process. That
08:39:51 process is reducing the ketone precursor, which we saw on
08:39:56 the other slide, in the presence of a certain amount of
08:40:00 hydrogenating agent. In Claim 1 it's 0.25 to 1 molar
08:40:05 equivalent of the hydrogenating agent.
08:40:07 And this claim, it reflects the discovery that I
08:40:11 was just discussing, the fact that Otsuka discovered that
08:40:15 you could obtain highly pure tolvaptan by avoiding the
08:40:20 dechlorinated impurity by using a claimed amount of the
08:40:23 hydrogenating agent.
08:40:26 Claim 2, similar to Claim 1, except instead of
08:40:29 claiming highly pure tolvaptan, it claims tolvaptan
08:40:33 substantially free from at least one of Compounds A, B, C,
08:40:38 or D. Now, Compounds A, B, C, and D, there are other
08:40:44 impurities in tolvaptan, and Otsuka discovered that its
08:40:47 process could avoid these other impurities just like it
08:40:50 avoided the dechlorinated impurity.
08:40:53 Now, what does substantially free from mean?
08:40:56 There was an issue regarding that during the Markman
08:41:01 hearing. And the specification discloses guideposts for
08:41:05 substantially free from. There are examples in the
08:41:08 specification of Compounds A, B, C, and D in amounts of
08:41:12 0.01 percent to 0.03 percent. So very small amounts.
08:41:20 Claims 4 and 5 of the '730 patent are also

asserted. They're dependent claims. Claim 4 requires the use of a particular hydrogenating agent, sodium borohydride. And Claim 5 is a dependent claim with an upper limit of 0.5 molar equivalents of hydrogenating agent, whereas the other claims have a higher upper limit. The other claims have an upper limit of 1 molar equivalent.

We next have the '735 patent. Three asserted claims, 7, 8 and 10. Claim 7 and 10 cover a process for producing tolvaptan which comprises -- again, reducing the ketone in the presence of a claimed amount of hydrogenating agent.

Claim 7 -- Claim 8 is similar except it has a different amount. The upper limit there is .5 molar equivalent of hydrogenating agent.

On this slide, we show the definitions of a POSA in this case. There is a dispute. Some of the differences are highlighted. Otsuka's definition requires at least two years of experience related to process chemistry for the large-scale synthesis and purification of pharmaceutical compounds for use in a drug product.

Now, Lupin may point out that the claims, the claims themselves, do not require industrial-scale synthesis. And that's correct. But the claims must be read in the context of the specification.

And, Your Honor, if you look at the

specification, it is full of disclosures about industrial-scale synthesis.

Now, Otsuka's POSA definition is not new. There was another ANDA litigation in 2015 involving one of the asserted patents here, the '730 patent. And Otsuka's attorney then, in 2015, said at the Markman, "We think that a definition of a POSA that does not include a knowledge or experience in industrial processes really is not quite appropriate."

So Otsuka's position here has been very consistent over the past eight years.

Now, Your Honor is going to hear from two chemistry experts. Otsuka's expert, Dr. Roush, who's here today with us, Dr. Roush has decades and decades of experience developing large-scale processes for synthesizing and purifying pharmaceutical products.

Lupin's expert is Dr. Dichtel. Now, Your Honor, there is no doubt that Dr. Dichtel is a talented chemist. But he's a -- he specializes in polymer chemistry. And there is no polymer chemistry in this case.

At his deposition, Dr. Dichtel was asked the questions on the screen and gave the following answers:

"QUESTION: You do not have any experience with the industrial-scale synthesis of medicinal compounds?

"ANSWER: That's correct."

THE COURT: You don't need to read his deposition to me in the opening statement.

MR. GARRETT: Understood, Your Honor.

So Dr. Dichtel, he has no experience in the industrial-scale synthesis or purification of medicinal compounds, and he will admit that he's not an expert in that field.

So turning back to Lupin's definition of a POSA, Your Honor, Lupin's definition requires experience, at least two years' experience, in the synthesis, research, and development of medicinal compounds.

Now, Dr. Dichtel does not appear to meet that definition either, Your Honor, because of his lack of experience with medicinal compounds.

Now, no matter which POSA definition Your Honor adopts, we think Dr. Dichtel is straying from his expertise. And we don't raise this just to raise this. We do think it matters because a lot of the issues that Your Honor is going to be hearing about over the next three days relate to a POSA's motivation who was pursuing tolvaptan in large quantities as a pharmaceutical product.

Turning to infringement. There are only two claims, limitations in dispute. These limitations relate to the amount of hydrogenating agent that is present during the reduction of the precursor ketone.

08:46:30 Dr. Roush is going to testify that Lupin
08:46:32 infringes the asserted claims. In Lupin's process, they
08:46:38 start with the ketone in a reactor. And then over the
08:46:44 course of up to four hours, Lupin adds in sodium
08:46:50 borohydride. And Dr. Roush will explain that as Lupin is
08:46:55 adding in the sodium borohydride over the four hours, the
08:46:59 reaction is quickly proceeding.

08:47:01 And Dr. Roush will explain that before Lupin has
08:47:05 added 1 molar equivalence of sodium borohydride to the
08:47:10 reactor, the reaction is done. It's no longer proceeding at
08:47:14 that point in time.

08:47:16 In fact, Your Honor, Dr. Roush will testify that
08:47:25 Lupin's process is done even before they've added 0.5 molar
08:47:29 equivalents of the sodium borohydride.

08:47:33 Now, Lupin's -- Lupin has its reactor. They've
08:47:37 added the sodium borohydride enough for the reaction to be
08:47:40 done. And then they continue to add more sodium borohydride
08:47:45 and more sodium borohydride. And Dr. Roush will explain
08:47:48 that there's no consequence of the addition of this extra
08:47:52 sodium borohydride. They just add the sodium borohydride to
08:47:56 add the sodium borohydride.

08:47:58 Dr. Roush is an expert in boron chemistry, and
08:48:03 that includes the use of sodium borohydride. His CV lists
08:48:06 at least 30 publications involving boron chemistry, and he's
08:48:11 trained around 85 postdoc students and 85 Ph.D. students.

08:48:19 And you will hear that the vast majority of those students
08:48:23 and postdocs are using sodium borohydride under his
08:48:27 supervision. So his group uses sodium borohydride a lot.

08:48:32 Now, during claim construction, Lupin sought
08:48:37 to -- a construction that would change the word "amount" to
08:48:43 "total amount" to reflect that in Lupin's reactor the total
08:48:50 amount of sodium borohydride they add over the course of
08:48:53 those four hours is 1.2 molar equivalents.

08:48:58 At the Markman hearing, Your Honor rejected that
08:49:00 construction, explaining that the claim itself explains that
08:49:05 it's the amount while the reaction is taking place and that
08:49:08 the question of when the reaction is taking place or not is
08:49:12 a factual question, something the experts can write reports
08:49:15 about.

08:49:16 Otsuka can say the reaction stops here, and some
08:49:18 more stuff you put in has no more effect. Lupin's expert
08:49:22 can say that, oh, the reaction keeps going as long as you're
08:49:25 adding stuff.

08:49:25 And Dr. Roush will explain that the reaction
08:49:29 does -- the reaction is done before you've added 1 molar
08:49:34 equivalent of sodium borohydride. The addition -- the
08:49:37 additional sodium borohydride is inconsequential.

08:49:41 Now, Dr. Roush will explain that Lupin's own
08:49:44 data demonstrate that they infringe the claims. Now, on
08:49:50 this slide, the vertical axis shows the percent of ketone

08:49:57 left in the reactor and the horizontal axis shows the
08:50:02 percent of sodium borohydride that Lupin has added. This
08:50:05 data reflects two experiments that Lupin conducted. We call
08:50:11 them Experiments 109 and 115. And in those experiments,
08:50:17 Lupin added sodium borohydride over a period of time, and
08:50:23 they examined how much ketone remained at various points.

08:50:29 And Dr. Roush will explain that the data shows
08:50:31 that by the time Lupin has added 70 percent of the sodium
08:50:38 borohydride, the reaction is no longer proceeding. You'll
08:50:42 see here it's 70 percent. There was, I mean, miniscule,
08:50:47 0.02 percent left, and it -- that amount remained even after
08:50:52 the rest of the sodium borohydride was added. And then
08:50:55 after it was let sit for an hour and then after it was let
08:50:59 sit for two hours, the reaction did not proceed.

08:51:01 Now, Lupin is likely to raise several
08:51:07 noninfringement theories. Lupin may argue that they do not
08:51:10 infringe because the total amount of sodium borohydride they
08:51:14 add is 1.2. That argument would be inconsistent with the
08:51:18 claim construction. Lupin may argue that they do not
08:51:22 infringe because there remains a miniscule amount of
08:51:27 leftover precursor ketone following the reduction reaction.
08:51:31 Now, Your Honor, there's no merit to that argument.

08:51:35 Dr. Roush will explain that these types of
08:51:40 reduction reactions are irreversible reactions with second
08:51:46 order kinetics. So what does that mean? Well, it means

08:51:49 that some miniscule amount of starting material will always
08:51:54 remain. Lupin's theory is that the existence of a few
08:52:01 molecules of leftover precursor ketones mean that the
08:52:05 reaction is still proceeding. That theory is more academic
08:52:11 or philosophical, but it's not rooted in the actual practice
08:52:16 of synthesizing pharmaceutical products.

08:52:19 Lupin's own DMF documents consider the reduction
08:52:25 reaction "complete," even if there is leftover starting
08:52:29 material and up to 0.05 percent of it. Lupin's 30(b)(6)
08:52:36 witness testified to the same effect, as Your Honor will
08:52:39 hear.

08:52:39 Dr. Roush will explain that process chemists,
08:52:45 they understand that a reaction is no longer proceeding when
08:52:50 there's no longer any meaningful conversion of the starting
08:52:54 material.

08:52:57 Now, Lupin may also argue that Experiments 109
08:53:01 and 115 are not representative of the Lupin DMF process due
08:53:10 to condition -- differences in the reaction conditions. But
08:53:15 Dr. Roush took into account those differences, and he will
08:53:19 testify that those differences actually weigh in favor of
08:53:24 Otsuka, not Lupin. And that's because, as Dr. Roush will
08:53:28 explain, the reaction in Lupin's DMF will proceed fourfold
08:53:37 faster than the reaction that we saw on the screen due to
08:53:40 the differences in temperature, for example.

08:53:45 Turning to obviousness, Your Honor, starting

08:53:50 with the '730 patent. On the screen, I show Claims 1 and 2. 08:53:56 As I noted before, these are product-by-process claims. 08:54:00 Now, Lupin argues that the validity of these claims is based 08:54:04 solely on the product limitations and that the process 08:54:06 limitations are not relevant.

08:54:08 We disagree. Under the case law, process 08:54:12 limitations in a product-by-process claim are usually not 08:54:15 relevant to the validity analysis, but there is an 08:54:18 exception, and that exception is if the process limitations 08:54:23 impart structural and functional differences to the claimed 08:54:28 product, then those process limitations are relevant.

08:54:33 And Dr. Roush will explain that that's the case 08:54:36 here. The process limitations result in tolvaptan with 08:54:45 minimal amounts of the dechlorinated impurity. That's a 08:54:50 structural difference. The minimal amounts of the 08:54:54 dechlorinated impurity is also a functional difference 08:54:58 because they permit the tolvaptan to be easily purified.

08:55:04 So under the correct standard, we believe that 08:55:07 Lupin must demonstrate obviousness of all of the claim 08:55:10 limitations, and they will be unable to meet that burden, 08:55:13 Your Honor. It was Otsuka who discovered the dechlorinated 08:55:17 impurity, discovered the fact that it was difficult to 08:55:21 purify, and discovered the solution for avoiding it. Lupin 08:55:26 does not allege that a POSA would have made those 08:55:29 discoveries.

08:55:30 So Lupin does not take into consideration the process limitations, but even under Lupin's standard, Your Honor, they won't be able to meet their burden of demonstrating obviousness by clear and convincing evidence.

08:55:47 So Lupin's obviousness theory is based on prior art reference called *Kondo*, which was thoroughly considered during prosecution. During prosecution, the examiner rejected the claims of being anticipated by *Kondo*. Otsuka responded by noting that "pure materials are novel vis-a-vis less pure or impure materials because there is a difference between pure and impure materials."

08:56:15 And Otsuka explained that they were aware of the *Kondo* reference and that they considered -- Otsuka considered the claimed products to have unexpected improvements over the tolvaptan in *Kondo*. Otsuka also explained that factors under the law, factors to be considered in whether a purified form of an old product is obvious include whether there were suitable methods of obtaining that form or structure. Otsuka submitted a declaration by Dr. Yukawa and explained that Dr. Yukawa's declaration establishes that the product of the present claims is different from and not the less pure product produced according to *Kondo*.

08:57:03 Otsuka went on to explain there is no teaching or suggestion in *Kondo* of how a POSA could or would modify

the teachings of *Kondo* to obtain a drug product of the recited purities.

Turning to Lupin's arguments, on the left side we see Lupin's purported motivations. Lupin argues that a POSA would have been motivated to use recrystallization and chromatography to purify *Kondo's* tolvaptan to obtain the claimed purity levels. There are a number of flaws in this argument.

It relies on *Kondo*, so I'll spend a moment summarizing the reference. *Kondo* is a prior art reference. It was published by Otsuka, and the authors synthesized a small amount of tolvaptan in order to examine its properties. And the authors concluded that tolvaptan has some properties which may make it a beneficial pharmaceutical product. They also disclosed the synthetic route that they used to make tolvaptan. And that's shown on this slide.

Dr. Roush will explain that *Kondo's* synthetic route for obtaining tolvaptan, it was long and it was linear. It required 11 different reactions to get from the starting point to tolvaptan. And the yield of this route was extremely low. It was less than 1 percent. It was 0.68 percent.

So if you begin with a hundred percent of your starting material, by the time you're done, you have

08:58:57 0.68 percent left. You lose over 99 percent of what you put
08:59:01 in.
08:59:02 Dr. Roush will testify that a POSA would have
08:59:06 known that pharmaceutical products require a synthetic route
08:59:09 that has a high yield. So a POSA would have avoided *Kondo's*
08:59:13 synthetic route altogether.
08:59:15 But even if a POSA chose to pursue *Kondo's*
08:59:23 route, Dr. Roush will explain that they would not have --
08:59:32 the POSA would not have been motivated to subject *Kondo's*
08:59:38 tolvaptan to recrystallization or chromatography. Dr. Roush
08:59:42 is going to explain that those techniques, recrystallization
08:59:46 and chromatography, they result in a loss of the compound so
08:59:49 they further reduce the yield. Dr. Roush is going to
08:59:52 explain that a POSA looking at *Kondo's* very low yield is not
08:59:57 going to say, "Let me subject that tolvaptan to
09:00:01 recrystallization and chromatography to further reduce the
09:00:05 yield."
09:00:06 Turning next to expectation of success, Lupin
09:00:12 alleges that a POSA would have expected that they could use
09:00:15 recrystallization or chromatography to purify *Kondo's*
09:00:19 tolvaptan to the claim limitations. Now, Dr. Roush will
09:00:25 testify that the success of recrystallization and
09:00:30 chromatography, it varies greatly from one compound to the
09:00:32 next. And you cannot have an expectation of success
09:00:36 especially if you're lacking information about the compound.

Dr. Roush will explain that *Kondo* does not disclose the level of its purity, it doesn't disclose what impurities were present, and it doesn't disclose any information on how difficult it was to remove those impurities. And without that information, a POSA would not expect success using recrystallization or chromatography.

I'm going to move on to the '735 patent, Your Honor. So the '735 patent contains process claims whereas '730 was product-by-process claims. Lupin's theory is again based on *Kondo*. And Lupin argues that a POSA would have been motivated to reduce the amount of sodium borohydride used in *Kondo's* reaction of 29C to 32, a particular step in *Kondo's* reaction. And the POSA would be motivated to reduce the amount of sodium borohydride in that step from 1.5 molar equivalents to below 1 molar equivalent and even below 0.5 molar equivalents.

Now, there are a number of flaws in Lupin's argument. The first is that the problem that the Otsuka inventors discovered, it wasn't known by a POSA. So the POSA had no reason to believe that there was -- that reducing the amount of sodium borohydride would be beneficial.

We think Lupin's obviousness theory is based in hindsight. On this slide we have the POSA on the left, and a representation of the countless options that the POSA

09:02:23 could have pursued will be shown on the right. Now, a POSA interested in tolvaptan would have known that the prior art disclosed a number of synthetic routes for obtaining tolvaptan and intermediates of tolvaptan. And a POSA would have also known that they could have developed new routes. *Kondo* was just one option.

Now, Dr. Dichtel alleges that all these other options are irrelevant to the obviousness analysis. But we think that's improper hindsight, Your Honor. As I noted earlier, Dr. Roush is going to explain that a POSA would have avoided *Kondo* altogether.

Now, the real-world evidence, Your Honor, supports Dr. Roush's conclusion that scientists would have avoided *Kondo* altogether.

On this slide, we show a reference from the Zard scientists, the relevant time period is 2004, which is one year before our priority date. Zard and his colleagues were attempting to synthesize tolvaptan on an industrial scale. And Zard and his colleagues, they identified the -- *Kondo's* process, and then they strongly criticized it. They said that the known methods for synthesizing currently available -- the various methods of synthesis currently available for obtaining these benzazepine derivatives, which includes tolvaptan, constitute a major obstacle. The Zard authors also noted that the method represented in Figure 1,

which is *Kondo's* method, corresponds, comprises 11 consecutive stages, some of which involve drastic conditions which are not compatible with the presence of a certain number of functional groups.

So the Zard scientists in 2004, they were pursuing tolvaptan, they criticized *Kondo's* process, and then they avoided it altogether and they went on to pursue their own route for obtaining tolvaptan.

So going back to the slide showing the POSA's options.

Even if a POSA would have pursued *Kondo*, there are many aspects of *Kondo's* process that could have been pursued. There are a number of different steps -- I mentioned earlier there's 11 different steps. Each step has reagents and variables that you can modify. And Dr. Dichtel alleges that a POSA would have been motivated to modify every aspect of *Kondo*, essentially. And according to Dr. Dichtel, at some point in time the POSA would arrive at Step 29c and 32 and decide to reduce the amount of sodium borohydride.

In effect, Dr. Dichtel's theory is that the POSA would have pursued every option under the sun, modified every aspect of *Kondo*, and eventually arrived at the claimed inventions.

Your Honor, we don't believe that's a proper

obviousness analysis. Even under the "obvious to try" standard, there needs to be a finite number of predictable solutions, and that's far from the case here. Even if a POSA would have focused on Step 29(c) to 32 in *Kondo*, there were multiple aspects of that step that could have been pursued.

Now, *Kondo* reports in this Step 29(c) to 32, the yield was 30 percent. It was low. Dr. Roush will explain that a POSA would have believed that that low yield was due to the isolation stage of the step, not the reduction stage. The reduction stage is where the sodium borohydride is used. The isolation stage is after the reduction reaction, the tolvaptan is in a solution, you have to pull that tolvaptan out of the solution to get it in solid form.

Dr. Roush will say that low yield from this step, a POSA would have believed it was from the isolation stage, not from the reduction stage. Nothing to do with the amount of sodium borohydride that was used.

Now, Dr. Dichtel will allege that a POSA would have been motivated to reduce the amount of sodium borohydride that *Kondo* used. And he will likely explain that in theory, in theory, only 0.25 molar equivalents is needed to reduce a ketone. And that's because sodium borohydride has four hydrides. So each hydride can reduce one ketone.

09:07:25 Dr. Roush will explain that in practice scientists do not use the theoretical minimal amount of sodium borohydride and there are a number of reasons for that:

09:07:36 First, the more sodium borohydride you use, the faster the reaction goes, the better yield you get.

09:07:45 Second, the sodium borohydride may be impure, meaning that you have to use more of it to compensate for these impurities.

09:07:53 Third, there might be side reactions that occur in the sodium borohydride, and so you have to use more of it to compensate for any of those side reactions with, let's say, other solvents that -- that may be in the reaction.

09:08:06 And fourth, sodium borohydride decomposes during storage. So, again, you have to compensate by -- for that by adding more.

09:08:14 So Dr. Roush will explain that a POSA would have had no reason to reduce the amount of sodium borohydride used by *Kondo*. *Kondo* does not disclose any problem with using 1.5 molar equivalents. In fact, *Kondo* used 1.5 molar equivalents for a number of reactions throughout the paper, and he even obtained yields as high as 99 percent using that 1.5 molar equivalents.

09:08:39 So what is Lupin's theory for why a POSA would reduce the amount of sodium borohydride? They have a

09:08:48 couple:

09:08:48 First, Lupin alleges that using less sodium borohydride could improve the yield. Dr. Roush will explain that that's incorrect. A POSA would never think that using less sodium borohydride would improve the yield. If anything, it would further reduce the yield.

09:09:05 Lupin argues that reducing the amount of sodium borohydride would reduce costs, but Dr. Roush will explain sodium borohydride is very cheap. He will also explain that if you reduce the amount of sodium borohydride in one step, you're likely to reduce the overall yield, which actually increases costs overall, because if you have a low yield, it means you just have to run the reaction more often which is going to cost more money.

09:09:34 The third reason Dr. Dichtel offers is that reducing the amount of sodium borohydride could simplify post-processing and improve safety. Dr. Roush will testify that a POSA would not believe there was any difference in post-processing or improving safety if you were using 1.5 molar equivalents of sodium borohydride or 1 or .5. The -- the POSA would not be concerned with those levels of sodium borohydride.

09:10:04 And last, Lupin relies on several references in the prior art where a reaction was conducted where less than 1 molar equivalent of sodium borohydride was used. I

09:10:22 believe last night Lupin dropped two of these references, *Setoi* and *Ogawa*, so now are relying on *Watthey* and *LeClerc*. These prior art references are unremarkable, Your Honor. Neither *LeClerc* or *Watthey* related to tolvaptan. And neither of them provide a reason for why the scientists in those references used less than 1 molar equivalent of sodium borohydride. They did not report that there was any benefit to doing so.

*Kondo*, on the other hand, used 1.5 molar equivalents to actually synthesize tolvaptan, and *Kondo* achieved yields of up to 99 percent doing so with -- with other related compounds.

Objective indicia of nonobviousness, Your Honor, support the asserted patents. Commercial success is the first one. You'll hear from John Jarosz, an expert economist. He will testify that Jynarque is a commercial success. It's a blockbuster product, Your Honor. It has earned over $3 billion in revenue to date.

The nexus here is simple. It's undisputed, as I mentioned earlier, that the tolvaptan in Jynarque is synthesized using the claimed inventions. Without the claimed inventions, there's no evidence that Jynarque would exist.

Lupin argues that the commercial success of Jynarque should be discounted due to the presence of

blocking patents. However, we will present real-world evidence demonstrating that that argument is flawed. There were scientists in the real world pursuing tolvaptan despite the existence of those alleged blocking patents.

There was also a long felt but unmet need for the claimed inventions. Dr. Roush will explain that there was a need for an industrial -- industrial synthesis for highly pure tolvaptan.

And you will also hear from Dr. Gansevoort, a medical doctor who specializes in the treatment of ADPKD. Dr. Gansevoort will explain that many others tried and failed to develop ADPKD treatments over the years. And Your Honor will also hear evidence on unexpected results.

Written description was asserted, I believe Defendants have now dropped that theory, so I will move on.

Lupin's last theory, Your Honor, is inequitable conduct. Lupin alleges that two U.S. attorneys, Charlie Van Horn and Arthur Garrett, committed fraud on the Patent Office when prosecuting the asserted patents. Lupin alleges that an Otsuka scientist, Dr. Yukawa, helped participate in that fraud. These allegations are baseless, Your Honor.

Charlie Van Horn had a 31-year career at the USPTO. He was the director of the patent examining group responsible for inventions in organic chemistry and biotechnology, the same subject matter here. Lupin is now

09:13:50 accusing him of committing fraud on the very office that he worked for for 31 years. Dr. Yukawa, at the time of the prosecution, was the director of the pharmaceutical chemical department at Otsuka.

09:14:03 And Art Garrett became a partner at the Finnegan law firm in 1968, became a named partner five years later, and had an unblemished career for many decades.

09:14:14 Now, given the seriousness of these allegations, Lupin has a high bar for proving inequitable conduct. They must show, by clear and convincing evidence, that these three individuals acted with specific intent to deceive the PTO. The proof of intent must be clear and convincing that the applicant knew the relevant information, knew that it was material, and made a deliberate decision to withhold it.

09:14:41 Lupin has no evidence, Your Honor, to demonstrate that Charlie Van Horn, Art Garrett, or Dr. Yukawa had specific intent to deceive the Patent Office. Instead, they are going to ask you to draw an inference of intent. They have no evidence.

09:15:00 Lupin must also prove by clear and convincing evidence but for materiality, and they will be unable to do so. The allegations that they are raising about misstatements in the prosecution history were all before the examiner.

09:15:18 So what arguments does Lupin raise? During

09:15:23 prosecution, Otsuka submitted a declaration by Dr. Yukawa. 09:15:26 And that declaration, it had two experiments in it. There 09:15:29 was Experiment I, and there was Experiment II. Lupin 09:15:33 alleges inequitable conduct with respect to both of those 09:15:36 experiments.

09:15:37 With respect to Experiment I, Yukawa compared 09:15:41 examples of the claimed invention, which in that declaration 09:15:44 are A, B, and C, with *Kondo's* process, which was D.

09:15:49 And Lupin alleges that it was scientifically 09:15:52 improper for Dr. Yukawa to compare examples A, B, C with D 09:15:59 due to experimental differences amongst those -- amongst 09:16:04 those examples.

09:16:05 Now, the flaw in that argument, as I said, is 09:16:08 that all of those experimental differences were right in the 09:16:12 declaration. On this slide, it's obviously too small to 09:16:18 see, Your Honor, but the Yukawa declaration has a long -- a 09:16:24 long paragraph for each of these examples disclosing exactly 09:16:27 what took place in these examples.

09:16:29 So Lupin says that you can't compare these, but 09:16:32 all the evidence was before the examiner. And Dr. Roush 09:16:36 will explain these experimental differences, they're common 09:16:39 variations used by scientists and they were immaterial.

09:16:42 Lupin also alleges inequitable conduct based on 09:16:47 Experiment II in the Yukawa declaration. And in Experiment 09:16:51 II, Lupin alleges that the Yukawa declaration purported to

replicate *Kondo's* process but failed to do so for at least two reasons. The first reason that Lupin alleges is that Experiment 2(1), 2 part 1, utilized 3 molar equivalents of sodium borohydride. Whereas *Kondo* used 1.5 molar equivalents.

Lupin also alleges that there were some other experimental differences between Experiment 2(1) and *Kondo*, but their main point is that Experiment 2(1) utilized 3 molar equivalents, whereas *Kondo* used 1.5.

But, again, Your Honor, the Yukawa declaration discloses those details. They were before the examiner. Here on the slide, these are excerpts from the Yukawa declaration, and you can see that Yukawa explained that the process of the cited *Kondo*, et al., reference was carried out using the hydrogenating agent sodium borohydride in an amount of 1. -- 1.5-fold mole to the starting compound. So the examiner was aware that *Kondo* used 1.5.

And then elsewhere in the Yukawa declaration, Yukawa describes how he performed experiment -- how to perform Experiment 2(1). And he says, "In the same manner as described in the cited *Kondo*, et al., reference, Page 1753, right column, first paragraph (as compared to Compound 32) using 3 fold molar amount of sodium borohydride per 1 mole of the starting compound."

So he disclosed that he was using 3 fold molar

in his experiment, whereas *Kondo* used 1.5.

Dr. Dichtel will admit that anybody reading this declaration -- anybody competent in chemistry would know that Dr. Yukawa was representing that he was conducting an experiment similar to *Kondo*, but he was using 3 molar equivalents instead of 1.5.

At bottom, Your Honor, we believe that it's implausible that Charlie Van Horn, Art Garrett, and Dr. Yukawa committed fraud on the Patent Office with the specific intent to deceive. All of the information that Lupin is alleging was -- could not be compared in these experiments was disclosed to the examiner.

Thank you, Your Honor.

THE COURT: All right. Thank you, Mr. Garrett.

MR. ZIMMERMAN: May I approach, Your Honor?

May I proceed, Your Honor?

Good morning. Bill Zimmerman of Knobbe Martens. With me in the courtroom is Minaksi Blatt, the senior vice president and global IP from Lupin. I represent Lupin Pharmaceuticals and Lupin Pharmaceuticals, Inc.

Lupin Limited filed an ANDA seeking approval to market tablets containing the drug tolvaptan. They also filed a drug master file with the FDA that details their process for making tolvaptan.

If we could look at Slide 1.2.

As Plaintiff indicated, they're asserting seven claims across the '735 and the '730 patent. The '735 patent is directed to processes for producing a genus of compounds, including tolvaptan. The '730 patent contains product-by-process claims. The products are tolvaptan having a high purity and tolvaptan that is missing certain impurities, and the process limitations are identical to those of the '735 patent.

If we could go to Slide 1.3.

All of the asserted claims in this litigation require reducing a ketone precursor in the presence of a hydrogenating agent in an amount of .25 to 1 or .25 to .5 per mole of the ketone precursor. These amount limitations are going to be key for purposes of the infringement issue.

The infringement issue is very narrow and very focused, and that issue is whether the process set forth in Lupin's DMF and its ANDA, the process that they will use to make the tolvaptan in their product, literally satisfies these range limitations.

If we could go to Slide 1.4.

During claim construction, Your Honor determined that these range limitations require no construction. However, the Court explained that because the numerical limitations lack broadening words, the ranges are strict numerical boundaries.

And here we're going to be focused on the upper-level boundary of .5 and the upper-level boundary of 1. Your Honor also explained that the amount of hydrogenating agent for purposes of assessing infringement is the amount that's present while the reduction reaction is taking place.

When all of the evidence is presented in this case, it will show that Lupin's tolvaptan product and the process used to manufacture it as set forth in Lupin's ANDA and DMF does not infringe because it uses more hydrogenating agent than permitted by the claims while the reduction reaction is taking place, in full accord with the Court's construction.

If we go to Slide 1.6.

In Lupin's process, a ketone precursor which is identified as TLV-III is reduced to tolvaptan TLV-IV using the hydrogenating agent sodium borohydride.

And what you'll see, Your Honor, if we go back, on the left-hand side you see an oxygen double-bonded to a nitrogen ring; it's a 7-membered ring. The transition is in that ring from the double-bonded oxygen to a single-bonded OH alcohol in the TLV-IV structure. That is the conversion we're talking about. It's the only step of the recited process that we are focused on.

If we go to the next slide.

09:24:15 Lupin's FDA documents specify that its process uses at least 1.2 molar equivalents of sodium borohydride per mole of the ketone precursor TLV-III during the reduction reaction.

09:24:32 The evidence will show that Lupin is not permitted to use less than 1.2 molar equivalents in its process, but it is permitted to use more.

09:24:42 During its development work, Lupin found that using less than 1.2 molar equivalents of the sodium borohydride risks leaving too much unreacted ketone precursor. The reaction didn't go far enough. So the reaction continued but it didn't go far enough.

09:25:01 Lupin will present its FDA batch records, and those will show that Lupin used 1.2 molar equivalents of sodium borohydride in each and every one of those batches. This 1.2 molar equivalents of sodium borohydride is more than the upper limit of the strict numerical boundaries of the claims; 1 and .5. There's no dispute about that.

09:25:28 And there is no dispute that Lupin's process adds 20 percent more hydrogenating agent than permitted by the highest boundary in these claims into the reactor that contains the TLV-III and where this reaction occurs.

09:25:47 Lupin's noninfringement positions are straightforward. The claims require .5 or 1. Lupin uses 1.2. The reaction in its process continues during that

09:25:58 period of time.

09:25:58 So in view of those straightforward arguments,
09:26:02 what are we going to see from Plaintiffs? You're going to
09:26:05 see inconsistent and unfounded shifting positions for
09:26:10 infringement. Their theory is that not all of the 1.2
09:26:14 counts in Lupin's process because the reaction is finished
09:26:18 and complete before the 1.2 is added.

09:26:23 That argument is fundamentally flawed.
09:26:26 Plaintiff's expert will rely on artificial stopping points
09:26:33 for the reaction. During this case, Plaintiff has contended
09:26:37 that the reaction is complete when the TLV-III level reaches
09:26:43 .05 percent. They've contended that the reaction is
09:26:46 complete when further ketone precursor conversion is not
09:26:52 observed. And that's a quote.

09:26:53 They say that it happens when there's no
09:26:56 meaningful conversion. And then today in opening statement,
09:27:00 we heard "when there's minimal amount of TLV-III precursor
09:27:04 remaining."

09:27:05 The evidence and the science won't support any
09:27:10 of those artificial stopping points. The evidence will show
09:27:13 that in Lupin's process the reduction reaction continues
09:27:17 during the full addition of the 1.2 molar equivalents of
09:27:22 sodium borohydride.

09:27:24 The expert testimony will show that the
09:27:27 reduction reaction continues so long as there is unreacted

09:27:32 TLV-III and sodium borohydride or until the reaction is
09:27:37 quenched and made to stop.

09:27:39 Plaintiff's position on how much of the sodium
09:27:43 borohydride used in Lupin's process is also inconsistent.
09:27:47 You will hear them say that .91 molar equivalents of the
09:27:52 sodium borohydride that Lupin uses counts. At the same
09:27:57 time, they will argue that Lupin infringes claims that
09:27:59 require an upper limit of .5. So they will propose another
09:28:04 limit below .5. You will see shifting limits with no
09:28:09 consistency as to what portion counts from the Plaintiffs.

09:28:13 When the evidence is in, you will see that the
09:28:16 entire 1.2 molar equivalents counts because it's added while
09:28:22 the reaction is proceeding.

09:28:25 Now, tellingly, Plaintiffs will not present any
09:28:29 evidence from Lupin's actual ANDA batches or the DMF
09:28:34 batches, that the reaction is complete before the 1.2 is
09:28:39 added. Nothing from the actual FDA documents, which are the
09:28:43 documents that should govern this case.

09:28:46 If we turn to the next slide. Let's look at
09:28:51 what Lupin's FDA documents actually show. Lupin performed
09:28:55 in-process quality testing on all three of its FDA exhibit
09:29:00 batches. Lupin tested the ketone precursor level, the
09:29:04 TLV-III, after it added the full 1.2 molar equivalents of
09:29:10 sodium borohydride and allowed the reaction to proceed for
09:29:13 15 minutes, and then 75 more minutes.

09:29:16 As shown on the slide, there was no detectable precursor at the end of the addition of 1.2 molar equivalents.

09:29:24 So contrary to Plaintiff's contention, this testing shows that the reaction doesn't stop when the TLV-III precursor reaches .05 or .02 or some other artificial limit. It goes until it's not detected. And that's why Lupin uses the 1.2 molar equivalents.

09:29:46 Now, Plaintiff's position will focus on two development experiments, Experiments 109 and 115, which you heard about earlier. This will be Plaintiff's sole evidence in their infringement case.

09:30:04 The evidence will show that these development experiments were conducted using different process condition than those in Lupin's DMF and its ANDA. These experiments are not representative of the process that Lupin has sought FDA approval for. In fact, these experiments used 1.3 molar equivalents of sodium borohydride, not 1.2.

09:30:30 The evidence will also show that these experiments do not support Plaintiff's contention that Lupin's reduction reaction is complete or finished before all of the sodium borohydride is added.

09:30:43 In fact, in these experiments, two hours after 1.3 molar equivalents had been added, there was still unreacted TLV-III precursor. And that shows that the

process conditions matter in getting you the completion from these reactions. And we'll confirm that these reactions are simply not indicative of Lupin's FDA process.

If we go to the next slide.

The infringement inquiry in this case focuses solely on the amount of hydrogenating agent limitations. When the evidence is presented, it will demonstrate that Lupin's DMF process and ANDA process do not satisfy these two limitations and therefore Lupin doesn't infringe.

I'd like to turn to invalidity for a moment. The evidence will show that the asserted claims of both patents would have been obvious to a person of ordinary skill in the art before the priority date.

If we look at Slide 1.13.

Lupin will present evidence that the asserted claims of the '735 patent would have been obvious in view of a prior art reference to *Kondo*, in view of the knowledge of the skilled artisan, or in combination with patents from either *Watthey* or *LeClerc*.

Lupin will also present evidence that Claims 1, 2, 4, and 5 of the '730 patent would have been obvious over the *Kondo* reference in view of the knowledge of a skilled artisan.

There's no dispute in this case that tolvaptan is an old drug. It was known well before the priority dates

of the patents. And the *Kondo* reference, which will be a focus of the invalidity arguments, was an Otsuka reference that disclosed the synthesis of tolvaptan. And yes, it had a complicated process that's disclosed, but for purposes of this case, there's only one step in question. The claims at issue here are reduction of a precursor to the ketone. That exact same step is taught in *Kondo*.

Now, Plaintiffs are going to spend a lot of time focused on other portions of *Kondo* and how you manufacture the precursor, which are irrelevant to whether the simple reduction that they're claiming would have been obvious using specific levels of sodium borohydride.

Now, when you compare the *Kondo* reference and its actual disclosure to the claims of the '735 patent, *Kondo* discloses every single limitation of those claims with the exception of one. And that is the molar equivalents of sodium borohydride limitation.

The *Kondo* reference uses 1.5 molar equivalents and the asserted claims require the ranges we discussed earlier of .25 to .5 and .25 to 1. That is the sole difference on which this patent is based.

Now, if we turn to the next slide, 1.16.

The use of sodium borohydride was well known to the skilled artisan well prior to the priority date of these patents. This is a basic reaction that has been known in

organic chemistry for 40 years. There's nothing unique about the reaction. It is a reduction reaction that is employed commonly.

And it was well-established from the structure of sodium borohydride that everybody knew in the field that each mole of sodium borohydride can reduce 4 moles of ketone precursor.

And the structure I showed you earlier, Your Honor, where you went from an oxygen with two double bonds to an oxygen with a single bond on a hydrogen, the hydrogen comes from the sodium borohydride, and because it has four, it can donate all of them and reduce four ketone precursor molecules.

So any amount of sodium borohydride above .25 molar equivalents is a molar excess of reducing agent, whether it's .3 or 1 or 1.2 or 1.5. Anything above .25 is more than you need to reduce four molar equivalents.

Now, in addition to the *Kondo* reference, there were additional prior art references that taught the use of sodium borohydride as a reducing agent. But they didn't just teach it in the context of any chemistry. These references teach reducing five oxo ketone precursors, compounds that had the same structure as TLV-III.

Yes, it's not tolvaptan, but it's in the same class of the precursor that's being reduced in *Kondo*.

09:36:00 And if we look at the first one, it's the *LeClerc* patent. And it disclosed reducing a 5-oxo ketone precursor using .76 molar equivalents of sodium borohydride. An amount within the claimed ranges.

09:36:17 If we go to the next slide.

09:36:19 There were a group of patents to *Watthey*. And *Watthey* was associated with Ciba-Geigy, and they disclosed reducing 5-oxo ketone precursors using .5 molar equivalents of sodium borohydride. The upper end of the lowest range claimed in the asserted patents.

09:36:39 The evidence in this case will show that a skilled artisan would have been motivated to lower the molar equivalents of sodium borohydride used in *Kondo* to the claimed ranges to simplify costs, simplify post-processing, and improve safety.

09:36:57 The evidence will also show that the skilled artisan would have reasonably expected success in making this modification and that the claims of the '735 patent would have been obvious.

09:37:07 I'd like to turn to the '730 patent. And these are the product-by-process claims. For purposes of invalidity, Lupin only needs to show the claimed products, not that the recited process steps would have been obvious. We disagree with Plaintiffs that there's a fundamental change in tolvaptan that requires an analysis of the process

09:37:31 limitations. The prior art produced tolvaptan, the claims
09:37:36 produced tolvaptan, tolvaptan's molecular structure doesn't
09:37:40 change. It's the same compound.

09:37:42 So the products that are the focus of the '730
09:37:46 patent, when you strip away the process limitations, are
09:37:49 tolvaptan having a purity of more than 99.5 percent in
09:37:54 Claim 1 of the '730 patent, and tolvaptan which is
09:37:59 substantially free from at least one of Compounds A through
09:38:03 D, which are impurities identified in Claim 2 of the '730
09:38:09 patent.

09:38:12 The prior art *Kondo* reference disclosed
09:38:14 tolvaptan as a promising pharmaceutical compound with
09:38:20 vasopressin antagonistic activity. While it didn't
09:38:24 expressly disclose the purity of its tolvaptan, the evidence
09:38:27 will show that a skilled artisan would have been motivated
09:38:29 to purify *Kondo's* tolvaptan for purposes of use in a
09:38:34 pharmaceutical to a purity level above 99.5 and without the
09:38:40 impurities in Claim 2.

09:38:41 If we look at Slide 1.21, prior art notices in
09:38:49 the *Federal Register* support that a skilled artisan would
09:38:53 have been motivated to purify pharmaceutical compounds to
09:38:57 levels above 99.5 percent and to have individual purities at
09:39:03 .03 percent or below. And other prior art that will be
09:39:07 presented will reinforce these motivations, Your Honor.

09:39:10 The evidence will show that a skilled artisan

would have been motivated and expected success in purifying *Kondo's* tolvaptan to the levels recited in Claims 1 and 2 of the '730 patent. And, thus, those claims would have been obvious. Even if the process limitations are considered, they're the same ones as the '735 patent and would have been obvious for the same reasons.

Now, Plaintiff's main argument against obviousness will focus on the industrial scale of the process and the assertion that *Kondo's* process was not suitable for use on an industrial scale. The asserted claims of the patent, both of them, aren't limited to industrial scale. And there's no scale limitations at all. And while there's statements in the spec about industrial applicability, there also are examples of production of tolvaptan on scales such that no one would consider them to be industrial scale. So while the processes may have industrial scale applicability, the patents are in no way limited to industrial scale. And there's no basis for limiting a person of skill in the art based on the scale of the process.

Rather, the patents focus on organic reduction reactions that are not limited to industrial scale, and they're not even limited to the pharmaceutical context. These are reactions that are common across all phases of organic chemistry.

09:40:46 The evidence will show that Otsuka's secondary considerations lack a nexus to the claimed subject matter and are insufficient to render the claims nonobvious. I'd like to turn briefly to the prosecution history of the asserted patents.

During the prosecution, the examiner rejected the claims over the *Kondo* reference. And Otsuka attempted to overcome these rejections by asserting that the claims showed an unexpected improvement over *Kondo*. To support this assertion, Otsuka submitted a declaration from Hirotaka Yukawa, an Otsuka employee. And in that declaration he wrote, as we see on Slide 123, in the same manner as described in the cited *Kondo* reference, Page 1753, right column, first paragraph as to Compound 32, using threefold molar amount of sodium borohydride per mole of the starting compound.

So the comparison that Yukawa presented in Example 2 was not *Kondo* versus the claimed process. It was *Kondo* using 3 molar equivalents. Now, Yukawa never tells the examiner in his declaration that *Kondo* doesn't disclose 3 molar equivalents. He does say that *Kondo* discloses 1.5 molar equivalents elsewhere in the declaration, but he never tells the examiner that this experiment is not the actual product of what's disclosed in *Kondo*.

And in that declaration, Yukawa provided this

purported testing comparing *Kondo* to the disclosure of the asserted claims. But the experiments were different by a factor of twofold with respect to the amount of sodium borohydride used.

Now, you heard Otsuka dismiss this argument as baseless, but that begs the question: Why did Yukawa's declaration use 3 molar equivalents of sodium borohydride rather than the actual 1.5 molar equivalents of sodium borohydride disclosed in *Kondo* in this Experiment II? Otsuka will not present a single witness to explain why the Yukawa declaration doesn't follow the actual teaching of *Kondo*. But Otsuka's own documents will tell us. Those documents will show that this dechloro impurity that they're focused on, they did not get it when they ran the experiments at 1.5 molar equivalents. It only showed up at 2 molar equivalents in their experiments which inferentially tells us why they ran this experiment for the declaration at 3.

If we could go to the next slide.

What did Yukawa conclude in his declaration? You heard statements in opening arguments from Plaintiffs that you would never be able to purify *Kondo's* tolvaptan to anywhere near the level we're talking about in the claim, the greater than 99.5.

Well, what did Yukawa get? Yukawa, in his

replication of *Kondo* that used 3 molar equivalents, got 99.3 percent pure as compared to 99.5 that's claimed. And that's using 3 molar equivalents which generates more impurities. So the difference in purity was only .2 percent. And so this is not some difference of, oh, you have to purify it by 10, 20 percent. Their own data shows that we're off by .2, and that's when you use twofold more sodium borohydride and generate this dechloro impurities.

If we go to the next slide.

In arguing for patentability based on the declaration, Otsuka's attorney wrote: "That is, in the *Kondo* et al.'s process, the molar ratio of sodium borohydride to Compound 1 was 3 to 1." That representation is not correct. In *Kondo*, it's 1.5 to 1, not 3 to 1.

The patent examiner in this case allowed the patents based on the Yukawa declaration and Otsuka's attorneys' arguments based on that declaration. They obtained the patents not by comparing the purity of tolvaptan produced by *Kondo's* method but by instead comparing it to a process that used twice as much sodium borohydride and was known to generate more impurities.

Yukawa and Otsuka's attorneys misrepresented to the patent examiner that the comparison was with the actual process of *Kondo*. And even by doubling the amount of sodium borohydride, the difference in purity was only .2 percent.

09:46:05 The evidence will show that these inaccurate statements and the false declaration were but for material and that the single most reasonable inference is that they were made with deceptive intent to obtain the patents.

09:46:19 At the very least, the evidence will show that these results that were the basis of getting the patent were not unexpected because it was an improper comparison and that when the proper comparison was done to *Kondo's* actual process, there are no unexpected results, and the claims would have been obvious.

09:46:40 Lupin will present testimony from Dr. William Dichtel, who's seated in the courtroom. Dr. Dichtel is the Robert L. Letsinger professor of chemistry at Northwestern University. He will explain why Lupin's ANDA products and DMF process do not infringe and why the asserted claims would have been obvious.

09:47:01 Lupin will also present testimony from Dr. Parker, who is also seated in the courtroom. Dr. Parker spent his entire career in drug development, both as a researcher and an executive at major pharmaceutical companies and as an industry consultant. He will explain that tolvaptan's efficacy in treating ADPKD is due to the molecule and the structure of the molecule and not how the molecule is synthesized. He will also explain that two of Otsuka's previous patents related to tolvaptan would have

09:47:34 discouraged others from investing in developing methods of
09:47:38 synthesizing or utilizing tolvaptan.

09:47:41 Finally, Lupin will present testimony from
09:47:44 Mr. Hofmann, who is seated in the back of the courtroom.
09:47:48 Mr. Hofmann is vice president and managing director of
09:47:53 Gleason IP. He will address Plaintiff's assertions of
09:47:56 commercial success.

09:47:57 Thank you, Your Honor. And we look forward to
09:48:00 presenting Lupin's case.

09:48:01 THE COURT: All right. Well, why don't we
09:48:06 start.

09:48:12 MR. MURNANE: Good morning, Your Honor. John
09:48:24 Murnane of the Venable firm. Plaintiff calls Dr. William
09:48:28 Roush. Dr. Roush will offer opinions on infringement of the
09:48:34 asserted claims.

09:48:36 Your Honor, we have a set of slides and an
09:48:38 exhibit book for Dr. Roush. May I approach to bring them
09:48:42 up, Your Honor?

09:48:43 THE COURT: Sure.

09:49:05 DEPUTY CLERK: Please state and spell your full
09:49:06 name for the record.

09:49:06 THE WITNESS: William Richard Roush, R-O-U-S-H.

09:49:09 DEPUTY CLERK: Do you affirm that the testimony
09:49:12 you are about to give to the Court in the case now pending
09:49:15 will be the truth, the whole truth, and nothing but the

truth, you do so affirm?

THE WITNESS: I do.

WILLIAM RICHARD ROUSH, the witness herein, after having been duly sworn under oath, was examined and testified as follows:

MR. MURNANE: Sorry, Your Honor. They're looking for the slides. I apologize.

Your Honor, there seems to be a lot of boxes there. May I offer up one for Your Honor until the slide -- they're trying to find the others. I apologize, Your Honor.

May we begin, Your Honor?

MR. ZIMMERMAN: Your Honor, we haven't been provided copies of the exhibits.

MR. MURNANE: We are finding things, Your Honor.

THE COURT: All right.

MR. MURNANE: Again, my apologies, Your Honor.

DIRECT EXAMINATION

BY MR. MURNANE:

Q. Good morning, Dr. Roush.

A. Good morning.

Q. Please state your name for the record.

A. William Roush.

Q. And please turn in your binder to PTX-1556.

Can you identify that document, please?

A. Yes, this is a copy of my CV, and my publications

that I submitted when I put together -- submitted my first one of the expert reports.

MR. MURNANE: Your Honor, Plaintiff moves to introduce into evidence PTX-1556, the Roush Curriculum Vitae.

MR. ZIMMERMAN: No objection.

THE COURT: Admitted without objection.

(PTX No. 1556 was admitted into evidence.)

BY MR. MURNANE:

Q. Dr. Roush, I've read your CV and the opening paragraph in your opening expert report.

MR. MURNANE: If I may, Your Honor. Just ask three brief questions with respect to one sentence each.

BY MR. MURNANE:

Q. Does your CV summarize that you have spent 45 years as an organic and medicinal chemist?

A. That is correct.

Q. And are you currently the executive vice president of chemistry for IFM Therapeutics in Boston, Massachusetts?

A. I am, yes.

Q. Are you also emeritus professor of chemistry at the Scripps Research Institute?

A. That is also correct, yes.

Q. Thank you.

MR. MURNANE: Your Honor, Plaintiff offers

Dr. Roush as an expert in drug development, including the large-scale synthesis and purification of pharmaceutical compounds for use in drug products and the use of sodium borohydride to reduce functional groups.

MR. ZIMMERMAN: No objection, Your Honor.

THE COURT: You may proceed.

MR. MURNANE: Looking at Slide 1, we have here. We'll focus on the asserted claims, Your Honor.

BY MR. MURNANE:

Q. Dr. Roush, please turn in your binder to JTX-001, the '735 patent, and JTX-003, the '730 patent.

Could you tell the Court, what are these exhibits?

A. Yes. These two exhibits are the patents-in-suit.

Q. Okay. Did you consider the patent specifications and the claims of those patents?

A. I did for both. Yes.

Q. What claims in the '730 patent and the '735 patent are being asserted by Otsuka against Lupin?

A. Certainly. So for the '730 patent, the asserted claims are 1, 2, 4, and 5. While for the '735 patent, the asserted claims are 7, 8, and 10.

Q. Thank you.

MR. MURNANE: Let's look at the second slide, please. And let's look at Claim 1 of the '730 patent.

BY MR. MURNANE:
Q. It recites, "A highly pure, 7-chloro-5-hydroxy-1,2-methylchlor, 2-methylbenza" --
THE REPORTER: I'm sorry. Can you slow down?
MR. MURNANE: I'm sorry. Please forgive me.
BY MR. MURNANE:
Q. It recites that chemical; right, sir?
A. I'm sorry. I missed your question.
Q. The chemical I began reading, that's in the -- that's in the slide, it recites that?
A. Yes. The --
Q. Okay.
A. -- the name that you were reading is -- is the chemical name for the molecule tolvaptan. Yes.
Q. Thank you very much.
Let's look, if you would, in your binder at JTX-001. And look at the page, which is Page 17 there.
It has claims. Do you see that?
A. Yes, I have -- I have it, yes.
Q. Okay. Does Claim 7 depend on Claim 6?
A. That is correct. Yes.
Q. Does Claim 8 depend on Claim 7?
A. Yes, it does.
Q. And does Claim 10 depend on Claims 6, 7, and 8?
A. That is correct.

09:55:14 MR. MURNANE: Okay. Now, going back to this Slide 2, let's look at Claim 6 of the '735 patent.
09:55:15 BY MR. MURNANE:
09:55:22 Q. Do you see that?
09:55:22 A. I do.
09:55:24 Q. And it recites a process for producing a compound of the Formula 10.
09:55:31 Do you see that?
09:55:32 A. I do.
09:55:32 Q. And it says that X1 is a halogen atom, R1 and R2, are independently a lower alkyl group.
09:55:39 Do you see that?
09:55:40 A. I do. Correct.
09:55:41 Q. What -- what is that compound?
09:55:43 A. In the structure Compound 10 here is a genus of molecules, which have a central benzazepine core, and if one selects X1 as chlorine and R1 and R2 being alkyl groups, then this defines the structure tolvaptan. So tolvaptan is part of this genus.
09:56:04 Q. Thank you.
09:56:05 MR. MURNANE: Let's look at Slide 3, if we could, please. And let's look, again, at Claim 1 of the '730 patent.
09:56:12 BY MR. MURNANE:
09:56:14 Q. "It recites a benzazepine compound of the Formula 1

and the chemical compound of Formula 1."

What is a benzazepine compound of the Formula 1?

A. Well, the benzazepine compound of Formula 1 is another genus. There's multiple compounds included or covered -- defined by this structure.

But in simple terms, this constitutes the ketone precursor. If you select the appropriate X1, R1 and R2 groups, then this is the ketone precursor of tolvaptan.

Lupin identifies that ketone precursor as TLV-III. And throughout my testimony, I'll be referring to this ketone precursor with that -- that abbreviation, TLV-III.

Q. Thank you.

What does it mean to reduce a ketone?

A. Reduction is a term that -- that chemists use when you're adding hydrogen to multiple bonds. And in this instance, as I believe Mr. Zimmerman pointed out in his opening remarks, the ketone is a functional group between a carbon and an oxygen that has a double bond.

THE WITNESS: And, Your Honor, each of the lines in these structures represents a chemical bond. So in this instance where I'm showing with my pointer, there's two bonds between a carbon and an oxygen -- the O is oxygen -- that is a double-bonded group, and chemists recognize that as the ketone functional group.

09:57:56 BY MR. MURNANE:
09:58:00 Q. Thank you.
09:58:01 MR. MURNANE: Let's look at Slide 4.
09:58:01 BY MR. MURNANE:
09:58:05 Q. Dr. Roush, based on your review of the patents, could you please tell the Court what the asserted claims cover?
09:58:12 A. Yes, certainly. The asserted claims in the '730 cover a product made by a specific process. Here looking just at Claim 1, we're -- we're speaking of the highly pure tolvaptan, having a purity of at least 99.5 percent, which is produced by the process comprising reduction of a ketone precursor in the presence of a hydrogenating agent selected from a group of four possibilities.
09:58:43 And for the record, these would be lithium aluminum hydride, sodium borohydride, zinc borohydride, or diborane, in an amount of 0.25 to 1 mole -- per 1 mole of the ketone precursor.
09:59:02 If we turn to the '735 patent, the '735 patent claims the asserted claims all have to do with -- with the process -- the process for ultimately the synthesis of -- of the compound tolvaptan.
09:59:20 Q. Thank you.
09:59:20 And what is tolvaptan?
09:59:22 A. Tolvaptan is the -- thank you. You put up the slide.
09:59:28 Tolvaptan is the active ingredient in the drug

Jynarque, which is used for treatment of slow kidney function decline in patients, adults, that are at risk of a disease involving rapidly progressing autosomal dominant polycystic kidney disease. This is also known by the acronym ADPKD.
Q. And is Jynarque Otsuka's product?
A. Jynarque is Otsuka's product, yes.
And -- and I meant to include in my previous answer that it's the only drug approved for -- anywhere for treatment of this particular disease.
Q. Okay. And what are Lupin's ANDA products?
A. Lupin's ANDA products is a generic version of Jynarque, which utilized tolvaptan here also as the active ingredient.
Q. And is the information that you've put together on this slide -- with respect to Lupin's ANDA, is that taken from Lupin's ANDA Section 2.3.P drug product, JTX-30, Page 5?
A. That is correct. Thank you.
Q. Thank you.
And what is it about this slide, if anything, that tells you that tolvaptan is the active ingredient for Lupin's product?
A. Well, in there -- in the left-hand part of the table, which we've copied out of the Lupin ANDA, there's a heading

of ingredient and the second entry is tolvaptan.

And reading across, one sees there are five dosage forms at the 15, 30, 45, 60, and 90-milligram levels. And those dosage forms in the Lupin product will be the same dose -- are the same as the dosage forms in Otsuka's Jynarque.

Q. Thank you.

MR. MURNANE: Let's consider Slide 6, please.

BY MR. MURNANE:

Q. Dr. Roush, in the asserted claims, what is the process for synthesizing tolvaptan?

A. In the asserted claims the process involves the reduction of a ketone precursor in the presence of a hydrogenating agent, and -- and I -- I won't redefine the group of four in this particular slide.

The primary -- the principal discussion here today will be focusing on the use of sodium borohydride as the reducing agent, the hydrogenating agent.

And here for Claim 1 of the '730, the quantity of the reducing agent present while the reduction is occurring is 0.25 to 1 mole per 1 mole of the ketone precursor.

Q. And what is your testimony with respect to the '735 patent?

A. The process in -- in the '735 patent is the same

process as -- as I just outlined to you.

Q. Thank you.

MR. MURNANE: Your Honor, Plaintiffs move to introduce into evidence JTX-1, the '735 patent; JTX-3, the '730 patent; and JTX-30, from Lupin's original ANDA.

MR. ZIMMERMAN: No objection.

THE COURT: All right. They're all admitted without objection.

(JTX Nos. 1, 3, and 30 were admitted into evidence.)

MR. MURNANE: Let's consider Slide 7.

BY MR. MURNANE:

Q. There is a heading there which asks the question: "Will Lupin literally infringe?"

Was that a question you were asked in this case?

A. Yes, that was the question I was asked to address.

Q. Okay. And in doing so, what did you consider?

A. I considered multiple documents. I reviewed appropriate sections out of the Lupin ANDA. I reviewed the drug master file, the DMF. I have reviewed a large number of experimental results, experimental pages from notebooks. I've reviewed batch records. I've reviewed summaries of data that were provided or generated by Lupin scientists. So I've reviewed a large number of documents in this case.

Q. Thank you.

MR. MURNANE: Let's look at Slide 8, please.

BY MR. MURNANE:

Q. Dr. Roush, we mentioned your experience earlier. My understanding is you have experience with organic and medicinal chemistry?

A. I do.

Q. Okay. And do you have experience with drug development?

A. I -- I do as well, yes.

Q. Okay. Do you have experience with the development of large-scale syntheses processes?

A. Yes, I do.

Q. Okay. Have you consulted pharmaceutical companies on large-scale syntheses?

A. For more than 40 years I've done so, yes.

Q. Have you authored any papers that were published in journals relating to medicinal chemistry?

A. Yes. More than -- well, certainly at least 50, and probably more than that.

Q. What journals were they published in?

A. A range of journals, but this would include the *Journal of Medicinal Chemistry*, which is the leading medicinal chemistry journal anywhere in the world. But I've published in *European Journal of Medicinal Chemistry*, *Bioorganic & Medicinal Chemistry*. I've published in nature

journals and science journals, cancer research, and many others. So a wide range of journals.

Q. Thank you.

One more question on this topic. Have you served on the boards of any journals related to medicinal chemistry?

A. I have, yes. In -- I think it was 2005 to 2010, I was on the board -- editorial advisory board of a journal entitled *Chemical Biology & Drug Design*.

Q. Thank you.

MR. MURNANE: Let's look at Slide 9, please.

And let's go to the topic of "A person of ordinary skill in the art."

BY MR. MURNANE:

Q. Dr. Roush, did you offer a definition of a person of ordinary skill in the art, or a POSA, regarding the asserted claims?

A. I did, yes.

Q. And for the purposes of the infringement assessment, why did you offer a definition of a person of ordinary skill in the art?

A. I did so because it's my understanding that the -- the claims in this assessment must be viewed from the -- the perspective of a person of ordinary skill in the art. So in -- in order to do that assessment, I needed to actually

know who and define who that person of ordinary skill was.

Q. And what is your definition of a person of ordinary skill in the art with respect to these asserted claims?

A. And I have two parts to this answer. First is that it would be the -- an organic chemist with a Ph.D. in organic chemistry or -- or a related field, with at least two years of experience related to process chemistry for the large-scale synthesis and purification of pharmaceutical compounds for use in a drug product.

And then the second part would be that -- that a person of ordinary skill could be an organic chemist having a lesser degree, such as a master's or a bachelor's degree in organic chemistry or a related field, but with more experience related to process chemistry for the large-scale synthesis and purification of pharmaceutical compounds for use in a drug product.

Q. Thank you.

MR. MURNANE: Let's look at Slide 10, please.

BY MR. MURNANE:

Q. Dr. Roush, why did you include experience related to process chemistry for the large-scale synthesis and purification of pharmaceutical compounds for use in a drug product in your definition of a person of ordinary skill in the art?

A. I did so because the patents -- both patents, both

10:07:35 the '730 and the '735, have multiple sections in which the -- the objective of making -- manufacturing -- of synthesizing the compounds of these inventions is on an industrial scale. For example, in the abstract it refers to a process for preparing benzazepine compounds in high yield and high purity on an industrial scale. Specifically, also noting that the pharmaceutically active benzazepine compounds being made will have vasopressin antagonist activity.

10:08:10 THE WITNESS: Your Honor, the vasopressin antagonist activity is the actual mode of action of -- of -- of the drug at issue in this case.

10:08:19 Reading further down, "A further objective of the invention is to provide a process for producing the pharmaceutically active compounds (10) in high yield and in high purity on an industrial scale. In the detailed description of the invention, the desired compounds of Formulas 1, 4, and 10 can be produced in high yield and in high purity on an industrial scale by the processes as mentioned below."

10:08:48 And, finally, there is a section in the disclosure of both patents indicating, which is headed by the title "Industrial Applicability," which again comments both on the vasopressin activity of the compounds being made and that the compounds can be produced by the reactions

described within these patents in high yield and high purity.

So in -- in total, the patents I felt appropriate, based on everything I show you here that the -- the person of ordinary skill would have experience in process research, large-scale synthesis, and large-scale purifications.

BY MR. MURNANE:

Q. Thank you, Doctor.

The information that you assembled on this slide and highlighted, did you obtain this from the '735 patent-in-suit, JTX-1, on pages 1, 3, 4, and 11?

A. That is correct. Yes.

Q. Thank you.

Do you consider yourself, Doctor, a person of ordinary skill in the art with respect to these asserted claims?

A. I do, yes.

Q. Have you ever worked with anyone who would be considered a person of ordinary skill in the art according to your definition?

A. Many. Yes.

Q. Who were those individuals?

A. Well, through my consulting relationships with multiple companies. So, you know, I highlighted on the

earlier slide, Genzyme, Eli Lilly, Parke-Davis, which evolved into a consultantship with Pfizer.

In all of the -- my consulting work with those companies where I interact with them on a very regular basis with the process chemists, working on scaling up, doing the very activities that we're referring to here, making, developing processes for making pharmaceutical intermediates or final APIs on a large scale.

In my consulting work, I interacted even at pilot and on production facilities, working with the chemists doing the actual manufacture of approved drugs, trying to troubleshoot problems that had been encountered in those processes.

In my current work at IFM Therapeutics, we have three drugs in clinical study. I'm an inventor and coinventor of all three. And I was responsible for developing the -- designing the methods, the processes used, and then working with POSAs, meeting this definition, who actually manufactured the compound that we needed and quantities and purity that we needed to support ongoing clinical studies.

Q. Thank you.

To your knowledge, has Dr. Dichtel offered a definition of a person of ordinary skill in the art in this case?

10:11:37 A. He did, yes.
10:11:38 Q. And how does his definition compare to your definition?
10:11:42 A. Well, the major difference is that he does not include the -- does not consider or does not include in his statement of qualifications. He excludes the large-scale synthesis and purification, the process scale connections which I think are important and which I've included in my definition.
10:12:05 Q. Do you agree with Dr. Dichtel's definition?
10:12:08 A. I don't, no.
10:12:09 Q. Okay. Why does it matter whether a person of ordinary skill in the art, for this case, has experience with large-scale synthesis?
10:12:18 A. Learning to do -- that's a good question. Thank you.
10:12:21 Learning to do large-scale synthesis, it's almost as though these individuals, once they take these positions, become an apprentice. They have to learn how to operate on -- with reaction vessels and equipment which you don't find in an academic laboratory.
10:12:40 It's a very, very different experience working with 100-milliliter glass round-bottom flasks versus getting into a pilot plant or a production facility where you're working with a vessel that's got thousands and thousands of gallons of volume and solvent and whatnot.

10:12:57 We don't teach courses in any graduate school that I know of that focus on process chemistry or process research. So this is something that a person of skill has to learn on the job. And it takes a while for a person to actually assimilate all this and to become totally adept at everything that he or she would need to do.

10:13:20 So several years of practical experience -- if you'll permit me to say the so-called trainingship period or apprenticeship period -- is something they all go through and do.

10:13:32 Q. Would your assessment of the asserted patents change if you applied Dr. Dichtel's definition of a person of ordinary skill in the art?

10:13:39 A. It would not, no.

10:13:41 Q. Would you consider yourself a person of ordinary skill in the art under Dr. Dichtel's definition?

10:13:46 A. I am and I do, yes.

10:13:48 Q. Okay.

10:13:49 MR. MURNANE: Let's look at Slide 11 and focus on claim limitations. Here, we're focused on the '730 patent.

10:14:02 BY MR. MURNANE:

10:14:04 Q. Doctor, you'll notice with my laser pointer here when I say "the first," I am going to focus on the first limitation because we have 1, 2, 3. I'd like to focus on

the first one.

What is the first limitation of Claim 1 of the '730 patent?

A. The first limitation is the highly pure tolvaptan. You will have a purity of more than 99.5 percent.

Q. Thank you. Does Lupin dispute that its tolvaptan has a purity of more than 99.5 percent?

A. No.

Q. Okay. The first claim limitation of the '730 patent reads, quote, "Highly pure tolvaptan," closed quote. What would highly pure tolvaptan mean to a person of ordinary skill in the art?

A. Well, reading -- the person of ordinary skill reading this patent would understand here that a highly pure tolvaptan will have a purity of more than 99.5 percent.

Q. Okay. Will Lupin's ANDA product contain highly pure tolvaptan?

A. Yes, it does. Or it will, yes.

Q. All right. Why?

A. Why? I've reviewed Lupin's ANDA, and they stipulate the minimum purity of material being used in their production of the actual drug product must be at least 99.5 percent pure.

Q. Thank you.

MR. MURNANE: Let's focus on Slide 12. Excuse

me, yeah, Slide 12. Forgive me.
BY MR. MURNANE:
Q. And here, let's focus on the second claim of the '730 patent. What is the first limitation of the second claim of the '730 patent?
A. Yes. So the first limitation here for Claim 2 is that the tolvaptan, that the highly pure tolvaptan will be substantially free from at least one of the benzazepine compounds selected from Compound A, Compound B, Compound C, or Compound D.
Q. Thank you.
Does Lupin dispute that its ANDA product is substantially free from at least one of the benzazepine compounds selected from Compound A, Compound B, Compound C and Compound D?
A. There is no dispute. No.
Q. Thank you.
MR. MURNANE: Let's look at Slide 13, please.
BY MR. MURNANE:
Q. And here, I'd like to focus on what we call the second limitation. These are the number two limitations. Do you see those?
A. I do.
Q. Okay. What is the second limitation of each of the asserted claims here?

A. The second limitation across all of these four asserted claims is that the highly pure tolvaptan will be produced by a process which comprises reducing a ketone precursor.

Q. Does Lupin dispute that its ANDA product is produced by a process which comprises reducing the ketone precursor?

A. No dispute, no.

MR. MURNANE: Let's look at Slide 14, please.

BY MR. MURNANE:

Q. And here, we'll be looking at the third element of the claims.

What is the third limitation in the asserted claims?

A. The third limitation across the board is the definition of the reducing agents. So the process involving reduction of a ketone precursor will be performed in the presence of a hydrogenating agent. For Claim 1, it's selected from the group of four that I defined before which specifically includes sodium borohydride.

And that aspect of the limitation occurs across all four of these claims with the difference, if you permit me, that in Claims 4 and 5, the third limitation gives only one choice, which is sodium borohydride. But there's choices of four hydrogenating agents in both Claims 1 and 2.

Q. Thank you.

Does Lupin dispute that its ANDA product is produced by a process in which a ketone precursor is reduced in the presence of sodium borohydride?
A. There's no dispute, no.
Q. Thank you.
MR. MURNANE: Let's look at Slide 15, please. And here we'll focus again on the third part of the slide for each of the claims.
BY MR. MURNANE:
Q. Doctor, what ultimately is the disagreement between you and Dr. Dichtel regarding infringement of the asserted claims of the '730 patent?
A. The difference in our opinion is whether the Lupin process is being performed -- it has to do with the stoichiometry of the hydrogenating agent present while the hydrogenation reaction is undergoing.
Q. Thank you.
MR. MURNANE: Let's look at Slide 16, please.
BY MR. MURNANE:
Q. And here, we're talking about claim construction. Before I ask you about your position on this issue, looking at this slide, let's consider what happened with claim construction which references the Markman phase of this case.
To your knowledge, did the Court address any

terms from this claim limitation during claim construction?
A. Yes, the Court did.
Q. And is it the term we see at the top there in an amount of 0.25 to 1 mole per 1 mole of the ketone precursor?
A. Correct. So the term at the top, which you just read in an amount of 0.25 to 1 mole per 1 mole of the ketone precursor, was addressed by the Court during the claim construction.
Q. When Lupin sought to add the word "total" before "amount," did Lupin explain what it meant by total amount?
A. Yes. Yes.
Q. What was that?
A. And so Lupin uses a larger amount -- or I guess let me just answer it this way: That Lupin is adding their hydrogenating agent in a dropwise manner, and they asked the Court to modify or adopt a construction of the claim where the total amount is the amount that's added for the first drop added to the very last drop added, irrespective of the total amount, that whether that total amount was within the asserted claim language or outside of the asserted claim language.
Q. Thank you.
MR. MURNANE: Let's look at Slide 17, please.
BY MR. MURNANE:
Q. And on Slide 17, we see on the left '730 patent

Claim 1, and there's some bold language there in the second and the third portions.

Could you please tell the Court why you bolded that language?

A. Certainly. So as I've reviewed these claims and as I think a POSA would have done so, again, the key language is that we were reducing a ketone precursor, but the claim stipulates that we are reducing a ketone precursor in the presence of a hydrogenating agent in an amount of stoichiometry.

So this defines the amount of hydrogenating agent that would be present, would be there in the presence of the ketone when the reduction is undergoing. So I viewed this as important because -- and I put together this chart or this figure, this diagram on the right. So let's imagine we're adding the hydrogenating agent, the sodium borohydride dropwise. And we get to the point where we're adding the sodium borohydride over a period of time. So the x-axis is time, the y-axis is the amount of hydrogenating agent.

And so I'll show evidence subsequently where I believe that the reduction is -- will be complete before the -- before 0.5 moles of sodium borohydride has been added. And I consider that blue. So I've highlighted this in blue. That's where the reaction is occurring.

So we're adding, dropwise, sodium borohydride,

reactions are occurring. And then we're going to get to a point as we're doing that dropwise addition where the reaction has actually gone to completion, where there's no more productive conversion of any very small amount of ketone that may be present.

So the brownish area would be the region in this reaction profile where the additional amounts of sodium borohydride up to Lupin's 1.2 molar stoichiometry would be added. If my sup- -- if my analysis is correct that the reaction is actually done at this point that I'm indicating here, it's totally superfluous, that whatever sodium borohydride is added in the brown portion of this diagram is not at all contributing to the reduction because the reduction is complete and is being conducted in the blue period.

And I think this assessment that I'm making is completely consistent with the claim language, that we're reducing a ketone precursor in the presence of a hydrogenating agent. That's the blue region.

If the ketone precursor is no longer being reduced, it's irrelevant how much other material is being added because this other material being added is not contributing to the further reduction of the ketone. The reaction is done in the blue period. So that's what I'm trying to indicate here.

10:24:02 Q. Thank you, Doctor.

10:24:03 On the horizontal axis, which you indicate is minutes, why do you have 240 on the right?

10:24:12 A. Because, you know, subsequently in reviewing the ANDA and the drug master file, Lupin permits their process to be run up to the 240-minute addition time. So 240 is the point in time where Lupin would no longer add any more sodium borohydride.

10:24:35 Q. Okay. Thank you.

10:24:36 MR. MURNANE: Let's look at Slide 18.

10:24:36 BY MR. MURNANE:

10:24:41 Q. As part of the work you did in assessing whether or not there is infringement in this case, did you consider the Court's claim construction?

10:24:51 A. Yes, I did.

10:24:53 Q. And could you explain how you did that?

10:24:55 A. Well, I've read. I reviewed the Court's decision on the matter, and the Court, after reviewing all the arguments that Otsuka and Lupin presented, the Court indicated that he rejected the Defendant's proposed assertion of total to modify amount. And then as I've highlighted in yellow here, the Court indicated that he thought that I think that the claim itself explains that it's the amount, meaning the amount of sodium borohydride present while the reaction is taking place.

And he goes on to point out that the question of when the reaction is or is not taking place, that's a factual question, and the experts will need to duke it out. And I guess that's what we're doing -- we're doing now.

Q. Thank you.

MR. MURNANE: Let's look at Slide 19, please.

BY MR. MURNANE:

Q. To the point you just mentioned, the experts providing their views in this case, in your opinion, does the amount of sodium borohydride that Lupin uses to reduce its ketone precursor when synthesizing the tolvaptan in this ANDA product meet the third claim limitation term here that is shown on this slide?

A. In my opinion, yes, it does. That -- there's experimental evidence from experiments we'll talk about shortly that indicate that the reductions are certainly complete before 1 mole per mole of sodium borohydride is added. And based on everything I know about the sodium borohydride chemistry, the rates of these reactions and the data that Lupin has provided, I also believe that their experiments -- that their reduction processes will be complete before 0.5 moles of sodium borohydride is added. That's pertinent to Claim 5.

So, yes, it's my opinion that Lupin literally infringes all three of these claims.

All four. Excuse me. All four of these claims.

Q. Thank you, sir.

A. Sorry.

MR. MURNANE: Let's look at Slide 20, please.

BY MR. MURNANE:

Q. Dr. Roush, does Slide 20 --

THE COURT: So, Mr. Murnane, why don't we take a morning break here. We'll take a 15-minute break.

Okay.

MR. MURNANE: Thank you, Your Honor.

DEPUTY CLERK: All rise.

(Recess was taken.)

DEPUTY CLERK: All rise.

THE COURT: All right. Everyone be seated. Let's continue.

MR. MURNANE: Thank you, Your Honor.

BY MR. MURNANE:

Q. When we broke, Dr. Roush, we were looking at Slide 20, which is on the screen.

Could you -- looking at those four assessment points, could you summarize why you believe that Lupin's tolvaptan is synthesized by a process wherein the ketone -- the ketone precursor is reduced in the presence of a claimed amount of sodium borohydride?

A. Yes. Certainly. So I highlight four reasons or --

reasons, factors that contributed to my opinion. The first is that Lupin's reactions proceed quickly, and the conclusion is that the reactions will be complete before 1 molar equivalent is added. That statement is supported by Lupin's own experimental data. It shows that the reaction is complete at least by the time 0.91 molar equivalents of sodium borohydride have been added.

My third point is that Lupin themselves through information and the batch records and the DMF, the drug master file, correct, indicates that the reduction is complete. Even if there is 0.05 percent of the ketone precursor -- that is, the TLV-III -- is remaining.

And then finally, Lupin's DMF process has very few restrictions about how Lupin must add the sodium borohydride.

Q. Thank you.

MR. MURNANE: Let's look at Slide 21.

BY MR. MURNANE:

Q. A moment ago you mentioned Lupin batch records. On the screen, have you put one of the Lupin batch records -- and this would be based on JTX-14, Page 12. Have you done this based on that batch record?

A. That is -- that is correct, yes.

Q. Okay. And why do you think Lupin's reaction proceeds quickly? The first point we just saw on the previous slide

mentioned that Lupin's reaction would go quickly.

Why do you think it would go quickly?

A. Well, there's two reasons. One, Lupin defines the time for the addition of the sodium borohydride -- Your Honor, that's the column I'm highlighting now.

It says STD, standard time, and in minutes. The standard time for performing these additions is 30 to 240 minutes. That's Point Number 1.

At the end of the experiment, there's an additional short period, 15 minutes of stirring before the reactions are allowed to be terminated.

So in total, Lupin is indicating that they know that the reaction will be complete within at least 45 minutes or less. That's Point Number 1.

Point Number 2 is that I have a vast experience performing sodium borohydride reactions myself, and I know that these reactions are extremely fast, much faster than even indicated by a 30-minute time point.

Q. Thank you, Doctor.

You have something else highlighted in yellow.

Could you explain to the Court what you've done there?

A. Yeah, certainly. So the drug master file indicates that the reaction temperature will be between 25 degrees and 30 degrees Centigrade, so a little bit above room

temperature. And in this particular batch, the experiment, the reduction was performed at 27.8 degrees Centigrade.

Q. What is the difference between a fast reaction and a slow reaction in this context, Doctor?

A. Well, in the context of the patents-in-suit, the fastness or lack of fastness really has to do with operational facility. Again, the context of this is that Lupin -- well, Otsuka and now Lupin want to manufacture a product in order to put into a drug, to go into a very important drug that's treating patients with this kidney disease.

They will need to make multiple batches. This isn't the case where they're going to make the material once a month or some -- make a compound, make a batch, and then this is going to be the supply for a really long period of time. It's my expectation that they're probably making batch after batch after batch after batch of material, and the objective of the process research group is to maximize compound throughput in the reaction vessels. So the shorter amount of time you can have a vessel occupied by Batch Number 1, the quicker you can get the product out of the first batch, the faster you can get on to starting Batch Number 2. And then, et cetera.

And so you keep making batch after batch after batch. So the objective of process research groups is to

have a reaction -- all reactions go as quickly as possible within, you know, the appropriate processing conditions, again, for the standpoint of maximizing reactor availability, reactor compound throughput.

Q. Thank you.

MR. MURNANE: Could we go back to Slide 20 for just a moment, please?

BY MR. MURNANE:

Q. And, again, the first point you have for your assessment of infringement is Lupin's reaction proceeds quickly such that the reduction is complete before 1 molar equivalent is added.

Why is it significant to you that Lupin's reaction proceeds quickly when you're analyzing how much sodium borohydride Lupin uses to reduce its ketone precursor?

A. As we'll discuss in just a moment, there's a very limited amount of real data that Lupin has provided that gives an indication of what the time course of these experiments are. So knowledge that the reaction is quick, is fast as I'm describing it, will enable us to interpolate among the data and assess -- really given what the reaction profiles are to assess where the reactions most likely will be done.

Q. And is what you just said relating to your opinion,

is that reflecting your experience with respect to sodium borohydride reactions?

A. It's -- certainly my experience with sodium borohydride reductions is a part of that -- that absolutely, yes.

Q. Is there anything in Lupin's DMF process that supports your conclusion that sodium borohydride reactions proceed quickly?

A. Well, again, as I testified just a moment ago, in the -- they -- the DMF allows their addition to be 30 minutes, and then there's a period of time, short period of time before the reactions are worked up. Lupin would not have permitted that short amount of time to be utilized if they did not think the reaction was -- would not be complete within that time period.

So the way -- just the construct of the process for doing this illustrates Lupin's knowledge that the reaction will be done very quickly.

Q. Thank you, Doctor.

Is there anything in the patents-in-suit that supports your conclusion that sodium borohydride reactions proceed quickly?

A. Certainly. There's a procedure -- I believe it's Example 2 -- in both of the patents-in-suit which describe the gram-scale synthesis of tolvaptan where those

experiments are conducted for a one-hour time period.
Q. Okay. In his expert reports, did Dr. Dichtel dispute that the reaction would proceed quickly?
A. He did not, no.
Q. Okay.
MR. MURNANE: Let's go back to Slide 20 for just a moment, please.
BY MR. MURNANE:
Q. And we're going to now address the second point of Slide 20 where it says, "Lupin's data shows that the reaction is complete at least by the time 0.91 molar equivalents is added."
MR. MURNANE: And so, now, look at Slide 22, please.
BY MR. MURNANE:
Q. While looking at Slide 22, Doctor, which has information from Lupin R&D lab notebooks, JTX-17, pages 113 and 114, is there any data with respect to Lupin's tolvaptan that is relevant to your position that Lupin meets this limitation?
A. There is. So this is an experimental result. This is what I've referred to as Experiment 109. You can see the 109 is part of the notebook identifier that I'm highlighting in yellow in the lower box on the screen.
This is from a series of experiments Lupin was

performing in order to define the conditions that they ultimately have used in their manufacturing process. But here at this time they were using 1.3 molar equivalents of sodium borohydride. In this instance they were performing the reduction at 2 degrees, essentially ice bath temperatures, which is not what they now do. But in this particular, with 109, as you read the highlighted at the bottom, it indicated they did something at the 30 percent or the 75 percent time period.

We continued looking -- I continued looking at -- and looked at the underlined HPLC data for these experiments, and it turned out, in fact, that the 35 percent time point and at the 70 percent time point, they actually took samples and looked for -- and quantitated the amount of residual starting ketone, the so-called TLV-III, that was remaining at those early time points in the experiments.

If we could go to the next slide.

MR. MURNANE: Slide 23, please.

THE WITNESS: Yes, please. Thank you.

So this is the underlying analytical data for the -- the Experiment 109.

This is an HPLC trace, Your Honor, the big peak in the middle here that I'm highlighting, and it's labeled, thankfully, by -- by Lupin.

This is the tolvaptan peak. And then every

other peak, which is identified by these numbers, these numbers mean a retention time, the time in minutes that the peak appears on the -- coming off of the column.

They're looking for the presence of TLV-III, the ketone precursor, and they've identified here, I've highlighted it in yellow. It's a peak that came off of the HPLC trace at about 16.4 -- my eyesight -- 16.49 minutes. And that's indicated further down in the table at the bottom where -- where the integrator on the HPLC instrument calculates the area -- area under the curve for each of these peaks, they're added up. The total areas are then -- like I said, this is 100 percent, and each peak is assigned an area of percent based on the area at -- the 16.49, for example, compared to the total of everything that's come off. And what you see at this point is that 0.02 percent of the total -- everything coming off the column, 0.02 percent is TLV-III, the ketone precursor.

So this represents the amount of ketone precursor that has not reacted at the point 70 percent of the sodium borohydride has been added.

If you take the 1.3 molar stoichiometry and multiply that by 0.7, to take 70 percent of 1.3, that tells us that at this point in time when this sample was taken for this analysis, 0.91 moles of sodium borohydride had been added to this experiment.

BY MR. MURNANE:
Q. Thank you.
Does -- the information that we have on Slide 23, does that come from the Lupin R&D analytical data, JTX-20, Page 19?
A. That is correct. Yes.
Q. Okay. You were pointing out a number of things here.
What does the area of percentage signify?
A. The area of percentage signifies, again, taking the amount of area underneath each of the peaks that are indicated with a retention time number, and some are so small you can barely see them coming up out of the baseline, but you take the total area and then you take the area of each peak and divide it by the area for the total. And so that gives you the percentage -- the area percent of what that peak constitutes compared to the total.
And, again, for TLV-III, the total amount is -- is 0.02 percent on an area integrated basis.
Q. And, again, the TLV-III is the ketone?
A. TLV-III is, yes, the ketone precursor, the starting material for this hydrogenation experiment.
Q. And this record shows that after the tolvaptan was made, there was 0.02 percent of the ketone remaining?
A. At this point in time with 70 percent of the total sodium borohydride having been added, yes. The -- the vast

majority is tolvaptan, and all that remains of the starting ketone, TLV-III, is 0.02 percent.

Q. Thank you.

MR. MURNANE: Let's look at Slide 24, please.

BY MR. MURNANE:

Q. Doctor, is Slide 24 presenting information from Lupin's R&D lab notebook, JTX-17, Pages 119 to 120?

A. That -- that is correct, yes.

Q. And is that also experimental data that you considered?

A. Yes, it is. So this is what I've referred to as Experiment 115, and that 115 comes from the experimental number on this second box where the 115 is just -- the last three digits in the descriptor.

Q. And why did you highlight the information that's in yellow on this slide?

A. In the first box, I was highlighting, again, the stoichiometry. The -- in this experiment, it's a 1.3 total molar ratio. This is the amount that -- that Lupin was going to add over an extended period of time.

In this instance, and so the Point Number 5 that I'm highlighting in the second box, we added the above solution, meaning the sodium borohydride. It's added over a two-hour period in the intended experiment.

There's also -- oh, so this one is performed at

3 degrees Centigrade. And there's a note that they did something, they took -- they did something -- some manipulation at the 70 percent mark. There are supporting HPLC data that I've reviewed, which shows that it appeared also then that at the 70 percent addition point, meaning they've added 70 percent of the 1.3 equivalents, they performed the same type of HPLC experiment to assess how much of unreacted -- how much residual starting ketone TLV-III remained at that point.

Q. Let's look -- thank you, Doctor.

MR. MURNANE: Let's look at Slide 25, please.

BY MR. MURNANE:

Q. Is this the HPLC data that you just mentioned before?

A. This is the HPLC trace for Experiment 115, correct.

Q. Okay. And is this from Lupin R&D analytical data, JTX-20, page 29?

A. That is correct. Yeah.

Q. Okay. Why did you highlight what you did on this page, sir?

A. Again, I just wanted the Court to be able to see, again, there's a very, very large tolvaptan peak. There's a very, very small TLV-III. TLV-III, again, is the starting ketone.

And highlighted at the bottom is actually the quantitation of the TLV-III, which in this experiment there

was 0.01 percent remaining or detected at that point in time.

Q. 0.01 remaining of the starting ketone precursor?

A. That is correct.

Q. Thank you.

MR. MURNANE: Let's look at the next two slides, 26 -- I'm sorry. One moment. 26 and 27, please.

Thank you.

BY MR. MURNANE:

Q. Do Slides 26 and 27 provide information from Lupin's Excel spreadsheet, PTX-1050, and do they indicate whether the reactions were still proceeding after 70 percent, or 0.91 molar, of the sodium borohydride was added?

A. Yes. So those -- so you asked two questions.

Yes, these data come from this Excel spreadsheet, which you identified.

THE WITNESS: And, Your Honor, there were multiple experiments summarized in this Excel spreadsheet. And -- and what I want to do is blow up and look at specifically Line 8, this part of this one. And then also 10.

Line 8 is the Experiment 109. And then -- well, this -- Section 8 is 109, and Section 10 is the 115 data.

So if we could go to the next slide.

Thank you.

So now those -- Section 8 and Section 10 are now quite readable.

So your second question was -- is: Are the reactions complete? I think is how you asked the question.

BY MR. MURNANE:

Q. Right.

A. So here we have highlighted at the moment, again, the data that I've already discussed with you about what the state of affairs was at the 70 percent addition point for the sodium borohydride was 0.02 percent remaining.

The Lupin experimentalist has continued to add sodium borohydride until the full -- the full 1. -- in this instance, 1.3 equivalents have been added.

After the full amount had been added, they did the analysis and they didn't -- I think ND is not detected, but it could also mean not determined. But I think it -- I'm going to here say it's probably not detected. They did not see any of the residual TLV-III.

But after waiting an hour, the quantity that they measured is 0.02 percent. After waiting two hours, after the full amount, again the amount that was detected is 0.02 percent.

So there are four measurements from 70 percent to 100 percent to 100 percent-plus, up to two hours. And three of those four values show the same numbers,

0.02 percent of residual unreacted TLV-III. A person of skill would look at these data and say that the reaction was not progressing. It's not progressed at all after the 70 percent of addition had occurred. And a POSA would conclude that the reaction has come to completion at that point in time.

Now, if you'd permit me to answer, also, with respect to Experiment 115.

The data after the 70 percent mark was 0.01 percent. After adding the full amount and then waiting two hours, they saw 0.02 and 0.03. The deviation in these numbers is small, and I would comment as well that -- that scientifically there's no way that -- that TLV-III is being regenerated in the reaction. So a POSA would know that the 0.01 that is not growing back in, a POSA would say that we just have this variation in these numbers.

Certainly the number, the amount of TLV-III remaining is not declining, and a POSA would, again, conclude there's no productive further reaction occurring at the point 70 percent of sodium borohydride is added. And we conclude that this experiment, as was the case with 109, that the -- the reduction has come to a completion at least by the time the 70 percent of the sodium borohydride had been added.

THE COURT: And, Doctor, did those two

11:04:24 experiments result in actually producing 99.5 percent pure tolvaptan?

11:04:29 THE WITNESS: Excellent question. I don't recall that -- that Lupin processed the experiments further in that sense. So I -- I -- unfortunately, I can't give you a definitive answer about that point.

11:04:48 The expectation, based on the patent, is that they would. And certainly, in other documents where Lupin has generated material at this level of purity, they have generated a compound that meets all the limitations of the claims. Yes.

11:05:10 THE COURT: Thank you.

11:05:10 BY MR. MURNANE:

11:05:11 Q. Dr. Roush, did you consider whether Lupin's data accounted for a margin of error?

11:05:15 A. Well, I'm implying that when I say that the 0.01 and 0.02 don't differ very much. That's one possibility. It's likely that that represents a margin of error.

11:05:28 I looked through the Lupin documents to try to understand what their margin of error actually is, but I didn't find it stated anywhere. So -- so I don't know what they believe the margin of error is, but a person of skill would look at the deviation of these three numbers and think that this is -- this is an experimental error. It's within -- the numbers are very similar to one another.

Q. Thank you.

MR. MURNANE: Let's look at Slide 28, please.

BY MR. MURNANE:

Q. Dr. Roush, you said that the amount of remaining TLV-III ketone precursor left in the reaction stays the same when Lupin adds 70 percent of the sodium borohydride and after Lupin adds 100 percent of the sodium borohydride.

Does this slide help express what you mean by this?

A. It does. So I thought this bar graph nicely illustrates this. So -- so the red colors represent the amount of TLV-III at the points in times examined. This axis, the y -- the x-axis is the percentage of the sodium borohydride solution that had been added. At the start of the reaction before any is added, so hence 0 percent, you have the full amount of TLV-III.

There was a data point that Lupin took a sample at the 35 percent addition of sodium borohydride, and they found there was 7 percent of the ketone remaining -- TLV-III remaining at the 35 percent mark. 35 percent of 1.3 equivalents is 0.41 equivalents.

So at the point when 0.41 -- it's somewhere between 0.41 and .42, so correct me if I've gotten the decimal placed wrong.

At that point in time, only 7 percent -- under

these conditions, 7 percent of the ketone remains. So that's before the half -- before the 0.4 mole point, bear in mind.

They continued adding. The next time they sampled is at the 70 percent, and as I've shown a moment ago, 0.02 percent remains. The reaction -- we don't know where -- or there are not data provided to indicate precisely where in between the 35 percent time point and the 70 percent time point that the reaction actually hits the -- the low point. That's why I've used the language that it's at least by the time 70 percent we have reached the -- this -- this center data.

Moving across the additional data points, they didn't detect anything at 100 percent, but after one hour and two hours, they're still seeing the same very low amount, 0.02 percent. A POSA, again, looks at this and says the reaction is complete, there is no productive chemistry occurring, at least by the time 70 percent of the sodium borohydride has been added. And undoubtedly, it -- it reaches that point some point before the 70 percent junction is reached.

Q. Thank you, Doctor.

Are the conditions of the Lupin Experiments 109 and 115 identical to the conditions of Lupin's DMF process?

A. They are not. No.

Q. Please explain why you relied on those experiments, 109 and 115, to form your infringement opinions in this case.
A. Experiments 109 and 115 are the only two experiments out of all the -- all the data that I've reviewed in this case where these time point determinations were actually performed. I've seen nothing in the -- the DMF, nothing in the ANDA, nothing in any other experimental work. It's only Experiments 109 and 115. So these are the two experiments that have data, and these are the only data, and hence these are the data that I'm discussing.
Q. Thank you.
In Lupin's Experiments 109 and 115, Lupin added 1.3 molar equivalents of sodium borohydride, but Lupin's DMF process calls for only adding 1.2 molar equivalents.
Is that difference meaningful?
A. In my estimation, no, that is not meaningful.
Let's look at this bar graph again. The evidence is clear that the reaction is not progressing beyond the point when 70 percent of the borohydride has been added.
And here, again, these data reflect adding 1.3 equivalents total. So if 1.3 doesn't do anything to make the reaction go further after the 70 percent time point, using even less, which is 1.2, is not going to do it either.

So I think this difference between the 1.3 stoichiometry versus a 1.2 stoichiometry is of no consequence.

Q. Thank you.

MR. MURNANE: Let's look at Slide 29.

BY MR. MURNANE:

Q. Is this a slide that you prepared based on Lupin R&D lab notebook, D-536, which is JTX-17, pages 113, 114, as well as 119, 120?

A. Yes.

Q. And did you also rely on Lupin's process validation and/or evaluation, JTX-208?

A. That is correct. Yes.

Q. And did you also rely on the Henry Foley publication, PTX-1106, Page 11?

A. Yes, that is also correct.

Q. Okay. How does the Experimental Batch 109 differ from Lupin's DMF process?

A. There are two major differences. One is the reaction temperature. As I showed a moment ago, Experimental Batch 109 is performed at 2 degrees Centigrade, whereas Lupin's DMF was a range of 25 to 30.

In fact, the data that I have compared here was performed at 28 -- excuse me -- 27.8 degrees, which I highlighted also on that preceding slide.

Your Honor, it's known in the art across all

fields of chemistry that the rates of a chemical reaction are faster when the reaction is hotter than a comparative case which is colder. So all reactions go faster at a higher temperature.

It's also well-appreciated in the art that reactions rates double for every 10-degree change, 10-degree Celsius change in the reaction temperature. So in going from 2 degrees Centigrade to 27 degrees Centigrade, that's 2.7-fold units of 10 degrees.

So I can take this principle that's here and discussed, summarized briefly in this folio, and calculate based on the temperature difference, how much faster the DMF process will be compared to Experimental Batch 109 based on this principle of the effect of temperature on the reaction.

And the conclusion is that it will be sevenfold faster than 109. So a second variable that's different among these experiments is the concentration. It's well-known in the art that the rate of a reaction, a biomolecular reaction like the sodium borohydride reduction of a ketone, depends on the concentration of the reacting species. And it follows from that that the more concentrated a reaction is, the faster it goes.

It basically means the more concentrated, it's easier for the reactors to bump into one another, and they have to get into touch with each other in order to react.

It turns out Experiment 109, the concentration is 0.148 molar. Capital M is the abbreviation for molar, which is the unit of moles per liter of solvent. And this is the conventional way chemists and chemical engineers discuss concentration.

The DMF process, the batch that we've summarized a moment ago, that concentration was 0.112. So it follows from this, based on concentration alone, that the DMF process will be slower than Batch 109 because it's more dilute.

Using standard kinetic expressions, which I've taught in freshman chemistry courses in universities for many, many years, you can easily calculate that the DMF process will be 50 percent -- 57 percent slower than 109. That is if both were run at the same 2-degree temperature.

Combining these two effects, the temperature effect and the concentration effect, and the conclusion is that Lupin's DMF process as defined in the Lupin DMF and as is shown in the experimental batch records will be fourfold faster than Batch 109.

Q. Thank you, Doctor.

Did you consider any difference in scale, whether that would affect the rate of reaction?

A. Initially, I would say no, I didn't. And Dr. Dichtel and what his reply report to me said, I didn't consider

scale, pH, or solvent composition. Well, I said no, I didn't consider. Yes, I did consider them, but I didn't write anything down about it because they have no impact on the reaction.

So, yes, I considered it, but I didn't include in my report.

More to the point, in terms of scale, yes, the scale of the 109 versus the DMF are different. But there are no terms in any mathematical expression that defines rate of reaction that depend on the scale of the reaction.

Again, I've taught kinetics and introductory chemistry courses for many, many times over my career. And there is no such a term. So the scale is not, in my opinion, anything that will have an impact on the rate of the reaction.

And I would point out as well that Dr. Dichtel did not provide any literature support for his proposition the scale was important. So if there is something out there and I don't know about it, Dr. Dichtel certainly didn't provide any literature documentation to support his supposition.

With respect to pH, he said that I didn't consider pH of the reaction. Again, I know the boron literature very well, I would think. And there are no papers, to my knowledge, that define the dependence of the

rate of a sodium borohydride reduction of a ketone on the pH of the reaction.

And based on Dr. Dichtel's report -- and, again, he provided no literature documentation on his own -- I did another literature search out of concern. Maybe I missed something. But I did not find anything.

THE WITNESS: Thinking about this further, though, there is one possible area where pH could play a role, and that is, Your Honor, that it is known that sodium borohydride reacts with certain solvents. It reacts with water and it reacts with methanol.

And it turns out the solvent in these experiments is 8 liters of methanol. It's a mixture of methanol and water. The literature shows unambiguously that the rate of that decomposition depends on the pH, and that the higher the pH, that is, the more basic the solution, the less decomposition.

So here in the DMF process the pH would be 13.8. The experimental batch is 12.9. And it ranges the pHs. The bigger the number means it's more basic. So the more basic solution in the DMF will therefore have less decomposition of sodium borohydride.

So if anything, this actually makes the Lupin process faster, still faster than the experimental batch because there's going to be less decomposition of the sodium

borohydride.

And finally, solvent composition. I mentioned that all these experiments are performed within methanol-water mixtures. It turns out that Experiment 109 and 115 have also different water:methanol ratios, and the DMF batch's composition is in between the two.

We know that both 109 and 115 have gone to completion at 2 degrees Centigrade, at least by the time the 70 percent addition of sodium borohydride had been added. So there's no reason to think that if those two experiments bracket the solvent composition of the DMF process that that difference is not going to have a tangible effect on my assessment whatsoever.

BY MR. MURNANE:

Q. Thank you, Doctor.

What is your overall conclusion about how these differences between Lupin's experiments and Lupin's DMF affect the rate of each reaction?

A. Well, my overall conclusion is here in making the comparison of the DMF process compared to Experimental Batch 109, that the Lupin process will be on the order of fourfold faster.

Could we actually go back to the bar graph slide? Thank you.

Let me answer your question here as well, and

that is that I commented earlier on this 7 percent remaining when .41 or .42 equivalents of borohydride had been added. This is for an experiment in 109 performed again at the 2 degrees Centigrade. At that comparable time point, given that the DMF is more -- is faster, fourfold faster, the amount of ketone TLV-III remaining at that point is going to be far less than what is seen at this point.

These reactions are very fast. And they have clearly, I believe, very clearly completed well before we get to the 70-percent addition time point.

Q. Thank you.

On this Slide 29, if we could go back to 29 for a minute, please, you only included information from Experimental Batch 109.

Does the data from Experimental Batch 115 also support your conclusion that Lupin's DMF --

A. It does. And I included 109 here because this is the case that's the most favorable to Lupin. It turns out the concentration of 115 is more dilute, and so the Lupin DMF will be actually faster than Experiment 115.

And if I -- when I had done this same set of calculations with Experiment 115, the rate difference is 8.5. The DMF is 8.5-fold faster than Batch 115.

So I presented just one, and it's the one which is the most conservative of the two.

Q. Thank you.

Doctor, did you conduct any experiments to reach your conclusion that Lupin's DMF process is faster than Lupin's experimental batches?

A. I did not, no.

Q. Why not?

A. I'm relying on Lupin's experimental data, and I'm relying on principles of the effect of temperature on a reaction and the effect of concentration on a reaction which are undisputed, and are principles that, again, I've testified already that I've used in teaching freshmen in college chemistry courses.

And so I saw no need or reason to do any additional experimental work.

Q. Dr. Roush, have you provided infringement testimony previously in other cases?

A. I have, yes.

Q. And have you ever conducted testing to support your infringement testimony in those cases?

A. I never have, no.

Q. Has Dr. Dichtel conducted any tests that you're aware of to support his position that your analysis of Lupin's documents is incorrect?

A. It's -- he has not. It's not mentioned in any of his reports, so no.

Q. Okay. Earlier, you said that process Experiments 109 and 115 were complete by the time that 0.91 molar equivalents of sodium borohydride had been added. And you just testified that the DMF process proceeds fourfold faster than that.

Do you have an opinion regarding at what point the reduction in Lupin's DMF process will be complete? And please look at Slide 30 here.

A. So given the way that we've seen the DMF being performed with this dropwise addition, with this, you know, the steady addition over a period of time, I believe it will be complete by the time 50 percent of the sodium borohydride -- excuse me -- by the time 0.5 molar equivalents of the sodium borohydride has been added.

Q. Experiments 109 and 115 show that there is still some TLV-III ketone precursor left in the reaction even after 0.91 moles of sodium borohydride were added.

What is the basis for your position that the reduction was complete even if there was still some TLV-III ketone precursor left in the reactor?

A. Well, it's complete in a practical sense. Again, from this bar graph slide we see at that 70 percent time point, adding more borohydride and waiting more period of time doesn't change the effect. So there is no productive change in the amount of ketone precursor TLV-III remaining.

So from a practical point of view, the experimentalist performing such a reduction would conclude that nothing is happening. The reaction has stopped. And would conclude that it has come to completion because it has stopped. And would choose at that point to work it up and get on with their day.

Q. Is Slide 30 based on Lupin's Excel spreadsheet PTX-1050?

A. It is, yes.

Q. Why don't such reactions go to absolute completion?

A. Absolute completion of a reaction is a theoretical possibility which I would dare say that no organic chemist has ever had a reaction go to absolute completion.

Here, Your Honor, we're dealing with a bimolecular reaction, and it requires two species to react with one another. They have to bump into each other. And I've shown you already that the rates do decrease as concentration decreases.

You get to a point where the concentration of the ketone becomes a needle in a haystack where you just don't -- you don't have very much. 0.02 is not much. And it just takes a long, long, long time for sodium borohydride to find it. But if you permit me to make an analogy.

How old is the universe? Right. When was the big bang? Billions and billions of years ago. Floating

around in interstellar space are extremely reactive molecules which, if we are allowed to come onto planet earth, would react with something in fractions of a second, would not survive bringing in to planet earth because they have got to react to something.

Why do they survive in interstellar space? They're diluted. The concentrations are diluted. You can't find those species, highly reactive species that are detected spectroscopically in interstellar space can't find something to react with. So that's the point of the notion that getting to absolute completion, it's a theoretical possibility, but in reality in the time course, the practical time course of doing something in a laboratory where the objective is to make this batch and move onward towards the drug product, having data that says, we see no productive conversion, the reaction is done. And you've -- you proceed with work-up and so on.

Q. Thank you, Doctor.

MR. MURNANE: Let's look again at Slide 20 for just a moment.

BY MR. MURNANE:

Q. And now we'll focus on the third point of your assessment. "Lupin considers the reduction complete even if there is 0.05 percent ketone precursor TLV-III remaining."

Why do you believe, doctor, that Lupin considers

the reduction complete even if there is still TLV-III ketone left in the reaction, and how does this affect your analysis?
A. Well, I believe this because Lupin has stated this. And it's completely consistent with my -- the analysis that I provided, so --
Q. Are you referring to your Slide 231?
A. 203 --
Q. I'm sorry. Excuse me. I'm sorry. My mistake. Slide 31. Yeah.
And is Slide 31 based on Lupin batch production record JTX-14, Page 13?
A. It is. Yes.
Q. And Lupin ANDA Section 3.2.S.2.6 manufacturing process development JTX-15 Page 22?
A. That is correct.
Q. All right. Please explain your slide, if you would, doctor.
A. So this is part of the batch production records, and the operation that's indicated here, .12, is to collect a sample and send it to QC to look for the TLV-III content. TLV-III, again, is the ketone. So how much of the ketone is remaining.
And at the limit the key point for them is whether there is NMT -- that's not more than -- 0.05 percent

detected. And if there is not, so if they're at 0.05 or less, then highlighted in yellow at the very bottom, it says, fine, you can proceed, go to step number 25, which entails the addition of water and then ultimately hydrochloric acid as part of the work-up procedure.

In the -- Lupin's brief manufacturing process with this Stage 3 description in the lower right-hand corner of the molecule -- of the molecule -- of the slide -- excuse me -- I've highlighted in yellow that "after completion of reaction, water is added followed by addition of diluted hydrochloric acid." So here they're saying the water is added after the reaction is complete. Over here you're saying you're adding water when you have less than 0.05 percent of residual ketone.

So the combination of the two says the reaction is complete when you're at the 0.05 percent or less level residual TLV-III starting ketone.

Q. Thank you.

MR. MURNANE: Let's look at Slide 32, please.

BY MR. MURNANE:

Q. Dr. Roush, is there anything else you relied on to conclude that Lupin considers the reduction step complete even if there is some TLV-III ketone remaining in the reaction?

A. Yes. So there is a Dr. Singh who is at Lupin. I

believe he was in charge of the team that did the process development work for Lupin, but at his deposition involved in this case, he was asked about this very question.

On this slide, again, I -- we put the -- repeated the section from the -- Lupin's brief manufacturing process at the top, which -- and Dr. Singh was specifically asked about this sentence highlighted in yellow, meaning, "After completion of reaction, water is added followed by addition of hydrochloric acid.

"Do you see that?"

Dr. Singh said, "Correct."

"QUESTION: And this language is also a reference to the steps that we saw a moment ago in the batch production record, again, the record that I just summarized for you in the preceding slide.

"ANSWER: Correct.

"QUESTION: And specifically, this is a reference to steps in the batch production record that explain that, if the TLV-III content is" -- that is the residual starting ketone content -- "is no more than" 0.5 percent -- excuse me -- "0.05 percent." I apologize, I misspoke -- "then water can be added followed by hydrochloric acid."

And Dr. Singh agreed.

BY MR. MURNANE:

Q. Thank you, Doctor.

Is the information on your slide from JTX-15, Page 22, and Dr. Singh's deposition transcript at Page 81, lines 12 to 20?

A. That is correct. Thank you.

Q. Thank you.

MR. MURNANE: Could we go back to Slide 20 for a moment again?

BY MR. MURNANE:

Q. And now we'll speak about the fourth element of your analysis where you say, "Lupin's DMF process has very few restrictions on how Lupin must add the sodium borohydride."

MR. MURNANE: Let's look at Slide 30 -- excuse me. Yeah, Slide 33, please.

BY MR. MURNANE:

Q. And please tell us what you can about your reason for believing that Lupin's tolvaptan is synthesized by a process meeting the claim limitations. That is, are there any restrictions or lack of restrictions in Lupin's DMF process that support your position?

A. The critical question issue is -- here that we're focusing on is how the addition is performed. All that Lupin stipulates is that it's added over a 30-minute or a 240-minute -- up to a 240-minute period. There's no restrictions that it has to be added dropwise. So it's

possible that you could add a bolus of reagent at the beginning and then wait an extended period of time before you add another bolus of reagent. So there's multiple modes of addition of sodium borohydride that would be satisfied by what they have indicated in terms of time of addition.

Q. Thank you.

MR. MURNANE: Let's look at Slide 34, please.

BY MR. MURNANE:

Q. Earlier, Doctor, when we were going through the various claims, including the claim referencing the 0.5 molar equivalents, you said that you believed that the reaction will be complete before Lupin adds 0.5 molar equivalents of the sodium borohydride.

Do you remember that?

A. I do.

Q. Okay. Looking at this Slide 34, is this a slide you prepared to provide any information regarding that subject?

A. Well, yes, I prepared, and I think it is still illustrative, and with what we've been discussing, it's conceivable that Lupin could add -- decide to add, let's say, .4 equivalents or .45 equivalents at the very beginning and then wait a 30-minute or even a longer period of time before adding additional sodium borohydride. I believe that in that 30-minute window, probably as little as 20-minute window, the reduction where you're adding this bolus, as

11:34:17 long as the bolus is more than 0.25 -- you must have .25 moles of sodium borohydride for complete reaction. As long as the amount that you're adding that bolus, which is more than .25 but less than .5 moles, and then if you wait as little as 20 or 30 minutes, I believe the reaction is absolutely going to be done.

11:34:41 Q. Do Experiments 109 and 115 support your conclusion that the reaction in Lupin's DMF will be complete by the time that 0.5 molar equivalents of sodium borohydride have been added?

11:34:53 A. In those experiments, yes. I believe the data do support that even with the addition being dropwise, the way that Experiments 109 or 115 or the DMF is being performed. Again, I focused back on the 7 percent of ketone, TLV-III remaining at the 35 percent time point. There's ample time between -- but -- and, again, the temp -- the fact that the DMF process will be fourfold faster than either 109, the DMF under the same conditions will have far less than 7 percent of ketone remaining at that point. There's still additional time and additional for them to keep adding sodium borohydride by -- to get to the .5 mole equivalent, and I believe the reaction will be complete in the DMF process by the time .5 moles of sodium borohydride are added.

11:35:50 Q. Thank you.

11:35:51 Doctor, were you here when opening statements

were made by counsel for the parties this morning?
A. I was, yes.
Q. Did you hear the opening statement by Lupin's counsel?
A. Yes, I did.
Q. In that statement, a remark was made about consistency between 0.5 and the 0.91.
Do you regard the positions that you've talked about today as being consistent or inconsistent?
A. I think everything I'm saying is completely consistent with one another, and so I was -- no, I do not believe anything I've said or testified to is at all inconsistent with anything I've said or testified to.
Q. Thank you.
Earlier, you said that Lupin's DMF process permits the sodium borohydride to be added uniformly.
If 1.2 molar ratio of sodium borohydride is added uniformly over 240 minutes, at which point in time will 0.5 moles be added?
A. That would be 100 minutes, which I've put on this particular diagram. So added continuously in the same amounts over time at 100 minutes the 0.5 equivalents are added, under an experiment when the full 240-minute addition time is utilized.
Q. Thank you.

11:37:17 I'd like to ask you a question, Doctor. If -- if in Lupin's -- let me rewind for a minute.
11:37:24
11:37:28 Does Lupin's DMF process permit Lupin to add 0.5 molar equivalents during the first minute of a reaction followed by a large gap of time, say three hours?
11:37:33
11:37:38
11:37:42 A. I -- yes, it does.
11:37:45 Q. Okay. And if that -- if that were to happen, when will the reaction be completed?
11:37:47
11:37:49 A. Under those conditions, I think it will be certainly less than 30 minutes, in the 20 to 30 minute time frame, if not even sooner than that.
11:37:53
11:37:58
11:37:59 Q. Why?
11:37:59 A. Why? Because of my knowledge of the rates of the sodium borohydride reactions. The reduction of a ketone by sodium borohydride is almost instantaneous. And, in fact, in the dropwise addition that they're performing at the early stage of the reaction what is -- dominates the rate is actually the rate of the drops of sodium borohydride going in.
11:38:04
11:38:08
11:38:13
11:38:15
11:38:21
11:38:24
11:38:25 The first drop goes in and will almost completely -- be completely reacted by the time the second drop goes in. So the rate of these sodium borohydride reactions is faster than the rate that sodium borohydride is being added, even in the fastest version of the Lupin DMF process.
11:38:28
11:38:32
11:38:35
11:38:40
11:38:47

Q. Thank you.

MR. MURNANE: Let's turn to Slide 35, please.

And here we have claims from the '735 patent. And let's focus on '735 patent, Claim 7.

BY MR. MURNANE:

Q. Based on your review of the information you've described so far today, do you have an opinion as to whether Lupin will infringe Claim 7 of the '735 patent?

A. Yes. I believe Lupin will infringe Claim 7 of the '735 for all the reasons that I've been providing today.

Q. And by those, are those the reasons that you've been providing with respect to reducing the precursor with the hydrogenating agent, being sodium borohydride, in an amount of 0.25 to 1 mole per 1 mole of the ketone precursor?

A. That is correct, yes.

MR. MURNANE: Let's look at Claim 8 on the slide. Claim 8 of '735 patent.

BY MR. MURNANE:

Q. And do you have a view as to whether or not Lupin will infringe this claim?

A. My view is that, yes, Lupin will infringe this claim, Claim 8.

Q. Why?

A. Why? Just a moment ago you asked the question about how fast a reaction would be with 0.5 moles. I testified

that the -- that reaction will be done within a 20- to 30-minute period and that I believe that -- even in the dropwise addition procedures that Lupin is using in this current DMF, that the reactions will have completed by the time 0.5 moles of sodium borohydride have been added.

So it's my opinion that, yes, Lupin -- Lupin infringes Claim 8 of the '735 patent.

Q. Okay. On the right portion of Slide 35 it says with respect to Claim 10, it's a process according to anyone of Claims 6, 7, and 8. Wherein the 2,3,4,5-tetrahydro-1-H-1-benzazepine compound (10) is tolvaptan or a salt thereof."

Do you have an opinion as to whether or not Lupin will infringe this claim?

A. I do. Yes, I believe Lupin will infringe that claim. And, again, for all the reasons that we've been discussing.

Q. Thank you.

MR. MURNANE: Your Honor, Plaintiff moves to introduce into evidence JTX-014, the Lupin batch production record; JTX-017, the Lupin R&D lab notebook; JTX-020, the Lupin R&D analytical data; PTX-1050, Lupin's Excel spreadsheet; JTX-012, Lupin's process validation and/or evaluation; PTX-1106, the Foley 2002 paper; and JTX-015, Lupin ANDA Section 3.2.S.2.6, manufacturing process development.

MR. ZIMMERMAN: No objection, Your Honor.

THE COURT: All right. They're all admitted without objection.

(PTX Nos. 1050 and 1106 were admitted into evidence.)

(JTX Nos. 12, 14, 15, 17, and 20 were admitted into evidence.)

MR. MURNANE: Thank you, Your Honor. I have no further questions.

THE COURT: All right. Thank you.

Doctor, if I understand correctly, basically your position is that .5 sodium borohydride -- .5 molar equivalent of sodium borohydride --

THE WITNESS: Hydride.

THE COURT: Hydride. Thank you.

-- that's what's necessary to complete the ketone reduction. Is there some chemical good thing that's being accomplished by the other .7 molar equivalent?

THE WITNESS: There's no evidence that the extra .7 that's being added is performing anything. In this case I've reviewed documents, I believe -- I -- I think that they were Lupin documents where their product was then treated -- retreated with sodium borohydride and there was no -- nothing happened.

A chemist would not expect anything to happen.

And there is experiments that I believe Lupin performed -- certainly a POSA wouldn't know that, of course, but -- but there is no other further chemistry that that extra material is accomplishing. And so the answer to your question is that that extra .7 is just extra. It's superfluous. It's not accomplishing anything productive.

THE COURT: All right.

MR. ZIMMERMAN: Thank you, Your Honor.

May I approach?

THE COURT: Yeah.

CROSS-EXAMINATION

BY MR. ZIMMERMAN:

Q. Good morning, Dr. Roush.

A. Good morning.

Q. I'd like to start with PDX-2025, your slide, and make sure we're on the same page.

You presented HPLC traces for Experiments 109 and 115; correct?

A. I did. I did, yes.

Q. And the traces report area percentages; correct?

A. The data summation reports the area percentages, yes.

Q. So that is the area of a particular peak divided by the total area of all of the peaks; right?

A. That is correct.

Q. Okay. So these aren't quantitative values, are they?

A. Repeat that, please.
Q. They're not quantitative. Like, for example, the TLV value in Slide 2025 is not .01 units, is it?
A. It's the percent, which is a unit. And -- and I guess I don't fully understand what you're getting at with your question --
Q. Let me -- let me see if I can help you.
A. -- but...
Q. It's not .01 percent of the original value of TLV-III that was put in, was it?
A. It is. Because the TLV -- the original TLV-III put in was 100 percent. So this would be the percent of TLV-III that is residual.
Q. So that's the relative area in this sample to the other components. It's not a quantitative number, is it?
A. I disagree. And my answer is in effect, yes, it is because everything on the HPLC trace derived from the reactions from the chemistry of TLV-III.
So everything on the slide has its origin with TLV-III, so I -- I think this is a reflective -- is a correct reflection of the amount of TLV-III that -- that in a quantitative sense is remaining.
Q. Okay. And it's your opinion then that you can compare values across these HPLC traces at different times; right, Dr. Roush?

A. Research chemists, analytical chemists do that all the time, and that's exactly why these types of data are generated. These data are generated precisely for that reason.

And so, yes, at a -- in a research environment, chemists compare a trace at time one, time two, time three, time four, in order to monitor conversion.

And so, yes, people do this all the time.

Q. And in your view, can you draw quantitative judgments from those comparisons?

In fact, you did; right?

A. Well, you have two questions there. And -- and the -- the issue of quantitative is you're putting an emphasis on it. The research chemist looks at this and is trying to assess is the reaction done, how much more does it have to go?

And so, yeah, there's a quasi-quantitative measure to it in the sense that you're asking, but chemists -- research chemists in a research environment, process chemists, this is exactly the data that's generated hundreds and hundreds and hundreds of times everywhere in the world on every drug product that's being looked at. And this is the data people use.

Q. Okay. And, Dr. Roush, the conversion of TLV-III to tolvaptan is irreversible; right?

A. Under the conditions we're discussing here today, I would say yes.
Q. Okay. So if you generate tolvaptan, it doesn't -- it doesn't then disappear an hour later; right?
A. The only way tolvaptan could disappear later is if it's undergoing some additional decomposition reaction.
So it's -- it's conceivable that tolvaptan could disappear, but I've seen no evidence in anything provided in this case that in the sodium borohydride reductions that that is actually going on.
MR. ZIMMERMAN: Okay. If we could turn to your slide PDX-2027. And look at the data for Experiment 115.
BY MR. ZIMMERMAN:
Q. At 100 percent addition, the tolvaptan value is 97.35; correct?
A. That is correct. You're -- I think you're referring to this -- this entry --
Q. Yes.
A. -- is that...
Q. And two hours later it's 85.93; correct?
A. That's what the HPLC trace says.
Q. Okay. And that's not possible from this reaction, is it?
A. The numbers are what they are. Let me comment then -- let's say the crude after working up is no longer

85, it's 98. There's something wrong with that value, the 85.

A person of skill reading this data would know, yes, there's just no way that the amount of tolvaptan is going to go from 97 percent to 85.9 percent, and then jump back up to -- to 99 percent. So there's something wrong with that particular value.

Q. And -- and that's what I'm saying. These -- these are not quantitative numbers that you can compare across the traces, are they?

A. Yes, they are. And --

Q. Okay.

A. -- a person of skill looks at this and says there's something fishy about that point and -- and the -- the critical features that once you've looked at it again, here in the crude, you confirm that the data says, yeah, there's something wrong with that entry. And -- and that doesn't negate the fact that the reaction was actually done at the 70 percent time point.

Q. And, Dr. Roush, the fact that it's an irreversible reaction means that the TLV-III content can't go down and then back up; correct?

A. That is correct. So could you please humor me and put back up the HPLC trace?

Q. We can come back to the HPLC trace. What I want to

show you here is in Experiment 115, at 70 percent it's .01, and then it goes up to .02, and then it goes up to .03.

So this data shows an increase in TLV-III; correct?

A. No, it doesn't. The data --

Q. Dr. Roush, .03 is greater than .02 is greater than .01. Yes or no?

A. The numbers are different. There is an implicit experimental error in doing these integrations on these HPLC traces. A person of skill would not look at this and say the amount is increasing. So I respectfully disagree. That's not --

Q. Do you know --

A. -- what --

Q. -- what the error is for Lupin's HPLC trace?

Have you seen a document that tells you that?

A. You didn't provide it, to the best of my -- you -- excuse me.

You, to the best of my knowledge, didn't provide that information or -- or I didn't -- I looked and I didn't find it.

Q. Okay. So the answer is no, right, you haven't seen a document that tells you?

A. And I think Lupin did not provide the information. So thank you.

11:51:51 Q. Okay. And then if we look at the Experiment 109, it's not possible at 100 percent addition for the 98.54 amount of tolvaptan to then go down to 95.94, is it?
11:52:12 A. I respectfully disagree. Yes, it is possible for the numeric since these are areas under the curve. If another -- one problem with doing HPLC in an analytical laboratory is that you have -- the columns need to be cleaned and purified because you have by-products from use of the column from previous batches that start to leach off. And so if in this particular run another -- something from a previous run happened to leach off in the HPLC, that's going to affect the numerical values. That happens all the time in an analytical lab environment.
11:52:55 Chemists -- medicinal chemists, process chemists experience this all the time, and they look at this data and they know the 98 -- this number has to be in error, and there must be something going on there as well. But the fact that -- that -- so here we're looking at the amount compared to the total, but the total of -- of TLV-III, the starting material, that's the critical column. And it isn't varying. And -- and that's what a person of skill will rely on.
11:53:28 Q. So you're looking at the TLV-III column and discounting the TLV-IV column; right?
11:53:34 A. I'm not -- I'm not discounting anything. What I'm

looking for from this assessment -- the question is, is the reaction done? Is the reaction done? And the amount of TLV-IV says nothing about whether the reaction is done. It's the amount of TLV-III that's key to whether the reaction is done. That's what counts.
Q. Dr. Roush, can we agree if the amount of TLV-IV goes up, the reaction is proceeding; right?
A. No.
Q. Well, TLV-III is converted to tolvaptan?
A. There's no way for the TLV-III concentration to go up. That's --
Q. No. No. If the TLV-IV concentration goes up --
A. Well, your question --
Q. -- the reaction is proceeding?
A. Excuse me, Counsel. You asked me whether -- if the amount of TLV-III goes up, and I answered that question.
Q. Okay. If the amount of TLV-IV goes up, tolvaptan, we know that the reaction is proceeding; right?
A. No. No. You assess whether the reaction is proceeding by the quantity of the starting material that's remaining.
Q. Yes. And I also --
A. The TLV-IV tolvaptan is a product of the reaction but it is not involved in the reaction.
Q. If --

11:54:50 A. The critical variable is TLV-III. Is it there? Is it not there? Is it changing? That's how to determine if a reaction is proceeding.
11:54:59 Q. I'm going to ask you a very direct question. If the amount of tolvaptan goes up, that means the reaction is proceeding -- that produces tolvaptan is proceeding; right?
11:55:09 A. Perhaps.
11:55:16 Q. Doesn't it have to be unequivocally yes?
11:55:16 A. Well --
11:55:20 Q. We're talking about one reaction that makes tolvaptan. So if tolvaptan goes up, the reaction is proceeding; right?
11:55:27 A. I'm thinking that through. The analytical chemist might look at the ratio of TLV-IV to TLV-III, but the analytical chemist would concentrate on the TLV-III.
11:55:43 As a general rule -- I'll put it that way -- as a general rule, yes, as the reaction progresses the amount of the key -- of the product would increase. But there are always -- these -- every entry in this table is performed once and only once. So these have not been put through appropriate quality control for each set of data.
11:56:05 The important thing, and the reason these experiments was done, was to look at the amount of TLV-III.
11:56:11 Q. Okay. Dr. Roush, we're on a clock so I'm going ask you some very direct questions. I'd like for to you give me

11:56:19 direct answers.
11:56:19 You didn't perform any experiments in this case, did you?
11:56:21 A. I did not.
11:56:24 Q. Okay. Experiments 109 and 115, these were not for the exhibit batches for Lupin's ANDA product or its DMF, were they?
11:56:34 A. They are not. I -- at least I think they are not. So.
11:56:37 Q. And Experiments 109 and 115 do not use the same process as Lupin's DMF, do they?
11:56:44 A. They -- they -- there's details that are different, but it's the same reaction. It's the same chemistry. And I believe that everything in 109 and 115 is directly relevant to everything we're talking about today in the DMF.
11:57:02 Q. Dr. Roush, if we could bring up Page 58 of your deposition, starting at Line 20.
11:57:13 A. Do I have the deposition transcript here?
11:57:16 Q. You do. It's in the front of your binder.
11:57:23 A. And I'm sorry, you asked --
11:57:25 Q. Page 58, Line 20.
11:57:29 You were asked: "But these processes are not the DMF process; correct?"
11:57:33 And your answer: "I believe it is the case that 109 and 115 are not the actual DMF process."

You were asked that question, and that was the answer you gave; right?

A. Yeah, just a moment ago you asked that question and I said yes. I don't think that either of these are the DMF -- I answered that. And I am not at all inconsistent here. So.

Q. Both Experiment 109 and 115 use 1.3 molar equivalents of sodium borohydride; correct?

A. They do.

Q. And Lupin's DMF process uses 1.2 molar equivalents; right?

A. Yeah, that is an inconsequential difference which I've already testified to, yes.

Q. And Experiments 109 and 115 use different process parameters than Lupin's DMF process; correct?

A. And my testimony a moment ago is the details of the experiments are not the same, so I suppose you could call those process parameters, but I stand by my earlier testimony that everything in Experiments 109 and 115 are directly relevant to everything that I've testified about the DMF processes.

Q. Okay. And in both Experiments 109 and 113 there was --

A. 115.

Q. I'm sorry, 109 and 115, thank you.

After two hours after the full addition of the 1.3 molar equivalents, there was detectable TLV-III in each experiment; right?
A. I discussed that with the Court in my direct examination.
THE COURT: So, Doctor, he's not asking you, did you discuss it. He says, is it detectable? And the answer is yes, just say yes.
THE WITNESS: Fine, yes.
BY MR. ZIMMERMAN:
Q. Okay. Now, I'd like to look at your expert reports in this case. You submitted two reports on the issue of infringement, right; an opening report and a rebuttal report?
A. I think that's correct, yeah.
Q. Okay. And they're both in your binder in case you need them.
Those reports accurately set forth your opinions in this case, didn't they?
A. Yes.
Q. Okay. I'd like to bring up paragraph 24 of your reply infringement report, and we'll put it on the screen for you. You wrote in this report that -- let me make sure.
MR. ZIMMERMAN: If we could go to the next -- the next portion of it.

12:00:52 We'll come back to that one in one second.
12:00:52 BY MR. ZIMMERMAN:
12:00:59 Q. The reaction kinetics for the conversion of TLV-III
12:01:03 to TLV-IV is an irreversible reaction with second order
12:01:08 kinetics; right?
12:01:09 A. That is -- that is correct.
12:01:11 Q. Okay. And the rate of reaction for an irreversible
12:01:19 second order reaction, like the reduction of TLV-III to
12:01:22 tolvaptan, depends on the concentration of the two reaction
12:01:26 components; TLV-III, the ketone precursor, and sodium
12:01:30 borohydride; correct?
12:01:31 A. That is correct.
12:01:34 Q. And there's an equation that governs this reaction,
12:01:38 isn't there?
12:01:38 A. There are multiple. Which one are you referring to?
12:01:42 Q. Let's go ahead and put the equation on the screen.
12:01:45 The rate of reaction for an irreversible second
12:01:50 order reaction, like the reduction of a ketone using sodium
12:01:55 borohydride, is governed by the equation: Rate equals K
12:02:00 times SM times R; where K is a constant, SM is the
12:02:06 concentration of the starting material, here the TLV-III
12:02:10 ketone precursor, and R is the concentration of the reagent,
12:02:14 sodium borohydride.
12:02:17 A. K is actually the rate constant, and there's
12:02:21 equations that define what the K is. But otherwise,

everything you said is correct.
Q. And, in fact, this is the equation you presented in your expert report; right?
A. It -- some -- yes. Yes.
Q. And it's paragraph 41 of your reply infringement report.
A. You said paragraph 41?
Q. 41 of your reply infringement report. We'll put it on the screen. In fact, this is the equation you presented, isn't it?
A. That is correct, yes.
Q. Now, in your report, in presenting this equation, you wrote, "For example, considering only the unreacted ketone concentration at 99.9 percent conversion, with 0.1 percent of ketone remaining, the reaction will proceed a thousand-folds slower than the initial rate."
Correct?
A. That is what I wrote.
Q. Okay.
And then you went on to write in the next sentence, "At 99.99 conversion, at which point 0.01 percent of the unreacted ketone remains, the reaction will proceed 10,000-folds slower than the initial rate?"
You wrote that; right?
A. I did.

12:03:59 Q. So your own report indicates that at TLV-III levels of .01 percent, you wrote "the reaction will proceed," didn't you?
12:04:10 A. I wasn't writing about any specific reaction, but this is the theory. And, yes, in theory, I don't disagree that in principle, the TLV-III reduction could, in theory, continue.
12:04:28 My point is that a person of skill doesn't want to wait 10,000 hours or whatever period of time to get that next -- that next incremental conversion.
12:04:39 Q. Dr. Roush, in the context of the conversion of TLV-III to tolvaptan that we're talking about here, you wrote that at 99.99 percent conversion of the TLV-III, the reaction will proceed.
12:04:56 Yes or no?
12:04:57 A. The context, I agree with that, what I wrote, and I agree -- and I believe that what I wrote is still consistent with the fact that the experimental data shows there is no additional conversion that is being detectable by the chemist who's looking at it.
12:05:16 Q. So --
12:05:16 A. These are completely consistent with one another.
12:05:18 Q. So according to your own expert report, the conversion of TLV-III to tolvaptan will proceed when the TLV-III level is .01 percent of its starting level; right?

A. I never said that it would not proceed. I said that the reaction is effectively complete.
Q. No. No. You affirmatively said in your expert report that it will proceed, in paragraph 41, didn't you?
I'm sorry, paragraph 42.
A. I used that language not with respect to this reduction. I used that language in Paragraph 42. Correct.
Q. When you say "not with respect to this reduction," that exact paragraph is talking about reduction of a ketone using sodium borohydride; correct?
A. It is.
Q. Okay.
A. I -- I didn't specifically comment on TLV-III in that paragraph. That's all I was saying. I'm sorry.
Q. Now, according to the equation that you presented that we looked at earlier, and if we could put it back on the screen, the reduction reaction continues so long as there is unredacted starting material, the TLV-III, and sodium borohydride; right?
A. In theory, it will, yes.
Q. Okay. And the rate of reaction slows down as the concentration of those two components gets lower; right?
A. I -- yes, I absolutely agree with that.
Q. Okay. And in your expert report, you wrote that the reaction will proceed, it will just get slower; right?

A. That's -- the interesting part about "will proceed" is that you do actually need data to show that it is proceeding. So the theory is that, yes, it should proceed. I don't actually know that it is proceeding. But the theory is that it should proceed, yes.

Q. And I want to be very clear, Dr. Roush. In your report, you didn't write the theory is that it should, it may or may not. You wrote, "it will proceed"; right?

A. I said that a sodium borohydride of a reduction at that level it -- I said to get to the next from 99.9 to 99.99 it's going -- that the reaction will be 10,000-fold slower or something.

So that implies it will proceed, and I would know that it will proceed, but waiting 10,000 times more than 240 minutes is not the decision that a person in this case would make.

Q. And the words you used are that the reaction will proceed, yes or no?

A. That --

Q. Right there on the screen?

A. That I was trying to answer. So thank you. Yes, that's what I wrote. Correct.

Q. So in Lupin's DMF process, the rate of reaction slows down as the TLV-III and the sodium borohydride concentration get lower; right?

A. That is correct.
Q. But even when the level of TLV-III reaches .01 percent, the reaction will keep proceeding. It will just proceed slower; right?
A. I -- that would be the theory, and I would agree with the theory. Yes.
Q. Okay. Now, you wrote in Paragraph 42 of your expert report that a person of ordinary skill in the art seeking to synthesize tolvaptan on an industrial scale would conclude that the sodium borohydride reduction reaction was no longer proceeding when further conversion is no longer observed; correct?
A. Correct.
Q. Now, the asserted claims don't contain any limitation regarding industrial scale, do they?
A. Industrial scale isn't written in the patents, but the claims of the patents, it's always my understanding, are understood within the context of the patent as a whole. And the industrial scale is certainly considered elsewhere in the disclosure.
Q. But the asserted claims don't have any limitation regarding industrial scale, do they?
A. They do not.
Q. Okay. And, in fact, the asserted claims have no limitation as to scale at all, do they?

A. The claims do not specify or limit a scale, no.
Q. Okay. And in your analysis of the reaction we've been discussing, on your Slide PDX-2029, you indicated that scale has no effect; right?
A. That is correct.
And just to -- for the context, it has no effect on the rate of the reaction; right. It's --
Q. Now, the no-longer-observed standard that you used in paragraph 42 of your report, that's different from the .05 percent TLV-III remaining cutoff. They're different tests; right?
A. Well, in a general sense, I wouldn't want to answer affirmatively to that because you could have experiments where you don't see any further conversion at the 1 percent level. But in the case at hand, the data that has been provided by you, I've seen the only thing I can comment on on the data that I've seen, which is that there is no further conversion being observed at the point when you're down to the 0.02 percent level in those experiments, but that doesn't mean that one wouldn't reach that same conclusion at a different percentage if Lupin had provided time course data with earlier cutoffs.
Q. So you've seen data where the TLV-III content gets down to .02, .01; correct?
A. I've seen the two cases we've discussed, yes.

12:11:42 Q. So we can agree that the reaction proceeds past TLV-III being .05 percent of its original level?
12:11:50 A. It -- certainly in those two cases, it did, yes.
12:11:53 Q. Okay. And so the reaction isn't complete when the TLV-III content reaches .05 percent of its original level?
12:12:03 A. The notion of when a reaction is complete is really the context of everything. And complete is when an experimentalist decides it's done and wants to work it up, so...
12:12:17 Q. Okay. Let me see if I can rephrase it for you, Dr. Roush. Lupin's data shows that TLV-III continues to convert to tolvaptan past the point where the TLV-III content is .05 percent of its original level; right?
12:12:34 A. I missed that. I'm sorry.
12:12:36 Q. Okay. The reaction in the data you've seen, the conversion of TLV-III to tolvaptan continues past .05 percent of the original TLV-III content and keeps reacting to lower levels; right?
12:12:50 A. I've certainly seen the two experiments where that is the case. I would think that if Lupin -- so I guess it's an interesting question to me as I'm thinking about this is why did Lupin put the 0.05 percent. I would think they did this because they may have experience where the reactions had also stopped at that point. So they -- or they're just being very conservative to make sure that they have a window

to capture everything.

But they've still made the determination that at that low level of material remaining, functionally, their experiment has completed and they say let's stop it, let's work it up and so...

Q. And when they stop it, they've already added 1.2 molar equivalents; right?

A. What we don't know in any of these other experiments is at what point earlier -- so we know in the two experiments that at the .0 -- at the 70 percent addition, the reactions are not progressing. It's conceivable -- if you permit me -- I'm sorry. It's conceivable that the state of affairs has occurred once we're at the .45 addition. The data haven't been provided. And so...

Q. Dr. Roush, maybe we had a disconnect. My question was, when Lupin stops the reaction, they've already added 1.25 -- 1.2 molar equivalents of sodium borohydride; right?

A. What I was trying to answer -- so in part, yes. That's when they have added it. But what we don't know from all the DMF batches, because Lupin didn't provide the data to show that, in fact, it was already stopped by the time they got to a much earlier time point, so it's my belief, based on the data that exists, it's -- it is done and not progressing at a much earlier time point, and they're just carrying stuff along for the ride and then they work it up.

Q. Okay.
A. When they work it up, and what is there doesn't mean that the reaction had been progressing the entire time they get to that work-up.
Q. Now, you had a discussion in your direct about industrial scale. What quantity are we talking about for industrial scale production of tolvaptan? Is it 20 kilograms, 50 kilograms, a hundred? What are you referring to as industrial scale?
A. Well, industrial scale will be, again, context-dependent. There are some drugs where it's actually possible to manufacture a year's supply on a laboratory bench. There are other drugs where we're talking about metric tons being produced in a year. And within that range, I -- I must confess I don't know what the total batch size is for tolvaptan molar.
I surmise, given the number of patients and the levels of sales, that we're looking at something which is hundreds and hundreds of kilograms per year, if not greater than that.
Q. Okay. So you'd be talking batch sizes of hundreds to hundreds of kilograms?
A. And that's my assumption. I haven't actually reviewed data to confirm what that number is.
Q. Okay. Now, in your discussion of industrial scale,

you did refer to Example 2 of the patents; correct?
A. I did.
Q. And that example produces 2.7 grams, correct?
A. 2.95 grams, but yes, it's --
Q. 2.95. Okay. Thank you.
We can agree that that's not industrial scale; right?
A. I agree with that.
Q. Okay. Now, the asserted patents don't contain any discussion about when the reduction reaction is complete, do they?
A. Please repeat the question. I'm sorry.
Q. The asserted patents don't contain any discussion about when the reduction reaction we've been discussing is complete, do they?
A. It does not.
Q. And the asserted patents don't disclose any tests for determining when the reduction reaction is complete, do they?
A. No.
Q. And they don't disclose any criterion to use for assessing completion, do they?
A. No. The point of completion is the state within when -- so I won't get you more of an answer. But so your question, my answer is no. So...

Q. And the asserted patents don't state the reduction reaction is complete when the TLV-III content is .05 percent of its original level?
A. The asserted patents do not make that statement.
Q. Now, according to the stoichiometry, each mole of sodium borohydride can reduce four moles of the ketone precursor; right?
A. That is correct.
Q. And so .25 moles of sodium borohydride is the stoichiometric amount required to reduce 1 mole of the ketone precursor?
A. That's the -- so I'll answer yes and with the caveat that the -- to be successful requires that it be really, really pure sodium borohydride, that what is weighed is entirely, you know, 99.9 percent pure sodium borohydride.
Q. Okay. And so according to the stoichiometry, anything above .25 molar equivalents of sodium borohydride is molar excess; right?
A. There is at least some amount of an excess if the stoichiometry use is above 0.25, yes.
Q. I just want to make sure we agree that any amount above .25 is stoichiometric excess or molar excess?
A. Well, I'm struggling with the stoichiometric term on --
Q. Would you feel more comfortable calling it molar

excess?
A. Well, I wouldn't because -- but let's just say it's an excess. It's in excess, and that's fine.
Q. Okay.
A. Okay.
Q. Now, you've reviewed Lupin's DMF process in detail; right?
A. I have, yes.
Q. And there's no dispute that Lupin adds 1.2 molar equivalents of sodium borohydride into the reactor that has the TLV-III; correct?
A. No dispute.
Q. Okay. And that's 20 percent more than the highest value of the range of the asserted claims; right?
A. The total amount added as specified, as you just asked in your question, yes, is 20 percent above the highest value in the asserted claims, yes.
Q. Okay. And according to the DMF, Lupin can't add less than 1.2 molar equivalents; right?
A. Do they limit that? I believe that's -- I think that the answer would be yes, that that's correct.
Q. Okay. But Lupin's DMF allows it to add more than 1.2 molar equivalents, doesn't it?
A. It does.
Q. And it allows it to add more when the TLV-III wasn't

sufficiently converted to tolvaptan; right?
A. That's the -- what they stipulate, and I've not seen any records, you know, that that has ever been executed. So I -- I've not seen any data for Lupin that that's actually a reality.
Q. But we agree that that's what the DMF specifies; right?
A. The DMF -- I believe you're correct -- allows that. Yes.
Q. Okay. Now, in Lupin's DMF process, Lupin adds water and hydrochloric acid after the reaction mixture passes Lupin's IP QC testing; right?
A. That is correct.
Q. Okay. And you testified about that in your direct testimony; right?
A. I did.
Q. Now, the addition of the water in the hydrochloric acid breaks all of the hydrogen-boron bonds in the sodium borohydride and the sodium borohydride species that have donated one or more hydrogens; right?
A. The water doesn't do this. It's the -- it's the HCL -- it's the hydrochloric acid that does the destruction, if you will, of any borohydride that remains.
Q. Okay. And we can agree that breaking of those bonds means that there can no longer be reduction of any remaining

TLV-III by the sodium borohydride because you've broken the boron-hydrogen bonds; right?
A. Once you have added the HCL of the -- any residual sodium borohydride will be consumed, correct. And so there should be no further reaction at that point, correct.
Q. Okay. And you -- you would agree there's no further reaction at that point from the data you've seen; right?
A. From the data I've seen, that is correct.
Q. Okay. And the addition of water and acid is a quench step. Isn't it?
A. Yes.
Q. And the purpose of that is to quench the reduction reaction; right?
A. To -- well, there's several purposes for it. One is to destroy the sodium borohydride and the second is to set up the -- an extraction that's then performed to -- to -- the water will take the inorganic materials and then you want to extract the tolvaptan crude product away from the inorganics that are generated. So -- so there's several purposes for that water dilution.
Q. One of which is the quench step; right?
A. No. The addition of the HCL is the quench. The water just help -- I mean, we're playing semantics here, but the water helps, but it's not involved in the actual chemical quenching.

Q. The hydrochloric acid liberates the hydrogen from the boron; correct?
A. That is correct.
Q. Okay. And so there's no longer the ability of the sodium borohydride and sodium borohydride species to donate a hydrogen; correct?
A. Because it no longer exists. So, yes.
Q. Yes. And so the addition of the hydrochloric acid quenches the reaction; right?
A. That is -- that is correct.
Q. Now, in your opinion, the reduction reaction in Lupin's DMF process is complete when the TLV-III ketone precursor content reaches .05 percent or less of its starting level; right?
A. I believe it's my testimony that Lupin has defined the reaction that it needed at that point. I stated that the experimental data provided by Lupin shows that the reaction certainly is complete in Experiments 109 and 115, and we're down to the 0. -- whatever it was, 0.02 level because that's what their data showed. But I don't think I actually stated that the reactions are done at the 0.05 percent level. If I did, I just don't remember.
MR. ZIMMERMAN: If we could look at paragraph 240 of your infringement report. And I'll bring it up on the screen.

THE WITNESS: The reply or the original?

BY MR. ZIMMERMAN:

Q. The original.

A. Thank you.

Q. You state that you believe that the reaction is done by .91 addition, and then you wrote, "By this point in time, the reaction would pass Lupin's in-process specification requiring a TLV-III content of not more than .05 percent, demonstrating completion of the reduction reaction."

A. Fine. And I'm here relying on Lupin's definition of that .05 percent cutoff point, so...

Q. Okay.

A. Which -- which is a functional completion of reaction time points. So fine. I did -- fine. I agree. Fine.

Q. Okay. But we agree that the reaction, in actuality, proceeds past that point; right?

A. It could proceed past that point. And whether they are -- whether all of them will proceed past that point, I have not -- I am not prepared to agree to.

Q. We can agree that the reduction of TLV-III to tolvaptan doesn't magically hit .05 percent of its original level and then just stop; right?

A. The rate of reaction at that level still could have dwindled to the point where -- where the -- the conversion from .05 down to .04 still could take hours and hours and

hours. So it's conceivable that one -- if you do have an experiment where you sample it at that point, then you would not see any further productive conversion in the time course that you're operating in.

Q. So the reaction is still going; it's just not going fast enough for your productive conversion test; right?

A. Which is exactly what Lupin has -- why they put that cutoff point. It's so slow at that point, they want to get on with it. That's exactly why they put 0.05 percent as their cutoff.

Q. But I just want to make sure that I'm clear.

.05 percent is not where the reaction stops. That's where Lupin decides to quench using water and acid; right?

A. It's when -- the point when Lupin has decided that the reaction is completed enough they're going to stop it by quenching.

Q. Yes.

A. So they have decided -- they have proactively decided that the reaction is complete.

Q. No, no. You said complete enough.

We can both agree that the reaction is still ongoing, they're just choosing to intervene and stop it at that point; right?

A. And I, a moment ago, testified that at that point,

evidently, Lupin doesn't want to wait the additional hours and hours and hours and hours to achieve any additional measurable conversion.

Chemists use this terminology when the reaction is complete all the time. That's -- we put that in our laboratory notebooks; we put it in research papers. That's simply a statement of when I've decided to stop the reaction. It's complete when I have proactively decided to stop it.

Q. Okay.

A. And here Lupin has given guidance to its pilot plant people that you have permission to stop the reaction at that point in time. At that point in time it's complete.

Q. And for Lupin's exhibit batches, for its DMF, the actual process it's going to use to make its FDA product, you haven't seen any data showing how much sodium borohydride is added at the time the TLV-III contents reaches .05 percent, have you?

A. I've not seen any data of any type from Lupin from any experiment, other than Experiments 109 and 115, that show how much TLV-III is remaining at earlier time points. Those are the only two where I've seen the data.

So my answer to your question is, no, I've seen nothing in the DMF batch records or what have you because those data were not provided.

12:28:09 Q. And you haven't seen any data from Lupin's DMF exhibit batches showing when the reduction of TLV-III to tolvaptan is complete and stops chemically, have you?
12:28:21 A. I firmly believe that the -- the information -- so have I seen the actual data? It was not provided. But do I believe, based on the data for 109 and 115? Absolutely. And I've testified to that.
12:28:37 Q. And my question was very specific. You haven't seen data from Lupin's DMF exhibit batches showing when that reaction is complete and stops, have you?
12:28:51 A. And I believe I answered that in a previous question. I said I have not seen any data along those lines from Lupin.
12:28:59 Q. Okay. Now, in your analysis of the materials in this case, how many molar equivalents of sodium borohydride will have been added in Lupin's DMF process when the reaction is done and completely stops?
12:29:16 A. Done and completely stopped is operator decision and -- and if they monitored the conversion as a function of time, I believe that they would conclude that the reaction has reached this point where there's not more than 0.05 percent of residual ketone by the time they've added 0.5 moles.
12:29:41 To answer your question, sir, there has to be data, and Lupin would have to actually perform in-process

12:29:48 monitoring to assess that. Based on all I know about the chemistry, based on all I know about the data that's been provided, I've -- my testimony is that I believe the DMF process will be complete at the 0.05 -- will be complete to the stage that Lupin says it can be worked up or it could be even at the stage where I've said that there's no productive conversion at the 0.02 percent level.

12:30:15 And I believe that's the case by the time that .5 moles of sodium borohydride is added, so...

12:30:23 Q. And, Dr. Roush, what I'm looking for -- I don't want an arbitrary cutoff. I want to know, in your opinion, how many molar equivalents of sodium borohydride will have been added when Lupin's reaction is done and the TLV-III stops converting at all to tolvaptan.

12:30:42 A. Well, your "at all" is something that I can't accept in -- or -- in your question because the rate has plummeted so much. This -- this borohydride will continue through the geologic ages and humans, on a human time scale, aren't going to wait years and years and years and years and years for any additional theoretical conversion.

12:31:06 So in the practical standpoint of the operators making the decision, the reaction has gone to the point where I do not see any more conversion, where the human is not observing further conversion, the reaction, in my definition, is done at that point. And I believe that will

occur before 0.5 moles of sodium borohydride are added.
Q. Now, in Lupin's DMF process, even after .91 molar equivalents of sodium borohydride have been added to the reactor, there are still TLV-III molecules in the reactor that haven't been reduced to tolvaptan; correct?
A. That's what the data showed. Correct.
Q. Okay. And you testified at your deposition that you can't say that one or more of those molecules is converted to tolvaptan during the addition of the remaining .29 molar equivalents of the sodium borohydride in Lupin's process; right?
A. Right. And I'm not concerned about 1 or 2 molecules because that is -- there are no analytical methods that can detect a change on a single molecule basis. That's -- that's beyond the capability of anything humanity has ever generated. What counts are the HPLC type data that we've looked at, can the operators say that the -- that the reaction is still progressing because I can monitor and see a productive change in the concentration of starting material, or do I not see.
And the data that I've reviewed for you here today is that the two experiments where we do have data, the experimentalists do not see any additional productive conversion, even if there might be a molecule here or there still reacting. But that's not measurable, you can't detect

that. And the practical determination is that I'm going to cut it off. It's done here. There's no point in waiting further because that further waiting isn't going to give me a better yield. It's not going to make more product for me to put into a pill.

MR. ZIMMERMAN: Your Honor, what time did you want to take the lunch break? I'm getting ready to shift to another topic and didn't know what time you wanted to --

THE COURT: Shift to another topic. We'll keep doing this until you're done.

MR. ZIMMERMAN: Okay. Thank you.

BY MR. ZIMMERMAN:

Q. Now, in the documents you reviewed, TLV-III ketone precursor is detectable at levels below .05 percent; correct?

A. I would say yes.

MR. ZIMMERMAN: Okay. If you could please turn to JTX-12 at Page 147. And we'll bring it up on the screen for you.

THE WITNESS: At page?

I'm sorry. I missed the page number.

BY MR. ZIMMERMAN:

Q. 147.

A. Thank you.

I'm sorry. Is that the JTX page number or...

Q. Yes.

MR. ZIMMERMAN: If we scroll down to the bottom of the page. Keep scrolling.

BY MR. ZIMMERMAN:

Q. Do you see JTX-012.0147?

A. Yes, I found it. Thank you.

Q. This page shows the results of in-process quality control analysis for Lupin's DMF exhibit batches after the full addition of 1.2 molar equivalents of sodium borohydride; right?

A. Let me just catch up with you.

Q. And it's the line marked BPR SR, Number 12, "TLV-III Content."

A. Fine. Thank you. Yes, yes, yes. I see it.

Q. And for all three of Lupin's exhibit batches, there was no detectible TLV-III ketone precursor in those tests after the full addition of 1.2 molar equivalents of sodium borohydride; right?

A. That's what it says here.

Q. Okay. So in Lupin's --

A. I want to make sure -- so this is the in-process -- in-process test. Fine. Thank you. Thank you.

Q. So we can agree that in Lupin's actual DMF process, the reduction reaction goes past the TLV-III being at .05 percent of its original level and continues to further

convert to tolvaptan; right?
A. Would you repeat the question?
Q. So in Lupin's actual DMF process, the TLV-III converts to tolvaptan past the level where it's .05 percent of its original level to the point where it's undetectable; correct?
A. That's what this -- those data would indicate. Yes. But the data don't indicate at what point that was reached in the process.
MR. ZIMMERMAN: Now, if we could bring up your slide PDX -2031.
BY MR. ZIMMERMAN:
Q. You'll see that there's the statement that you referred to in the lower right-hand box, "After completion of reaction water is added, followed by addition of dilute hydrochloric acid."
A. I see that.
Q. Okay. So in Lupin's process, how many molar equivalents of the sodium borohydride have been added by the time the water and the hydrochloric acid are added?
A. That would have been the full amount. The full 1.2 molar equivalents, I believe.
Q. Okay. Dr. Roush, I have one more question. You indicated that Lupin's DMF process is complete at a level below .5 molar equivalents.

Have you determined what point that is?
A. I'm sorry. I don't follow your question.
Q. You testified in your direct that Lupin's DMF process is complete before .5 molar equivalents of sodium borohydride are added.
A. Yeah, I think --
Q. Correct?
A. -- you're using -- so the Lupin paragraph that we had, it's after completion of reaction, and Lupin links that to the 0.05 percent. And I've adopted Lupin's definition in my responses, so yes.
Q. Dr. Roush, we may be talking past each other. I'm not talking about .05. I'm saying you said Lupin's process is complete by the time .5 molar equivalents of sodium borohydride are added; right?
A. My apologies. And yes, that's my testimony. Yes.
Q. Okay. We're on the same page now?
A. I think so.
Q. Okay. At what level do you think the reaction is complete? How much sodium borohydride has been added, in your opinion? .3, .4, .5, what -- what's your number?
A. Well, it will depend on the rate that it's being added. If you add a bunch of bolus at the beginning, I think you could -- with pure, really pure sodium borohydride, you could add .25 or .3, and it will be done in

the 20 to 30 minutes. Bingo.

If you're adding it very slowly over time, as Lupin does in its DMF, I still think it probably will be done in the 30 to 40 percent addition time, only because you have that element of added time to -- for the reaction to catch up with the addition.

Q. Okay.

A. If you're adding -- anyway, so I think the -- so the answer to my question -- your question -- my answer to your question is really the context of how the addition is performed.

Q. And given your comments about the bolus, I think it's best to go ahead and we'll get this out there.

In all of the experiments you've seen in the Lupin data, the exhibit batches, all of the experimental batches, have you seen any batches where this bolus of addition was done?

A. Good question. I'd have to go back and re-review everything, but I do seem to recall multiple experiments, small-scale experiments, where all of the sodium borohydride was added at once at the beginning.

So there may well be, but the point of any -- isn't that I've seen them do it this way, but that the DMF permits it to be done that way. That was -- that was the point of that testimony.

12:40:27 Q. Didn't Lupin's corporate witness testify that the practice is to add it uniformly over time?
12:40:34 A. In the DMF, but you asked had I seen any documents, et cetera, and I believe I saw information in these long spreadsheets of data summaries where it was added in a bolus.
12:40:47 Q. Let me rephrase the question. Apart from development experiments where it was all added at once, all the other batches, it was uniformly added over time; right?
12:40:58 A. In the batch records that I have seen, there was a uniform addition over time, correct.
12:41:04 Q. And Lupin's corporate representative testified that in the plant, the practice is to add it uniformly over time; right?
12:41:12 A. I don't specifically -- I think I remember that testimony, but I don't remember if there was any testimony on his part about whether they ever do boluswise, but certainly he did say that doing it over time is a standard practice.
12:41:28 Q. Okay. And you haven't seen any DMF batches that use this bolus theory or you add some in the beginning, wait three hours, add some, add some, wait a half hour. Have you?
12:41:46 A. Sitting here today, I don't remember seeing a DMF batch performed that way.

Q. In fact, every DMF batch you've seen were a uniform addition; right?
A. Yes, but I have -- I would also say I've not reviewed a hundred percent of all the DMF batches that -- well, I've reviewed the three standard ones, but whether there are more people doing in-process development and whatnot, there are multiple, multiple batches. So I've seen the three. I don't know what else might have been done.
MR. ZIMMERMAN: Okay. Thank you. I have no further questions, Your Honor.
THE COURT: All right. So we'll do the redirect after lunch, unless you're telling me you have no redirect.
MR. MURNANE: I do have a brief redirect, Your Honor.
THE COURT: So we'll take a lunch break until approximately quarter of 2:00.
DEPUTY CLERK: All rise.
(Whereupon a luncheon recess was taken.)
DEPUTY CLERK: All rise.
THE COURT: All right. Let's continue.
MR. MURNANE: Thank you, Your Honor.
James, could we have Slide 27 up there, please?
Thank you.

REDIRECT EXAMINATION

BY MR. MURNANE:

Q. Dr. Roush, on cross-examination, you were asked a number of questions about this slide. And with the pointer, I'm pointing to this column -- this is the TLV Roman numeral IV.

That is the tolvaptan; correct?

A. That is correct. Yes.

Q. Okay. And you had spoken earlier on direct and some on cross about the column which had the TLV-III. That's the ketone; correct?

A. That is correct.

Q. Okay. And there were a number of questions about this amount of TLV-IV.

I'd ask you, if you could, would you look, please, at --

MR. MURNANE: Let's have Slide 231, please, James.

Thank you.

BY MR. MURNANE:

Q. So, looking at this slide, Doctor, let's go over here to the left. Do you see where I have the laser pointer? And you see where it's the NMT 0.05. What does that mean?

A. Not more than 0.05 percent. That means that's -- they're looking to assess that -- that the TLV-III content would not -- be not more than 0.05 percent. It's what they're looking to find.

Q. And that is the ketone?
A. That is the ketone precursor, yes.
Q. And then at the bottom it says "Proceed to" -- and that's Step 25?
A. Correct.
Q. Okay.
MR. MURNANE: And, James, could we go back to the full slide?
BY MR. MURNANE:
Q. And that's addition of water; right?
A. That's the first part of that, yes, correct.
Q. Okay. And then you also, when you created this slide, you had in the lower right-hand portion information from Lupin's brief manufacturing process?
A. Correct.
Q. Okay. It says, "TLV-III is suspended in methanol and aqueous sodium borohydride is added to the reaction mass. After completion of reaction, water is added, followed by addition of dilute hydrochloric acid." Right?
A. Correct.
Q. Okay. Besides this document, you've seen thousands of pages of Lupin documents; right?
A. Probably. Yes.
Q. Have you seen any others that say "after completion of reaction"?

A. I can't cite chapter and verse, but I do recall that there were others.

Q. And were they telling you how to -- how you knew when there was completion of reaction?

A. I believe so.

Q. What was that?

A. Well, by again doing the assessment of the quantity of TLV-III that was remaining.

Q. 0.05?

A. 0.05. Correct.

Q. Thank you.

MR. MURNANE: Let's go to the next slide, please. I think it's 2032.

BY MR. MURNANE:

Q. And here at the top of the slide, you have that same language which you had in the lower right-hand corner before; right? It's on Lupin's brief manufacturing process?

A. Yes.

Q. Okay. And, here again, it says what we just read, "After completion of reaction, water is added, followed by the addition of the dilute hydrochloric acid."

And then you had the portion of Dr. Singh's deposition testimony, when he was asked about that same statement; right?

A. Correct.

01:47:51 Q. Okay. And he was asked about it. And then in the last question, "And specifically this is a reference to steps in the batch production record that explain that if the TLV-III content is no more than 0.05 percent, then water can be added, followed by hydraulic" -- excuse me -- "hydrochloric acid."

01:48:09 And he said, "Yes"; correct?

01:48:10 A. Correct.

01:48:11 Q. Okay. I don't see anything there, and have you seen anything in any other Lupin documents where Lupin said that the amount of tolvaptan, TLV-IV, had anything to do with completion of the reaction?

01:48:27 A. No. I do not.

01:48:29 Q. Okay. Have you seen anything in any of the Lupin documents where a Lupin person -- I think we have the 30(b)(6) witness here -- said that in order to know whether the reaction is complete, you have to wait 10,000 hours?

01:48:44 A. No, there -- that, no. No.

01:48:47 Q. Are these two pages the only pages we know that have -- or is this the only type of information we have that tells us the reaction is complete after 0.05 TLV-III is collected?

01:48:59 A. That is correct.

01:49:01 Q. Thank you.

01:49:02 You were asked on cross-examination about scale

and the patent-in-suit. Is it your understanding that the claimed invention works for both small-scale and large-scale reactions?

A. That is my understanding. We wouldn't be here today if it didn't work on a large scale because that's the process that's being used in part for the manufacturing of tolvaptan.

Q. Okay. Does *Kondo* also provide information for large-scale production?

A. No. *Kondo* does not.

Q. Okay. I'd ask you, if you would, Doctor, could you look in your binder. And I'm asking you to look at JTX-003. That's the '730 patent-in-suit. I'm sorry, it's the binder that I had given you earlier for direct examination.

A. Okay.

Q. So the '730 patent-in-suit. And look, please, if you would, and we're looking -- the page numbers are in the middle of the bottom of the page. JTX-0013. And that's -- the patent and the columns are 23 and 24.

A. Okay.

Q. Okay. So, I'm interested in Example 2, which I believe bridges the bottom of 23 into the top of 24. Do you see that?

A. I do. Yes.

Q. Example 2. Okay.

01:50:33 And looking at this Example 2, do you see where it says -- and then there's its chemical name, which I'll spare the court reporter by not reading that now, large chemical name there -- "is suspended in methanol, 27 milliliters, and thereto is added at one time crystalline sodium borohydride."

01:50:55 Do you see that?

01:50:55 A. I do.

01:50:56 Q. Okay. What does that mean to you, "added at one time"?

01:50:58 A. That means that the sodium borohydride that's being added is being -- you open the flask and you actually dump in -- it's like putting a spoonful of sugar in a coffee. It's a lot, goes in at one time.

01:51:11 Q. Okay. But because it's added at one time, is there any need for there to be more information there in that example about when the reaction would be complete?

01:51:19 A. No.

01:51:20 Q. Okay.

01:51:21 MR. MURNANE: Thank you. No further questions, Your Honor.

01:51:23 THE COURT: All right.

01:51:27 Excuse me. I understand you're going to be testifying again, but you're done for right now. All right. So step down. Watch your step. Be careful. Okay.

01:51:35 THE WITNESS: Thank you, sir.

01:51:42 MR. GARRETT: Your Honor, next we'd like to play some deposition designations, and my colleague Becky Steephenson was going to introduce those.

01:51:49 THE COURT: All right.

01:51:53 MS. STEEPHENSON: ^ good afternoon, Your Honor. We would like to call Dr. Girij Singh by deposition. Dr. Singh was the team leader for Lupin's development of tolvaptan and he is their 30(b)(6) witness on Lupin's DMF.

01:52:07 THE COURT: All right. Go ahead.

01:52:10 MS. STEEPHENSON: Would you like highlighted deposition testimony, Your Honor?

01:52:13 THE COURT: Sure. And I'm sure the court reporter would, too.

01:52:18 MS. STEEPHENSON: If I may approach?

01:52:19 THE COURT: Yes.

01:52:37 MS. STEEPHENSON: Whenever you're ready, Your Honor.

01:52:42 THE COURT: Whenever you're ready.

01:52:45 (Video played in open court and transcribed as follows:)

01:52:46 Q. Good morning, Dr. Singh.

01:52:49 A. Good morning.

01:52:52 Q. And are you aware that you are here today to testify as Lupin's corporate representative on certain topics?

01:52:59 A. Yes.

01:53:03 Q. And do you understand that you are here today as Lupin's corporate representative to testify on Lupin's knowledge of the research leading to the subject matter of Lupin's DMF Number 32623 for tolvaptan?
01:53:21 A. Yes.
01:53:25 Q. And what was your doctorate degree in?
01:53:27 A. It was in organic chemistry.
01:53:32 Q. Who is responsible for deciding how much sodium borohydride should be used to synthesize Lupin's tolvaptan API?
01:53:42 A. The team who developed tolvaptan.
01:53:51 Q. And you oversaw that team, correct?
01:53:54 A. Yes.
01:53:56 MR. GARRETT: Okay. I would like to look at that batch production record next.
01:53:57 BY MR. GARRETT:
01:54:01 Q. Okay. I am marking Exhibit 8 which is a document bearing Bates numbers LTOL0050575 through LTOL0050649. Does this document look familiar to you, Doctor?
01:54:30 A. Yes.
01:54:34 Q. Okay. And what is this document?
01:54:35 A. It's a batch production record of tolvaptan.
01:54:42 Q. And this document was submitted by Lupin to the FDA as part of Lupin's DMF Number 32623?
01:54:53 A. Correct.

Q. So this batch was prepared using the same specifications that will be used to synthesize the tolvaptan in Lupin's DMF Number 32623?

A. Correct.

Q. Are you aware of any other restrictions on how the sodium borohydride must be added in Lupin's DMF other than having to be added between 30 and 240 minutes?

A. As per this document, these are the conditions to satisfy the addition of sodium borohydride.

Q. And this document dictates how Lupin's tolvaptan has to be synthesized in its DMF, correct?

A. Correct.

Q. So if there were other restrictions on how the sodium borohydride must be added, they would be found in this document?

A. Yes.

Q. So under Lupin's DMF, Lupin could synthesize tolvaptan by adding sodium borohydride in 30 minutes?

A. Yes.

Q. And the scientist can decide how to go about adding the total amount over those 30 minutes?

A. As long as it is meeting the specification. As long as it is meeting the instructions given on the batch processing record.

Q. And the instructions on this batch production record

01:56:58 would permit that scientist to add 50 percent of the total amount of sodium borohydride at minute 1 and then 50 percent at minute 29.

Is that fair to say?

01:57:16 A. It's difficult to speculate. What I can speak what is in front of me.

01:57:26 Q. I'm not asking you to speculate, Doctor. I'm just asking what is permitted under the instructions provided in this batch production record?

01:57:35 A. So if it is written in 30 minutes, it will be added in 30 minutes.

01:57:45 Q. Correct. And 50 percent could be added at minute 1 and 50 percent could be added at minute 29, correct?

01:57:54 A. It could be, but theoretically, yes.

01:58:04 Q. And 90 percent could be added at minute 1 and then 10 percent could be added at minute 29?

01:58:13 A. Theoretically what you are saying is right.

01:58:16 Q. And so there's no instruction that would prevent the scientist from adding 70 percent of the sodium borohydride at minute 1, correct?

01:58:26 A. No. The sodium borohydride solution to be added, there is a meter, you know, so there is a uniform rate.

01:58:42 MR. GARRETT: I'm going to share my screen. I'm showing Exhibit 8, Page LTOL0050586. And we're looking at Step 10.

01:59:02 Do you see that, Doctor?
01:59:04 THE WITNESS: Yes.
01:59:07 Q. Okay. This document does not require a uniform rate, does it?
01:59:11 A. No, it's not written here. But my understanding is it is -- the solution is kept in a pot and there is a meter. So the solution is added uniformly. It's not that in one minute it is releasing a hundred ML and at another minute it is releasing 200 ML. No, it will be a uniform addition rate.
01:59:46 Q. All right. I am going to turn to page LTOL0050587. And I'd like to look at Step 12. All right. Step 12 says to collect and send the sample to QC4 TLV-III content.
02:00:24 Do you see that?
02:00:25 A. Yes.
02:00:27 Q. And what is the purpose of this step?
02:00:30 A. This is the -- just to know the progress of the reaction.
02:00:43 Q. And this step states: If sample does not comply, then follow from Step 13. If sample complies, then proceed to Step 25. Is that correct?
02:01:00 A. Serial number 25, correct.
02:01:03 Q. And above that there is a limit which is not more than 0.05 percent, correct?
02:01:17 A. Correct.

Q. And so the sample complies if the TLV-III content is not more than 0.05 percent?
A. Yes.
Q. And if the sample has a TLV-III content of not more than 0.05 percent, then the reaction can continue to the next step, which is Serial Number 25?
A. Correct.
Q. And I'm going to turn to page LTOL0050592 and look at Serial number 25.
So in Serial number 25, water is added, correct?
A. Correct.
Q. And then in Serial number 27, hydrochloric acid is added?
A. Correct.
MR. GARRETT: I am going to mark Exhibit Number 9 which is a document bearing Bates numbers L2L -- L2 -- LTOL0001824 through LTOL0001933.
Does this document look familiar to you, doctor?
THE WITNESS: Yes.
Q. Okay. And it was -- this document was submitted by Lupin to the FDA as part of Lupin's DMF?
A. Correct.
Q. I am going to turn to page LTOL0001845. And the title at the top says Process Write-up, and below that the title is Brief Manufacturing Process.

Do you see that?
A. Yes.
Q. Okay. I'd like to focus on Stage 2, which is the TLV-III to TLV-IV stage, correct?
A. Correct.
Q. And it states: TLV-III is suspended in methanol and aqueous sodium borohydride is added to the reaction mass. Correct?
A. Correct.
Q. Now, this language is a reference to the steps that we saw a moment ago in the batch production record, correct?
A. Correct.
Q. And, specifically, that was -- this is a reference to Step 12 in the batch production record?
A. Correct.
Q. And then the next sentence states: After completion of reaction, water is added followed by addition of dilute hydrochloric acid.
Do you see that?
A. Correct.
Q. And this language is also a reference to the steps that we saw a moment ago in the batch production record?
A. Correct.
Q. And, specifically, this is a reference to the steps in the batch production record that explain that, if the

TLV-III content is no more than 0.05 percent, then water can be added followed by hydrochloric acid?

A. Yes.

MR. GARRETT: I am going to mark Exhibit 12, which is a document bearing Bates numbers L2 -- LTOL0038711.

Q. Does this document look familiar to you, Doctor?

A. Yes.

Q. And what is this document?

A. That's an email from Swapnil, Jadhav. To Swapnil Jadhav.

Q. And this email was sent on May 22, 2017?

A. Yes.

Q. And the subject of the email is TLV-III to TLV-IV analytical data to 22/05/17?

A. Yes.

Q. And there is an attachment to this email, and the file name for the attachment is "copy of TLV-III to TLV-IV.xlsx."

Do you see that?

A. Yes.

Q. And I believe you testified before that Swapnil is on your team, correct?

A. Correct.

Q. And was Swapnil on your team when he sent this email to himself in 2017?

02:08:10 A. Yes.
02:08:14 Q. Okay. I would next like to look at the attachment to this email.
02:08:21 MR. GARRETT: All right. I am going to mark Exhibit 13, which is a document that was produced to Otsuka in its native format as an Excel document. And the Bates number for that document is LTOL0038712.
02:08:49 Q. Now, Doctor, Lupin produced this document with the email that we just reviewed and it was produced electronically. You can't see it on this document, but the file name of this document, when it was produced to us, was -- was "copy of TLV-III to TLV-IV.xlsx."
02:09:15 And that is the same file name as the attachment of the email that we just looked at, correct?
02:09:23 A. Correct.
02:09:26 MR. GARRETT: So I am going to mark Exhibit 14, which is a document bearing Bates numbers LTOL0031192 through 31395.
02:09:59 Q. Doctor, does this document look familiar to you?
02:10:01 A. Yes.
02:10:04 Q. Okay. And what is it?
02:10:05 A. That's a lab notebook used for tolvaptan synthesis.
02:10:16 Q. This was a lab notebook created at Lupin?
02:10:21 A. Yes.
02:10:23 Q. If we look at Exhibit 13, do you see the entries for

Experiment 109?
A. Yes.
Q. All right. And then if we go to Exhibit 14, which is the lab notebook, and we look at Page 31304, do you see the lab notebook entry for Experiment 109?
A. Yes.
Q. And a 1.3 molar ratio of sodium borohydride was used in Experiment 109; is that correct?
A. Correct.
Q. And if we go back to Exhibit 13 and we look at the entries for Experiment 109, you will see that there were six HPLC analyses conducted for this experiment, correct?
A. Correct.
Q. The first HPLC analysis in Exhibit 13 for Experiment 109 states: After 35 percent NaBH4 addition.
Do you see that?
A. Yes.
Q. This means that the sample was sent for HPLC after 35 percent of the sodium borohydride was added, correct?
A. Correct.
Q. And if we look at the next HPLC analysis, it states: After 70 percent NaBH4 addition.
Do you see that?
A. Yes.
Q. And this means that the sample was sent for HPLC

analysis after 70 percent of the sodium borohydride was added, correct?

A. Correct.

Q. Then if we look at the third HPLC analysis, it states: After 100 percent NaBH4 addition.

Do you see that?

A. Yes.

Q. And this means that the sample was sent for HPLC analysis after 100 percent of the sodium borohydride was added, correct?

A. Correct.

Q. Okay. So after 35 percent of the sodium borohydride was added in Experiment 109, what was the content of TLV-IV?

A. 91.90.

Q. And what was the content of TLV-III?

A. 7.0.

Q. And after 70 percent of the sodium borohydride was added, what was the content of the TLV-IV?

A. 98.81.

Q. And what was the content of the TLV-III?

A. 0.02.

Q. Experiment 109 used 1.3 molar ratio of sodium borohydride, correct?

A. Correct.

Q. And 35 percent of 1.3 is 0.455, correct?

02:15:14 A. Correct.
02:15:17 Q. So after 0.455 molar ratio of sodium borohydride had been added in Experiment 109, the TLV-IV content was 91.90, correct?
02:15:41 A. Correct.
02:15:44 Q. And the TLV-III content was 7.00?
02:15:51 A. Correct.
02:15:56 Q. Now, 70 percent of 1.3 is 0.91, correct?
02:16:11 A. Yes.
02:16:18 Q. So after 0.91 molar ratio of sodium borohydride had been added in Experiment 109, the TLV-IV content was 98.81, correct?
02:16:37 A. Correct.
02:16:41 Q. And the TLV-III content was 0.02?
02:16:49 A. Correct.
02:16:55 Q. So we are looking at Exhibit 13, and I would like to focus on the entries for Experiment 115.
02:17:10 Do you see those entries, Doctor?
02:17:13 A. Yes.
02:17:16 Q. And according to Exhibit 13, there were five HPLC analyses conducted for Experiment 115?
02:17:38 A. Correct.
02:17:44 Q. Going back to Exhibit 13 and focusing on the HPLC analyses for Experiment 115, do you see that the first HPLC analysis was for a sample that was sent after 35 percent of

02:18:08 the sodium borohydride had been added?
02:18:12 A. Correct.
02:18:30 Q. All right. So after 0.455 molar ratio of sodium borohydride was added in Example (sic) 115, the TLV-IV content was 68.01, correct?
02:18:50 A. Correct.
02:18:55 Q. And the TLV-III content was 29.42?
02:19:04 A. Correct.
02:19:09 Q. And then the next HPLC analysis for Experiment 115 was after 70 percent of the sodium borohydride was added?
02:19:20 A. Correct.
02:19:25 Q. And as we've discussed, that amounts to a 0.91 molar ratio of sodium borohydride being added?
02:19:33 A. Yes.
02:19:40 Q. So after 0.91 molar ratio of sodium borohydride had been added in Experiment 115, the TLV-IV content was 97.24, correct?
02:19:59 A. Correct.
02:20:04 Q. And the TLV-III content was 0.01?
02:20:09 A. Correct.
02:20:15 Q. And then the next HPLC analysis is for a sample that was sent after 100 percent of the sodium borohydride had been added, correct?
02:20:29 A. Correct.
02:20:37 Q. And after 100 percent of the sodium borohydride had

02:20:41 been added, the TLV-IV content was 97.35?
02:20:48 A. Correct.
02:20:55 Q. And the TLV-III content was 0.02?
02:21:00 A. Correct.
02:21:05 Q. Doctor, I'd like to look at Exhibit 14, which is the lab notebook Page 31305.
02:21:15 This page shows the details for Experiment 109; is that right?
02:21:26 A. Right.
02:21:30 Q. And in Step 4 and 5 is where the sodium borohydride is added; is that correct?
02:21:49 A. Correct.
02:21:49 BY MR. BUNKER:
02:21:57 Q. Okay. What we're looking at is Exhibit 13. Do you recall answering some questions from Mr. Garrett regarding Exhibit 13, this document?
02:22:06 A. Yes.
02:22:10 Q. In one of these columns it says EXPT NO. Do you see that?
02:22:15 A. Yes.
02:22:17 Q. What does that mean?
02:22:18 A. Experiment number.
02:22:23 Q. Were these experiments conducted according to Lupin's DMF process for tolvaptan?
02:22:30 A. No.

02:22:36 (Conclusion of video.)

02:22:45 MS. STEEPHENSON: Your Honor, Plaintiffs would
02:22:51 like to enter into evidence Exhibit 12 from Dr. Singh's
02:22:55 deposition, which is PTX-1049.

02:22:59 THE COURT: All right.

02:23:00 MR. ZIMMERMAN: No objection, Your Honor.

02:23:01 THE COURT: It's admitted without objection.

02:23:03 (PTX No. 1049 was admitted into evidence.)

02:23:03 MS. STEEPHENSON: Thank you, Your Honor.

02:23:05 MR. GARRETT: Your Honor, Plaintiffs have
02:23:10 completed their infringement case.

02:23:12 THE COURT: All right. Thank you.

02:23:14 MR. ZIMMERMAN: Your Honor, Lupin moves for
02:23:18 judgment under Rule 52(c). Plaintiff's infringement case
02:23:22 rests entirely on two experiments that are not Lupin's DMF
02:23:26 process, and they presented no evidence from which a
02:23:30 reasonable fact finder can conclude that Lupin's actual DMF
02:23:34 and ANDA process infringe.

02:23:36 THE COURT: All right. Motion is denied.

02:23:39 Go ahead.

02:23:40 MR. ZIMMERMAN: Your Honor, Lupin calls as its
02:23:51 first witness, Dr. William Dichtel.

02:24:09 May we approach, Your Honor?

02:24:10 THE COURT: Sure.

02:24:11 DEPUTY CLERK: Please state and spell your full

name for the record.

THE WITNESS: William Dichtel. Last name is D-I-C-H-T-E-L.

DEPUTY CLERK: Do you affirm that the testimony you are about to give to the Court in the case now pending will be the truth, the whole truth, and nothing but the truth, you do so affirm?

THE WITNESS: Yes.

WILLIAM DICHTEL, the witness herein, after having been duly sworn under oath, was examined and testified as follows:

THE WITNESS: Maybe these binders are for somebody else?

MR. ZIMMERMAN: Your Honor, there are two prosecution history documents that we're also going to use with the witness, but I will save those until the time when we're going to use them because they're just volumes that will get identified and marked.

THE COURT: All right.

MR. ZIMMERMAN: And then we'll refer to smaller portions of them.

THE COURT: Ah, okay.

DIRECT EXAMINATION

BY MR. ZIMMERMAN:

Q. Good afternoon, Dr. Dichtel.

A. Good afternoon.
Q. Can you please state your full name?
A. William Robert Dichtel.
Q. And what is your current occupation?
A. I am currently the Robert L. Letsinger Professor of Chemistry at Northwestern University.
Q. In your binder, can you please turn to DTX-2146?
A. Yes. Yes, I'm there.
Q. What is this document?
A. This is a copy of my CV.
Q. And does your CV accurately detail your educational and professional background?
A. Yes.
Q. Does your CV accurately list your publications, awards, and honors?
A. Yes.
Q. What degrees do you hold?
A. I hold a Bachelor of Science in chemistry from MIT, which was conferred in 2000. And a Ph.D. in chemistry from the University of California, Berkeley, which was conferred in 2005.
Q. And what did you do after receiving your Ph.D.?
A. After I received my Ph.D., from 2005 to 2008, I served as a joint research associate split between UCLA and Caltech.

Q. And after that?
A. In 2008, I moved to Cornell University where I became an assistant professor of chemistry. And in 2014, I was promoted to the rank of associate professor with indefinite tenure.
Q. And when did you join Northwestern University?
A. I moved to Northwestern in 2016 to assume my current position.
Q. And what do you do in your current role as a professor at Northwestern University?
A. As a professor, I conduct research in organic chemistry. I supervise graduate students and postdoctoral researchers who are pursuing their degrees, their further training in that subject. I also teach the courses -- and they're both undergraduates and graduate students -- in the topic of organic chemistry.
Q. And approximately how many graduate students or students pursuing their doctorate are you mentoring?
A. At any given time it ranges from 12 to 20.
Q. And can you describe the major awards you've received?
A. From this list, in -- in 2015, I was named MacArthur Fellow, sometimes called a Genius Grant. It's been given to 19 chemists in the 35 or so year history of that program.
In 20- --

THE COURT: Actually, let me interrupt for a second because I notice that -- and I was asking my law clerks, who are all young people, at lunch so have you heard of this, and they hadn't. I have, but it would be worthwhile if you just put in the record because I'd like them to know about this -- a little bit more about that.

And, particularly, do you get like $600,000 for winning it?

THE WITNESS: Certainly, Your Honor.

The MacArthur Fellowship program is -- recognizes creative Americans from all walks of life. The foundation -- it's a special award because one cannot apply for it. And so they call you out of the blue and inform you that you've been selected for this honor.

It does -- at the time, it -- it carried an award of $625,000 of unrestricted funds, where the foundation trusts that the recipients of this award will use that money to advance their own creative pursuits.

THE COURT: So the last trial I had, and one of the witnesses had won the Nobel Prize, and I asked him why he didn't have that right under his name on his resume.

And I ask you: Why don't you have MacArthur Fellow right under your name on your resume?

THE WITNESS: Well, after this, I might take that advice.

THE COURT: All right. Sorry. Go ahead.

BY MR. ZIMMERMAN:

Q. Dr. Dichtel, if you could continue with your awards.

A. Yeah, briefly.

In 2017, I was awarded the Leo Hendrik Baekeland Award from the American Chemical Society. That award is given once every two years to the top chemists in the United States. In 20- -- who's younger than 40 years old.

In 2020, I was named the National Laureate in Chemistry by the Blavatnik Family Foundation. That award is given to the top chemist in the United States who's younger than 42.

Q. Do you have experience with reduction reactions using hydrogenating agents such as sodium borohydride?

A. Yes, I have extensive experience with those reduction reactions. I ran reduction reactions with my own hands using sodium borohydride as a graduate student. I was aware of colleagues running them as a postdoctoral researcher, and now as a professor, this -- the students and postdocs who I mentor routinely run these reactions, including using sodium borohydride quite regularly.

Q. And have you reviewed the organic synthesis described in the two asserted patents?

A. Yes, I have.

Q. And do you have experience developing strategies and

protocols for the synthesis of organic compounds?

A. Yes. I -- I have extensive experience in that as well, dating all the way back to, again, my time as a graduate student, and in a postdoc I would design syntheses and execute them. And as a professor, the students that -- and postdocs that I mentor routinely design new syntheses for their targets and conduct and execute them, and I work with them daily on that pursuit.

Q. Now, does your experience include analyzing the progress of organic reactions?

A. Yes. My research commonly involves those kinds of measurements in making mechanistic judgments about a certain organic synthesis or process based on those, the findings of those measurements.

MR. ZIMMERMAN: Your Honor, Lupin offers Dr. Dichtel as an expert in organic chemistry and organic synthesis, including the synthesis of organic reactions.

MR. GARRETT: No objection.

THE COURT: All right. You may proceed.

BY MR. ZIMMERMAN:

Q. Dr. Dichtel, did you have slides prepared today to help in understanding your testimony?

A. Yes, I do.

Q. And have you formed any opinions based on your work in this case?

A. Yes, I have.

MR. ZIMMERMAN: If we could go to Slide DDX-2.2.

BY MR. ZIMMERMAN:

Q. Can you provide a summary of your opinions in this case?

A. Yes. First, my opinion is that Lupin's ANDA products and its DMF process do not infringe the asserted claims.

Second, I believe that the asserted claims would have been obvious to a person of ordinary skill in the art over the prior art.

And, third, that certain statements made to the Patent Office during the prosecution of the asserted patents regarding the *Kondo* prior art reference were not accurate.

Q. I'd like to start with your opinions regarding non-infringement. What were your opinions regarding non-infringement?

A. Well, my opinion is that Lupin's ANDA products and DMF process would not or do not infringe the asserted claims.

Q. And can you tell us why?

A. Yes. The asserted claims all include language that are in these claims that specify reducing a ketone precursor in the presence of a hydrogenating agent in amounts of either 0.25 to 1 or 0.25 to .5 moles per 1 mole of the ketone precursor.

Lupin's DMF process uses 1.2 equivalents of the hydrogenating agent which is outside of those ranges. Lupin adds this -- adds its reducing agent over time, but the reaction proceeds over the course of that addition and does not stop until later in the quench step.

Q. Okay. Did you review the Court's claim constructions in this matter?

A. Yes, I did.

MR. ZIMMERMAN: If we could go to Slide DDX-2.4.

BY MR. ZIMMERMAN:

Q. Which of the claim constructions were relevant to your analysis of non-infringement?

A. Well, so on the language that I show on this slide, I understand that the Court ruled that no construction was necessary. I also understand that the Court ruled that because the claim term lacks broadening words, the numerical range in this claim involves a strict numerical boundary.

And, finally, I understand that the Court ruled that this claim explains that it's the amount of reducing agent present while the reaction is taking place.

Q. What does it mean to you that the Court concluded that the term doesn't require construction? And I understand you're not a lawyer.

A. It's my understanding that that means to apply the plain and ordinary meaning of the term.

Q. And so did you apply the plain and ordinary meaning of the numbers in the range?
A. I did.
Q. And did you apply the same claim constructions to the terms of the '735 patent?
A. Yes.
Q. Now, did you review regulatory documents that Lupin submitted to the FDA related to its ANDA and its DMF process?
A. Yes, I did.
MR. ZIMMERMAN: If we could look at Slide DDX-2.5.
BY MR. ZIMMERMAN:
Q. Were any of Lupin's documents particularly relevant to your analysis?
A. Yes. The documents I show here were particularly relevant. They are Lupin's official batch record, its description of manufacturing process and process controls, and Lupin's process validation report.
Q. And the official batch record is designated as JTX-014? Is that correct?
A. Yes, that's correct.
Q. And the description of manufacturing process and controls is JTX-019?
A. Yes. That's correct.

Q. And the process validation report is JTX-12; correct?
A. Correct.
Q. Does Lupin's process for producing tolvaptan involve a reduction step?
A. Yes. Yes.
MR. ZIMMERMAN: Okay. If we could look at your Slide DDX-2.6.
BY MR. ZIMMERMAN:
Q. This is an excerpt from Page 7 of JTX-019, which you showed earlier. Can you tell us what's shown here?
A. Yes. This depicts Stage 2 of Lupin's tolvaptan synthesis. Stage 2 is the reduction reaction that we've heard a lot about today. The starting materials are labeled there as TLV-III; that is the ketone precursor.
Over the arrow you see the sodium borohydride, and then that reaction produces tolvaptan, which is also labeled there as TLV-IV.
Q. Now, are the terms hydrogenating agent and reducing agent sometimes used interchangeably?
A. In this matter, yes, they are.
MR. ZIMMERMAN: If we could go to your next slide, DDX-2.7.
BY MR. ZIMMERMAN:
Q. And this is an excerpt from Page 39 of JTX-19, which you showed earlier. Can you explain what's shown on this

page?
A. Yes. So this shows the raw materials and quantities of raw materials that are used in Stage 2 of Lupin's tolvaptan synthesis. Again, the sodium borohydride reduction step to make tolvaptan.
Q. And does this page identify the ratio of the sodium borohydride relative to the ketone precursor TLV-III used in Lupin's DMF process?
A. Yes. That is listed here. You can see the mole ratio is highlighted on the right-most column. It is 1.2 moles of sodium borohydride per 1 mole of TLV-III, the ketone precursor.
Q. And does 1.2 molar equivalents of sodium borohydride fall within the ranges claimed in any of the asserted patents?
A. No.
MR. ZIMMERMAN: If we could look at your next slide, DDX-2.8.
BY MR. ZIMMERMAN:
Q. And this is an excerpt from Page 16 of JTX-019. And I'll give you a minute to get there.
A. Yes, I'm there now.
Q. Can you explain what's shown on this page?
A. Yes. This is a flow chart that describes the process for Stage 2, the reduction step of the ketone precursor to

02:39:03 tolvaptan.
02:39:06 Q. And is this in Lupin's process?
02:39:07 A. Yes, this is Lupin's process.
02:39:11 Q. Can you explain what the first two boxes in this flow chart show?
02:39:16 A. Yes. The first two boxes show that Lupin makes a solution of sodium borohydride in water. It adds that solution to a solution of TLV-III, the ketone precursor dissolved in methanol, which is stored in a reactor.
02:39:37 Q. Now, if you look at the right-hand side of the page. Page 16 of JTX-019. You'll see reference to IPQC testing to the right of the box, the second box.
02:39:51 Can you tell us what this refers to based on your analysis of the Lupin process?
02:39:55 A. Yes. A Lupin chemist takes a sample of the reaction mixture and tests it for residual TLV-III content, the ketone precursor.
02:40:08 Q. And is this test conducted after all 1.2 molar equivalents of sodium borohydride have been added?
02:40:13 A. Yes.
02:40:16 Q. What is the next step in the flow chart after the IPQC testing?
02:40:21 A. The next step in the flow chart describes the addition of water and dilute hydrochloric acid.
02:40:27 Q. And what does the addition of water and 5 percent

hydrochloric acid do?
A. The addition of water and hydrochloric acid serves to destroy any residual sodium borohydride or other boron hydride-containing species, thus ending the reduction reaction. This process is sometimes called quenching the reaction.
Q. If you could turn to JTX-014, which is Lupin's batch production record that we looked at earlier.
A. Yes, I'm there.
Q. What is your understanding of what a batch production record is?
A. A batch production record describes the process and observations related to making a particular batch of a pharmaceutical substance. In this case, this is a batch record for the production of tolvaptan.
Q. And would this be the Stage 2 of Lupin's DMF process?
A. Yes, that's right.
Q. If you could turn to Page 12 of the batch record, JTX-14.
MR. ZIMMERMAN: And if we could go to your next slide, DDX-2.9.
THE WITNESS: Could you repeat the page number one more time?
BY MR. ZIMMERMAN:
Q. Yes. It's Page 12.

02:41:59 A. Page 12, thank you.
02:42:00 Q. Of JTX-14. Can you explain what's shown on this page?
02:42:05 A. Yes. This page shows Series 10 of Stage 2 of Lupin's tolvaptan synthesis. This is the step that describes the addition of sodium borohydride to the reactor containing the ketone precursor TLV-III.
02:42:27 Q. Now, you'll note on this page that the batch record indicates the quantity of sodium borohydride solution charged to the reactor.
02:42:35 Do you have an understanding of how that quantity relates to the amount of ketone precursor TLV-III on a molar equivalents basis?
02:42:44 A. Yes. It's my understanding that that corresponds to 1.2 moles of sodium borohydride per mole of the ketone precursor.
02:42:52 Q. Now, can Lupin add less than 1.2 molar equivalents of the sodium borohydride in its DMF process?
02:42:58 A. No. That's not an option for Lupin's chemists.
02:43:02 Q. If you look at JTX-12, and this is Lupin's process validation report that you showed earlier. And if we could go to Page 210.
02:43:21 MR. ZIMMERMAN: And we can bring up your next slide, DDX-2.10.
02:43:23 BY MR. ZIMMERMAN:

02:43:27 Q. Did you identify any statement from Lupin in its regulatory document about any concerns with using less than 1.2 molar equivalents of sodium borohydride?
02:43:37 A. Yes. Here in this document, Lupin notes that if the quantity of sodium borohydride is less, then unreacted TLV-III can be more than their specified limit.
02:43:53 Q. Okay.
02:43:53 MR. ZIMMERMAN: I'd like to turn back to the batch record, JTX-14, and go to your next slide, DDX-2.11.
02:43:55 BY MR. ZIMMERMAN:
02:44:03 Q. Does the batch record indicate the standard time over which Lupin adds sodium borohydride solution to the reactor?
02:44:10 A. Yes, that's highlighted here in this slide in yellow. It is a range of 30 to 240 minutes.
02:44:18 Q. And did you hear Dr. Singh's testimony regarding how that solution is added?
02:44:23 A. Yes. In the -- the testimony that we just heard, Dr. Singh testified that that solution would be added at a uniform rate.
02:44:37 Q. What is Series Number 10 -- I'm sorry, Series Number 11 of the batch record?
02:44:43 A. Series Number 11 specifies that Lupin chemists stir the reaction after all of the sodium borohydride has been added for 15 minutes.
02:44:56 Q. If you could turn to Page 13 of the batch record,

JTX-014.

MR. ZIMMERMAN: And if we could go to your next slide, DDX-2.12.

BY MR. ZIMMERMAN:

Q. Can you explain what's shown here?

A. Yes. This is Step 12 of the Lupin -- of the reduction step of Lupin's tolvaptan synthesis. It describes the IPQC testing that I mentioned a few minutes ago. That stands for "in-process quality check."

Q. And when are the samples taken for the IPQC testing?

A. Lupin takes two samples for IPQC testing in this step. The first one is after the completion of Step 11 that you just asked me about. That sample is tested for TLV-III content. Meanwhile, the reaction is continued, is allowed to stir for an additional period of time, 75 minutes, after which a second sample is taken and also sent for the IPQC testing.

Q. And in order to pass the IPQC testing, what does the test have to show?

A. It -- at least one of the tests has to show no more than 0.05 percent of the original amount of TLV-III, the ketone precursor.

Q. It says on this section of the batch production record that if the sample passes the IPQC testing, proceed to Series 25.

02:46:38 Can you turn to pages 16 -- I'm sorry -- 18 through 20 of the batch record, JTX-014?
02:46:50 A. Yes. Pages 18 through?
02:46:53 Q. 20.
02:46:54 A. Yeah, I'm there.
02:46:55 MR. ZIMMERMAN: If we go to your next slide, DDX-2.13.
02:46:56 BY MR. ZIMMERMAN:
02:46:59 Q. Can you explain what's shown here?
02:47:00 A. Yes. So Steps 25 through 30 are a description of the addition of water and then hydrochloric acid to the reaction mixture.
02:47:12 Q. Is this the quench step you discussed earlier?
02:47:16 A. Yes. This is a description of the quench step.
02:47:18 Q. Okay. If we could go back to Series Number 12 of the batch record.
02:47:22 MR. ZIMMERMAN: And turn to your next slide, DDX-2.14.
02:47:24 BY MR. ZIMMERMAN:
02:47:28 Q. If the samples do not pass the IPQC testing, what happens next?
02:47:33 A. If a sample does not pass the IPQC testing, then Lupin's chemists are directed to go to Step Number 13.
02:47:47 Q. And what does Step Number 13 entail?
02:47:50 A. Step 13 directs Lupin's chemists to add additional

02:47:54 sodium borohydride, wait additional periods of time, perform
02:48:00 IPQC testing again. That process can be repeated.
02:48:05 Q. Does this mean that Lupin's DMF process can actually
02:48:08 use more than 1.2 molar equivalents of sodium borohydride in
02:48:12 the reduction reaction?
02:48:14 A. Yes, that's possible.
02:48:16 Q. Now, you mentioned the 0.05 ketone precursor
02:48:21 specification level in the IPQC testing. In your
02:48:27 assessment, does the .05 percent specification level mean
02:48:31 that the reduction reaction in Lupin's DMF process stops
02:48:35 when the ketone precursor reaches a level of 0.05 relative
02:48:41 to its original level?
02:48:42 A. No.
02:48:44 Q. Why not?
02:48:45 A. Well, the -- this reduction reaction, as we've heard
02:48:52 a lot about it today already, it's an irreversible reaction.
02:48:59 There's -- there's no evidence that it will distinctly stop
02:49:04 at 0.05 percent. That just represents the point at which
02:49:08 Lupin has directed its chemists to change steps in the
02:49:13 process and move forward.
02:49:15 Q. Now, can each mole of ketone precursor in Lupin's DMF
02:49:19 process be reduced to tolvaptan?
02:49:21 A. In principle, yes, there's certainly enough sodium
02:49:26 borohydride present to do that.
02:49:29 Q. Now, did you see any data from Lupin's DMF batches

02:49:33 that supports your opinion that the reduction reaction is
02:49:36 not complete or does not stop when the ketone precursor
02:49:40 level reaches .05 percent?
02:49:42 A. Yes.
02:49:46 MR. ZIMMERMAN: If we could go to your next
02:49:48 slide, DDX-2.15.
02:49:48 BY MR. ZIMMERMAN:
02:49:52 Q. This is an excerpt from Page 147 of the validation
02:49:55 report, JTX-012.
02:50:18 A. Yes, I'm there.
02:50:20 Q. Okay. Can you explain what's shown on this page?
02:50:23 A. Yes. These are IPQC testing of Lupin's three
02:50:34 validation batches for its DMF process that was submitted to
02:50:38 the FDA. Each one of them show essentially no detected
02:50:46 TLV-III. And so I think this is pretty strong evidence that
02:50:51 the reaction goes beyond the threshold of 0.05 percent
02:50:57 residual TLV-III content.
02:50:59 Q. Now, did you hear Roush testify about Lupin
02:51:03 Experiments 109 and 115?
02:51:05 A. Yes, I did.
02:51:09 Q. In your assessment, are those experiments reliable
02:51:12 bases for Dr. Roush to make conclusions about whether
02:51:16 Lupin's DMF process infringes the asserted claims?
02:51:20 A. No, I do not.
02:51:22 Q. Why not?

A. Well, Lupin's Experiments 109 and 115 were not run using Lupin's DMF process.
Q. Okay. If you could turn to JTX-017.
A. Yes.
Q. What is this document?
A. This is a Lupin laboratory notebook.
Q. And on Pages 113 to 114 and 119 to 120, does this laboratory notebook outline the experimental procedures for Experiments 109 and 115?
And, again, that's pages 113 and 114 and 119 and 120.
A. Yes, they do.
Q. Okay. And did you prepare a slide outlining the differences you identified between Experiments 109 and 115 on the one hand and Lupin's actual DMF process on the other?
A. Yes, I did.
MR. ZIMMERMAN: If we could go to your next slide, DDX-2.16.
BY MR. ZIMMERMAN:
Q. Can you please explain these differences?
A. Yeah. So there are many differences between Lupin's Experiments 109 and 115 as compared to Lupin's DMF process. Those include the molar equivalents of sodium borohydride used, the scale at which these reactions are conducted, either grams versus kilograms. The concentration of the

starting concentration of TLV-III. The volumes of the solutions involved the ratio of methanol to water in that results which is also changing over the course of these reactions, the amount of sodium borohydride, the pH of the sodium borohydride solution, and the temperature.

Q. And in your view, are these differences important?

A. Yes, I think they are.

Q. Can you explain why?

A. Yes. Well, so in Dr. Roush's testimony, he opined that Lupin's reduction reaction would be complete or that it would no longer take place or many other terms I think I heard. And he -- he's basing that assumption on -- or he's making that determination that that occurs, for example, when 0.91 molar equivalents of sodium borohydride have been added. I disagree with Dr. Roush's assertion that the reaction stops at 0.05 percent or some other low value of TLV-III concentration. So, you know, I already disagree.

But even taking that into account, 0.91 equivalents is pretty close to being outside of the specifications of the patents at issue. And Dr. Roush does not have to be off by very much to change the exact point at which these reactions would approach these very, very high levels of conversion because we've already talked about how the reaction slows down towards the end.

Q. Okay. If you look at JTX-20 --

A. Mm-hmm.
Q. -- in your binder. Can you tell me what this document is?
A. JTX-20 is a collection of HPLC traces for various Lupin experiments.
MR. ZIMMERMAN: And if we go to your next slide, DDX-2.17.
BY MR. ZIMMERMAN:
Q. Are these excerpts from pages 25 and 34 of that collection of HPLC traces JTX-20?
A. 25 and then the second one is 34?
Q. Yes.
A. Yes. I agree.
Q. Now, I understand Experiments 109 and 115 didn't follow Lupin's DMF process. But if we were to consider them, do these experiments support Dr. Roush's opinion that the reduction reaction is complete or stops by the time 0.91 molar equivalents of sodium borohydride have been added in the Lupin process?
A. No, they do not.
Q. Why not?
A. Well, you can see in these traces that there is still detectable TLV-III. First, you can also -- well, you can see that it's there. And the reaction, as I think we've also heard today, is irreversible. And so the -- these data

show that based on the second order of kinetics that we have discussed, that there will be a rate for this reaction. As long as there is still sodium borohydride and TLV-III present, the reaction will proceed at some finite rate.
Q. Okay. And, Dr. Dichtel, the points you've highlighted, the TLV-III numbers are listed as an area percent. Can you explain what that is?
A. Yes. The area percent is the -- if one examines the actual trace, there will be a baseline and then several peaks that allude as a function of time in this experiment. The analysis software can calculate the area under each one of those peaks. And the area percent is the area of the peak in question; so listed here, the area for the peak corresponds to TLV-III divided by the total area under all the curves identified in the experiment.
MR. GARRETT: Your Honor, I'm sorry. I don't mean to interrupt. We're going to object as outside the scope of his reports and his deposition.
MR. ZIMMERMAN: Your Honor, he talked about the traces in his expert report. He cited the documents. He's explaining what the percentage means.
THE COURT: So isn't he right now saying what the area under the curve is?
MR. ZIMMERMAN: Yes.
MR. GARRETT: He's going into detail he did not

go into his report. We haven't had an opportunity to question him on this at his deposition. We don't know what he's going to say.

THE COURT: All right. Well, I don't know what he's going to say either, but I'm going to let him talk about the area under the curve because I don't know. Seemed pretty basic.

MR. GARRETT: Thank you, Your Honor.

BY MR. ZIMMERMAN:

Q. Now, Dr. Dichtel, based on your review of the material in his this case, is there any discussion or suggestion in the asserted patents that the reduction reaction is no longer taking place or complete when the ketone precursor level reaches 0.05 percent of the starting amount?

A. No.

Q. And is there any discussion or suggestion in the asserted patents that the reduction reaction is no longer taking place or complete when the ketone precursor level reaches any specified concentration?

A. No.

Q. If we could turn to JTX-015 in your binder.

A. JTX-015?

Q. 015.

A. Okay.

Q. What is this document?
A. This is Lupin's process development report.
MR. ZIMMERMAN: And if we could turn to your next slide, DDX-2.18.
BY MR. ZIMMERMAN:
Q. Is this an excerpt of Page 22 of Lupin's drug development report JTX-15?
A. Yes, it is.
Q. And this refers to Stage 2 in Lupin's DMF process, the stage we've been discussing; correct?
A. Correct.
Q. And the document reads, "After completion of the reaction, water is added followed by addition of dilute hydrochloric acid."
Does this statement mean that the reduction reaction in Lupin's DMF process is complete and stops when the ketone precursor level reaches 0.05 percent?
A. No, it does not.
Q. Why not?
A. Well, this document is -- describes Lupin's instructions to its chemists for manufacturing its tolvaptan, but it does not indicate a completion of the reaction in chemical terms to -- in terms of when that might happen. It's -- it's certainly at the point of the quench step here where -- where we've said, okay, the borohydride

ions and other by-products are destroyed by that process.

One other thing, you know, I note that that instruction also corresponds to after Lupin has added all of the sodium borohydride in its process, so at least 1.2 equivalents.

Q. Okay. I'd like to ask you a question that I asked earlier and apparently asked incorrectly.

Can each molecule of ketone precursor in Lupin's DMF process be reduced to tolvaptan?

A. Yes, in principle. There's -- there's more than enough sodium borohydride present for that to occur.

Q. Okay. Did you hear Dr. Roush testify that he believes the reduction reaction in Lupin's DMF process will proceed quickly?

A. Yes.

Q. And did you hear Dr. Roush testify that he believes the reduction reaction will be complete before 0.5 molar equivalents of hydrogenating agent have been added?

A. Yes, I did.

Q. Do you agree with those opinions?

A. No, I don't.

Q. Why not?

A. Well, we talked a lot about rates in this -- in -- or we heard a lot about that. And I -- I think it's pretty clear that this reaction will -- will go to a high level of

conversion, but the rate is proportional to the amount of residual ketone that is present in real time in the solution.

As TLV-III is converted to tolvaptan, the concentration of TLV-III decreases. As the concentration of TLV-III decreases, the rate in real time decreases as well. And so I -- I'm not convinced that the reaction will proceed to a point of completion at 0.5 equivalents added sodium borohydride.

Q. Okay. Earlier today we heard Dr. Roush talk about adding boluses and adding things at different times.

Based on the materials you've seen, have you seen any Lupin experiment or process where the sodium borohydride wasn't added all at once or uniformly over time?

A. I haven't seen any evidence for that.

MR. ZIMMERMAN: If we could go to your slide DDX-2.20.

THE COURT: I'm sorry. The last question and answer -- I may not have heard the question right.

Can you just take your answer and tell me as more of a statement of fact what you were saying?

THE WITNESS: Sure, Your Honor.

Would you mind repeating the question, just so I make sure I got this right?

BY MR. ZIMMERMAN:

03:04:52 Q. In the experiments you saw, was the sodium borohydride added all at once or as a uniform addition over time as opposed to unequal boluses of any type?
03:05:09 A. Got it.
03:05:11 THE WITNESS: Yeah. I'm sorry if I was unclear.
03:05:13 THE COURT: I think it was the question.
03:05:14 BY MR. ZIMMERMAN:
03:05:15 Q. Dr. Dichtel, the question is the problem. Let me ask you this --
03:05:17 THE COURT: No, no. I think I get the question now. That wasn't the same question you asked a minute ago.
03:05:23 BY MR. ZIMMERMAN:
03:05:23 Q. Did you see experiments where Lupin added the sodium borohydride all at once?
03:05:31 A. Yes, I believe I saw experiments where Lupin did that.
03:05:34 Q. Okay. And did you see experiments or exhibit batches where Lupin added sodium borohydride uniformly over a period of time?
03:05:43 A. Yes, that's my understanding. For some of their experiments.
03:05:46 Q. Did you see any experiments where Lupin added sodium borohydride in some other fashion than those two?
03:05:52 A. I don't recall seeing any of Lupin's experiments described as being done in that way.

Q. Okay.

MR. ZIMMERMAN: Did that clarify it, Your Honor?

THE COURT: Yes.

MR. ZIMMERMAN: Okay.

Looking at Slide DDX-2.20.

BY MR. ZIMMERMAN:

Q. Dr. Dichtel, can you summarize your opinions regarding non-infringement?

A. Yes. First, that there's no dispute that in Lupin's DMF process, at least 1.2 molar equivalents of sodium borohydride must be added.

It's also possible that Lupin may use more than 1.2 molar equivalents of sodium borohydride, but there's no option to add less than that.

In Lupin's DMF process, all of the ketone precursor can be reduced to tolvaptan.

And, finally, I have seen no evidence or reason that the reduction reaction in Lupin's DMF process will stop or end until the quench step, after all 1.2 molar equivalents have been added.

Q. Okay. Dr. Dichtel, I'd like to now shift to your opinions regarding invalidity.

MR. ZIMMERMAN: If we could look at DDX-2.21.

BY MR. ZIMMERMAN:

Q. Can you generally summarize your invalidity opinions?

A. Yes. My opinions regarding invalidity are that Claims 7, 8, and 10 of the '735 patent would have been obvious to a person of ordinary skill in the art. I also believe that Claims 1, 2, 4, and 5 of the '730 patent would have been obvious to the person of ordinary skill in the art.
Q. Now, did you form an opinion regarding the qualifications of the person of ordinary skill in the art?
A. Yes, I did.
MR. ZIMMERMAN: If we could go to your next slide DDX-2.20 -- 2.22. My mistake.
BY MR. ZIMMERMAN:
Q. Can you please explain your opinions regarding the qualifications of a person of ordinary skill in the art?
A. Yes. Based on the patents at issue, the other documents in this case, my -- my experience as a chemist, I feel that a person of ordinary skill would be one who holds a doctoral degree in chemistry, medicinal chemistry, organic or synthetic chemistry, or a related field, and have at least two years of experience in the synthesis research and development of medicinal compounds.
I feel that a person of ordinary skill may have an education level lower than that if they have commensurately more experience. I -- I feel that a POSA may have also worked as part of a multidisciplinary team and

drawn upon the overall experience of the team, in addition to his or her own skills.

And then, finally, I -- I understand that the earliest possible effective filing date for the asserted patents is September 2nd, 2005. And so that's the date that I used for my analysis.

Q. Okay. And do you understand that Dr. Roush has a different definition of the person of skill in the art?

A. I do.

Q. And how do your opinions with respect to the person of skill in the art differ from those of Dr. Roush?

A. Dr. Roush specified that a person of ordinary skill would -- would also have experience in the large-scale or industrial-scale synthesis of a pharmaceutical product, if I'm paraphrasing correctly.

MR. ZIMMERMAN: If we could go to your next slide, DDX-2.23.

BY MR. ZIMMERMAN:

Q. Can you explain why you disagree with Dr. Roush's opinion?

A. I disagree because the asserted claims are not limited to large-scale synthesis or purification. So, I think that small-scale synthesis and purification is also relevant to these claims.

And the -- and the specification of these

patents is also not limited to large-scale synthesis or purification of -- of many examples of that point. I've just shown one here where there's -- there's a synthesis conducted here on the scale of 2.5 grams, which I -- I don't believe any person of ordinary skill would consider that large scale or industrial scale.

Q. Now, would any of your opinions regarding invalidity of the asserted patents change if we were to apply Dr. Roush's definition of the person of ordinary skill in the art?

A. No, they would not.

Q. Now, do you have experience with the synthesis and purification of organic compounds?

A. Yes. As -- as I described earlier in my testimony, I have extensive experience in the synthesis and purification of organic compounds dating all the way back to, really, my time as an undergraduate, and certainly with my -- my own experience in my scientific training. And then as -- as a professor in mentoring others who are performing these kinds of syntheses and purification processes every day.

Q. And do the courses you teach cover medicinal compounds or medicinal chemistry topics?

A. Yes. I teach graduate courses and undergraduate courses in organic chemistry, and we draw upon medicinal chemistry examples quite frequently.

Q. Have you ever personally synthesized or purified medicinal compounds?
A. No, I have not.
Q. And have you purified and synthesized compounds -- organic compounds that are similar to medicinal compounds?
A. Yes. A lot of the organic synthesis that I have done and that I supervise really focuses on compounds that are similar molecular weight, similar structural characteristics, similar characterizations, or similar properties in -- in how they react and -- and then similar processes are used to purify them as well.
Q. Have you ever consulted for a pharmaceutical company?
A. Yes, I have.
Q. And what company was that?
A. I consulted for a pharmaceutical company named Relypsa.
Q. And what did you do for them generally?
A. Generally, over the course of one to two years, I provided advice for -- to them on one of their drug candidates.
Q. Now, based on your background and experience, and your study of the materials in this case, are you comfortable opining on the validity of the asserted patents from the perspective of a person of ordinary skill in the art?

A. Yes. I feel comfortable doing that.

Q. And in your assessment, does the validity of the asserted patents depend primarily on chemical principles unique to medicinal chemistry or medicinal compounds?

A. No. I feel like the relevant -- I feel that the relevant issues here are more broadly applicable and are shared among organic compounds more broadly defined than that.

Q. And the hydrogenation reaction or the reduction reaction that we're looking at, is that unique to the medicinal context?

A. Far from it. It's used throughout organic chemistry.

MR. ZIMMERMAN: Okay. If we could go to your next slide, DDX-2.24.

BY MR. ZIMMERMAN:

Q. Can you explain the bases for your invalidity opinions?

A. Yes. The bases for my invalidity opinions for Claims 7, 8, and 10 of the '735 patent, I believe they would be obvious to a person of ordinary skill over, first, the prior art *Kondo* reference in view of the background on general knowledge of the person of ordinary skill, as well as the *Kondo* reference in view of *Watthey* or *LeClerc*.

And for the seven -- for Claims 1, 2, 4, and 5 of the '730 patent, I believe they would be obvious to a

person of ordinary skill over *Kondo* in view of the background or general knowledge of a person of ordinary skill.

Q. I'd like to start with the '735 patent.

I'll let you take a moment and get water.

A. Thanks.

MR. ZIMMERMAN: If you'd turn to JTX-005.

BY MR. ZIMMERMAN:

Q. Can you tell me what this document is?

A. Yes. JTX-005, I'm there.

Q. Can you tell me what the document is?

A. Yes. This is the *Kondo* reference.

Q. And does the reference identify what group *Kondo* was a part of?

A. Yes. *Kondo* is identified as part of Otsuka.

MR. ZIMMERMAN: And if we could go to your next slide, DDX-2.25.

BY MR. ZIMMERMAN:

Q. Can you explain what the *Kondo* reference describes?

A. *Kondo* describes the synthesis and promising pharmacologic properties of tolvaptan. There's the long compound name in the title, and it's also denoted as OPC-41061, as well as the -- the sodium borohydride reduction strategy that we've been talking about for most of this matter.

Q. So were the asserted patents the first publication to disclose tolvaptan?

A. No, they were not.

MR. ZIMMERMAN: If you turn to JTX-051.

BY MR. ZIMMERMAN:

Q. What is this document?

A. Okay. I'm there.

Q. What is this document?

A. Oh, I'm sorry. JTX-051 is a regulatory document submitted by Otsuka that describes patents related to tolvaptan.

Q. And if we go to DDX-2.26, are these excerpts from that patent submission, JTX-051?

A. Could you repeat the exhibit name, please?

Q. JTX-051.

A. Okay.

Q. Is what's shown on the Slide DDX-2.26 excerpts from that?

A. Sure. Just a second.

Sorry, got a little bit ahead of myself here.

Yes, these are excerpts from that -- from that exhibit.

Q. And what did the excerpts show?

A. These show a patent, the '510 patent that is related to tolvaptan. It was issued in 1993, a little over 30 years

ago, and 12 or so years before the patents at issue in this case.

Q. And if you look at JTX-043, is this the '510 patent referred to in that submission?

A. Yes, this is the '510 patent.

MR. ZIMMERMAN: If we turn back to *Kondo*, JTX-005, and if we could look at your next slide, DDX-2.27.

BY MR. ZIMMERMAN:

Q. Can you describe what *Kondo* discloses in more detail?

A. Yes. So shown here on the slide is an excerpt from *Kondo*. In particular, it focuses -- it shows *Kondo's* synthetic strategy for tolvaptan. The text descriptions, the top one is for tolvaptan itself. Here, it's listed as Compound 32. And you can also see that it's again listed as its OPC-41061.

*Kondo* says, "Using the same procedure as for 20, 32 tolvaptan was obtained as colorless prisms from 29C." 29C is the ketone precursor. And then if you look down at 20, we can see that -- the procedure that was adopted for the sodium borohydride reduction.

Q. And does *Kondo* disclose how many molar equivalents of sodium borohydride it uses in the reduction reaction?

A. Yes. So if you look at 20 and you do the math for how much sodium borohydride is there versus its ketone precursor, which I believe is 12A there, that would

correspond to 1.5 moles of sodium borohydride per mole of its ketone precursor.

So, therefore, in transferring that back to the tolvaptan procedure, one would also -- this would indicate that *Kondo* used -- also uses 1.5 equivalents of sodium borohydride when reducing the ketone precursor to tolvaptan.

Q. Now, *Kondo* doesn't expressly say the 1.5 molar equivalents, does it? You have to do the math; correct?

A. That's correct.

Q. Now, did you prepare a slide showing how the tolvaptan synthesis in *Kondo* compares to the asserted claims in the '735 patent?

A. Yes, I did.

MR. ZIMMERMAN: If we could bring up your next slide, DDX-2.28.

BY MR. ZIMMERMAN:

Q. How does the tolvaptan synthesis disclosed in *Kondo* compare to the claims of the '735 patent that are asserted?

A. So *Kondo* discloses every aspect of the claims of the '735 patent with the exception of the amount of sodium borohydride used. *Kondo* used 1.5 moles per mole of its ketone precursor, and the process of the '735 patent uses ranges of 0.25 to 1 or 0.25 to .5.

Q. And in your assessment, would it have been obvious to a person of skill in the art, based on his or her

background, to modify the amount of sodium borohydride used in *Kondo's* tolvaptan synthesis to the ranges claimed in the '735 patent?

A. In my opinion, yes.

Q. If we could turn to DTX-2060. What is this document?

A. Okay. DTX-2060 is a review article by H.C. Brown, who is a very notable boron chemist. It describes the historical development and use of sodium borohydride as a reducing agent. This article was published in 1978, and even starting from a perspective of 1978, it says that these had already been known for four years.

Q. Okay. And did you have a slide prepared depicting the molecular structure of sodium borohydride?

A. Yes, I did.

MR. ZIMMERMAN: If we could go to your next slide, DDX-2.29.

BY MR. ZIMMERMAN:

Q. What about sodium borohydride structure is particularly relevant to your invalidity opinions, if anything?

A. Well, this is a ball-and-stick model of the borohydride anion, and it shows the fact that the borohydride anion contains four hydrogens. Each reduction reaction transfers one of those hydrogens from sodium borohydride to the ketone precursor.

03:22:33 And so a POSA would be aware that one equivalent of sodium borohydride can, in principle, reduce up to four equivalents of the ketone precursor.

03:22:43 Q. And can you explain this relationship between the amount of sodium borohydride and the target ketone in terms of molar equivalents?

03:22:52 A. Sure. This means that 0.25 moles of sodium borohydride can reduce up to one mole of ketone precursor.

03:23:04 Q. How would a chemist refer to amounts greater than 0.25 molar equivalents of sodium borohydride relative to the ketone precursor?

03:23:14 A. In my own words, I would call it a molar excess of reducing equivalents.

03:23:22 MR. ZIMMERMAN: If we could go to your next slide, DDX-2-30.

03:23:24 BY MR. ZIMMERMAN:

03:23:27 Q. This is the reduction of the ketone precursor to tolvaptan that we've been looking at.

03:23:32 Can you explain this reaction to us?

03:23:34 A. Yes. So this -- this is the -- this is the reduction of ketone precursor to tolvaptan as we've seen a few times. The ketone precursor is known as a 5-oxo benzazepine compound. The benzazepine ring is a 7-membered ring containing a nitrogen and a benzene ring fused onto that structure.

I've highlighted that in yellow on the TLV-III structure. And then the 5-oxo group refers to the ketone. It's on the fifth position of the ring, hence 5-oxo. A ketone is a functional group that is a carbon that is bonded to two other carbons, as well as doubly bonded to an oxygen. And so that -- that's there in blue.

The reduction transforms TLV-III to a 5-hydroxybenzazepine. And so the benzazepine ring, again highlighted in yellow, is preserved.

The -- now we've got a 5-hydroxy group that's shown there in pink. The carbon that is attached to that OH group still has the original bonds to its two carbons, but now it only has a single bond to the oxygen.

And so the fourth bond to that carbon is now a hydrogen. And it's that hydrogen that came from the sodium borohydride to -- in the process of the reduction reaction.

Q. The asserted claims of the '735 patent recite a range of .25 to 1 molar equivalents and .25 to .5 molar equivalents of sodium borohydride relative to the ketone precursor.

Do you consider the claimed ranges to recite a molar excess of reducing equivalents?

A. Yes, I do. The 0.25 figure exactly is not in excess, but every value above that is -- potentially represents a molar excess of reducing equivalents.

Q. Would a person of skill in the art have understood and been familiar with these concepts that we've been discussing relating to sodium borohydride reduction reactions and the relative amounts of hydrogenating agent to ketones in these reactions?
A. Yes. These issues of stoichiometry and reactivity of sodium borohydride are taught in introductory organic chemistry to freshmen and sophomores.
Q. Now, would a person of ordinary skill in the art have known that the amount of sodium borohydride used in *Kondo* to reduce the ketone precursor to tolvaptan could be reduced to the claimed ranges of the '735 patent?
A. Yes. Again, a POSA would be very familiar with that possibility.
Q. Did you identify any examples in the prior art of the reduction of a ketone to an alcohol similar to the reduction of the ketone precursor to tolvaptan, using a hydrogenating agent in an amount within the ranges claimed in the '735 patent?
A. Yes, I did.
Q. And did you prepare slides of those examples?
A. Yes.
MR. ZIMMERMAN: If we could look at your first example, Slide DDX-2.31.
BY MR. ZIMMERMAN:

Q. What is shown here?
A. This shot -- this slide shows three patents issued to the Ciba-Geigy corporation. The inventor is listed as *Watthey*. I note they're all issued in the early to mid-1980s, well -- well before the patents at issue in this case.
Q. For the record, are those JTX-045, 046, and 047?
A. Yes.
Q. And you've reviewed each of those patents?
A. Yes, I did.
MR. ZIMMERMAN: If we could go to your next slide, DDX-2.32.
BY MR. ZIMMERMAN:
Q. What do the *Watthey* patents disclose?
A. The *Watthey* patents disclose a reduction reaction of a 5-oxo benzazepine compound, as shown in the structure there with the benzazepine and the 5-oxo ketone again highlighted, using sodium borohydride to obtain a 5-hydroxy benzazepine compound, also shown there. With the 5-hydroxy group highlighted in pink.
Q. And how many molar equivalents of sodium borohydride were used per mole of ketone precursor in the example you've highlighted from the *Watthey* patents?
A. The *Watthey* patents used 0.5 molar equivalents of sodium borohydride to conduct this reduction reaction.

Q. And if we could go to your next example, DDX-2.33, what are you showing here?
A. This is another patent issued to Laboratoires Alcon SA. The first inventor listed there is *LeClerc*. And it was issued in 1990, well -- well in advance of the patents at issue of the matter today.
Q. And this excerpt is taken from the *LeClerc* patent, JTX-048?
A. Yes.
MR. ZIMMERMAN: If we could go to your next slide, DDX-2.34.
BY MR. ZIMMERMAN:
Q. What does the *LeClerc* patent disclose?
A. The *LeClerc* patent discloses a reduction of a 5-oxo benzazepine derivative. Again, using sodium borohydride to make a 5-hydroxy benzazepine compound. The structures are shown on the slide and the ring system is highlighted again.
Q. And how many molar equivalents of sodium borohydride relative to the ketone precursor were used in this example from *LeClerc*?
A. *LeClerc* uses 0.76 moles of sodium borohydride per mole of its ketone precursor. I do note there's a slight -- what I assume is an arithmetic error in *LeClerc*. So when calculated, according to the weights, it's 0.76 molar equivalents.

Q. And in your opinion, are there reasons that a person of ordinary skill in the art would have been motivated to modify the amount of sodium borohydride used in *Kondo's* synthesis, in view of his or her knowledge or the *Watthey* or *LeClerc* references, to use the ranges recited in the claims of the '735 patent?
A. Yes.
Q. And did you prepare a slide summarizing those reasons?
A. Yes, I did.
MR. ZIMMERMAN: If we could go to your next slide, DDX-2.35.
BY MR. ZIMMERMAN:
Q. Can you explain those reasons?
A. Yes. In my opinion, a POSA would be motivated to reduce costs as well as simplify the post-processing of a reaction and improve its safety profile.
Q. How would lowering the molar equivalents of sodium borohydride have simplified post-processing?
A. Well, so we've talked about at the end of the reaction one needs to isolate the -- the products, here with tolvaptan, and by using less reagent, one can generate fewer by-products and more easily separate those by-products, potentially, from the desired substance.
Q. And how would lowering the amount of sodium

borohydride used in the reaction have improved safety?
A. Well, sodium borohydride is well known to pose risks of a fire or explosion, in the sense that it -- in addition to reducing ketones, it also can generate hydrogen gas.
Q. Okay. If you look at DTX-2232, what is this document?
A. 2232?
Q. Yes.
A. Yes. This is a material safety data sheet, or MSDS, for the compound sodium borohydride.
Q. And if you turn to JTX-041, what is this document?
A. This document is a National Oceanic and Atmospheric Administration data sheet that describes the safety considerations associated with the use of sodium borohydride.
MR. ZIMMERMAN: If we could go to your next slide, DDX-2.36.
BY MR. ZIMMERMAN:
Q. Does this show excerpts from the two documents we've just looked at, DTX-2232 and JTX-41?
A. Yes, they do.
Q. And what do these excerpts show?
A. Both of these excerpts show that it is well known that sodium borohydride reacts exothermically with water, and especially acidic water, to generate heat and hydrogen

gas simultaneously. And so the less of that one would have to do, the greater the safety profile of the reaction. The more -- you know, the best way to mitigate that risk is to never generate the hydrogen at all.

Q. Now, would a person of ordinary skill in the art have reasonably expected to successfully synthesize tolvaptan by modifying the amount of sodium borohydride used in *Kondo's* synthesis to the ranges claimed in the '735 patent?

A. Yes.

Q. And did you prepare a slide summarizing the basis for your opinion on expectation of success?

A. Yes, I did.

MR. ZIMMERMAN: If we could go to your next slide, DDX-2.37.

BY MR. ZIMMERMAN:

Q. Can you please explain the bases for your opinion regarding expectation of success?

A. Yes. So as I said a few minutes ago, reduction reactions using sodium borohydride are extremely well known for many decades before the asserted patents. Examples in the prior art of using the claimed amounts of sodium borohydride to reduce ketones were known and of compounds of very similar structure to that of the ketone precursor to tolvaptan.

And then, finally, I didn't identify anything

03:34:52 special about tolvaptan or competing chemical groups or in the solvents that were used that would really compete with that 5-oxo ketone group for the hydrides in sodium borohydride.
03:35:04 Q. Now, would a person of ordinary skill in the art have considered modifying the amount of sodium borohydride used in *Kondo's* synthesis to the amounts in the '735 patent to be routine optimization?
03:35:17 A. Yes.
03:35:20 Q. I'd like to go back to *Kondo*, JTX-005. In your assessment, is the tolvaptan synthesis that *Kondo* describes an industrial-scale or a large-scale synthesis of tolvaptan?
03:35:40 A. No. I don't believe so. Yeah, I mean, let me turn to it, but I believe that *Kondo* performs its tolvaptan synthesis on 93 milligrams of compound, if my memory serves.
03:36:03 Q. Now, would that discourage or dissuade a person of skill in the art from starting with *Kondo's* tolvaptan synthesis and modifying it to arrive at the claimed processes of the '735 patent?
03:36:15 A. No.
03:36:16 Q. Why not?
03:36:16 A. Well, a person of ordinary skill would recognize that *Kondo* was not focused on developing an industrial-scale synthesis of tolvaptan. It was -- *Kondo's* focus, very clearly, was to prepare enough of this compound to

characterize some of its pharmacologic properties. Nevertheless, a person of ordinary skill would still see the procedure in *Kondo* as a reasonable starting point to begin to develop such a process. *Kondo* doesn't criticize its tolvaptan synthesis in -- you know, it does not say that it -- you know, this is what we got, but it will never work in other contexts. There's really no language in there about that.

Q. Okay. Does *Kondo* report a yield relating to the reduction of the ketone precursor to tolvaptan?

A. Yes.

Q. And what is that yield?

A. That yield is 30 percent isolated yield of tolvaptan.

Q. Now, would that yield discourage or dissuade a person of ordinary skill in the art starting with *Kondo's* tolvaptan synthesis and modifying it to the ranges of sodium borohydride recited in the claims of the '735 patent?

A. No.

Q. Why not?

A. Well, a person of ordinary skill would recognize that *Kondo* already used more than enough sodium borohydride to accomplish this reaction, and so they could certainly reduce the amount of sodium borohydride used and still in principle get a high yield of the compound. They would also recognize that *Kondo*, again, was not focused on isolating every last

bit of the tolvaptan that it produced.

You know, the goals of the study were to obtain a sample of the compound so that it could be tested. And so a person of ordinary skill would look at *Kondo* and have, I think, a very reasonable expectation of success that they could optimize this procedure, both the reaction conditions and the purification process to improve the yield potentially dramatically.

Q. Could lowering the amount of sodium borohydride in *Kondo's* synthesis lower the yield and the reaction rate?

A. That is possible. Yes.

Q. And does that change your opinion that a person of ordinary skill in the art would have been -- would have reasonably expected to successfully synthesize tolvaptan by modifying the amount of sodium borohydride in *Kondo* to the ranges of the '735 patent?

A. Could you repeat the question? I just wanted to hear the phrasing again.

Q. Sure.

A. Sorry.

Q. The fact that *Kondo's* synthesis could result in a lower yield or slower reaction rate if you lower the amount of sodium borohydride, would that change your opinion that a person of skill in the art would have reasonably expected to successfully synthesize tolvaptan using *Kondo's* process but

the ranges claimed in the '735 patent?

A. No, it doesn't change my opinion.

Q. Why not?

A. Well, a person of ordinary skill, again, would know that *Kondo* was already using a molar excess of reducing equivalents. *Kondo* doesn't really comment on the rate of the reaction or, you know, the risk of slowing it down. And, again, *Kondo* is -- a person of ordinary skill would be pretty confident that they could take *Kondo* and modify -- potentially modify the synthesis, potentially modify the purification, likely both, to arrive at tolvaptan that suited their purposes.

Q. Okay. I'd like to turn now to the '730 patent.

THE COURT: So before we do that, why don't we take our afternoon break, and we'll come back at five minutes of 4:00. Okay?

MR. ZIMMERMAN: Sounds great.

DEPUTY CLERK: All rise.

(Recess was taken.)

DEPUTY CLERK: All rise.

THE COURT: All right. Let's be seated and continue.

BY MR. ZIMMERMAN:

Q. Dr. Dichtel, if we could turn now to the '730 patent. Let's turn to your next slide, DDX-2.38. What is your

opinion regarding the invalidity of the asserted claims of the '730 patent?

A. In my opinion, Claims 1, 2, 4, and 5 of the '730 patent would have been obvious to a person of ordinary skill in the art over *Kondo* in view of the background or general knowledge of the person of ordinary skill.

MR. ZIMMERMAN: If we could turn to your next slide, DDX-2.39, which shows Claims 1, 2, 4, and 5 of the '730 patent.

BY MR. ZIMMERMAN:

Q. Are these claims product-by-process claims?

A. Yes, they are.

Q. And, again, I know you're not a lawyer. What is your understanding of how the validity of product-by-process claims is assessed?

A. It is my understanding that while the -- the claims are limited by the described process if the validity is determined from the product itself. And so if the product is known in the prior art or obvious from a person of ordinary skill, then the claim or claims would be invalid.

Q. And did you prepare a slide highlighting the products that are the subject of Claims 1, 2, 4, and 5 of the '730 patent?

A. Yes, I did.

MR. ZIMMERMAN: If we could turn to your next

slide, DDX-2.40.

BY MR. ZIMMERMAN:

Q. Can you identify the products that are the subject of those claims?

A. Yes. There are two products that are associated with those four claims. The first one is a tolvaptan, which has that long compound name that's on the slide by 1, having a purity of more than 99.5 percent. And then the second product is tolvaptan which is substantially free from at least one of the four impurities listed there, which are known as Compound A, Compound B, Compound C, and Compound D.

Q. And is it your understanding that a Court -- the Court addressed the construction of the term "substantially free from" that is recited in Claim 2?

A. Yes.

Q. And did you prepare a slide summarizing the Court's construction?

A. Yes.

MR. ZIMMERMAN: If we could turn to your next slide, DDX-2.41.

BY MR. ZIMMERMAN:

Q. Can you please explain your understanding of the Court's construction of substantially free from?

A. Yes. I understand that the Court ruled that the references in the asserted patents to 0.01 percent and

0.03 percent provide support for what substantially free from means and provides guideposts to a person of ordinary skill to understand the boundaries of that phrase. For me, I then applied a standard of .03 percent or less as being what substantially free from means.

MR. ZIMMERMAN: If we could turn to your next slide, DDX-2.42, which is an excerpt from page 11 of JTX-005, the *Kondo* patent.

BY MR. ZIMMERMAN:

Q. I'm sorry, the *Kondo* reference.

Does *Kondo* disclose tolvaptan?

A. Yes, *Kondo* discloses tolvaptan.

Q. And does *Kondo* disclose the purity of its tolvaptan?

A. *Kondo* does not disclose a purity of its tolvaptan.

Q. Does *Kondo* disclose any information relevant to the purity of its tolvaptan?

A. Well, *Kondo* reports a melting point of its tolvaptan that's listed there, 225.9 degrees C. Normally, melting points are reported as a range. And a POSA reading *Kondo* and seeing *Kondo* specify a single number for the melting point and specifying the precision of that number to the 10th of a degree would -- would think that *Kondo's* tolvaptan was likely very highly pure.

Q. If the tolvaptan disclosed in *Kondo* did not have a purity of more than 99.5 percent or was not substantially

free from one of Compounds A through D identified in Claim 2 of the '730 patent, would a person of ordinary skill in the art have known techniques to purify *Kondo's* tolvaptan to those levels?
A. Yes.
Q. And what are those techniques?
A. Those techniques include recrystallization and chromatography.
Q. Can you please explain what "recrystallization" is?
A. Yes. Recrystallization is a purification method in which a target compound is dissolved in a solvent or a mixture of solvents at a concentration that is at saturation or close to saturation at an elevated temperature. That solution is cooled, and the target compound crystallizes from the solution and can be separated by filtration, and so that -- the impurities stay dissolved in the solution. And so that forms the basis for this purification method.
Q. And would a person of skill in the art have known solvents that were commonly used for recrystallization?
A. Yes. A person of ordinary skill would know many solvents. There would be methanol acetone, ethanol mixtures of -- I mean, there -- there are several solvents that are commonly used.
Q. And earlier you referred to "chromatography." Can you explain what chromatography is?

A. Yes. Chromatography is a purification method in which a -- that uses a stationary phase, usually in the form of a column, and a mobile phase, which is a solvent in liquid form.

The target compound is introduced to the top of the column of the stationary phase and then the mobile phase is passed through that column. As the mobile phase passes through the stationary phase, the impurities interact to a different degree than the target compound with that stationary phase. And so they -- they will then move through that column at a different rate than -- than the target compound. And so then at the end of the compound, the solution is collected and the -- the separation within that column forms the basis for isolating a more pure sample of the target compound. And as -- yeah. And that -- that's pretty much it.

Q. Okay. Now, do any of the references that we've discussed today refer to these purification techniques?

A. Yes.

Q. And did you prepare slides to explain the references that refer to these purification techniques?

A. Yes, I did.

MR. ZIMMERMAN: If we could turn to DDX-2.43.

BY MR. ZIMMERMAN:

Q. Can you explain what's shown here?

A. Yes. This is one of the synthetic procedures from the *Kondo* reference. It uses recrystallization for the purification of this compound. Here 20, but many of the *Kondo* procedures involve recrystallization.

MR. ZIMMERMAN: And if we could turn to your next slide, DDX-2.44.

BY MR. ZIMMERMAN:

Q. Can you explain what's shown here?

A. Yes. This is an excerpt from the *LeClerc* patent that we discussed -- or that I discussed earlier. This is from its 5-hydroxybenzazepine compound that -- that I showed. And *LeClerc* uses both chromatography and recrystallization to purify its product in this case.

Q. If you could turn in your binder to DTX-2120.

What is this document?

A. Could you give me the name of the exhibit one more time?

Q. Yes. DTX-2120.

A. 2120. Okay. There you go. I found it. Thank you.

Q. What is this document?

A. This is a review article by an author named Mann entitled "Some Considerations on the Use of Preparative Liquid Chromatography in the Pharmaceutical Industry." I note it was published in 1998, many years before the asserted patents.

MR. ZIMMERMAN: If you could turn to your next slide, DDX-2.45.

BY MR. ZIMMERMAN:

Q. Is this an excerpt from the Mann article, Page 1 of DDX -- DTX-2120?

A. Yes. So Mann in this -- in this portion of the article is noting that pharmaceutical products have certain purity requirements and that this chromatography method is gaining increased use.

Q. Now, are there reasons a person of ordinary skill in the art would have been motivated to purify the tolvaptan disclosed in *Kondo* to a purity of more than 99.5 percent or to be substantially free from Compounds A through D identified in the claims of the '730 patent?

A. Yes.

Q. And did you prepare a slide summarizing those reasons?

A. Yes, I did.

MR. ZIMMERMAN: If we could turn to your next slide, DDX-2.46.

BY MR. ZIMMERMAN:

Q. Can you explain why a person of skill in the art would have been motivated to purify *Kondo's* tolvaptan to the levels in the Claims 1 and 2 of the '730 patent?

A. Yes. A POSA would be motivated to purify tolvaptan

because *Kondo* identified tolvaptan as a promising pharmaceutical with -- with this desirable vasopressin and antagonistic activity. Pharmaceuticals require certain purity levels, and purifying *Kondo's* tolvaptan to these purity levels claimed in the patent would have been part of routine optimization by a person of ordinary skill.

Q. Now, did you identify any references that support your opinion that a person of ordinary skill in the art would have been motivated to purify *Kondo's* tolvaptan to the levels claimed in the '730 patent?

A. Yes, I did.

MR. ZIMMERMAN: If we could turn to DTX-2061.

THE WITNESS: Yes.

BY MR. ZIMMERMAN:

Q. What is this document?

A. This is a *Federal Register* that published in 1996. It is an FDA document providing guidance for the impurity levels of -- for the approval of new drug substances.

MR. ZIMMERMAN: And can you turn to the next document, DTX-2062.

THE WITNESS: Yes.

BY MR. ZIMMERMAN:

Q. What is this document?

A. This is another *Federal Register*, this one published in 2000. This is also an FDA document providing guidance

04:07:27 about impurity levels for those seeking the approval of new pharmaceuticals.

04:07:35 MR. ZIMMERMAN: If we could turn to your next slide, DDX-2.47.

04:07:36 BY MR. ZIMMERMAN:

04:07:41 Q. Does this show excerpts from the two *Federal Register* notices, DTX-2061 and 2062?

04:07:47 A. Yes, these are excerpts from those documents.

04:07:51 Q. And do these excerpts support your opinion that a person of ordinary skill in the art would have been motivated to purify *Kondo's* tolvaptan to the levels recited in Claims 1 and 2 of the '730 patent?

04:08:03 A. Yes. These -- these documents generally show that impurity levels associated with the asserted patents would -- would be required.

04:08:21 Q. And do the two FDA documents discuss quantification thresholds for impurities of less than .05 percent?

04:08:35 A. Yes, they do.

04:08:37 Q. And do they discuss reporting thresholds of .05 and .03 percent?

04:08:43 A. Yes. As you can see from the slide, yes.

04:08:48 MR. ZIMMERMAN: Now, if we turn to your next slide DDX-2.48.

04:08:51 BY MR. ZIMMERMAN:

04:08:53 Q. Is this an excerpt from the Mann article, DTX-2120,

that we looked at earlier?
A. Yes.
Q. Can you please explain what's shown here?
A. Yes. So Mann, writing in the late 1990s, notes that the required product purity of greater than 99 percent is the standard today. However, it can be observed that the trend is moving towards an even higher purity.
And, later, Mann shows or states if -- if there are unknown impurities present, they are not allowed to be at a level higher than 0.1 percent. And Mann anticipates that this limit might be lowered in the future to 0.05 percent or even lower.
Finally, Mann states that the -- that -- that the admissible total level of impurities at a value of approximately 0.5 percent is -- is discussed but more vaguely.
Q. And this was what Mann said in 1998; correct?
A. Yes, 1998.
Q. Now, would a person of ordinary skill in the art have reasonably expected to successfully purify *Kondo's* tolvaptan to achieve the purity levels recited in Claims 1 and 2 of '730 patent?
A. Yes.
Q. Can you explain why?
A. Yes. A person of ordinary skill would view purifying

the -- the tolvaptan of *Kondo* as routine optimization using recrystallization or chromatography, for -- for example.

*Kondo* does not note any particular impurity or any difficulty in -- in its tolvaptan synthesis that would cause a -- a person of ordinary skill to -- to be -- to avoid *Kondo* for that reason.

Q. And did *Kondo* disclose purifying tolvaptan using recrystallization?

A. Yes, *Kondo* purified its tolvaptan by recrystallization.

Q. Okay. Now, in your assessment, is the motivation to purify *Kondo's* tolvaptan inconsistent with a motivation to reduce costs and simplify post-processing steps?

A. No. I think all of those considerations are important in the development of a pharmaceutical product. The -- just because sometimes those might be at odds with one another doesn't mean that a POSA would -- would not have to simultaneously navigate them all and achieve certain levels of purity and -- and other -- and other desirable considerations for such a pharmaceutical synthesis.

Q. Now, could purifying *Kondo's* tolvaptan reduce the isolated yield of tolvaptan?

A. Yes, that's possible.

Q. And would that discourage or dissuade a person of ordinary skill in the art from purifying *Kondo's* tolvaptan

to achieve the levels recited in Claims 1 and 2 in the '730 patent?
A. No. Again, purification of pharmaceutical products is standard and routine. And so a POSA wouldn't view a potential loss in yield of that process as disqualifying.
Q. Now, would the fact that *Kondo* does not report the purity of its tolvaptan discourage or dissuade a person of skill in the art from starting with *Kondo's* tolvaptan and purifying it to the levels claimed in the '730 patent?
A. No.
Q. Why not?
A. Well, a person of ordinary skill would -- would first view the -- the application of those methods as -- as standard and routine and part of their -- their training and their -- their background knowledge.
*Kondo* doesn't note that the purification of tolvaptan is particularly challenging or that it failed from those considerations.
MR. ZIMMERMAN: If we could look at your next slide, DDX-2.49, which shows the Claims 1, 2, 4, and 5 of the '730 patent.
BY MR. ZIMMERMAN:
Q. Are you aware that Otsuka contends that structural and functional differences between tolvaptan made by *Kondo's* process and tolvaptan made by the claimed process exist

because the claimed process results in less amounts of a dechloro impurity?
A. Yes, I'm aware of that.
Q. Do you agree with that contention?
A. No, I don't.
Q. Are there any molecular differences between tolvaptan made by reducing the ketone precursor using 1.5 mole equivalent of sodium borohydride and tolvaptan made by reducing the ketone precursor using the claimed ranges of sodium borohydride?
A. No. Both of those syntheses produce tolvaptan.
Q. Now, the process limitations in the '730 patent are the same as those in the '735 patent; correct?
A. Correct.
Q. Okay. If the Court were to decide that the process limitations of the '730 patent should be considered for purposes of validity, would your analysis from the '735 patent, with respect to those limitations, apply?
A. Yes, it would.
MR. ZIMMERMAN: Your Honor, if I could approach with two binders.
THE COURT: Yes. I don't think I need that.
THE WITNESS: Thank you.
BY MR. ZIMMERMAN:
Q. I will make this easy, Dr. Dichtel, and then we'll

proceed to smaller pieces.

If you look at JTX-002, is this the prosecution history of the '735 patent?

A. Yes, it is.

Q. And if you look at JTX-004, is that the prosecution history of the '730 patent?

A. Yes.

MR. ZIMMERMAN: Okay. If we could go to DDX-2.50.

BY MR. ZIMMERMAN:

Q. Are those excerpts from those prosecution histories?

A. Yes, they are.

Q. And they're taken from JTX-2 at Page 1198 and JTX-4 at Page 95; correct?

A. Yes.

Q. Was the Patent Office aware of the *Kondo* reference when it was reviewing the applications that issued as the asserted patents?

A. Yes.

Q. And in both applications, did the Patent Office reject the pending claims over *Kondo* based on your review?

A. Yes, the Patent Office rejected the claims.

MR. ZIMMERMAN: If we could go to DTX -- DDX-2.51, your next slide.

BY MR. ZIMMERMAN:

Q. Are these excerpts from office action responses submitted by Otsuka at JTX-2 at Page 1501 and JTX-4 at Page 104?
A. Yes, they are.
Q. How did Otsuka's attorneys respond to the Patent Office's rejections of the claims in view of *Kondo*?
A. Otsuka's attorneys filed a declaration by Dr. Yukawa, who is an Otsuka employee, that claimed that there were differences between the *Kondo* reference and the claimed products.
MR. ZIMMERMAN: And if we could turn to your next slide, DDX-2.52.
BY MR. ZIMMERMAN:
Q. Is this the Yukawa declaration that was submitted in both prosecution histories at JTX-2, Page 1518, and JTX-4, Page 111?
A. Yes. This is -- this is an excerpt from that declaration.
Q. And did you review the entirety of the Yukawa declaration?
A. Yes, I did.
MR. ZIMMERMAN: If we go to your next slide, DDX-2.53.
BY MR. ZIMMERMAN:
Q. Can you explain what's shown here?

A. Yes. So this is an experiment labeled as Experiment II in the Yukawa declaration.

And Yukawa is describing what is purported to be a comparison between the -- the tolvaptan synthesis as described by *Kondo* versus the process that is associated with the assessed claims.

Q. And under Experiment II it reads, "In the same manner as described in the cited *Kondo, K., et al.*, reference, Page 1753, right column, first paragraph (as to Compound 32), using threefold molar amount of NaBH4 per one mole of the starting." And then there's a compound name; correct?

A. That's right.

Q. Now, does the *Kondo* reference describe a tolvaptan synthesis using three molar equivalents of sodium borohydride per one mole of starting ketone?

A. No, it does not.

Q. How much sodium borohydride does *Kondo* disclose for that reduction reaction on a molar equivalents basis?

A. *Kondo* uses 1.5 moles of sodium borohydride per mole of its ketone precursor.

Q. So in Experiment II, did Yukawa follow the procedure disclosed in the *Kondo* reference?

A. No, he did not.

Q. And what were the differences?

A. Well, the main difference is what is highlighted on

this slide. Yukawa used three equivalents of sodium borohydride, with three moles of sodium borohydride per mole of the starting ketone, which is twice as much as *Kondo* used in the actual procedure reported in the paper.

Q. Okay. In your reading, did Yukawa or any Otsuka representative tell the Patent Office that it was following *Kondo's* procedure, except that it was changing the amount of sodium borohydride used from 1.5 molar equivalents to three molar equivalents?

A. No. I don't see that language here.

Q. Now, in another part of the declaration, there's reference to *Kondo* using 1.5 molar equivalents; correct?

A. Yes.

Q. But not in connection with Experiment II, is there?

A. No, not in connection with Experiment II.

Q. Did you identify any other instance where Otsuka's representatives told the Patent Office that the amount of sodium borohydride used in *Kondo* was three molar equivalents?

A. Yes.

MR. ZIMMERMAN: If we could go to your next slide, DDX-2.54, which shows an excerpt of JTX-004, Page 106.

BY MR. ZIMMERMAN:

Q. Can you explain what's shown here?

A. This is a description of -- from Otsuka's attorneys in the -- I believe in the office action response. You can see in the highlighted portion they state, "That is, in *Kondo* et al.'s process, the molar ratio of sodium borohydride to Compound 1 was 3 to 1."
Q. Now, was that statement accurate?
A. No. *Kondo* used a ratio of 1.5 to 1.
Q. Is the use of three molar equivalents rather than 1.5 molar equivalents a meaningful difference, in your opinion?
A. In my opinion, yes.
Q. Can you explain why?
A. Yes. I think a lot of the -- you've heard a lot of testimony today about how the amount of sodium borohydride used has a meaningful impact on the results of the reaction, including the impurities that are formed.
And so certainly if one is then using twice as much sodium borohydride as the prior art reference, to me, that is a meaningful difference.
MR. ZIMMERMAN: If we could go to your next slide, DDX-2.55.
BY MR. ZIMMERMAN:
Q. Can you please explain what Yukawa stated regarding the conclusions for Experiment II with respect to purity?
A. Yes. Yukawa stated that when he used the procedure that he attributed to *Kondo*, albeit with far more sodium

borohydride, the tolvaptan obtained had a lower purity, listed at 99.3 percent.

And then later on, Yukawa compares that result to the tolvaptan synthesized by the claimed process, and that it had -- and noted that it had a higher purity of 99.5 percent.

Q. And in your assessment, are these statements accurate?

A. No.

Q. Why not?

A. Well, because Yukawa did not use the process that was described in the *Kondo* reference. And so the downstream conclusions from that are -- are inaccurate.

MR. ZIMMERMAN: If we could go to your next slide at DDX-2.56.

BY MR. ZIMMERMAN:

Q. What did Otsuka's attorneys argue to the Patent Office based on the declaration?

A. Otsuka's attorneys argued, you know, as highlighted in some of these excerpts, first, that the declaration of Dr. Yukawa clearly establishes that the product of the present claims is not the product produced according to the teachings of *Kondo*.

Later on they go on to say, "Dr. Yukawa concludes that the products of the claimed invention are

different than those described in *Kondo*, et al., and possess unexpectedly superior advantages that are not taught or suggested by *Kondo*, et al."

And then, finally, the declaration of Dr. Yukawa establishes that, "The product of the present claims is indeed different from, and not the less pure product produced according to the teachings of *Kondo*, et al."

Q. And in your assessment are these statements accurate?
A. No, they are not.
Q. Why not?
A. Here again, all of these statements are comparing the product of the asserted claims to the process reported in *Kondo*, but the experiment did not actually follow the procedure of *Kondo*.
Q. Did the Patent Office withdraw the rejections and allow the claims based on the Yukawa declaration and Otsuka's arguments?
A. Yes, they did.
Q. Now, could the Patent Office have figured out that *Kondo's* process used 1.5 molar equivalents of sodium borohydride and not three molar equivalents?
A. Yes, they could have figured this out. Perhaps by just looking at *Kondo*.
Q. And, again, they would have had to do the math to get to the 1.5; right?

A. That's true. Yes.
Q. Does that mean that Yukawa's and Otsuka's attorneys' statements to the Patent Office in the declarations and the office action response were accurate in your opinion?
A. No. Just because the Patent Office could have figured out if those statements were inaccurate doesn't mean that the statements were accurate.
Q. Now, Dr. Dichtel, if we could turn in your binder to JTX -- I'm sorry, DTX-2114. And if we could bring that document up on the screen.
Do you recognize this document?
A. Yes, I do. This is a translation of a monthly report from an Otsuka chemist named Fujita. It's dated December 1991.
Q. And if we go to Page 3. Is that where it identifies the author as Fujita?
A. Yes.
Q. And the date is December 1991?
A. That's right.
Q. And is Mr. Fujita one of the inventors listed on the asserted patents?
A. Yes.
Q. If we could look at the monthly report on Page 5. Do you see there's a tank scale study?
A. Page 5?

04:27:27 Q. .2.
04:27:29 A. .2. Yes.
04:27:39 Q. And if you go down in that section on to Page 7, Roman numeral VI, there's a reference to the sodium borohydride reflux?
04:28:00 A. Yes.
04:28:02 Q. Is that the reducing step we've been looking at today?
04:28:06 A. Yes, it is.
04:28:08 Q. And in this monthly report, Otsuka used two molar equivalents to do the reduction; correct, of sodium borohydride?
04:28:19 A. That's right.
04:28:22 Q. And if you look under that, did they identify any particular impurities?
04:28:29 A. Yeah. So in this experiment, Otsuka identified this dechlorinated impurity that has been mentioned earlier.
04:28:43 Q. Earlier in this trial?
04:28:44 A. Yes.
04:28:45 Q. Not earlier in this document; correct?
04:28:46 A. Yeah, I apologize. Yeah, earlier today.
04:28:54 Q. And is this the first mention of the dechloro impurity in this document?
04:29:01 A. To my knowledge, yes, it is.
04:29:06 Q. And based on your review of this document, did Otsuka

identify the dechloro impurity in their experiment that used 1.5 molar equivalents --

MR. GARRETT: Objection.

MR. ZIMMERMAN: -- of sodium borohydride?

MR. GARRETT: Objection, Your Honor. Dr. Dichtel has not opined on this issue on his previous deposition.

THE COURT: Can you repeat the question?

MR. ZIMMERMAN: Earlier in the document.

THE COURT: And, I'm sorry, you're referring to which document?

MR. ZIMMERMAN: DTX-2114.

Is the dechloro impurity identified in connection with the synthesis that uses 1.5 molar equivalents of sodium borohydride?

And, Your Honor, we believe this is covered in the reply invalidity report, Paragraph 3.

MR. GARRETT: It's not, Your Honor.

THE COURT: All right. Well, why don't you hand up the reply in the invalidity report, Paragraph 3, and I'll tell you what my opinion is.

MR. ZIMMERMAN: Your Honor, the copies that I have are marked, if that's okay.

THE COURT: Show them to counsel just to make sure that it's not a secret message or something.

MR. ZIMMERMAN: Paragraph 3. And then it's highlighting the paragraphs of Roush's response to. So this is Roush and this is what he's responding to.

MR. GARRETT: You just asked for this paragraph.

MR. ZIMMERMAN: Your Honor, the paragraph of Dr. Dichtel's report is responding to a paragraph in Dr. Roush's report. We have both of them for context, if that helps.

THE COURT: It might or it might not. What's the paragraph in Dr. Dichtel's report?

MR. ZIMMERMAN: He specifically --

THE COURT: Or Dr. Roush's report.

MR. ZIMMERMAN: He specifically says he's responding to Paragraphs 30 and 31.

THE COURT: Okay. Well, hand them up.

All right. Can you ask the question again?

MR. ZIMMERMAN: Yes.

BY MR. ZIMMERMAN:

Q. Dr. Dichtel, in DTX-2114, prior to the experiment that uses two molar equivalents, was the dechloro impurity identified in connection with the experiments that used 1.5 molar equivalents like *Kondo*?

THE COURT: I'm going allow that.

MR. GARRETT: Thank you, Your Honor.

THE COURT: Go ahead and answer the question, if

you remember it.

THE WITNESS: I believe it was not identified before that experiment that used two equivalents.

MR. ZIMMERMAN: I have two minor housekeeping issues, Your Honor.

BY MR. ZIMMERMAN:

Q. Dr. Dichtel, earlier we looked at the '510 patent, the Otsuka patent that issued in 1993.

A. Yes.

Q. Does that patent claim tolvaptan, the compound?

A. Yes, it does.

Q. Okay.

MR. ZIMMERMAN: And, Your Honor, we would move to admit JTX-002, JTX-004, JTX-005, JTX-12, JTX-14, JTX-15, JTX-17, JTX-19, JTX-20, JTX-41, JTX-43, JTX-45, JTX-46, 47, and 48. JTX-51. DTX-2060, -61 and -62. DTX-2114. DTX-2120. DTX-2146. And DTX-2232. All of which I believe are consented to.

THE COURT: All right. Well, they're admitted without objection.

(JTX Nos. 002, 004, 005, 12, 14, 15, 17, 19, 20, 41, 43, 45, 46, 47, 48, and 51 were admitted into evidence.)

(DTX Nos. 2060, 2061, 2062, 2114, 2120, 2146, and 2232 were admitted into evidence.)

MR. ZIMMERMAN: Your Honor, I have no further

questions at this time.

THE COURT: All right. I just had one. And, in fact, maybe since it's in evidence, you can just tell me. What's the date of the Dr. Yukawa declaration.

MR. ZIMMERMAN: The date? It was submitted multiple times, Your Honor. It is --

THE COURT: Then I guess the first time, roughly.

MR. ZIMMERMAN: Yeah. The date of signature. Give me one moment, Your Honor. It was signed, Your Honor, the 23rd day of January 2012. And that's at JTX-004, Page 121.

THE COURT: All right. Thank you.

Cross-examination.

Yes, Your Honor.

MR. GARRETT: May I approach, Your Honor?

THE COURT: Yeah.

CROSS-EXAMINATION

BY MR. GARRETT:

Q. Good afternoon, Dr. Dichtel.

A. Good afternoon.

Q. Nice to see you again.

A. Good to see you, too.

Q. All right. I'd like to pull up DDX-2.57. Okay. Now, Dr. Dichtel --

MR. ZIMMERMAN: Objection, Your Honor. This is a demonstrative that specifically wasn't used because they objected to it last evening. So it's - the demonstrative wasn't used on direct.

MR. GARRETT: Your Honor, it's showing the 1.5 experiment that Dr. Dichtel was just referencing two minutes ago that Your Honor allowed the testimony on.

THE COURT: Right. Right. Right. So, well, in any event, whether -- I don't know why they objected to it and -- but I don't see that I necessarily --

I take it you don't object to it other than the fact that they objected to it.

MR. ZIMMERMAN: I didn't have an objection. It's just it wasn't used in direct, Your Honor.

THE COURT: Okay. No problems. Go ahead.

BY MR. GARRETT:

Q. Dr. Dichtel, the experiment on the left here is the experiment that you were just referencing a couple minutes ago; is that correct?

A. Yes, that's correct.

Q. And that's an experiment from Fujita's December 1991 monthly report?

A. Yes.

Q. And a moment ago you testified that this experiment used 1.5 molar equivalents of sodium borohydride?

04:39:47 A. Yes.
04:39:50 Q. And you testified that the dechlorinated impurity was not seen?
04:39:55 A. I testified that there's no mention of it there.
04:39:58 Q. And you gave that testimony right after discussing the alleged inaccuracies in the Yukawa declaration?
04:40:08 A. Yes, those were the preceding questions.
04:40:10 Q. And you gave that testimony right after alleging that Otsuka's attorneys made misrepresentations to the Patent Office?
04:40:16 A. I said their statements were inaccurate.
04:40:20 Q. And you believe those statements are inaccurate in part because this experiment allegedly used 1.5 molar equivalents of sodium borohydride?
04:40:31 A. No. I believe the statements were inaccurate because the Yukawa declaration used three equivalents of sodium borohydride as compared to *Kondo's* 1.5 equivalents.
04:40:44 Q. But in terms of the relevance of that, you identified this experiment allegedly using 1.5 molar equivalents of sodium borohydride as an example where dechlorinated impurity was not shown; is that correct?
04:40:57 A. Yes. This is a piece of evidence that I used to support that opinion.
04:41:03 Q. How do you know that this experiment used 1.5 molar equivalents of sodium borohydride?

04:41:12 A. Well, I judge it based on what is written in by Fujita in this report.
04:41:21 Q. So specifically here on your demonstrative, which is DDX-2.57, you have highlighted $NaBH_4$, and then there's a (1.5 EQ); is that right?
04:41:37 A. That's right.
04:41:38 Q. That's the information that you're basing your conclusion on that this experiment used 1.5 molar equivalents of sodium borohydride?
04:41:45 A. Yes. That -- that's what I used to -- that -- that was the basis of that conclusion.
04:41:53 Q. And are you relying on any other information to arrive at the conclusion that this experiment used 1.5 molar equivalents of sodium borohydride?
04:42:02 A. No, that was -- that was the information. That was how I evaluated Fujita's description of this experiment.
04:42:11 Q. Okay. Now, before we go forward, I need to talk about some scientific -- some basic scientific terms.
04:42:22 So the patents-in-suit, they -- they refer to amounts of sodium borohydride; is that correct?
04:42:31 A. Yes.
04:42:35 Q. Molar equivalents of sodium borohydride?
04:42:37 A. Yes.
04:42:39 Q. And in the claims, the upper limit in Claim 1 of the '730 patent is 1 molar equivalent of sodium borohydride; is

that correct?
A. That's correct.
Q. Okay. Now, each sodium borohydride has 4 hydrides?
A. Yes.
Q. We saw the structure of the molecule earlier. And so for every sodium borohydride, you have 4 different hydrides?
A. Yes, that's correct.
Q. And so if you have 1 molar equivalent of sodium borohydride, that means you have 4 molar equivalents of hydrides; is that correct?
A. Yes, that's correct.
Q. Okay. And scientists sometimes refer to molar equivalents of hydride instead of referring to molar equivalents of sodium borohydride; is that correct?
A. I'm sure sometimes people define the term one way. Maybe -- you know, I'd have to see a specific example, but I think that if one was clear how it was stated, then yes, one could express the amount of -- reducing equivalents, I think, was the term that's been used earlier today.
Q. In this experiment that we're looking at on DDX-2.57, how do you know that the 1.5 equivalents is 1.5 equivalents of sodium borohydride and not 1.5 equivalents of hydride?
A. Mm-hmm. Well, I would infer that based on how that -- how the -- you know, how this reaction is expressed. If I were writing this or if one of my students were writing

a description of this, and they write the reagent itself sodium borohydride NaBH4 and then they write in equivalents, I would interpret that as them saying I used 1.5 equivalents of that amount of that compound.

Q. Now, Fujita is a scientist in Japan; correct?

A. As far as I know. I know he that he's an employee of Otsuka. I don't -- I -- I know he's writing in Japanese, yeah.

Q. Do you know the notation that Otsuka scientists use when they're referring to 1.5 molar equivalents of sodium borohydride or they're referring to 1.5 molar equivalents of hydride?

A. If -- I don't know exactly what -- if -- what Otsuka scientists use in their description.

Q. It's possible that Fujita here was -- in this experiment was referring to 1.5 equivalents of hydrides; isn't that right?

A. I can't eliminate that possibility, but when I see a description of a reaction like this, even, you know, even in the scientific literature which is not confined to Americans or native English speakers, I'm telling you that's how I would interpret it.

Q. Mm-hmm.

A. I can't completely discount that Otsuka has its own convention.

04:46:14 Q. And, Dr. Dichtel, if this was 1.5 molar equivalents of hydride, what would the molar equivalents of sodium borohydride be?
04:46:26 A. Well, so if this were 1.5 equivalents of hydride, one would divide that number by 4. I'm not very good at math, and under a high pressure situation, but it would be 1.5 divided by 4.
04:46:46 Q. 0.375 molar equivalents of sodium borohydride?
04:46:52 A. Okay. Yeah. That -- that seems to check out.
04:46:54 Q. And do you know that's about the amount of sodium borohydride that Otsuka uses to synthesize a tolvaptan in Jynarque?
04:47:00 A. I don't know the exact amount that Otsuka uses.
04:47:05 Q. So sitting here today, how sure are you that this 1.5 equivalents is sodium borohydride and not hydride?
04:47:14 A. Well, I can tell you that when I see that description, generally the convention is that you're talking about the compound itself. And if one wanted to specify reducing equivalents, I would expect someone to -- that notation to be clear such that one doesn't run into this kind of ambiguity.
04:47:39 Q. And I understand that, Dr. Dichtel, but I think my question was a little bit different. How certain are you that the 1.5 equivalents here is a reference to sodium borohydride and not hydrides?

04:47:52 A. Well, I -- I am not completely sure, but I am pretty sure, based on what I just told you, as to why I interpret that the way I do.
04:48:09 Q. Are you aware that Lupin is accusing Otsuka of inequitable conduct?
04:48:12 A. I am aware of that.
04:48:16 Q. Okay. Accusing three individuals of inequitable conduct?
04:48:19 A. Yes, I'm aware.
04:48:21 Q. Okay. And those allegations of inequitable conduct are based on statements in the Yukawa declaration in the prosecution; correct?
04:48:31 A. Yes, which I believe are inaccurate.
04:48:35 Q. Yes. And you will agree that the examiner would have been well aware of all of those statements in the Yukawa declaration because the examiner, as you said, could have just gone to *Kondo* and saw that *Kondo* used 1.5 molar equivalents?
04:48:50 A. I agree the examiner could have figured it out, yes.
04:48:54 Q. Okay. Well, we'll get to that in -- a little bit later. The Yukawa declaration actually explicitly discloses that *Kondo* used 1.5 molar equivalents of sodium borohydride in two different places?
04:49:08 A. I -- I am aware of at least one of them, and if you say there are two, right, and you want to show them to me,

04:49:17 I'm happy to look at them with you.
04:49:18 Q. So the examiner wouldn't even have to go to *Kondo* and do some math to figure out that *Kondo* used 1.5 molar equivalents. The examiner just had to read Yukawa because the Yukawa declaration explicitly disclosed it?
04:49:30 A. The Yukawa declaration does disclose that. But in the description of Experiment II, I actually think the wording is unclear.
04:49:44 Q. And we'll come back to that. That's a topic for another time.
04:49:47 A. Okay.
04:49:50 Q. Now, this monthly report is from December 1991?
04:49:56 A. Yes, it is.
04:49:58 Q. Okay.
04:50:00 MR. GARRETT: James, could we please pull up PTX-1017?
04:50:09 And if we could scroll down one more page. There we go. Thank you, James.
04:50:15 BY MR. GARRETT:
04:50:18 Q. Dr. Dichtel, this is Dr. Fujita's monthly report from January and February of 1992?
04:50:27 A. Yes.
04:50:31 Q. So that's one month after the last monthly report we were referring to?
04:50:37 A. Yes. This is -- this is -- yeah. January is one

month after December 1991. Yes.
Q. Okay. And -- and you've reviewed this document before?
A. I have, but I haven't looked at this portion of it in some time. So I'd -- if you're going to ask me very specific questions about it, I'll need to review it.
Q. Okay. So in this monthly report, Dr. Fujita reports the results of a number of experiments, similar to how he did in the prior monthly report; is that right?
If you'd like to take a moment and flip through.
A. Mm-hmm.
(Witness reviewing.)
MR. GARRETT: And, James, if we could go to the fifth page on this.
THE WITNESS: Okay. I've read it. Happy to walk through any questions you might want to ask me about it.
BY MR. GARRETT:
Q. So -- thank you, Dr. Dichtel.
So on the fifth page, there's a section that's titled "2. Investigation of the cause of the dechlorinated by-products." And, here, Dr. Fujita is conducting experiments to assess the cause of the dechlorinated impurity; is that correct?
A. Yes. That appears to be the -- the motivation here.

Mm-hmm.
Q. And he conducts a number of experiments, nine of them, I believe; is that correct?
A. Yes. I see nine subheadings here. I'm -- I'm not -- I guess, yeah, each one appears to be its own individual experiment. I think that's the case.
MR. GARRETT: Okay. So if we could -- sorry about the delay.
If we could look at Reaction 1 on Page 5.
THE WITNESS: Mm-hmm.
BY MR. GARRETT:
Q. Do you see this reaction, Dr. Dichtel?
A. Yes, I do. Mm-hmm.
Q. In this reaction, Dr. Fujita reports using "sodium borohydride (2 equivalents)."
Do you see that?
A. Yes, I do.
Q. Dr. Dichtel, is Fujita here referring to two equivalents of sodium borohydride or two equivalents of hydrides?
A. Well, Fujita doesn't list an amount. The translation lists it similarly to how I described in the previous example. And so my default would be to interpret this as two equivalents of sodium borohydride.
Q. Mm-hmm. And how certain are you?

A. I would have the same answer to that as your -- as when you asked me that question about the previous example.

You know, that -- my default when I see that is that it's -- it's two equivalents of sodium borohydride. But, you know, if Otsuka had a different convention for doing that, I can't completely discount that.

Q. But, Dr. Dichtel, how sure are you?

You said it was your default, but how sure are you? Are you 100 percent sure? Are you 90 percent sure? Or 30 percent sure? Because Lupin is accusing Otsuka of inequitable conduct; that's a serious allegation.

A. Yeah. I --

Q. Or Lupin is -- sorry. I think I got that backwards. Lupin is accusing Otsuka of inequitable conduct, and that's a serious allegation.

A. I -- I understand that, and I was evaluating this from the basis of whether statements were inaccurate or not. In terms of this experiment, you know, I -- like assigning a specific percentage is difficult for a matter like that, but I would say I'm like -- by saying it's my default, I would certainly say I'm more than 50 percent sure that that would be how the average chemist would describe an amount of sodium borohydride by writing it that way. Mm-hmm.

Q. And you're as sure for this reaction, Reaction 1, as you were for the last reaction we looked at in the December

04:56:33 report.
04:56:34 A. Well, I -- there is one difference here that I -- I
04:56:41 think could be important, and that is that the -- as far as
04:56:46 I know in this translation, these structures that are drawn,
04:56:50 I assume are in -- in the original drawings by Fujita
04:56:57 himself, whereas the italic text might be a translation.
04:57:04 Please tell me if I have that wrong.
04:57:05 But if -- if you -- you'd pull up the whole page
04:57:12 here, maybe you'll see what I'm talking about. Right. If
04:57:15 we just kind of -- I mean, we can zoom back in on this
04:57:19 later, but, you know, like, I'm referring to the structure
04:57:21 that's -- that's faint on the top of the slide. That's the
04:57:23 actual chemical scheme of the reaction.
04:57:27 Q. So just to make sure I understand, you're saying
04:57:31 because it looks like this is a translation and maybe not
04:57:33 original, that it -- there may be a difference there?
04:57:36 A. That -- that's what gives me pause because I think in
04:57:40 the Fujita -- you know, if we went back to the previous one,
04:57:42 what your question was: Are you -- are you -- do you have
04:57:45 the same level of certainty, or, you know, something to that
04:57:48 effect. And the -- I'm not -- I'm not saying that one is
04:57:54 totally certain and the other one is not, but I am saying
04:57:57 that I believe the previous example was drawn in Fujita's
04:58:01 own hand saying 2.0 equivalents. It, you know, appears to
04:58:07 be written in pencil or what -- the longhand of the

scientist himself. Whereas if the italics is a translation, I don't know where that was translated from. So it's a little harder -- you know, like, to me, there's a slightly lower sense of certainty in evaluating this example as compared to before.

Q. Mm-hmm. Dr. Dichtel, are you aware that your counsel had an opportunity to object to the translations of these documents and there were no objections?

A. I -- sure. I'm aware that there's a process by which these exhibits are -- are approved. But -- but, again, like, you're showing me what's written on here and asking me how I feel certain, you know, like, do I feel certain about this versus another thing, I'm just evaluating what's in front of me. I don't -- I don't know who objected to what, when, prior to our conversation today.

Q. And, Dr. Dichtel, if this experiment was two equivalents of hydrides, how many equivalents of sodium borohydride would it be?

A. Well, so if this were hydride equivalents, it would be two divided by four. So I'm comfortable with that math and I would say that that's 0.5.

Q. Thank you.

MR. GARRETT: All right. Could we next go to PTX-1006. And then if we could go to Page 108.

A. PTX-1006?

04:59:51 Q. Yes.
04:59:52 A. And then was there -- there's a page number?
04:59:54 Q. That's right. It was 108.
04:59:58 A. 108.
05:00:04 MR. GARRETT: And if we can zoom in, James, in this upper right-hand corner.
05:00:06 BY MR. GARRETT:
05:00:17 Q. So feel free to look at the entire page, Dr. Dichtel, but I will represent to you that this notebook page is the same Reaction 1 that we were just looking at in the monthly report. Okay?
05:00:33 A. Do you mean the December report or the January/February report.
05:00:37 Q. The January/February. So we were just looking at the January/February monthly report. We were looking at Reaction 1.
05:00:45 A. Okay.
05:00:45 Q. And it said NaBH4 (2 equivalents). Remember?
05:00:50 A. Yes.
05:00:51 Q. And you said you were fairly confident -- or whatever phrasing you used; I don't mean to put words in your mouth -- but you had a level of comfort that that was a 2 molar equivalents of sodium borohydride; correct?
05:01:05 A. Yes.
05:01:07 Q. So, now, Dr. Dichtel, if we look at this experiment,

do you see where Fujita again reports two equivalents here?
A. Yes, I see that.
Q. And that's -- you see NaBH4 here?
A. Yes.
Q. Uh-huh.
And then here, unlike the monthly report, Fujita provides additional details, doesn't he?
A. Yes. There -- there look to be amounts there. Mm-hmm.
Q. And, Dr. Dichtel, can you do the math and let us know, now that you have these numbers, whether the two equivalents is sodium borohydride, like you were fairly confident it was, or two equivalents of hydrides?
A. On the fly, I -- I don't know the molecular weight of sodium borohydride off the top of my head.
Q. If I could interrupt, Dr. Dichtel, I can make this easier, I think.
A. Okay. Sure.
Q. So the moles are already calculated for us. All we have to do is take moles of NaBH4, 1.120, and then compare them to the moles of the starting material, 2.138. And we see that there's about half as much of the sodium borohydride as the starting material; correct?
A. Yeah, the mil-to-mole comparison, I agree that the top number is just slightly less than twice the bottom

number.
Q. Yeah. And -- and that demonstrates that the 2.0 equivalents is 2.0 equivalents of hydrides. Doesn't it?
A. That's -- that's what it appears to show in that experiment, yes.
Q. So if we could go back now --
THE COURT: I'm sorry to cut you off here, but I have something else I need to do. So we're going to stop for the day. You can pick this up tomorrow morning.
Is there anything we need to address right now?
MR. ZIMMERMAN: Your Honor, I have just one clarification. I know that I'm not allowed to talk to a witness because he's in the midst of cross. Does that apply to the secondary considerations issues that he would be preparing in his next round?
THE COURT: I think it doesn't.
MR. ZIMMERMAN: Okay.
THE COURT: But I trust you to make sure you --
So do you understand what he's talking about, Doctor?
THE WITNESS: Yes, I understand.
THE COURT: Okay. All right.
Yeah, I think you can talk to him about the subject matter that's for -- I'm hoping it's the end of the day tomorrow, but whenever it is.

MR. ZIMMERMAN: Yes. Thank you, Your Honor.

THE COURT: All right.

MR. GARRETT: Nothing from Plaintiff. Thank you, Your Honor.

THE COURT: All right. And I'm just curious, but it seems to me that we're going along at a decent clip here. You-all -- when do you see this case ending based on what's happened so far?

MR. GARRETT: Sometime on Wednesday, Your Honor. I'm not sure we're going to wrap it up tomorrow.

THE COURT: Okay. All right. So if you get close to wrapping it up, I'll be happy.

MR. ZIMMERMAN: Your Honor, for planning purposes, my guess would be before -- before the lunch break on Wednesday.

THE COURT: Yeah, that's -- we don't need to -- it's helpful just to have the ballpark.

All right. So we'll be in recess until tomorrow morning. See you all at 8:30.

DEPUTY CLERK: All rise.

(Court was recessed at 5:04 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi
Certified Merit and Real-Time Reporter
U.S. District Court