IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

OTSUKA PHARMACEUTICAL CO., LTD., )
)
Plaintiff, )
) C.A. No. 21-900(RGA)
v. )
) TRIAL VOLUME II
LUPIN LIMITED and LUPIN )
PHARMACEUTICALS, INC., )
)
Defendants. )

J. Caleb Boggs Courthouse
844 North King Street
Wilmington, Delaware

Tuesday, December 19, 2023
8:34 a.m.
Bench Trial

BEFORE: THE HONORABLE RICHARD G. ANDREWS, U.S.D.C.J.

APPEARANCES:

MORRIS NICHOLS ARSHT & TUNNELL LLP
BY: JEREMY A. TIGAN, ESQUIRE

-and-

VENABLE LLP
BY: JOHN D. MURNANE, ESQUIRE
BY: JOSHUA I. ROTHMAN, ESQUIRE
BY: BECKY E. STEEPHENSON, ESQUIRE
BY: ZACHARY L. GARRETT, ESQUIRE
BY: STEPHEN KRACHIE, ESQUIRE
BY: CAMILLE H. MANGIARATTI, ESQUIRE

For the Plaintiff

APPEARANCES CONTINUED:

RICHARDS LAYTON & FINGER, P.A.
BY: FREDERICK L. COTTRELL, III, ESQUIRE
BY: ALEXANDRA M. EWING, ESQUIRE

-and-

KNOBBE MARTENS OLSON & BEAR, LLP
BY: WILLIAM R. ZIMMERMAN, ESQUIRE
BY: JARED BUNKER, ESQUIRE
BY: CAROL PITZEL CRUZ, ESQUIRE
BY: MATT FRIEDRICHS, ESQUIRE

For the Defendants

08:18:57
08:18:57
08:18:57
08:18:57

*** PROCEEDINGS ***

08:20:48
08:20:49 DEPUTY CLERK: All rise. Court is now in
08:27:01 session. The Honorable Richard G. Andrews presiding.
08:34:14 THE COURT: All right. Everyone be seated. And
08:34:20 let's continue.
08:34:26 MR. ZIMMERMAN: Your Honor, could we recall
08:34:29 Dr. Dichtel to the stand?
08:34:30 THE COURT: Yes.
08:34:32 MR. ZIMMERMAN: Dr. Dichtel.
08:34:57 MR. GARRETT: Your Honor, yesterday I handed out
08:35:00 a binder with documents related to validity. I had a binder
08:35:05 with infringement. Since we went over it yesterday, we've
08:35:08 now consolidated those binders. So may I approach with new
08:35:14 binders for you?
08:35:15 THE COURT: New binders to replace the old
08:35:17 binders?

MR. GARRETT: Yes, sir.
THE COURT: Okay.
MR. GARRETT: Thank you, Your Honor.
THE COURT: All right.
THE WITNESS: Now, this is everything then for this testimony?
MR. GARRETT: I'm sorry, I'm still working on the other copies.
THE WITNESS: Your Honor, I'm not sure who to ask, but this water jug is empty.
THE COURT: All right.
THE WITNESS: It never got refilled. It's not an emergency. Just at some point --
THE COURT: All right. Well, we'll get some more water in there.
THE WITNESS: Yes. Thank you.
THE COURT: You may start, Mr. Garrett.

CONTINUATION OF CROSS-EXAMINATION

BY MR. GARRETT:
Q. Good morning, Dr. Dichtel.
A. Good morning.
MR. GARRETT: James, could we please start with JTX-004? And if we could go to Page 112.
BY MR. GARRETT:
Q. Dr. Dichtel, on JTX-004 at Page 112, we're looking at

08:36:38 the Yukawa declaration?
08:36:40 A. Okay. Is that in this binder or is that --
08:36:43 Q. Yes. It should be. It's also on the screen.
08:36:48 A. Okay. Oh, 004, yeah. I see it now. Thank you. And
08:36:52 page?
08:36:52 Q. 112.
08:36:54 A. 112.
08:37:03 Okay. I'm with you now.
08:37:05 Q. Now, near the bottom of the page, the last three
08:37:12 lines, do you see where Dr. Yukawa states, "While the
08:37:18 process of the cited *Kondo, et al.* reference was carried out
08:37:22 using the hydrogenating agent NaBH4 in an amount of 1.5 fold
08:37:29 mol to the starting compound"?
08:37:31 A. Yes, I do.
08:37:33 Q. The Patent Office examiner who reviewed this
08:37:36 declaration would have known that the *Kondo* reference used
08:37:39 1.5 molar equivalents of sodium borohydride?
08:37:42 A. Yes. That's what this language says.
08:37:45 Q. If we could turn to Page 116.
08:37:53 And we're still in the Yukawa declaration; is
08:37:57 that correct, Doctor?
08:37:58 A. Yes, sir.
08:38:00 Q. And if we could look at the first paragraph, the last
08:38:04 two lines. Do you see where it says, the last two lines,
08:38:12 "Dr. Yukawa discloses which is much higher than the yield

08:38:15 (30 percent) in the process of *Kondo, et al.* using NaBH4 of
08:38:21 1.5 fold mole to 1 mole of the starting compound."
08:38:26 Is that correct?
08:38:29 A. Yes, that's what that says.
08:38:35 Q. So this is the second instance where Dr. Yukawa
08:38:38 discloses that *Kondo* used 1.5 molar equivalents of sodium
08:38:44 borohydride?
08:38:44 A. Yes.
08:38:46 MR. GARRETT: And if we could zoom out on this
08:38:49 page, James. Thank you.
08:38:51 BY MR. GARRETT:
08:38:51 Q. And then on this very same page, Doctor, do you see
08:38:56 below the last full paragraph, it starts with "in the
08:39:01 same" -- "in the same manner"?
08:39:04 A. Yes, I do.
08:39:06 Q. Now, yesterday you provided testimony on this
08:39:11 statement, "in the same manner, as described in the cited
08:39:15 *Kondo, et al.*, using 3-fold molar amount of sodium
08:39:21 borohydride."
08:39:21 Do you recall that testimony?
08:39:22 A. I do.
08:39:24 Q. Now, in this portion of the declaration, Dr. Yukawa
08:39:29 is representing that this experiment represents similar
08:39:33 conditions to *Kondo*, except for three equivalents of sodium
08:39:39 borohydride is used.

08:39:44 A. Is that a question? You're asking me if -- if --
08:39:48 Q. Yes. I can restate the question.
08:39:50 A. Yes, please.
08:39:51 Q. So, Dr. Dichtel, isn't it true that in this sentence,
08:39:57 Dr. Yukawa is representing that this experiment represents
08:40:01 similar conditions to *Kondo*, except for three equivalents of
08:40:05 sodium borohydride is used?
08:40:08 A. Well, I think the language is more ambiguous than
08:40:11 that in that Yukawa does not say "except using 3 fold molar
08:40:17 amount of sodium borohydride." So if someone were looking
08:40:20 at this, they might interpret this a different way, that
08:40:25 *Kondo* indeed used a 3 fold molar amount of sodium
08:40:28 borohydride, based on how this is written.
08:40:31 Q. Doctor, do you recall you gave a deposition in this
08:40:35 matter?
08:40:35 A. Yes.
08:40:51 MR. GARRETT: Your Honor, may I approach?
08:40:53 THE COURT: Sure.
08:41:09 BY MR. GARRETT:
08:41:14 Q. All right. And Dr. Dichtel, if you could turn to
08:41:23 Page 241. And if we could focus on line 14. If you could
08:41:31 let me know when you're there, Doctor.
08:41:35 A. Line 14, Page 241. Yes, I see it.
08:41:54 Q. So at Page 241, line 14, it reads:
08:41:59 "QUESTION: So here Yukawa is reporting that

he's performing an experiment in the same manner as *Kondo*, except that he is using a 3 fold molar amount of sodium borohydride, right?"

Then there was an objection. And then:

"ANSWER: It definitely -- Yukawa definitely states that that is the intention of the experiment in this paragraph, and then there's a description. I'd have to compare very closely to *Kondo* or look at my report for specific differences. But, you know, Yukawa is representing that this -- that this experiment represents similar conditions to *Kondo* except for three equivalents of sodium borohydride is used."

Doctor, were you asked that question, and did you give that answer at your deposition?

A. Yes, I did.

Q. Okay. Thank you.

MR. GARRETT: James, if -- could we put -- look at JTX-16.

And if we could go to Page 5.

BY MR. GARRETT:

Q. If you'd let me know when you're there, Dr. Dichtel.

A. JTX-16, Page 5. Yes, I'm there.

Q. All right. This document is one of Lupin's DMF documents?

A. Yes. That appears to be so.

08:43:45 Q. Okay. And do you see the impurity name on this page listed as TLVRC-1?
08:43:54 A. Yes.
08:43:55 Q. And that is the deschloro tolvaptan?
08:43:59 A. Yes.
08:44:03 Q. I'm going to ask you a few questions about the TLVRC-1. You'll agree that that is the deschloro tolvaptan?
08:44:10 A. Yes, I agree.
08:44:11 Q. Okay.
08:44:11 MR. GARRETT: James, if we can next to go to JTX-15.
08:44:20 BY MR. GARRETT:
08:44:22 Q. If could you let me know when you're there, Doctor.
08:44:25 A. I'm on JTX-15.
08:44:26 Q. Okay. This is another one of Lupin's DMF documents?
08:44:29 A. Yes, that's what it appears to be.
08:44:32 Q. Okay. And if we could turn to Page 44.
08:44:45 A. Page 44. Yes.
08:44:47 Q. Okay. Do you see the section titled "Critical Process Parameter"?
08:44:53 A. Yes.
08:44:54 Q. And here Lupin is identifying the sodium borohydride quantity as 1.2 mole equivalents?
08:45:03 A. Yes.
08:45:06 Q. And then Lupin states, "If the quantity of sodium

08:45:11 borohydride is more, then it leads to the formation of the TLVRC-1 impurity."

08:45:18 Do you see that?

08:45:20 A. Yes, I do.

08:45:22 Q. So in this document, Lupin is alleging that the use of more than 1.2 molar equivalents of sodium borohydride leads to the formation of the dechlorinated impurity?

08:45:33 A. Yes, that's what's stated here.

08:45:35 Q. And *Kondo* used 1.5 molar equivalents of sodium borohydride?

08:45:40 A. Yes, *Kondo* did.

08:45:47 MR. GARRETT: James, could we please turn next to DDX-2.15? Thank you.

08:45:56 BY MR. GARRETT:

08:46:01 Q. Dr. Dichtel, on the screen we're looking at your demonstratives from yesterday. Do you recall those?

08:46:05 A. Yes.

08:46:07 Q. Okay. And this slide of your demonstratives is citing to one of Lupin's DMF documents, specifically JTX-12, Page 147?

08:46:20 A. Yes. That's right.

08:46:23 Q. Now, on this slide, the TLV-III content is reported for three different batches?

08:46:31 A. Yes.

08:46:32 Q. And the TLV-III content was tested in these batches

after Lupin had added all 1.2 molar equivalents of sodium borohydride?
A. Yes, that's correct.
Q. So the only data point for these three batches is the TLV-III content after all 1.2 molar equivalents of sodium borohydride have been added?
A. Well, that -- that's this data point that is shown on the slide. I -- I don't know what other measurements might have been made, but this is the only one that I'm aware of.
Q. There's no data that you are aware of, Doctor, for these three batches to demonstrate what the TLV-III content was at any other point in time?
A. I'm not aware of other data.
Q. There's no data for these three batches to demonstrate what the TLV-III content was after .25 molar equivalents of sodium borohydride had been added?
A. Not that I'm aware.
Q. There's no data for these three batches to demonstrate what the TLV-III content would be after .5 more equivalents had been added?
A. No. Not that I'm aware.
Q. So for the first batch listed here, ending in 29, and the third batch ending in 31, they're reported here as not detected; correct?
A. Correct.

Q. For these two batches, you do not know at what point in time the TLV-III content reached the not detected level, do you?
A. I -- I -- there's no data to demonstrate that. No.
Q. And for the batch ending in 30, this document reports TLV-III content after 1.2 moles have been added as 0.00?
A. Yes.
Q. And you do not know at what point in time the TLV-III content reached 0.00?
A. No, I do not.
Q. And let me ask it in a slightly different way. For Batch 29, we know that Lupin added the sodium borohydride over 145 minutes; correct?
A. I'd have to go check the batch record for -- for that particular experiment.
Q. I'll represent to you that that's -- that's the case. Do you have any reason to dispute that?
A. If -- no, I don't have reason to dispute that. If that's what the batch record says, that corresponds to that experiment.
Q. And you do not know when within those 145 minutes the TLV-III content reached the not detected level, do you?
A. No. They're -- I -- they're -- this is the first data point that was collected as far as I know.
Q. The TLV-III content could have reached the not

detected level after 30 minutes of addition?
A. It's possible. I -- I -- from the -- from what's on the slide, I don't recall the exact limit of detection that Lupin claims for this experiment. But I think that -- I don't have information about that question, or I don't have data that answer that question directly.
Q. And the TLV-III content could have reached the not detected level after 60 minutes of sodium borohydride addition?
A. That is also a possibility.
Q. Okay.
MR. GARRETT: James, if we could look at PDX-6000.
BY MR. GARRETT:
Q. This was the demonstrative I sent you.
MR. GARRETT: And, Your Honor, may I approach?
THE COURT: Yeah.
MR. GARRETT: Thank you.
BY MR. GARRETT:
Q. Okay. So, Doctor, this is a demonstrative that I've put together, and it's -- I've based it on the data that we were just looking at in that prior document. So just to walk you through this very briefly.
So on the vertical axis here, we have the percent of TLV-III remaining, and then on the horizontal

axis, we have the molar equivalents of sodium borohydride that has been added. And at 1.2, based on that document we were just looking at for Batch 30, it's reported as being 0.00; is that correct?
A. Yes, that -- that's what this demonstrative shows.
Q. Okay. And when no sodium borohydride has been added, I think we can agree that there's a hundred percent of the TLV-III content remaining?
A. You're saying prior to any addition of sodium borohydride?
Q. Yes.
A. Yes, I agree with that.
Q. Okay. And once .25 more equivalents of sodium borohydride had been added, you don't know what the TLV-III content remaining is, do you?
A. No, I do not.
Q. Okay. And once .5 molar equivalents of sodium borohydride have been added, you don't know how much of the TLV-III content remains?
A. No.
Q. It could be 0.00, as you said before?
A. By Lupin's measurement, it's possible.
Q. Okay. And you don't have any data to dispute that by .5 molar equivalents the TLV-III content is 0.00?
A. Correct.

Q. If we could turn to PDX-2028.
MR. WATKINS: 2028?
MR. GARRETT: Yes. Thank you, James.
BY MR. GARRETT:
Q. Doctor, were you in the room yesterday when Dr. Roush testified with respect to Experiments 109 and 115?
A. Yes, I was.
Q. And do you recall Dr. Roush providing testimony about the slide on the screen?
A. Yes, I recall him describing a slide that looked like this.
Q. And in Lupin's Experiments 109 and 115, Lupin examined TLV-III content at different periods over time?
A. Yes, they made those measurements in this case.
Q. And in these experiments, Lupin tested the TLV-III content after 35 percent addition of the sodium borohydride?
A. Yes.
Q. After 70, after a hundred?
A. Yes.
Q. And then two more times an hour after a hundred had been added and then two hours after a hundred had been added?
A. That's correct.
Q. Experiments 109 and 115 are the only data that Lupin has demonstrating TLV-III content over time?

A. They are the only data that I have seen in this matter. I don't know what Lupin has or doesn't have otherwise.

Q. And Experiments 109 and 115 are the only data that Lupin has that tests the TLV-III content before all 1.2 molar equivalents of sodium borohydride has been added?

A. They're the only ones that have I seen.

MR. GARRETT: James, could we turn to DDX-2.10?

BY MR. GARRETT:

Q. All right. Doctor, this is one of the slides from your demonstratives?

A. Yes.

Q. And this slide contains a quote from a Lupin DMF document. It's JTX-12, Page 210?

A. Let's see. Yes.

Q. And this document that you're quoting states, "If the quantity of the sodium borohydride is less then" -- let me restate that. "If the quantity of sodium borohydride is less, then unreacted TLV-III can be more than the specified limit."

Correct?

A. Yes. That's what Lupin stated to the FDA.

Q. Are you aware of any experiment in which Lupin used less than 1.2 molar equivalents of sodium borohydride?

A. I can't recall every experiment that I reviewed, so

08:57:05 no, I can't -- I can't think of one specifically where that was the case. But I don't know if they exist or not.
08:57:14 Q. Are you aware of any data that supports this sentence in Lupin's DMF?
08:57:22 A. Let me think carefully about that. If the specified limit is 0.05 percent, then no. I'm not aware of the data that underlied the statement.
08:58:05 MR. GARRETT: James, could we turn to DDX-2.13?
08:58:11 BY MR. GARRETT:
08:58:13 Q. Doctor, this is from your demonstratives. We're looking at Lupin's quench step; is that correct?
08:58:21 A. Yes, that's correct.
08:58:26 Q. Okay. And you provided testimony about the quench step yesterday?
08:58:29 A. I did.
08:58:32 Q. Okay. And is it your testimony that a POSA would not consider the reaction complete until the quench step was performed?
08:58:41 A. Yes. That's my opinion.
08:58:46 MR. GARRETT: Can we turn to DDX-2.18?
08:58:46 BY MR. GARRETT:
08:58:55 Q. This is another slide from your demonstratives, and it's citing one of Lupin's DMF documents, JTX-15, Page 22.
08:59:04 A. Yes, that's correct.
08:59:07 Q. And in this document, Lupin states, "After completion

08:59:14 of reaction, water is added followed by addition of dilute
08:59:21 hydrochloric acid"; correct?
08:59:24 A. Yes, that's right.
08:59:25 Q. The quench step is the addition of the dilute
08:59:29 hydrochloric acid?
08:59:32 A. Yes. Well, I -- I view the quench step as kind of
08:59:38 the -- the Steps 25 through 30, but, yes, it's likely the
08:59:44 hydrochloric acid itself that destroys the sodium
08:59:47 borohydride.
08:59:48 Q. And Step 25, just to be clear, was the water
08:59:52 addition?
08:59:54 A. That's right.
08:59:54 Q. Okay. So it's your testimony -- well, the quench
08:59:58 step is the addition of water and HCL?
09:00:02 A. Yes. I -- I was kind of bucketing the addition of
09:00:07 water and HCL kind of as one process, but if you want to
09:00:10 break them down into individual steps, then sure. I mean,
09:00:16 certainly it's water. Then hydrochloric acid is delineated
09:00:19 in Lupin's process.
09:00:20 Q. Okay. Well, either way, Lupin here is considering
09:00:26 the quench step separate from completion of the reaction;
09:00:35 isn't that correct?
09:00:35 A. Well, I -- I testified to this effect on direct and
09:00:42 I -- I still feel that -- the same way that here the term
09:00:46 "after completion of reaction" signals to Lupin's chemists

09:00:52 as to when they can move on, you know, when Lupin feels that
09:00:56 the reaction has proceeded enough so that they can move on
09:01:00 in their manufacturing process. It doesn't mean that there
09:01:06 isn't still TLV-III present, the ketone precursor present.
09:01:10 It doesn't mean that it has stopped reacting. It doesn't
09:01:14 mean that the reaction is not going on at some rate. It
09:01:17 just means that this is when Lupin's chemists can move on so
09:01:22 as to expedite the synthesis of their tolvaptan.
09:01:26 Q. This is when Lupin's chemists consider the reaction
09:01:31 complete?
09:01:33 A. Well, again, there is -- I think complete can mean
09:01:40 different things to a chemist versus somebody else. So here
09:01:47 I think this is a shorthand that says, you know, once you've
09:01:53 progressed to this point and one -- and the reaction has
09:01:56 passed the IPQC testing, the chemist can move on as, you
09:02:02 know, in the process as we have talked about a few times.
09:02:06 It doesn't mean that all the TLV-III is consumed. It
09:02:10 doesn't mean that the rate of the reaction when the water is
09:02:15 added in this quenching process is started, and it doesn't
09:02:18 mean that the rate is nonzero. It doesn't mean that the
09:02:22 reaction is not still taking place.
09:02:25 It simply means, okay, we have gotten to the
09:02:29 point where because the economics of this process or
09:02:33 whatever -- whatever other reason we can move on and
09:02:37 tolerate whatever leftover TLV-III there might be.

Q. And I understand your position, Doctor, but my question, I think, was more simple than that. Lupin scientists considered the reaction complete at this point on -- in the process? It's what they say in the document. Is that correct?

A. That is the language that is used, but I disagree with the definition of the reaction being complete as opposed to the process step being complete and moving on to the next step of the process.

Q. Well, but, Doctor, you can disagree, but that's how Lupin scientists are defining completion. I'm not making that definition up. That's how Lupin scientists are defining completion of the reaction.

A. I -- I agree and I think that -- I -- I fully agree with you that that is what this says. But I -- when this was written, I'm not sure Lupin scientists were anticipating a time that we were going to be fighting over exactly when they were -- when the reaction was going to be absolutely stopped. Right. And so I think this is a shorthand for -- for Lupin's chemists to be allowed to move on to the next step of the process. I don't think it means that the reduction reaction itself is not going on.

Q. And when Lupin scientists wrote this, as you just said, you don't think that they were considering that we'd be here disputing whether a few molecules remaining meant

that the reaction was ongoing?
A. I'm not sure exactly what they were thinking, but you know, I -- I think that this was -- this is just a common shorthand vernacular. I do not think that that little phrase suggests to the chemists that the reaction is absolutely done, not going on anymore. I -- I think that they're -- you know, we've talked a lot already about how the reaction slows down towards the end of the process at these high levels of conversion. At some point, Lupin feels that it can move on in the process. But if we're then talking about whether the reaction itself is going on, I -- I think that that's a different question than what Lupin is describing in this document.
Q. Lupin is -- the Lupin scientists in this document are describing their understanding of when the reaction reaches completion from the perspective of a scientist.
A. I think that they're describing the end of the process step from the perspective of advancing their -- their goals and their economic interests. I do not think that they are talking -- when you say "as a scientist," I think that this statement is imprecise.
Q. You think Lupin's statement is imprecise?
A. Yes, I -- I think that their -- you know, at the risk of repeating myself again, I think that this -- this sentence is signaling, okay, the reaction has gone to a

point where it's in our economic interest to move on to the next step. It's not saying, okay, the -- this reaction is no longer taking place from a chemistry perspective or from a scientific perspective, if you will.

MR. GARRETT: If we could turn to DDX-2.15.

BY MR. GARRETT:

Q. Lupin's DMF states that the TLV-III content was tested by HPLC?

A. Yes.

Q. What is the limit of detection for the HPLC method?

A. I -- I think that depends. In -- in Lupin's DMF process, they do describe their HPLC methods, and so I can't recall if they report a specific limit of detection for the -- the data that are reported here or not. So I can't answer that rigorously.

Q. And, generally, what is a limit of detection?

A. Broadly speaking, what a limit of detection is?

Okay. Well, so an analytical measurement that is trying to detect the presence of a compound is -- by virtue of whatever that measurement is, it's going to have a certain concentration range for which it's valid, and then if you try to use that method on -- for a -- you know, if the compound is present below a certain concentration, it will not be detected at all.

And so an analytical chemist will define a limit

of detection which is the minimum -- you know, the minimum concentration of a substance that can be detected by a particular method under a particular set of conditions.

Q. So amounts below the limit of detection cannot be reliably detected?

A. Yeah. Amounts below the limit of detection means that there's not a sufficient signal above a threshold level of signal to noise in that -- in that measurement to confidently state that the compound is present.

Q. Because the -- the remaining amount of the substance is so miniscule that the equipment can't pick it up?

A. Well, that depends on what the limit of detection is. Different -- different experiments have different levels of detection. You know, I note yesterday Dr. Roush, I believe, testified to the effect that it wasn't possible to measure reactions of single molecules, you know, something like that. That's actually not even true. There are -- there are methods available to go all the way down that far, if one cares. I'm not saying that that's the case in here.

But if we're talking, broadly speaking, about analytical chemistry, different analytical methods are used for different purposes. They have different limits of detection and, you know, one -- one chooses a measurement to -- you know, in part, based on that or based on what one -- what information one needs from the experiment.

09:09:36 Q. So, Doctor, for Batch 29, it's reported as not detected. But there could be miniscule amounts of leftover ketone that are just below the detection level; correct?
09:09:53 A. That's correct.
09:09:54 Q. And you don't know what that detection level is?
09:09:57 A. I mean, I -- I -- I don't know exactly, but it -- it's -- yeah, I -- I don't know.
09:10:09 Lupin, it -- I know there's a section in the DMF that describes these HPLC methods in detail. I can't recall exactly what it says but, you know, if one were to look at it, perhaps the limit of detection is specified. I'm not sure. But it -- you know, there certainly is a limit of detection, and they're reporting that the TLV-III content is below whatever that limit of detection is.
09:10:36 Q. And what is the limit of quantitation for the HPLC method that Lupin uses to detect TLV-III?
09:10:46 A. Again, that's -- that's not clear from -- from these data. They -- you know, similar to my answer to your last question, Lupin describes its HPLC methods in the DMF. It would be common for an analytical chemist to report both a limit of quantification and a limit of detection for -- for a method, especially if there was a lot of motivation to -- to have it be validated and reliable. It's not the -- the limit is not listed here so I -- I don't know exactly what it is.

09:11:26 Q. And just very generally, the limit of quantitation means that amounts below that limit cannot be reliably measured?

09:11:37 A. No, I don't think that's quite right. A limit of -- an analytical measurement has a limit of detection, which I already described what that is. Above that, there will be a limit of quantification. And so the limit of quantification is the limit at which the concentration can be measured reliably. Such as, you know, if you want to quote a real concentration value.

09:12:08 It's -- the reason those are different is that it's possible to have a signal that's above the limit of detection, but below the limit of quantification. And in that case, you can tell that the compound is still present, but you -- you can't necessarily tell exactly how much it is.

09:12:27 Q. Okay.

09:12:29 MR. GARRETT: James, if we go to JTX-16.

09:12:32 THE COURT: Actually, before do you that.

09:12:34 Doctor, I'm just curious about one thing.

09:12:36 THE WITNESS: Mm-hmm.

09:12:36 THE COURT: And I'm sure -- so we've got three batches, two of them it says not detected. The other one says 0.00.

09:12:45 Does that mean it was detected but rounds off to

zero?

THE WITNESS: I suspect that that's what it means, Your Honor. I -- I wasn't completely sure about that and so my inter -- my interpretation of this data is that I -- I testified that essentially this was all not detected. But there is some possibility that the middle experiment is denoted differently because it -- it's right -- it's right around that limit of detection and quantification and can't be accurately determined. I -- I'm not completely sure, unfortunately.

THE COURT: All right. Thanks.

BY MR. GARRETT:

Q. And, Doctor, for the middle batch, 0.00, if the limit of quantification was 0.04, then this 0.00, it could be 0.03 or 0.02 or 0.01?

A. Yes, those are all possible concentration values that would correspond to the scenario you described.

Q. Because once you're below that limit of quantification, you can't measurably -- you can't accurately measure the amount of the substance that's there?

A. That's right.

Q. Okay. Thank you.

MR. GARRETT: James, if we could turn to JTX-16.

BY MR. GARRETT:

Q. Doctor, this is a document from Lupin's DMF?

09:14:13 A. Yes.
09:14:18 MR. GARRETT: If we could turn to Page 7.
09:14:18 BY MR. GARRETT:
09:14:33 Q. If you'd let me know when you're there.
09:14:35 A. Yes, I'm here.
09:14:36 Q. All right. So on -- on Page 7, Lupin's reporting
09:14:42 information on the impurity TVLRC-2, which is also known as
09:14:49 TLV-III?
09:14:51 A. Yes.
09:14:54 Q. And Lupin is reporting limit of detection of
09:14:57 0.02 percent?
09:14:58 A. Yes, for -- for this method, that's correct.
09:15:06 Q. And are you aware of a limit of detection for any
09:15:11 other method that Lupin has for testing TLV-III?
09:15:16 A. Well, could you repeat the question? Because I want
09:15:27 to be very careful about answering that.
09:15:28 Q. Well, let me -- let me ask the next question. The
09:15:32 limit of quantification for this method was 0.04 percent.
09:15:39 A. Yes, that's what's reported.
09:15:40 Q. Now, we were just looking at another document, and
09:15:45 they were measuring amounts using an HPLC method. And you
09:15:49 testified that you were not aware of what the limit of
09:15:52 detection and limit of quantification were; correct?
09:15:55 A. Yes, I didn't recall exactly what they were.
09:15:58 Q. Okay.

09:16:05 MR. GARRETT: James, I'd next like to look at the supplemental responses.
09:16:09 Your Honor, may I approach?
09:16:10 THE COURT: Yes.
09:16:16 THE WITNESS: Okay.
09:16:17 BY MR. GARRETT:
09:16:30 Q. Okay. Doctor, this is a Lupin interrogatory response that you considered in your expert reports?
09:16:38 A. I believe so. It's -- it's been awhile since I've looked at this document. I mean, it looks familiar, but I don't remember the exact contents of it.
09:16:55 MR. GARRETT: Okay. If we could turn to Page 27.
09:16:57 BY MR. GARRETT:
09:16:59 Q. Do you see the bottom paragraph, it says, "Plaintiff has failed to explain"?
09:17:08 A. Page 27?
09:17:10 Q. Yes, sir.
09:17:11 A. Yes. I'm -- I'm --
09:17:14 Q. So here Lupin says, "Plaintiff has failed to explain its contention that Lupin's reduction reaction does not utilize sodium borohydride in a molar ratio of 1.2 moles to 1 mole ketone starting material while the reaction is taking place."
09:17:30 Do you see that?

A. I see that.
Q. And the next sentence goes on, "Nor can Plaintiff do so at least because the ketone starting material is still present, even after Lupin has added all 1.2 equivalents of sodium borohydride."
A. Yes, I see that as well."
Q. So here Lupin is representing that the ketone starting material, at least some small amount of it, some miniscule amount of it, is still present even after Lupin has added all 1.2 equivalents of sodium borohydride.
A. Yes, that's what the Plaintiff is representing there.
Q. I'm -- that's what Lupin was representing?
A. Or -- I'm sorry. Yeah, that's what Lupin is representing, I'm sorry.
Q. Thank you, Doctor.
MR. GARRETT: And if we could go to -- if we could zoom out. And if we can look at Page 28. It's the same paragraph.
BY MR. GARRETT:
Q. Now, we're looking at the documents that Lupin is relying on to support the premise that it just stated.
MR. GARRETT: Sorry. If you could zoom out, James.
BY MR. GARRETT:
Q. All right. So the last paragraph there, Doctor, on

Page 28 says, "Lupin's development documents also demonstrate that the tolvaptan/TLV-IV material that Lupin isolates as the product of its reduction reaction contains small amounts of TLVRC-2/TLV-III."

Do you see that?

A. I see that.

Q. So here Lupin is relying on its development documents to demonstrate what -- what is present in Lupin's process. Lupin's DMF process.

A. That's my understanding of this language. Yeah.

MR. GARRETT: And then if we can zoom out.

Let's see what development documents Lupin relies on, if we can go to the next page.

BY MR. GARRETT:

Q. About the -- five lines down, do you see a citation to Experiment 109?

A. Sorry. You might have to direct me to that a little bit more --

Q. Oh, of course.

A. -- specifically.

Q. Yes. No problem.

MR. GARRETT: James, if we could zoom out.

BY MR. GARRETT:

Q. So, Doctor, it is on -- 1, 2 -- below the graph.

A. Okay.

09:19:59 Q. It's on Line 4, 5, 6, and 7. There's two citations.
09:20:05 A. Okay. If you don't mind just me taking a look at that for a few seconds.
09:20:11 Q. Of course.
09:20:29 A. Okay.
09:20:30 Q. So the development documents that Lupin was relying on -- is relying on include Experiment 109?
09:20:38 A. Yes. So just to be clear, this is the Experiment 109 that we -- that was testified about earlier. Is that the --
09:20:48 Q. Yes, sir.
09:20:48 A. Yeah.
09:20:49 Okay. Yes. I see that.
09:20:51 Q. Okay. Thank you.
09:20:53 MR. GARRETT: James, if we can go to DDX-2.46.
09:20:57 BY MR. GARRETT:
09:21:03 Q. Doctor, yesterday you testified that *Kondo* identified tolvaptan as a promising pharmaceutical product?
09:21:15 A. Yes.
09:21:17 Q. And you offered testimony on what considerations would be important to a POSA who was pursuing the development of a pharmaceutical product?
09:21:28 A. Yes. I offered some testimony in that regard, yeah.
09:21:32 Q. And, Doctor, you do not have any experience with industrial-scale synthesis of medicinal compounds; is that right?

A. That's right.
Q. And you do not hold yourself out as an expert on the industrial-scale synthesis of medicinal compounds, do you?
A. That's correct.
Q. And, Doctor, you do not have any experience with the industrial-scale purification of medicinal compounds?
A. No, I do not.
Q. And you do not hold yourself out as an expert on the industrial scale of purification of medicinal compounds?
A. No, I do not.
Q. Okay. And you offered a definition of a POSA in this matter?
A. Yes, I did.
Q. And your definition requires at least two years of experience in the synthesis, research, and development of medicinal compounds?
A. Yes, that was included in my definition.
Q. Now, you have not personally synthesized or purified any medicinal compounds?
A. No, I haven't.
Q. And you were retained in the early part of 2023?
A. Yes.
Q. And before you were retained, Lupin had another chemistry expert who offered a definition of a POSA?
A. I'm -- that may be true, but I -- I am not familiar

with that portion of the case.
Q. Yeah. We looked at -- during the deposition, we looked at Dr. Williams' declaration, and he offered a definition of a POSA.
Do you recall that?
A. I recall you asking me if I was familiar with that declaration and I -- I believe I said that I was not.
Q. Okay.
MR. GARRETT: Your Honor, may I approach?
THE COURT: All right.
BY MR. GARRETT:
Q. So, Doctor, this is a declaration of David Williams. We looked at this in your deposition. Do you recall?
A. I see that this is a deposition of David Williams.
Q. A declaration of David Williams?
A. Yes.
Q. Okay. Could you turn to Paragraph 19?
A. Is that Page 19?
Q. Well, Paragraph 19.
A. Oh, Paragraph 19. I apologize.
Q. Well, I may have misspoke. So Paragraph 19. Thank you?
A. Yeah. Okay. Okay. Paragraph 19.
Q. All right. So above Paragraph 19, there's a heading for a POSA.

A. Yes, I see that.
Q. And then in 21, Dr. Williams states that "a POSA would include a person having a doctoral degree in chemistry, medicinal chemistry, organic or synthetic chemistry, or related field with at least two years' experience in the synthesis, research, and development of medicinal compounds"?
A. Yes.
Q. And this declaration is dated -- it's from April of 2022?
That's on Page 34, if you'd like to look.
A. Page 34. Yes, I see it's dated April 2022. That was the question?
Q. Yes, it was. Thank you. Thank you.
A. Okay.
Q. So Dr. Williams offered a POSA definition that required at least two years of experience in the synthesis, research, and development of medicinal compounds.
And then you did as well in 2023?
A. Yes.
Q. Now, your definition of a POSA requires experience in the research and development of medicinal compounds?
A. Yes.
Q. And yesterday you identified your consulting with the pharmaceutical company called Relypsa?

A. Yes.
Q. And other than that consulting experience, do you have any other experience -- you don't have any other experience with the research and development of medicinal compounds, do you?
A. That's correct.
Q. Now, you spent, at most, 50 hours consulting with Relypsa?
A. Yes. I -- I recall that estimate from my deposition. I didn't go back and check my records, but that sounds about -- about right for that engagement.
Q. And you may have spent as little as 10 hours consulting for Relypsa?
A. Well, I mean, I think that was my off-the-cuff answer to you, and then I revised it to 50 because 10 was definitely too low. So I think 10 would be a very, very conservative estimate in that -- I mean, I spent full days there. So as soon as you do that more than once, I mean, that's 10 hours already. So I think -- in the range of 10 to 50, I think it's more likely to be the high end of that range.
Q. Understood. Now, Relypsa is the only pharmaceutical company that you've consulted for?
A. That's right.
Q. And you signed a stringent NDA with Relypsa, so you

cannot disclose what work you did for them?
A. No. I -- I can only talk about it in general terms. So yeah, I mean, I did sign an NDA.
Q. Doctor, no prior art reference discloses the existence of the dechlorinated impurity?
A. I'm not aware of the dechlorinated impurity being disclosed, no.
Q. And no prior art reference disclosed that the dechlorinated impurity is difficult to remove?
A. No; by virtue of it not being reported in the first place.
Q. And no prior art reference disclosed that the dechlorinated impurity could be avoided by reducing the amount of sodium borohydride?
A. Also correct.
Q. A POSA would not know which impurities were present in the tolvaptan found in *Kondo*?
A. Again, it -- is that a question or a statement?
Q. A question.
A. Okay. No. A person of ordinary skill would not know what impurities were -- resulted from *Kondo's* synthesis.
Q. Now, Doctor, your position is that the claims are obvious over *Kondo*?
A. In part. You know, *Kondo* sometimes in combination with other things, yeah.

Q. And in his expert reports, Dr. Roush pointed out that there were a number of other prior art processes for synthesizing tolvaptan or intermediates of tolvaptan; correct?

A. That's right.

Q. And during your direct testimony yesterday, you did not address any of those other prior art processes for synthesizing tolvaptan or intermediates of tolvaptan, did you?

A. No, I didn't say anything about that yesterday.

Q. And in your opinion, whether there are other routes, other prior art routes for obtaining tolvaptan is not relevant to the obviousness analysis?

A. Well, I -- I think that that's a pretty black-and-white statement. I think there's some nuance to that. So I think, in terms of the obviousness analysis, *Kondo* is obviously very important to evaluate in the sense that *Kondo's* synthesis matches the claims in every respect except for the amount of the sodium borohydride added. So, of course, *Kondo* is very relevant.

Now, I also know that a POSA seeking to synthesize tolvaptan would evaluate the prior art, and they would evaluate other routes. And I think the key here is that they would be motivated to pursue routes that included *Kondo* and wouldn't eliminate *Kondo* for any specific

09:31:06 deficiency that *Kondo* obviously had, because I think
09:31:09 improving *Kondo's* process would have been obvious.
09:31:12 But that doesn't mean that -- you know, that one
09:31:14 would not look at other routes also. But, you know, in
09:31:19 terms of figuring out whether reducing the amount of sodium
09:31:23 borohydride is obvious or not, I mean, that comes right from
09:31:28 *Kondo*. So, you know, I -- that's a more nuanced view of my
09:31:32 opinion in the matter.
09:31:35 Q. Doctor, you think *Kondo* -- apologize. Let me restate
09:31:39 that. Doctor, it's your testimony that *Kondo* is a very
09:31:44 important reference because it closely matches the claims of
09:31:47 the patents?
09:31:49 A. Yes. In that it uses the same ketone precursor. It
09:31:54 makes tolvaptan. It uses sodium borohydride. You know, one
09:31:59 of the four reducing agents or the one reducing agent,
09:32:03 depending on what Claim 1 is looking at. It -- it's -- it
09:32:11 bears an obvious resemblance to what the patent is talking
09:32:13 about. It's just that, you know, the patent uses a
09:32:15 different amount of sodium borohydride than *Kondo's*
09:32:17 procedure. That's the major difference.
09:32:19 Q. And because *Kondo* closely matches the patent claims,
09:32:24 you began your obviousness analysis evaluating *Kondo*?
09:32:29 A. When we say "began," you know, again, I read a lot of
09:32:37 documents when I was first engaged in this case. I did not
09:32:40 only read *Kondo*, but -- and, you know, as I said in my

deposition, I did my own literature search. I looked at ways to make tolvaptan. But *Kondo* -- so when I say I began my search at *Kondo*, no. But *Kondo* -- I mean, I think it's pretty clear that *Kondo* is very relevant to the claims here.

Q. Doctor, you did not consider the other prior art references for synthesizing tolvaptan or intermediates of tolvaptan that Dr. Roush identified in his expert report?

A. I did not -- I -- in my reports, I did not opine on them. I did not -- I did not rely on them in my reports. I did not respond to every point that Dr. Roush made in that regard. But I think it's incorrect to say that I didn't look at anything else but *Kondo*, you know, so I want to make that clear.

Q. Now, a POSA looking at *Kondo* would know that many factors would need to be optimized.

A. I -- I think a POSA would look at *Kondo* as a starting point and see, okay, it's clearly not an industrial-scale synthesis, and it's clearly not optimized to be efficient. But in terms of many factors, there would be several goals that a POSA would have in improving *Kondo*.

But that doesn't mean that there would be -- that it would be correspondingly more difficult to optimize those as opposed to another small-scale synthesis that -- you know, that might be reported, generally speaking.

Q. In your opinion, Doctor, a POSA would look at *Kondo*

09:34:45 and believe that most or all of the procedures in the paper
09:34:49 were starting points for the development of an
09:34:52 industrial-scale process?
09:34:53 A. Yes. I -- you know, the tolvaptan synthesis itself,
09:35:00 again, is on, I think it was 93 milligrams of the compound?
09:35:06 I believe the other procedures in *Kondo* are also on
09:35:09 similarly small scale, perhaps milligram-to-gram quantities.
09:35:13 I don't recall anything much above that.
09:35:16 And so -- but that's the case for many -- you
09:35:22 know, many papers of that type, or many other patents that
09:35:27 have specifications that are done at that level. I don't
09:35:31 think that that's unique.
09:35:33 Q. And, Doctor, when a POSA is working to optimize every
09:35:38 step in *Kondo's* process, you don't know at which point the
09:35:43 POSA would consider the amount of sodium borohydride?
09:35:46 A. I'm not quite sure I understand the question. Could
09:35:56 you repeat it, and I'll give my best answer?
09:35:58 Q. Okay. I'll rephrase it. A POSA who was developing
09:36:06 *Kondo's* process?
09:36:08 A. Mm-hmm.
09:36:08 Q. You don't know at what point during that process they
09:36:13 would consider the amount of sodium borohydride?
09:36:16 A. Well, if the vantage point you're asking me to
09:36:23 evaluate is a POSA looking at *Kondo's* route, not just the
09:36:29 sodium borohydride step, that's the hypothetical that you're

09:36:32 trying to describe is just --
09:36:34 Q. That's right.
09:36:35 A. Okay. Yeah. So that's not completely clear to me.
09:36:42 In terms of, you know, a POSA operating at that level, I
09:36:48 believe, would look at *Kondo's* route and say, okay, there
09:36:53 are several -- you know, none of the steps in *Kondo* are an
09:36:56 industrial-scale synthesis.
09:36:58 And so probably every one of them needs to be
09:37:01 looked at and developed in process. You know, that's the
09:37:06 normal course of developing a -- scaling up one of these
09:37:10 things. I don't know exactly when in that process the POSA
09:37:16 would -- would view, okay, now is the time to study the
09:37:22 sodium borohydride amount. But certainly when it came time
09:37:26 to look at that sodium borohydride step, a POSA would view
09:37:31 the *Kondo* procedure as a starting point, and they would --
09:37:36 you know, they would optimize both the synthesis and the
09:37:39 purification of *Kondo* to achieve that -- those goals.
09:37:47 Q. So, Doctor, as the POSA is developing *Kondo's* process
09:37:56 and optimizing every step, you don't know at what point
09:38:02 whether it would be early in the developmental process or
09:38:05 later in the developmental process that they would consider
09:38:08 the sodium borohydride?
09:38:13 A. I think that there would be an evaluation. You know,
09:38:18 if a POSA is considering how to -- how to make tolvaptan,
09:38:22 and as a pharmaceutical product, they would be evaluating

the *Kondo* route. They might be evaluating other routes. They might -- and then at some point they're going to decide, okay, which route or routes have the -- the best probability of feasibility. Then they're going to start looking at -- looking at whatever processes they -- you know, they downselected. I certainly think that *Kondo's* route would be part of that -- you know, part of -- you know, it would be in that conversation. And then they would start looking at, okay, how do we make the *Kondo* route better? How do we -- you know, what considerations are there at each step that have to be addressed to scale it up?

So, you know, I can't tell you, okay, the POSA would zoom in on the *Kondo* borohydride procedure fifth or sixth. That seems to be the kind of answer that you're asking me for, and I'm just not sure I can answer that to -- to much precision.

Q. Yesterday, you testified that a POSA would be motivated to reduce the amount of sodium borohydride using *Kondo* in order to reduce costs.

A. Yes.

Q. A POSA would know that reducing the amount of sodium borohydride could result in lower yield?

A. That is one possibility.

MR. GARRETT: And, James, if we could look at DTX-2120.

MR. WATKINS: Say that again?
MR. GARRETT: Oh, I'm sorry, James. DTX-2120. Thank you.
BY MR. GARRETT:
Q. Doctor, this is the *Mann* article you testified on yesterday?
A. Yes.
Q. Mann does not discuss tolvaptan?
A. No.
Q. And Mann discusses a purification technique known as PHPLC?
A. That's right.
Q. PHPLC is a type of column chromatography?
A. Yes, it is.
Q. A POSA would have known that the column chromatography is not a viable technique to use on an industrial scale to manufacture a pharmaceutical product?
A. I think a POSA would know that it is expensive and, you know, more expensive than some other purification methods. And, in fact, I believe Mann goes into that in some detail later. But I wouldn't be willing to say that -- that a POSA would know that it's not viable, particularly in that, you know, this whole article is talking -- from Mann is talking about how it is sometimes used in the pharmaceutical industry.

Q. A POSA would be suspicious about the use of column chromatography on an industrial scale to manufacture a pharmaceutical product?

A. I think it -- speaking in the broadest sense, I think that a POSA would know that that method would be expensive, and so it would depend on what the expected dose of the pharmaceutical would be, what the -- you know, what the demand would be, you know, exactly how much of this stuff needs to be manufactured and potentially how much it could be sold for. But I do agree with the -- with kind of the -- the underlying heart of the question is, yes, chromatography methods are clearly more expensive than some of the other methods that are -- that I described yesterday.

Q. A POSA would be suspicious of the use of column chromatography?

A. A POSA would view that as less desirable than other purification methods.

MR. GARRETT: Could we turn to Dr. Dichtel's deposition testimony?

BY MR. GARRETT:

Q. Dr. Dichtel, if you could look at your deposition transcript.

A. Okay.

MR. GARRETT: If we go to Page 223.

THE WITNESS: Sorry, I'm a little overwhelmed

09:43:17 with paper here. Give me just a second.
09:43:19 BY MR. GARRETT:
09:43:19 Q. I apologize for all of the binders.
09:43:35 A. Okay. I'm at my deposition. Is there a page number
09:43:39 you --
09:43:39 Q. Yes sir, 223.
09:43:41 A. 23. Okay.
09:44:00 Q. So starting at Line 6.
09:44:01 "QUESTION: A POSA as of September 2nd, 2005,
09:44:06 would have known that column chromatography is not a viable
09:44:09 technique" -- "equity" -- it's a typo -- "to use on an
09:44:12 industrial scale to manufacture a pharmaceutical product?"
09:44:15 And there's an objection.
09:44:17 "ANSWER: I think that that would be very --
09:44:21 yes, I think a POSA would be suspicious of that. I wouldn't
09:44:26 say absolutely not, but it generally appears that it's a
09:44:29 more expensive technique than crystallization. And so
09:44:32 depending on the scale needed for that pharmaceutical
09:44:35 product, it could very well prove too expensive to justify
09:44:39 its use."
09:44:40 Doctor, were you asked that question, and did
09:44:42 you give that answer at your deposition?
09:44:43 A. Yes, I did.
09:44:45 Q. Thank you.
09:44:48 MR. GARRETT: If we can go back to Mann. And go

09:44:51 to Page 3. Thank you very much, James.
09:44:54 BY MR. GARRETT:
09:44:58 Q. And, Doctor, if you could let me know when you're
09:45:00 there.
09:45:00 A. Do I have Mann in this book that you gave me?
09:45:05 Q. You should, yes. It's DTX-2120.
09:45:15 A. Okay. Yeah. It's back here. Okay. I'm at it.
09:45:28 Q. Do you see -- well, if you could turn to Page 3.
09:45:33 A. Okay.
09:45:34 Q. Do you see the section titled "Crystallization versus
09:45:37 PHPLC"?
09:45:38 A. Yes.
09:45:41 Q. In this section, Mann is comparing the use of
09:45:44 crystallization versus PHPLC for a single product; correct?
09:45:50 A. Yes, I see that.
09:45:52 Q. And Mann reports that the average purity for this
09:45:56 single product using PHPLC was 99.5 to 99.7 percent;
09:46:03 correct?
09:46:03 A. Yes, I see that.
09:46:06 Q. Mann does not disclose what product this was?
09:46:16 A. No. It -- I believe Mann is -- you know, it's
09:46:21 talking about a -- it looks like Mann is talking about a
09:46:25 case study but doesn't identify exactly what the -- what
09:46:30 the -- what the actual substance -- the target substance is,
09:46:34 yeah.

Q. And a POSA reading Mann would not know what product Mann is referring to?
A. That's correct.
Q. All a POSA would know is that Mann reported using PHPLC on one unknown compound to obtain a purity of 99.5 percent.
A. Well, I mean, I think taken as a whole, Mann is -- throughout the article is describing trends in the pharmaceutical industry and what is typical. He does use one example here, but I think the sum of the article is more than just that.
Q. Okay. There are no other examples in Mann. This is the only example; is that correct?
A. Yes, I believe that's correct.
Q. Okay. All right.
I believe one last document.
MR. GARRETT: If we could turn to PTX-1017. Thank you, James.
THE WITNESS: 1017?
BY MR. GARRETT:
Q. Yes. This is the monthly report that we looked at yesterday.
A. Yes. This is the -- yeah, I see it.
Q. Okay.
MR. GARRETT: And, James, if we could turn to

09:47:55 the fifth page.
09:47:57 BY MR. GARRETT:
09:47:59 Q. So, Doctor, yesterday we were discussing the reaction
09:48:03 with romanette i on Page 5?
09:48:07 A. Yes.
09:48:09 Q. And there, it was reported as NaBH4 2 equivalents.
09:48:16 Do you recall that?
09:48:16 A. Yes.
09:48:17 Q. Okay.
09:48:18 MR. GARRETT: Now, James, if we could zoom out.
09:48:23 BY MR. GARRETT:
09:48:24 Q. Below that reaction there is the reaction number 3.
09:48:27 It says, "Reaction conditions, NaBH4 12 EQ."
09:48:34 Do you see that?
09:48:34 A. Yes, I see that.
09:48:36 Q. Okay. I'll represent to you that the 12 equivalents
09:48:43 here is equivalents of hydride.
09:48:46 Do you have any reason to doubt that?
09:48:50 A. If this is using the same convention that you walked
09:48:54 me through yesterday, if that's indeed the case, then --
09:48:59 then, yeah. If 12 is supposed to indicate the number of
09:49:03 hydrides as opposed to sodium borohydride itself, I think it
09:49:08 would be 12 divided by 4. So that would be 3. If that's
09:49:12 what you're representing to me.
09:49:14 Q. It is, yes.

A. All right.
Q. So Reaction 3 used three more equivalents of sodium borohydride?
A. That appears to be the case.
MR. GARRETT: And, James, if we could zoom out. And go to the next page.
BY MR. GARRETT:
Q. And then, Doctor, if you look at Reaction Experiment 5, there's another experiment NaBH4 12 EQ. I'll represent to you that's another experiment where the 12 EQ is hydrides.
Do you have any reason to dispute that?
A. If you represent that you went back and checked that indeed this convention is followed, uniformly through the document, then I don't protest that.
MR. GARRETT: Thank you, Doctor.
THE COURT: All right.
MR. GARRETT: Thank you, Your Honor.
THE COURT: Any redirect?
MR. ZIMMERMAN: Briefly, Your Honor.
REDIRECT EXAMINATION
BY MR. ZIMMERMAN:
Q. Good morning, Dr. Dichtel.
A. Good morning.
Q. Do you recall during your cross-examination Counsel

showed you interrogatory responses from Lupin that referenced an Experiment 109?

A. Yes.

Q. And you asked him if it was the same 109 that had been discussed throughout trial by you and Dr. Roush?

A. Yes.

Q. And he represented to you that it was?

A. Yes.

Q. Okay.

MR. ZIMMERMAN: I'd like to bring up your slide DDX-2.17.

BY MR. ZIMMERMAN:

Q. What is the experiment number for Experiment 109 that you and Dr. Roush have been talking about through trial?

A. The experiment number?

Q. Yes.

A. I -- I thought it was Experiment 109. Maybe it's 48 -- do you mean this whole name?

Q. Can you give the full name, please?

A. Yeah. Sure. It's 486/SDJ/D-536/109.

Q. And how many molar equivalents of sodium borohydride did that experiment use?

A. That used 1.3 equivalents of sodium borohydride.

Q. Okay.

MR. ZIMMERMAN: Dave, if we could do a split

09:52:02 screen of this and Page 29 of the interrogatory response
09:52:09 that was shown to the witness.
09:52:12 And if we could highlight four lines down -- I'm
09:52:17 sorry -- five lines down, 486 HBK?
09:52:24 Q. So is that the same experiment number, Dr. Dichtel?
09:52:29 A. It -- it does not appear to be.
09:52:32 Q. And did this Experiment 109 use 1.2 molar equivalents
09:52:38 of sodium borohydride?
09:52:40 A. That -- that appears to be what's written there.
09:52:43 Yes.
09:52:43 Q. Okay. So from what you can tell, this interrogatory
09:52:46 response relates to a different experiment than the one
09:52:48 we've been discussing throughout trial; correct?
09:52:50 A. Yes, that seems likely.
09:52:52 Q. Okay. Thank you.
09:52:53 You were also asked some questions about limit
09:52:58 of detection and limit of quantification, and then shown
09:53:02 values of .02 and .04; correct?
09:53:06 A. Yes.
09:53:06 Q. And those documents came from the DMF; correct?
09:53:11 A. Yes, that's right.
09:53:13 Q. Okay. Have you seen any indication of what the limit
09:53:18 of detection is for Lupin's experimental batches that
09:53:23 predate the DMF?
09:53:24 A. No. And, in fact, in the HPLC data, as I think you

just had up on the screen, and -- and throughout our testimony on that, both mine and Dr. Roush's, it -- the -- the amount of TLV-III is quantified as an area percent of the curve, not an actual calibrated concentration value.

Q. And have you seen any quantitative method that was used with Lupin's experimental batches that we've been looking at?

A. No, I haven't seen any actual quantification of those concentrations in Lupin's experimental batches.

MR. ZIMMERMAN: If we could bring up PDX-2028.

BY MR. ZIMMERMAN:

Q. So, Dr. Dichtel, we've seen Plaintiffs present a number of these slides, and they're taking values that are off of the HPLC trace.

Do the values on the HPLC trace, the .02, .02, 7, do those represent the percentage of TLV-III remaining compared to the original amount?

A. No, they do not.

Q. What do they represent?

A. So those are the area percents taken from the HPLC traces for this experimental batches. We -- we've talked -- there has been testimony about what area percent means, but this 0.02, when it's reported as that area percent, that doesn't mean 0.02 percent of the original TLV-III value. It means 0.02 percent of the area under the curve for TLV-III

over the area -- over the areas under the peaks in all the curves in that particular HPLC experiment.

And so particularly down at -- at these relatively low levels, that's -- that's not quantitative. The -- and so another way to say that is 0.02 in one experiment is not the same as 0.02 in another experiment. And not the same as 0.02 in the third experiment. Each one of those -- it's actually inappropriate to plot those on the same bar graph -- bar graph -- sorry. Bar chart.

Q. And, in fact, you said from experiment to experiment, at different time points for the same experiment, can you compare those HPLC trace values?

A. No. So, you know, I apologize. In my last answer when I was -- when I was saying "experiment," I was imprecise. I meant from one HPLC trace to another.

So, you know, this, I believe, is one sodium borohydride experiment. It's also correct to say each HPLC trace is -- is an experiment, in my mind.

So each -- each one of those values is -- is nonquantitative. It certainly shows that there are low levels of TLV-III. I think they -- they also show that -- there that TLV-III is present, but I don't think that they are valid for showing that they are exactly the same point after point after point.

Q. Okay. Now in Lupin's DMF, is there a methodology to

take the HPLC trace and get a quantitative amount of TLV-III based on the HPLC trace?
A. Yeah. So in the regulatory documents it's necessary to go a little bit beyond this level of quantification. And so for the validation batches, there is extensive documentation of Lupin's process that involves injections of standards and -- and measuring different response factors, that is that each compound, including TLV-III, tolvaptan, and all the other impurities, have a different detector response per molecule or per mole or per unit concentration.
All of that stuff is taken into account in the -- in the regulatory process, but here in Lupin's experimental batches, you know, they -- they didn't go to that extent to -- to -- of quantification.
And so to -- to look at these data at -- at the end of this -- this bar chart and ascribe exact concentrations to them, I -- I feel is overinterpreting the data.
Q. And in the documents you've seen from Lupin, was there any effort made to go back and quantify the TLV-III value for Experiments 109 or 115, other than the area percent reported in the original HPLC trace?
A. I'm not aware of any of that data.
Q. Okay. I'd like to turn to PTX-1015, and it's in the binder that's been designated obsolete. So I don't know if

09:58:49 it's in the binder you have, but if you have yesterday's binder in front of you.
09:58:53 A. I think I have yesterday's binder, if you want me to open that up.
09:58:56 Q. If not, I can bring it up on the screen, and I think it will be fairly easy.
09:59:01 A. Okay. I'll work on the screen for now.
09:59:04 MR. ZIMMERMAN: If we could look at Page 7 of PTX-1015.
09:59:10 THE WITNESS: Okay.
09:59:10 BY MR. ZIMMERMAN:
09:59:10 Q. And you'll see a Section 6 that is a sodium borohydride reflux.
09:59:17 Do you see that?
09:59:17 A. I do.
09:59:22 MR. ZIMMERMAN: And if we could highlight in the middle.
09:59:24 BY MR. ZIMMERMAN:
09:59:25 Q. You'll see that there's a reference to two equivalents.
09:59:28 A. Yes, I do.
09:59:30 Q. And in this experiment, Otsuka's chemists identified the dechloro impurity; correct?
09:59:41 A. That's correct.
09:59:42 Q. And they actually wrote "dechloro body" in describing

this experiment?
A. Yes, that's in the description.
Q. Okay. Now, do you recall a back-and-forth with Counsel during your cross-examine about whether this 2.0 was really 2.0 molar equivalents, like we've been discussing, or a hydride, which means you divide by 4?
A. Yes, I remember that exchange.
Q. Okay. If we were to divide 2 by 4?
A. That would be 0.5.
Q. It would be 0.5.
Okay. And in all of the materials you've seen in this case, does the dechloro impurity show up at .0 -- at .5?
A. I don't recall other experiments that showed the dechloro by-products under those conditions.
Q. And everything you've heard throughout this trial, Plaintiff is asserting that the range of .25 to .5 is the magic range where you don't get the dechloro impurity; right?
A. That's right.
Q. Okay. So does that impact your belief as to whether this is 2.0 equivalents -- molar equivalents like we've been discussing or the 2.0 hydrides where you have to divide by 4?
A. Well, I -- I want to be careful in answering that. I

think that -- I'm sure the -- the raw data of -- of this experiment may be in Otsuka's documents, so we may be able to go back and check exactly. I'm -- you know, I don't recall other data where the dechloro impurity was -- was seen at only 0.5 equivalents of sodium borohydride, but that is -- you know, that is what is reported here.

So, yeah. I -- I don't want to jump to conclusion about that, if indeed Otsuka has a different convention in these reports of how much reagent they use.

Q. And have you seen any indication that this is 2 hydrides, as opposed to 2 molar equivalents in this document?

A. No. I didn't see any indication in this document that that's the case.

Q. Now, if we could look at -- maybe we don't need to look at the document.

Do you recall looking at the Yukawa declaration?

A. I do.

Q. And specifically Experiment II.

A. Yes, Experiment II, I -- I recall it.

Q. And there are purity comparison in that experiment?

A. Yes, that's right.

MR. ZIMMERMAN: And if we could look at -- let's go to JTX-4 at Page 112.

If we could go to the next page. Keep going.

10:03:20 Four. Next page. Next page.
10:03:26 BY MR. ZIMMERMAN:
10:03:27 Q. Okay. Here we see Experiment II on Page 116.
10:03:31 A. Yes, I -- I see it.
10:03:33 Q. And this was the experiment that led to the purity values that were compared in the Yukawa declaration; right?
10:03:40 A. Yes, that's my understanding.
10:03:42 Q. Okay. And for the method that followed the claim, the purity was greater than 99.5; right?
10:03:50 A. That's what Yukawa reported. Yeah.
10:03:55 Q. And Yukawa reported a value of 99.3 for the *Kondo* using 3 molar equivalent tests; correct?
10:04:06 A. That's right.
10:04:08 Q. Okay. Have you seen any purity comparisons from Otsuka that show the claimed process and the purity that you get from actually using *Kondo* at 1.5 molar equivalents?
10:04:28 A. No, I haven't seen any -- any data that directly compares the *Kondo* process to -- to Otsuka's further development.
10:04:41 Q. With respect to purity?
10:04:42 A. That's right.
10:04:43 Q. And was the Patent Office ever shown that comparison, the claimed purity versus the actual purity of *Kondo's* process using 1.5 molar equivalents of sodium borohydride?
10:05:01 A. No, I don't believe that they were.

MR. ZIMMERMAN: I have no further questions for the witness, Your Honor.

THE COURT: All right. Thank you.

Dr. Dichtel, you can step down. So we'll take a ten-minute break here.

DEPUTY CLERK: All rise.

(Recess was taken.)

DEPUTY CLERK: All rise.

THE COURT: All right. Please be seated.

Did you tell me -- are there any exhibits we need to deal with before we go on to the next one, next witness?

MR. GARRETT: Yes, Your Honor. Plaintiff moves into evidence JTX-16. It's one of Lupin's DMF documents on impurities.

MR. ZIMMERMAN: No objection, Your Honor.

THE COURT: All right. Admitted without objection.

(JTX No. 16 was admitted into evidence.)

THE COURT: All right.

MR. FRIEDRICHS: Your Honor, Matthew Friedrichs for Defendants. We have a couple deposition video clips we'd like to play next.

THE COURT: All right. Go ahead.

MR. FRIEDRICHS: Defendants next call by

deposition Mr. Shigekazu Fujita, who is a named inventor on both patents-in-suits.

May I approach with a few transcripts?

THE COURT: Sure.

(Video played in open court and transcribed as follows:)

MR. BUNKER: This lab notebook is dated from April 1991 through January of 1992.

THE WITNESS: It says -- so it's April '91 through January -- in the experimental notebook it says 1991, but insofar as I can tell, looking at the continuity of this experimental notebook, it's 1992.

Q. Will you turn to the next page, please. This is Page 364.

Does this page also reflect a reduction reaction you performed with the ketone body and sodium borohydride to -- to synthesize tolvaptan?

A. Yes.

Q. And this -- does this page reflect that you made two additions of sodium borohydride for the reaction?

A. You mean these two times?

Q. Correct.

A. Yes.

Q. To confirm, you added 1.2 equivalents of sodium borohydride and then added an additional 0.2 equivalents of

sodium borohydride, correct?
A. Yes.
Q. So in total, you added 1.4 equivalents of sodium borohydride, correct?
A. Yes.
Q. For this reduction reaction, did you need to add 1.4 molar equivalents sodium borohydride to complete the reaction?
A. What it's saying is that in this experimental notebook, 1.4 equivalent was required for this ketone body. I don't recall now how I made this ketone body, but 1.4 equivalent was necessary or needed for this ketone body.
Q. Under your procedure, you say that the reaction was not complete or not ended; is that correct?
A. It does say, yes, because the reaction was not completed.
Q. What did you mean by "the reaction was not completed"?
A. It means that there was the ketone body raw material -- there was ketone body raw material still remaining.
Q. Do you recall how much ketone body raw material still remained?
A. I do not recall.
Q. Do you recall how you determined that there was

ketone body raw material still remaining?
A. No, I don't remember.
(Conclusion of video.)
MR. FRIEDRICHS: Your Honor, Defendants next call Mr. Jim Greene by deposition designation. Mr. Greene is director of financial planning and analysis at Otsuka Pharmaceuticals. This clip will only be about 30 seconds.
THE COURT: Okay.
(Video played in open court and transcibed as follows:)
Q. And Mr. Greene, what is your current title at Otsuka?
A. Director of commercial financial planning.
Q. Are you familiar with what the wholesaler acquisition cost per Jynarque tablet is today?
A. Yes, I am.
Q. And what is it today?
A. I believe it's $326.84.
(Conclusion of video.)
MR. ZIMMERMAN: And, Your Honor, Lupin concludes its rebuttal case on infringement and rests its affirmative case on validity and inequitable conduct.
THE COURT: Okay.
MR. MURNANE: Your Honor, we'd like to call Dr. Roush back to the stand for responding to the opinions that have been offered by Dr. Dichtel relating to the

validity and enforceability issues.

THE COURT: Okay.

MR. MURNANE: Your Honor, may I approach with slides?

THE COURT: Sure.

MR. MURNANE: And also exhibits?

Pardon me, Your Honor. Before we begin, Plaintiff would like to move for a Rule 52(c) judgment with respect to the inequitable conduct issue. We believe that there has been no showing of specific intent by the three named individuals, nor has there been materiality demonstrated.

THE COURT: All right. Well, I don't know about materiality, but it's clear to me that the inequitable conduct is pretty much a frivolous assertion, because there's not the slightest hint of specific intent to defraud the PTO. It's not the single-most reasonable inference. It's not even just a reasonable inference.

My read of the Dr. Yukawa's deposition -- declaration, the first time I saw it, was what was sort of argued by you-all with cross-examination of Dr. Dichtel, which is that he wasn't saying or implying that the *Kondo* used three molar equivalents. The way it was written, it appeared to be saying, I'm following the procedure of *Kondo*, but using three molar equivalents. And so, there was no

deception or concealment on his part.

As for the two attorneys, there's just nothing in the record they -- whatever kind of conversations, if any, they had with Dr. Yukawa. Certainly, there's nothing in the record showing any of these three people had the slightest clue about some lab notebook that was done 20 years before.

And, you know, I think in the mean time, the attorneys doing it. They were they may have slightly misconstrued what it was Dr. Yukawa was saying. So I think that may not be as fully accurate as it could be.

But when they were talking about three molar equivalents, but the most logical inference is they didn't fully understand what Dr. Yukawa had said.

So, in any event, I've never done this before, but I'm going to grant your motion on inequitable conduct.

MR. MURNANE: Thank you very much, Your Honor.

DIRECT EXAMINATION

BY MR. MURNANE:

Q. Good morning, Dr. Roush.

A. Good morning.

Q. Yesterday you testified about your opinions in this case regarding infringement. We've just heard a ruling from the Court.

Were you asked to offer any other opinions with

respect to the obviousness issue in this case?
A. Yes, I was.
Q. And in doing so, did you apply a person of ordinary skill in the art standard?
A. I did. I did, yes.
Q. Was it the same one that you articulated yesterday?
A. It is, yes.
Q. And what, if any, conclusions do you have with respect to the obviousness issue?
A. My conclusion, after reviewing all of the documents, is that the asserted claims in both of the patents-in-suit are non-obvious.
Q. Thank you.
Dr. Roush, let's talk about your non-obviousness conclusion. And we first begin with a consideration of the invention story.
Did you consider the invention story?
A. I did, yes.
Q. Okay. And let's look, if we could, at PDX-3002. This is a slide that you talked about yesterday?
A. That is correct. Yes.
Q. Very, very briefly, how does this relate to the invention story?
A. Well, very briefly, again, it's because within the disclosures in both patents, there's an indication that

production of, in this instance, tolvaptan in high purity in large scale applicable to industrial application is well -- well-defined within the documents.

Q. Okay. And based on your review of the record that you've seen in this case, do you know why the inventors were seeking to develop a process for synthesizing tolvaptan on an industrial scale with high purity and high yield?

A. Certainly. By the early 1990s, the Otsuka scientists had identified the tolvaptan, and had known that the molecule had very favorable pharmaceutical -- or potential pharmaceutical properties by virtue of its vasopressin antagonist activity, and sought to move the compound further into, you know, clinical studies and so on.

But at that point in time, there was not a method available for synthesis of tolvaptan that could produce the material with the level of quantity on the scale -- excuse me, with the level of the purity on the scale necessary -- the large scale necessary to supply the material that was -- would be required for the clinical studies, and then, ultimately, would be required to support the patient population if the drug were approved.

Q. Thank you.

Based on your review of the asserted claims, do you have a view as to how Otsuka's efforts to develop an industrial scale for tolvaptan are reflected in the claims?

A. I do, yes.
Q. And what is that?
A. Well, the claims reflect the process, the key aspect of the process, which enables the tolvaptan to be produced in high purity and high yield and, ultimately, on the large enough scale to support commercial application of the drug.
Q. In your review of the Otsuka information in this case, did you learn anything about any problems that Otsuka had -- Otsuka inventors had in their work?
A. Certainly, yes.
Q. What were they?
A. Well, the Otsuka scientists, in the course of this work, discovered that the -- if you permit me to say, the tolvaptan that had been prepared by other routes, the *Kondo* route that we've heard so much about already, that the material produced by that route could not be purified sufficiently.
They identified that there was a -- what we now have been referring to, Your Honor, is the deschloro impurity that was present that was difficult to remove. And they --
Q. I'm sorry, I don't want to interrupt, but would PDX-3 help with your explanation?
A. Oh, absolutely. Thank you. So, yes, it was known from -- you know, on *Kondo*, for example, that the ketone

10:30:20 precursor, the ketone here on the left is the TLV-III we've heard so much about. The sodium borohydride reduction gives the tolvaptan structure on the right.

10:30:29 And, Your Honor, the deschloro impurity, I've put a red box around Cl, the chlorine atom, and the deschloro impurity, that chlorine has disappeared. It's no longer present in the molecule.

10:30:44 And with respect to your initial question, the problem that the Otsuka inventors discovered was as this deschloro impurity was being generated, that it was difficult to purify.

10:30:57 And at the time they were beginning this effort to scale up and to move the product forward, they did not know how to address and solve this problem.

10:31:09 Q. Thank you. Let's look at Slide 4, please.

10:31:11 Is this one of the slides you prepared for this case, sir?

10:31:15 A. It is, yes.

10:31:16 Q. And does it reflect work by Otsuka on the problem that you've just described?

10:31:20 A. It does, yes.

10:31:22 Q. Would you explain for the Court -- to the Court, please, why you highlighted what did you here?

10:31:26 A. This page, which comes out of the December 1991 Otsuka report, is where Otsuka internally identified that

they had found the so-called deschloro body, the deschloro -- deschloro body is just another name for the deschloro -- the dechlorinated by-product.

So this is where they've identified that. And there's the statement within this paragraph about the difficulties that they -- they, the scientists, were having in their attempts to purify the tolvaptan sufficiently to move forward. And as it states here, they couldn't get to that level of purity.

Q. In the last sentence, Dr. Fujita, who you saw on the screen a moment ago, said that he planned to study the recrystallization method and the reason for the production of the dechloro by-product.

Do you have any information as to whether or not that study took place?

A. Yes. Dr. Fujita and his team performed those studies and reported results on both aspects, both of those studies in the January, February 1992 Otsuka monthly report.

Q. Is Slide 5 a document reflecting that work?

A. Yes. Yes. Yes, this is -- well, part of that work. This is a slide that refers -- or summarizes specifically attempts that Dr. Fujita was making to accomplish the purification by recrystallization.

Q. Okay. This is from PTX-17. This page happens to be Page 4.

Let's look at Slide 6. Is this another slide that you've put together and highlighted?

A. Yes, it is.

Q. And why did you highlight what you did here?

A. I put this slide -- this is the heading, the introduction to the studies that Dr. Fujita performed in his efforts to attempt to understand the cause for the formation of the dechlorinated by-product.

Q. And let's look at Slide 7, please. Why have you included this among the slides that you wanted to discuss today?

A. So there's -- I believe this section of the report is probably three pages long, and it enumerated nine different experiments that were performed by the group, looking at different conditions, looking at effective temperatures, stoichiometry, multiple conditions to see what impact this had on the production of the deschloro compound.

Q. I'm sorry.

A. No, go ahead. I'm sorry.

Q. Would it be correct then that we see Slides 5, 6, 7, 8, and 9, they were all part of that work that you looked at?

A. That is -- we have Slide 9 up at the end, and that would be the last of those. That's correct.

Q. Okay. And let's look at Slide 10, please. This is

also -- this is PTX-17, Page 3.

Could you tell the Court why you created this slide, please?

A. Well, just to present to the Court the ultimate conclusions from that study that Dr. Fujita performed. And he came to the conclusion, based on his experimental data, that the cause for the production of the deschloro, here again, he calls it the dechlorinated body, was that excessive sodium borohydride is the cause.

And he also, in summing up his attempts at the crystallization, he had stated that removal of the dechlorinated body is difficult requiring recrystallization multiple times. He thought it would take up to four or five times to recrystallize to achieve the purification. But with the discovery that the amount of dechlorinated material could be kept to a minimum by using less than 1 molar equivalent of sodium borohydride, then the purification step was simplified and one would not need to do multiple recrystallizations.

Q. Thank you.

MR. MURNANE: Your Honor, if I could just make a housekeeping note here. We've been referring to an exhibit which is a translation, and my understanding is that the original Japanese language is in everyone's binder, PTX-1014, and the translation is PTX-1015.

10:36:21 THE COURT: And -- okay.
10:36:25 MR. MURNANE: Okay.
10:36:26 THE COURT: Great.
10:36:27 BY MR. MURNANE:
10:36:34 Q. And if I may -- if I may, Your Honor, just for housekeeping, I'm also informed that PTX-1017 is the translation of PTX-1016 in everyone's binder, the original Japanese language document PTX-1016.
10:36:53 THE COURT: All right.
10:36:54 BY MR. MURNANE:
10:37:05 Q. Dr. Roush, please look in your binder at PTX-1006.
10:37:11 A. I do apologize, but I wasn't given a set of the binders.
10:37:19 MR. MURNANE: I apologize, sir.
10:37:24 THE WITNESS: Thank you.
10:37:24 BY MR. MURNANE:
10:37:48 Q. I'll pass on that, Doctor. I don't want to take up time with that. I'm sorry.
10:38:02 MR. MURNANE: Pardon me, Your Honor. One minute.
10:38:05 BY MR. MURNANE:
10:38:27 Q. Let's look at Slide 11, please.
10:38:36 A. Yes, thank you.
10:38:37 Q. Okay. What is this slide, Doctor?
10:38:40 A. I'm sorry. I missed that.

Q. What is this slide?
A. Thank you. This is a slide summarizing a paragraph out of the '730 patent which indicates that within the patent itself, the notion that the patent relates to -- well, obtaining, producing Compound 10, the tolvaptan high yield, high purity because the hydrogenating reaction of the present invention can proceed with hardly occurring undesirable dehalogenation reaction, which has been known to occur in the -- well, which has been -- occurred in the known processes. So this is a statement within the patent that the invention actually accomplishes minimization of the dehalogenation, and for the Court, dehalogen -- chlorine is a halogen, so dechlorination and dehalogenation are -- a person of skill would understand to mean basically the same thing.
Q. Thank you. Let's look at Slide 12, please.
A. Yes.
Q. This appears to be a Lupin document. Have you seen this before, sir?
A. I have, yes.
Q. And did you highlight the information here?
A. I did. And what I've highlighted here just simply points out the Lupin scientists themselves were experiencing difficulty in removing the deschloro impurities. So here, one crucial impurity is the deschloro tolvaptan. The level

of this impurity is not reduced during purification.
Q. After the inventors -- the Otsuka inventors discovered the amount of hydrogenating agent to use, was there work to develop a synthetic route for tolvaptan complete?
A. No, it was not.
Q. What more did they need to do?
A. Well, the entirety of the route that was being looked at at that point in time was the *Kondo* routes. It's 11 linear steps. And there are multiple steps within that process which are low yielding. There's problems associated with them.
So the Otsuka scientists revamped the entire synthesis and came up with a different synthesis which -- permit me to call it a convergence synthesis. So they make, let's say, the left-hand part of the molecule by a series of steps. And they make the right-hand part of the molecule by a series of steps.
And then those two are combined very close to the end before you then proceed onward to the -- in this instance, tolvaptan. Persons of skill in process research understand, fully appreciate that a linear sequence -- you know, if you have to do a synthesis over 11 linear steps, the efficiency is intrinsically going to be much less than if you can do two shorter parallel syntheses, then combined

that's the conversion approach.

And the Otsuka scientist in this instance, yes, developed a conversion approach, and this is described elsewhere within the document. The figures that I have summarized in the slide are just, you know, taken from the disclosure and illustrate aspects of making -- Scheme 3 is making the left hand. Scheme 3 is making the right hand. And then in more detail about how you make the right hand over here in Scheme 4. And then at the very end of the synthesis, those pieces are combined and taken forward to the drug substance.

Q. Thank you very much.

MR. MURNANE: James, could you please put up JTX-003, Page 0013?

BY MR. MURNANE:

Q. Okay. Here we have Example 2 from the '730 patent. There's been some testimony about this example to date.

Let's look here, if we could. Thank you.

MR. MURNANE: And we're going to -- James, we're going to go from the bottom of Column 23 up to the top of Column 24.

Right. Thank you.

BY MR. MURNANE:

Q. So we have here, "The chemical," it says, "is suspended in methanol 27 milliliters and thereto is added at

10:43:18 one time crystalline sodium borohydride."
10:43:24 Do you see that?
10:43:24 A. I do.
10:43:25 Q. And the mixture is reacted for about one hours.
10:43:29 A. Correct.
10:43:30 Q. Then it says, "To the reaction mixture is added
10:43:33 dropwise 0.5 percent diluted hydrochloric acid, and the
10:43:40 mixture is stirred at room temperature and then cooled."
10:43:43 Do you see that?
10:43:44 A. I do. Yes.
10:43:45 Q. It then says, "The precipitated crystals are
10:43:48 separated by filtration and dried at room temperature to
10:43:52 give the desired..." -- that's tolvaptan; right?
10:43:56 A. That chemical name on those lines, yes, is tolvaptan.
10:43:58 Q. Okay. And it says, "...as white powder," and it
10:44:01 lists a yield and a melting point. And then it says, "The
10:44:05 pure..." -- the tolvaptan; right?
10:44:06 A. That is correct. Correct.
10:44:10 Q. "...is obtained by recrystallizing the above product
10:44:14 from methanol/water. The ratio is 4 to 1"; right?
10:44:19 A. Yes.
10:44:19 Q. And it says, "The product thus obtained is while
10:44:21 crystalline powder, yield of recrystallization, 90 percent,
10:44:25 purity more than 99.5 percent"; right?
10:44:29 A. That is correct.

10:44:30 Q. Okay. Is this your understanding of how Otsuka made the 99.5 percent pure tolvaptan that is mentioned in the patent?
10:44:41 A. This is, yes.
10:44:43 Q. Thank you.
10:44:43 As far as you know, did Otsuka succeed in developing an industrial-scale synthesis for tolvaptan?
10:44:51 A. Yes. Otsuka did develop an industrial-scale synthesis of tolvaptan using the route that's described from start to finish within the -- these two patents. And so the answer is yes.
10:45:07 Q. Okay.
10:45:08 MR. MURNANE: Let's turn to Slide 14, please, James.
10:45:11 Thank you.
10:45:12 BY MR. MURNANE:
10:45:16 Q. Did you create this slide, sir?
10:45:17 A. I did, yes.
10:45:18 Q. Why did you do that?
10:45:19 A. The question that I wanted to address or begin to discuss with this slide is the question that, when assessing the validity or invalidity of a process -- a product-by-process patent, the question was should the process limitations be considered?
10:45:37 Now, it's my understanding that, in general, the

answer would be no. But there are exceptions. And the exceptions, to my understanding, are that if there are structural and functional differences that distinguish the claimed product from the prior art, then the structural -- then the process limitations should be considered in the assessment.

Q. Thank you.

And did you consider whether the process limitations of the asserted claims impart structural and functional differences that distinguish the claims from the prior art?

A. Yes, I did.

Q. Okay. In your opinion, should the process limitations be taken into consideration when considering the validity of the '730 patent claims?

A. Yes, I believe they should be. In terms of structural differences, the claimed tolvaptan contains minimal amounts of dechlorinated impurity. That distinguishes that tolvaptan from other versions of -- distinguishes it from -- let me call it the *Kondo* version of tolvaptan because the *Kondo* version doesn't have a purity level that's appropriate to -- would never be allowed to be put into a human in clinical studies or as a drug. Whereas the much lower levels of impurities in the claimed tolvaptan meets the criteria of an API for use as a pharmaceutical

agent. So there's a structural difference.

The functional difference comes from the fact that the minimal amount of the dechlorinated impurity enables the tolvaptan, the claimed tolvaptan to be purified more easily, as we saw in that procedure we just went through, by recrystallization. So in my assessment, both the structural differences and the functional differences should be considered and I have done so.

Q. Thank you.

You heard Dr. Dichtel testify on the obviousness subject while you were here; is that correct?

A. I had -- I did, yes.

Q. Did he address the process limitations that are found in the asserted claims?

A. He did not. He thought that they were not -- well, I don't want to put words in his mouth, but my take is that he did not consider the structural or functional differences to be relevant in this case.

Q. Before I ask you about the ultimate obviousness theory that Dr. Dichtel expressed regarding the '730 patent, let's consider the validity of the claims if the -- and when we do that, we'll be considering if the process limitations are taken into account.

My question would be this: Do you believe if the process limitations are not taken into consideration,

the claims have a different valid -- a different -- let me rewind -- reword -- excuse me. Forgive me.

Do you have a different view with respect to obviousness if the conditions are or are not taken into consideration?

A. My view is that the claims are not obvious, whether or not we consider these -- these -- the process limitations.

Q. Okay. And let's take a look at Slide 16. Does this reflect -- is this a slide you prepared?

A. Again, yes.

Q. And does it reflect your views with respect to that question that I garbled when I was asking you?

A. Yes, it does. So the prior art does not disclose the dechlorinated impurity, does not disclose the difficulty in removing the dechlorinated impurity, and does not disclose a solution for avoiding production of the dechlorinated impurity. These three bullet points, this is what the invention was all about. This is what the Otsuka inventors -- these are their discoveries.

And I view, as I think I testified yesterday, as well, that this is an inventive process, and I believe the claims, the asserted claims to be valid.

Q. Thank you.

MR. MURNANE: Let's look at Slide 17, please.

BY MR. MURNANE:
Q. And we considered this yesterday. Just briefly to recap, so Claim 1, you have the highly pure tolvaptan greater than 99.5 percent; correct?
A. That's correct.
Q. Claim 2, the tolvaptan substantially free from at least one of Compounds A, B, C, and D?
A. That is correct.
Q. And Claims 4 and 5 depend on Claims 1 and 2; right?
A. That is -- yes, correct.
Q. Okay. Let's consider with respect to Claim 1, the subject that you see up there, and the topic of motivation.
Would a POSA try to obtain pure tolvaptan by -- by looking for *Kondo* and considering *Kondo*?
A. I don't believe that a person of ordinary skill would select *Kondo* as a starting point. No.
MR. MURNANE: And let's look at Slide 18.
BY MR. MURNANE:
Q. Is this one of your slides?
A. It is, yes.
Q. Okay. And why did you put together this slide as you have for the Court?
A. Well, what's coming out in the moment is actually on the bottom of the slide, is -- is the sequence of steps and intermediates that *Kondo* utilizes from the beginning when

10:50:59 they take starting materials out of a bottle from a commercial source, and 32 at the end is the tolvaptan produced in the *Kondo* reference.

This overall is 11 steps. It's linear, meaning it's a single assembly line going along. I've already commented on how intrinsically inefficient a linear sequence of this would be. And the reason it's inefficient is that -- that in order to make the reduction from 29c to 32, any molecule or any gram or kilogram of 29c that you wish to use, you have to assemble by going through three preceding steps. And the second point that I would make is that the overall yield for this entire process is less than 1 percent. It's 0.68 percent.

So if you permit me to use round numbers, the efficiency in going from 1(a), the initial starting material, to the substrates for the reduction, this is a little above 1 percent overall yield. So that means regardless of how much of the ketone you want to use as a substrate, you're going have to use at least a hundredfold greater amounts of all the starting materials and all the reagents and all the solvents that -- that you have to use and work with when going through each of these steps.

A person of ordinary skill looks at this and says this is not -- this does not have the earmarks of what a commercial -- a commercially viable process for producing

a compound on large scale looks like. So with these deficiencies, lengthy, linear, and already low yielding, it's my opinion that a person of skill would not be motivated to select this, but -- and alternatively, the person would be motivated to find some other means of making tolvaptan.

Q. Thank you.

MR. MURNANE: If we could, James, could we go back to PDX-03? Thank you. For just a moment.

BY MR. MURNANE:

Q. Dr. Roush, Dr. Dichtel testified that a person of ordinary skill in the art would have been motivated to use recrystallization to modify *Kondo*.

Could you briefly explain what the technique of recrystallization entails and your views with respect to what he said and this slide?

A. Very good. Thank you.

THE WITNESS: So, Your Honor, recrystallization, you take a solid -- and let me just back up and say that the underlining principles, that the compound -- the solubility depends on the temperature. For a compound like tolvaptan, it's more soluble at a high temperature than at a lower temperature.

So in performing a recrystallization, you strive to dissolve your starting material in the minimal amount of

the hot solvent, so meaning that the solution is as close to saturated as possible at the higher temperature. As you allow the solution to cool, the solubility of tolvaptan decreases, and it will crystalize and come out of the solution. So that -- that's the principle.

The goal of this crystallization is that you would like to have an impurity -- there could be many impurities, but in this instance you hope that the deschloro impurity will be excluded and that term simply means that you hope that the deschloro remains in the solution as the desired compound is crystallizing.

Two comments, I guess, I'd like to add to this is that because of the solubility considerations, you -- I often speak too much in the absolute. Let me just say that it's usually the case that you do not recover all of the starting material that you put in. I personally have never done a recrystallization where you get back 100 percent of the material that goes in. So I -- so I think it's probably closer that all of the time this would be true.

So you intrinsically are going to lose material when -- when you do this attempt at crystallization, which means that the overall yield of *Kondo*, which was .68 percent before you do additional recrystallizations, is going to become even smaller because of the loss of material, which is -- which is standard practice for doing a

10:55:34 crystallization. So that's one point.

10:55:36 The other point I wanted to make is that when you form a crystal, Your Honor, think -- so the molecules pack and stack in a regular basis in the form. Think of taking bricks or something and putting a mosaic pattern on a driveway or a walkway, how you have these beautiful patterns in the bricks or whatnot.

10:55:56 The goal is that as the molecules are stacking up into this pattern that the impurity won't fit properly and it won't get included in this pattern as -- as the crystal is growing. But you know that if your builder actually uses a brick where the corner has been broken off, you can have a defective brick that goes in. It will still fit. Well, the chlorine -- loss of the chlorine here is a small defect, and it's often the case persons of skill working in the scale-up of drug substances have experienced repeatedly the fact that closely related substances are sometimes very hard to exclude because they can still pack in the crystal, much like a cracked brick can go into your driveway or pavement.

10:56:46 So when doing crystallizations, you expect to see -- would expect a diminished yield because of lack of recovery and no expectation that you're going to be able to achieve purity because of the -- once you know that it's in the deschloro, you know you have this -- it's a structurally

similar compound and know that it will be challenging to exclude it.

BY MR. MURNANE:

Q. Thank you.

MR. MURNANE: Let's go back to Slide 18, please.

BY MR. MURNANE:

Q. Dr. Roush, Dr. Dichtel testified that a person of ordinary skill in the art would have been motivated to use chromatography to modify *Kondo*.

Could you briefly explain what the process of chromatography entails?

A. Dr. Dichtel gave explanations of chromatography, I think, yesterday, and I agree with his explanation, but it's a matter of having a column with a packing material that you allow the mixture to elute through and -- and the differential interactions of different components in the mixture in theory allow you to separate compounds as they move through the column.

Q. Thank you.

Doctor, if a POSA selected *Kondo*, would the person of ordinary skill in the art have been motivated to use recrystallization and chromatography to purify *Kondo's* tolvaptan above 99.5 percent?

A. Well, again, at a high level, I don't think a person of skill would have selected *Kondo*. A moment ago I

testified that -- that I thought additional recrystallizations would be viewed as detrimental and would not provide a motivation.

As far as chromatography, yes, chromatography is expensive. Your ability to actually achieve a separation is compound-specific. I personally -- the 175-some-odd Ph.D. students and post-doctoral associates who have worked in my laboratory have each, on numerous occasions, experienced situations where we've attempted to use chromatography to remove a by-product or to remove an impurity and have been unsuccessful. The ability to separate by chromatography requires that the impurity move through your column at a different rate, but sometimes that doesn't happen, especially if the compounds are closely related structurally.

So I don't view -- it's my opinion that a person of ordinary skill would not be motivated to use chromatography, even if they did select *Kondo* as a starting point.

Q. Thank you.

MR. MURNANE: Let's look at Slide 19, please.

BY MR. MURNANE:

Q. On this slide, could you explain why you highlighted the 30 percent number?

A. I've highlighted this here. This is the experimental

procedure in *Kondo* for producing tolvaptan. And it's just a reminder, both to me and the Court, that the written yield obtained in *Kondo* is 30 percent and that if we did apply -- if we, a POSA, another team, applied recrystallization or chromatography, the yield of this specific step would become even lower, and that would negatively impact the overall process of -- of the *Kondo* synthesis.

Q. Thank you, Doctor.

Do you have an opinion as to what this 30 percent *Kondo* yield, that disclosure would have conveyed to the person of ordinary skill in the art?

A. Well, a person of skill reading this in the context of everything in *Kondo*, *Kondo* describes the reduction of, I think, seven total. So there would be six other structurally related ketones that were reduced. And within *Kondo*, some of these other examples -- well, one of the other examples perceives a 99 percent isolated yield, all of which are performed using the 1.5 molar stoichiometry of sodium borohydride that we've heard so much about.

So a person of skill reading *Kondo*, knowing that close cousins of this compound undergo the reduction in -- in very high yield, would -- would appreciate that the -- that the amount of sodium borohydride is not the culprit.

I believe a person of skill reading this would understand that it was probably the isolation step

associated with this reduction that was problematic.
Q. Thank you.
Dr. Dichtel testified that a person of ordinary skill in the art would repeatedly perform recrystallization or chromatography on *Kondo's* tolvaptan until it was more than 99.5 percent pure.
Do you agree with that?
A. I -- I don't for the -- for the reason that I've already testified, that when you do a recrystallization, you will lose material. And if you have to do this repeatedly, that means you're just increasingly losing more and more material with each repeated recrystallization.
So I view the -- the statement that -- that a person of skill would be motivated to do multiple recrystallizations as -- as -- I just don't agree with that. That's not how the process chemists that -- that I have worked with and interacted with over the entirety of my career would approach this problem.
Q. Thank you.
Yesterday, Dr. Dichtel testified that a person of ordinary skill in the art would have assumed that *Kondo* has a high purity because of the melting point.
Do you agree with that?
A. Well, I thought that -- that statement, I viewed as quite interesting because if -- if Dr. Dichtel is correct

that the 20 -- 225.9 with this high precision, which he highlighted is an indication that -- that the material here is already highly pure, that further would negate any motivation to do additional purifications on it, so...

MR. MURNANE: Let's look at Slide 20, please.

BY MR. MURNANE:

Q. And on the left-hand side, you've articulated Dr. Dichtel's argument that a POSA would have been motivated to use recrystallization and chromatography to purify the tolvaptan disclosed in *Kondo*.

And why do you have the view you have, which is expressed on the rest of the slide?

A. Well, because the -- the motivation that Dr. Dichtel is putting forward with respect to *Kondo*, right, at this stage of the case, is in contrast to his overall position that a POSA would be motivated to reduce costs and simplify post -- post-synthesis processing.

The additional chromatography or crystallizations are expensive and they do not simplify post-processing. And I -- I view the loss of yield as you do repeated crystallizations as a cost because the amount of material that you're producing, based on -- on all the raw materials that you've used is less and less and less. So that means the overall cost is higher for what you're generating.

Q. Thank you.

MR. MURNANE: Let's go back, if we could, to Slide 12, James, please.

BY MR. MURNANE:

Q. This is the Lupin slide we talked about a little while ago. That's JTX-21, Page 1. The email from May 17th, 2017.

On the first sentence, and you've highlighted a portion of it, "Tolvaptan drug substance has one crucial impurity, it is deschloro tolvaptan which is eluted at 0.65 RRT. The level of this impurity is not reducing during purification."

Again, this is 2017, 12 years after the filing of the patents-in-suit; is that correct?

A. That is correct.

Q. And looking at that, do you have any further thoughts as to whether a person of ordinary skill in the art, prior to the filing date of the patents-in-suit, would have been motivated and expected that purification would solve a deschloro problem?

A. Well, I -- I think that anybody who attempted to do this purification by crystallization would have -- would have this experience and I -- I've actually seen another internal Lupin document which -- which give -- gave their data where they did attempt multiple purifications and were

not ever able to generate a sample of the tolvaptan which met their specification of not more than 0.05 percent of this material.

So not only would -- I believe this would be the experience of anybody who attempted this. Lupin themselves have tried the multiple recrystallizations that -- that Dr. Dichtel says would be done, and Lupin was unable to accomplish -- achieve the desired purity.

Q. And, again, prior to the filing date of the patent -- the two patents-in-suit, do you have any information that anyone in the prior art was aware of the deschloro impurity at all?

A. Prior to the filing date of the patents, no. The knowledge, existence of the deschloro impurity was unknown. That had not been disclosed. The presence of that impurity was discovered by the Otsuka scientists.

Q. Thank you.

MR. MURNANE: Let's look at Slide 21, please, James. Thank you.

BY MR. MURNANE:

Q. Dr. Dichtel testified that a person of ordinary skill in the art would be motivated to use PHPLC to purify *Kondo's* tolvaptan.

Do you agree with that, Doctor?

A. No, I -- I don't agree with that, no.

Q. Why not?
A. Again, I've consulted extensively in the pharmaceutical world over -- over a 40-year period. And the process chemists that I have worked with, when they receive a process coming out of the discovery labs, you know, a *Kondo*-type paper, when they receive a process of that type and they see that there may be chromatographies that had been performed, and whatever the discovery scientists group had done, the process groups always strive to -- one of the first things they do is to figure out how to eliminate all chromatography steps.
Within the process research groups that I have interacted with, focusing on the large-scale production of pharmaceutical ingredients, performing chromatography for manufacturing purposes is totally verboten. This is just not -- it's not something that is done. So I don't -- I don't agree with the premise that Mann provides a motivation to actually do so. And I don't think a POSA would do so either.
Q. Dr. Dichtel relied on this Mann reference to argue that a POSA would have been motivated. Is there anything in particular that you see here with respect to this publication that you'd like to bring to the Court's attention as to why you agree or disagree?
A. Well, within Mann's reference, he says -- I've

highlighted here -- that in some cases, particular cases, preparative chromatography has replaced crystallization, but he doesn't say what those cases are. There are no literature citations. There are no chemical structures in the paper. So someone reading this paper has really no idea what the -- what it is that he's referring to.

What are the -- there -- so let me just leave it at that. There's nothing here that would key a person of skill into the possibility that this would actually be something worth pursuing for tolvaptan.

Q. Thank you.

MR. MURNANE: Let's look at Slide 22, please, James.

BY MR. MURNANE:

Q. Here, we have on the left, Dr. Dichtel's argument about expectation of success.

Did you provide the information on the right, Doctor?

A. I did.

Q. Okay. Could you explain to the Court why you included that?

A. Well, for the same reasons that I have testified, that there are no reasons that a POSA would have selected *Kondo*. If a POSA doesn't know about the purity levels of tolvaptan, if a POSA doesn't know what the actual impurities

are or know anything about how easy or difficult it might be to remove those impurities, meaning if a POSA doesn't know that a problem even exists, I don't see how there could be any motivation of success in solving a problem that the POSA doesn't know about. Right.

So I don't see that there's any motivation of success in -- as Dr. Dichtel has testified to on this point.

MR. MURNANE: Let's look at Slide 23, please, James.

BY MR. MURNANE:

Q. Here's another slide referencing Mann.

Is there anything on this slide you'd like the Court to hear about concerning your views with respect to that?

A. Well, Mann does discuss -- thank you -- one case study where he did achieve, by preparative HPLC a purity of 99.5 to 99.7 percent. But Mann does not, again, define what this case study is, what is the structure, what is it that he was removing?

So a person of skill, again, at the risk of repeating myself, wouldn't look at Mann and see anything that says I think that this would be applicable to solving the problem that the POSA doesn't even know about concerning *Kondo*.

I mentioned as well that in one bullet point in

Mann, he does say that the purity is significantly increased, in general, using preparative HPLC when the limit of specification is at the greater than 98 percent level. Certainly, the 98 percent level is not the level of purity that we're seeking in *Kondo*, which is the 99 -- excuse me, in the asserted claims, which is the 99.5 percent level.

So if this is intended by Mann to say this is in general what a person of skill might expect by performing preparative HPLC, the level of purity here is not sufficient for those products to be used as APIs in a drug substance.

Q. Thank you.

MR. MURNANE: Let's look at Slide 24, please, James.

BY MR. MURNANE:

Q. Dr. Roush, did you consider the prosecution history of the '730 patent as part of your validity analysis?

A. Yes, I did.

MR. MURNANE: And Slide 25, please, James.

BY MR. MURNANE:

Q. Did you consider the information on this page?

A. Yes, I did. So we're moving into the decisions made by the -- by the patent examiner. And so here on this slide is just a recognition that initially the examiner rejected the claims and the -- this would be from the '730 -- yes, the '730 file history.

So, initially, the claims were rejected in view of *Kondo*, because at that point of the assessment, the patent adjuster -- the patent examiner, excuse me, concluded that the product of the patent application was the same as *Kondo*, even if made by a different process.

Q. Thank you.

MR. MURNANE: And let's look at Slide 26, please, James.

BY MR. MURNANE:

Q. And did you consider this information on this page, and did you factor that into your thinking with respect to your opinion?

A. Yes, I did. To all of the parts of your question. So the -- in the response from Otsuka to the -- the -- I guess that initial rejection, the Otsuka attorneys pointed out that the pure materials are novel compared to less pure or impure materials because there's a difference between -- there's functional difference, ultimately, between the pure and impure materials.

And they go on to state that, yes, applicants were aware of the teachings of *Kondo* at the time of the filing of the application. But we consider the claimed products to be an unexpected improvement over Compound 32 in *Kondo* in view of the greater purity and so on.

Q. Thank you.

And the next page is 27. Is there something on this page that also factored into your thinking with respect to your opinion?

A. Well, yes. So the Otsuka attorneys pointed out -- or commented in their response to the rejection that -- that according to other -- I don't know if this is a law or this is an interpretation or -- so I'm not sure exactly what the MPEP stands for, but the point is that there's case law that would indicate that a purified form of an old product would be considered obvious over the prior art, if the compound or composition has the same utility or --

Q. Sorry for interrupting, I don't mean to be rude. But I believe the word "whether" at the beginning of that line had some influence on that. If you wouldn't mind starting with "whether." Thank you.

A. "In the assessment that the purified form over an older product is obvious, whether the claimed compound" -- correct.

So you need to compare whether the claimed compound or composition has the same utility as the closely related materials in the prior art, or whether the prior art suggests the particular form or structure of the claimed material or suitable methods for obtaining that form.

And then, again, in their -- the response, the Otsuka attorneys pointed out the important difference in the

purity of the claimed compound and that the purified form is different because of the purity, which allows it to be used as a pharmaceutical entity. And also point out that the prior art did not disclose suitable methods for achieving that purity.

Q. Thank you.

MR. MURNANE: Look at Slide 28, please.

BY MR. MURNANE:

Q. Is there anything here that you also considered?

A. Correct. So here, the attention of the examiner is being brought to the Yukawa declaration, which we've heard a lot about in the past two days. And key statement at the bottom, that the "Declaration of Dr. Yukawa establishes that the product of the present claims is indeed different from and not the less pure product produced according to the teachings of *Kondo*."

Q. And let's look at Page 29, please.

Did you consider anything on this page?

A. Correct. Well, the most -- an important statement on the page is that there's no teaching or suggestion in *Kondo* of how a person skilled in the art could or would modify the teachings of *Kondo, et al.* to obtain a drug product of the recited purity.

Q. Okay.

MR. MURNANE: James, could we also see Slide 60,

6-0?

BY MR. MURNANE:

Q. Okay. A lot has been said about Yukawa being cited by the attorneys. Have you seen this page before from the file history?

A. Excuse me. Yes, I have.

Q. Okay. And here, it begins -- if I may, it says, "Furthermore, it is well known in the medical field that a drug is required to have a high purity, even for use in clinical trials." And there's a citation to the dosing publication.

Do you see that?

A. I do, yes.

Q. And then there's a quote from that publication, Page 16, Lines 6 to 9, which is quoted as saying, "After having been defined, the standard for the quality of the drug, when the medical compound produced by any process found hereafter contains a new impurity of 0.1 percent or more, or contains any impurities as defined in the standard, the medical compound does not conform to the defined impurity profile and, hence, cannot be used for clinical trials."

Did you read this when you were considering the file history?

A. I -- yes, most certainly I did.

Q. And what do you think of what's highlighted thereafter?

A. Well, thereafter, it's pointing out that the difference of even 0.1 percent impurity is significant. And so the difference between the 99.3 percent pure product in Experiment II in Dr. Yukawa's declaration and the purity of more than 99.5 percent, which is recited in Claim 12, is indeed significant.

Q. Thank you.

MR. MURNANE: Let's look at Claim 2 now and -- oh, I'm sorry. One more -- one more.

BY MR. MURNANE:

Q. After this was submitted, including what you just read in the last slide, did the examiner ultimately allow the patent?

A. That is correct. Yes.

Q. Thank you.

MR. MURNANE: Let's look at Claim 2 and Slide 30, please, James.

BY MR. MURNANE:

Q. Earlier you testified that Claim 2 covers tolvaptan that is substantially free from at least one of Compounds A, B, C, and D.

What does "substantially free from" mean to you, Doctor?

11:19:51 A. Well, in the context of this patent, there's information within the disclosure and in the file history which indicates that these Compounds A, B, C, and D, which are impurities in the process, are occasionally obtained in an amount of 0.01 to 0.03 percent by weight respectively compared to the chemical name here, which is tolvaptan.

11:20:21 So I believe that a person of skill would look at this level of these compounds which are occasionally present in -- stated to be occasionally present in the isolated purified tolvaptan. I think that -- this range of numbers would -- would provide the basis for understanding what substantially free from means.

11:20:48 Q. Thank you.

11:20:49 MR. MURNANE: And let's look at Slide 32.

11:20:51 BY MR. MURNANE:

11:20:52 Q. Are these the Compounds A, B, C, and D that you've been studying?

11:20:55 A. That is correct. These are their chemical names, yes.

11:20:58 Q. And were those four compounds known in the prior art prior to the filing of this -- these applications?

11:21:03 A. No, they were not.

11:21:05 Q. In your opinion, would a person of ordinary skill in the art have been motivated to purify *Kondo's* tolvaptan to be substantially free from Compounds A, B, C, or D?

11:21:16 A. My answer is no. And the reason is that without knowledge that these compounds would be present, there could be no motivation to remove them.
11:21:25 Q. In your opinion, would a person of ordinary skill in the art have expected success in purifying *Kondo's* tolvaptan to be substantially free from Compounds A, B, C, or D?
11:21:36 A. And my response here is also no because without knowing what these -- the presence of these compounds, without knowing their properties, a person of skill would not know, you know, how easy it might be to remove them by crystallization. So it could have no expectation of success.
11:21:56 Q. Okay.
11:21:57 MR. MURNANE: Let's look at Slide 33, please.
11:21:57 BY MR. MURNANE:
11:22:01 Q. Dr. Dichtel testified that a person of ordinary skill in the art would have been motivated to purify *Kondo's* tolvaptan to be substantially free from all compounds which would include Compounds A, B, C, and D and reasonably expect success.
11:22:16 Do you agree with that?
11:22:17 A. No, I don't.
11:22:18 Q. Okay. For the reasons you've stated?
11:22:20 A. All the reasons I've stated, yes.
11:22:22 Q. Thank you.

11:22:24 MR. MURNANE: Let's turn to the '735 patent, please, and Slide 34, please, James.
11:22:30 BY MR. MURNANE:
11:22:38 Q. Doctor, what -- generally, what do the asserted claims of the '735 patent cover?
11:22:43 A. Generally speaking, the asserted claims cover the process for producing tolvaptan comprising the reduction of the ketone precursor in the presence of sodium borohydride. Claim 7 has a range of 0.25 to 1 molar equivalent, whereas Claim 8, it's restricted to 0.25 to 0.5 molar equivalents. And then Claim 10 depends from either Claim 6, 7, or 8 -- or sorry -- and 8 -- 6, 7, and 8.
11:23:16 Q. Okay.
11:23:17 MR. MURNANE: Let's look, if we could, please, James, at Slide 36.
11:23:18 BY MR. MURNANE:
11:23:22 Q. And here, this slide is regarding Dr. Dichtel's position regarding the '735 patents and the citation of *Kondo*, *Watthey*, or *LeClerc*.
11:23:35 Have you looked at those references?
11:23:37 A. I have, yes.
11:23:39 Q. Okay. Tell the Court, if you would, what you have done with this slide and whether or not you agree with Dr. Dichtel's position.
11:23:49 A. Well, I've commented already, I think, extensively on

11:23:56 the modification of *Kondo*, and so I don't see any need to repeat that here at this point.

11:24:01 THE WITNESS: But in terms of modifying *Kondo* in view of *Watthey* or *LeClerc*, these two references, Your Honor, *Watthey* and *LeClerc* are ones that Dr. Dichtel identified where less than 1 molar equivalent of sodium borohydride is used in a very small number of -- of reduction reactions. The -- I don't think it's my testimony that those two references would not (sic) motivate somebody to say uh-huh, the issue with *Kondo* is the stoichiometry of the reduction, and based on *Watthey* or *LeClerc*, I can solve the problem by reducing the amount of sodium borohydride. I don't see that as a viable pathway that a POSA would take, and so I don't agree with Dr. Dichtel's assessment on either of these two points.

11:24:57 BY MR. MURNANE:

11:25:00 Q. Thank you.

11:25:04 A. And I guess, sorry, I didn't comment, and also to have the reasonable expectation of success. I think there's no motivation, and I also think that even if they did it, wanted to do it, they would not have a reasonable expectation of success.

11:25:18 MR. MURNANE: Let's look at Slide 38, please.

11:25:20 BY MR. MURNANE:

11:25:24 Q. And I take it this is a slide that's going to grow as

we're talking?
A. It grows.
Q. Okay.
A. Correct.
Q. You prepared this slide, Doctor?
A. I did.
Q. Okay. Why do you believe that a person of ordinary skill in the art would not have been motivated to reduce *Kondo's* 1.5 molar equivalents of sodium borohydride to the claimed amounts?
A. Well, ultimately, I would say that with respect to the -- well, I'm not sure how I want to answer this. The *Kondo,* as I have already described, has multiple, multiple steps associated with it that the overall yield is low, and so one of my first points that I wanted to make is that I don't believe that a POSA would pick -- would have picked *Kondo* as a starting point. So that's high and superimposes over everything.
A POSA, in my opinion, would inspect the prior art, would inspect the literature and find out what else was available at the point of the -- that September 2005, I think, time point, the priority dates for the asserted claims. And what a POSA would see is at least these three other articles that I've identified, there's two Japanese patent applications, and there's a publication here by

Torisawa, one of these Japanese patent applications actually describes a different synthesis altogether of tolvaptan. The other two of these three describe syntheses of intermediates, which would be useful in a so-called conversion approach that I described earlier.

So a POSA, I think, certainly would consider these three pieces of art as a potential starting point. But it's also the case that a POSA could consider something altogether new and come up with a route on their own. And later today, I will discuss one such case where that has been accomplished.

So why don't we allow the slide to grow a little bit to the next level. Fine.

THE COURT: Actually, just before you do that, do I understand from what you're saying that at the priority date 2005, besides for *Kondo*, there was one other synthesis of tolvaptan that was prior art?

THE WITNESS: That is -- that is correct, Your Honor.

THE COURT: And then these other two that you're talking about, they were prior art that showed a synthesis for, I think you said, an intermediate, how an intermediate did the references themselves. Explain that. They were intermediate to tolvaptan or...

THE WITNESS: The references, my recollection --

11:28:31 my recollection, Your Honor, those references indicate that the importance of tolvaptan, that tolvaptan was the group of vasopressin antagonists. So there's a connection in the patents showing that those other documents have -- are relevant to tolvaptan, and they are intermediates that could be used probably in the original *Kondo* process, but it would entail great simplification of *Kondo* by using those intermediates.

11:29:03 THE COURT: All right. Thank you.

11:29:05 THE WITNESS: Thank you.

11:29:05 Okay. So thank you. So we -- as I asked a moment ago, to grow out the figure a little bit.

11:29:14 So if a POSA were to have selected *Kondo*, I've already commented that there are multiple steps that proceed in poor yield, low yield, and that there's multiple stages where a POSA will need to -- would need to make improvements, and so I've highlighted a bunch of these here.

11:29:38 The -- Dr. Dichtel was focused repeatedly on the reduction step, which is 29(c) to 32. And it's important to recognize that in the reduction there's both the chemistry for the borohydride step, but there's also the isolation. I've commented in my testimony, you know, a half hour ago or something, that there are other -- six other examples in *Kondo* where at least one of them precedes a 99 percent yield under the same conditions used for 29(c) to 32 and that it's

my belief that a person of ordinary skill would not view the stoichiometry of the reduction to be the issue but, rather, would view the isolation to be at issue.

So I think a person would actually concentrate, if they picked this step to work on, they would work on the isolation. And that's also consistent with the knowledge that Dr. Dichtel has testified that tolvaptan that's being produced by *Kondo* is already highly pure because of the melting point argument.

My final comment, if we get to if a POSA were to look at the reduction step, certainly there's this sodium borohydride that they could attempt to alter, but a POSA could say, you know, maybe the 30 percent is because this reaction just didn't go to completion. So that would mean let's increase. They could say, from all I've said a moment ago, there's no problem. Let's leave it alone. And Dr. Dichtel says we're going to reduce the amount, decrease the amount of sodium borohydride.

That would have -- I think a POSA would look at that and say that the probability is that this will lead to a diminished -- if the issue is that the reaction hasn't already gone to completion, reducing the amount of borohydride will further exacerbate that by reducing the yield even -- even further. Okay.

So a POSA to do all -- to do what Dr. Dichtel

has suggested has to, you know, leapfrog through on a very specific pathway to get to the point where using/reusing the amount of sodium borohydride is accomplished. And I don't see the motivation to do it.

BY MR. MURNANE:

Q. Thank you.

MR. MURNANE: Let's go to Slide 39, please, James.

BY MR. MURNANE:

Q. And you have at the top your -- one of your decision points first here.

A. Correct.

Q. A POSA would not have been motivated to reduce Kondo's 1.5 molar equivalents of sodium borohydride to 1 molar equivalent or less or 0.5 molar equivalents or less.

And you have some points here that you'd like to discuss?

A. I think I've made these points already in my testimony. So maybe we could move on.

Q. Very good.

MR. MURNANE: Let's look at Slide 40, please.

THE WITNESS: Yes, thank you.

BY MR. MURNANE:

Q. Is there anything you'd like to discuss with respect to this slide?

A. At this stage, no. Again, I'm highlighting the linear nature of *Kondo* focusing on the reduction step and that these figures actually from -- that this is the actual *Kondo* synthesis. So I think that's sufficient. We can move on.
Q. Okay. Look at Slide 41, if you would, please, Doctor.
A. Yes, thank you.
Q. Here we have *Zard*. Did you do any searching in this case, Doctor, when you were thinking about the work you were doing and your assignment to discuss whether or not there was invalidity or infringement here?
A. Yes. When approaching a case like this, when the issue -- the question arises, what is -- what would a POSA select as a starting point? I -- I do a literature search, and I did one here, and the question is looking to find what -- what information -- other information -- other potential starting points might there be that -- that a POSA could look at, and I identified three just a moment ago that we discussed.
But I also, in that search, found this real life example by a group, *Zard*. Remember that early slide I said we would -- that I would come back to the point of coming of -- of having a POSA generate a new synthesis all of their own? Well, *Zard* is what I was thinking of.

So a group of scientists in France who published -- who submitted their first patent application sometime in 2004 and then the French PCT published in 2005.

THE WITNESS: And the bottom line, Your Honor, is that *Zard* generated an entirely different route, which is ultimately encompassed in these other patent documents, which are cited on the slide.

But in reading this *Zard* -- so *Zard* acknowledges that -- that benzazepine derivatives, given this name -- this is on tolvaptan. We see included in the -- I've boxed the OPC-41061, which is the code name for tolvaptan -- comments that these compounds are powerful arginine vasopressins and so on.

Highlighted in green, at Paragraph 4, "However, the various methods of synthesis currently available for obtaining these benzazepine derivatives constitute a major obstacle. Firstly, to obtaining these compounds under satisfactory conditions in terms of yield and cost, and, secondly, in the development of novel derivatives."

And when he's talking about obtaining these compounds by -- by the existing methods, he's referring to *Kondo*. Thus, the method represented in Figure 1 -- Figure 1 is in the *Zard* document. Figure 1 is, in fact, the *Kondo* synthesis which he reiterates.

"Thus, the method represented in Figure 1, which

corresponds to the synthetic pathway currently used to obtain the tolvaptan derivative, comprised 11 consecutive stages, some of which involve drastic conditions, which are not compatible with the presence of a certain number of functional groups."

So, Your Honor, *Zard* had the option of -- of using *Kondo* to pursue the research that he wanted to perform at that point in time, but he recognized deficiencies in *Kondo* and said I can do better, and he generated his own route.

BY MR. MURNANE:

Q. Thank you, Doctor.

MR. MURNANE: Let's look at Slide 42.

BY MR. MURNANE:

Q. Is this a slide that has information that you had already discussed with the Court today?

A. Yes, it is. So this is, again, *Kondo's* path. And I've already discussed the -- the notion of -- of whether one would -- whether -- if a POSA picked this, do they work on the reduction step or the isolation step? And I've already testified that I think the isolation purification step is where a POSA would go.

Q. Thank you, Doctor.

MR. MURNANE: Slide 43, please, James.

BY MR. MURNANE:

Q. This is another of your slides relating to *Kondo*, Doctor.

Is there something here you'd like to tell the Judge?

A. Other than, again, this is -- actually stipulates the high yield that is obtained in one of the reductions. I've already testified to this, and I think the *Kondo* document is in the court record already. So it's probably sufficient for now.

Q. Thank you.

MR. MURNANE: Let's look at Slide 44, please.

BY MR. MURNANE:

Q. Did you prepare this slide, Doctor?

A. I did, yes.

Q. Okay. And what was your purpose in preparing this slide?

A. Just an overall summary that -- that, again, I don't think that a POSA would be motivated to modify *Kondo* by reducing the amount of sodium borohydride used to either reduce costs or to actually simplify the post-processing steps.

MR. MURNANE: Let's look at Slide 45, please.

BY MR. MURNANE:

Q. Is this a slide that you prepared to give more information regarding the reduction in cost?

A. Correct. And I think all the points I've highlighted here are -- are included in my prior testimony. But to summarize -- well, no. This is a little different point. Sorry.

There are additional points here that I would like to make. The first is that process chemists when they take a route to work on, the first priority is getting a route that will work, that has the ability to be scaled up. A person of skill doesn't put reducing costs at the top of the list. There's no benefit to have an unwilled synthesis that's -- that's low yielding or -- and so, you don't want an inexpensive inefficient synthesis. You want an efficient, ultimately inexpensive synthesis.

So -- so in the work that a POSA does, they -- they prioritize making sure that the chemistry works before trying to deal with the -- the cost issues.

The second question, I guess, I would address at this point is using less sodium borohydride really financially beneficial. In this very long synthesis of *Kondo*, which I've already said that -- that we're -- you know, we're literally throwing away over 99 percent of all the raw materials and reagents and solvents, et cetera, that you're using to manufacture, there's a substantial contribution to the overall cost of the process based on the inefficiency.

Sodium borohydride is one of the least expensive reagents that is utilized in this entire 11-step process. So if you -- if you save a penny on -- on hundreds and hundreds of dollars of raw material, is that really a financial benefit? And -- and I would argue I don't think so.

Could using less sodium borohydride actually have an undesirable effect? And I've pointed out already, yes, it could by further reducing the yield.

Q. Thank you. Thank you, Doctor.

MR. MURNANE: Let's look at Slide 46, please.

BY MR. MURNANE:

Q. And here you have some other thoughts concerning the potentially simplifying post-processing and improved safety issue.

Is there anything further you want to tell the Court about this?

A. Certainly. I'd be happy to.

So in terms of post-processing, one of Dr. Dichtel's arguments is that, you know, you have to somehow remove the sodium borohydride. You wind up at the end with sodium ion and inorganic boron species that have to be removed. But the fact is that these boron species are -- are highly water soluble. They could be easily removed by extraction. And we've already seen in the processes that --

11:40:54 in the patent that the tolvaptan is being obtained by crystallization from an aqueous solution where these by-products are already there.

So the notion that reducing the amount of sodium borohydride would somehow make that crystallization easier, there's -- I've seen no data to support that thesis, that that thesis is correct.

Secondly -- well, you've already asked could using less sodium borohydride have undesirable effects. Yes, the yield.

But then what about the safety? Is using less sodium borohydride safer?

THE WITNESS: It turns out, Your Honor, that for many, many years, and maybe even still today, automobile companies or whatnot have been -- have been using -- looking at the use of aqueous sodium borohydride solutions as a source of hydrogen gas for a hydrogen-powered vehicle -- hydrogen-powered vehicle.

So aqueous solutions of sodium borohydride, if -- if at a pH above 10 where the decomposition is slow, are -- are viewed as safe. The -- the -- Dr. Dichtel pointed out that when you quench these reduction reactions with hydrogen chloride, you generate hydrogen gas, which I agree that is -- presents potential safety hazards because of its combustibility in air. Well, process engineers have

already well worked out how to handle hydrogen that's involved in reaction. There's engineering solutions to that problem.

And I'd also point out that if this were truly a concern, the experimentalists could -- could not use -- don't have to use hydrogen chloride in the workup. You can do the workup in a way where there is no hydrogen produced.

Then, finally -- let me make a final analogy, just to -- to comment on -- on the notion that somehow we would be safer, or the experimentalists would be safer if they used .75 moles of sodium borohydride, for example, compared to the 1.5. So this analogy, I'm cutting 50 percent.

We all know that if you have a tank of gasoline in your car, and in certain traffic accidents or car accidents there are fires when the -- when the gas tank ruptures. Are the passengers in the car safer if the gas tank is half full or it's three-quarters full or completely full? You still have a fire hazard.

And if you're using .75 moles of sodium borohydride, there still will be hydrogen gas being involved. So the safety issue, which is hydrogen gas, is not eliminated by reducing the amount of sodium borohydride that's used in the experiment.

So in final assessment, I don't -- I don't

believe that any of these arguments make sense.

Q. Thank you.

MR. MURNANE: Let's look at Slide 47, please, James.

BY MR. MURNANE:

Q. Doctor, are there any other references, besides *Kondo*, that teach reducing ketones using more than one molar ratio of sodium borohydride?

A. Absolutely. So the standard way that POSAs use sodium borohydride is to use it in excess. And -- and what I did here is conducted the literature search looking for compounds in the prior art time -- or publications, excuse me, in the prior art time frame that were structurally related to tolvaptan, meaning that they had the benzazepine core and I found -- I don't know, this slide has 14 -- 1, 2, 3, 4, 5, 6 -- there's 16 papers on this slide. Two of them are my own, the two that says Roush 1980 or 1990, those are not benzazepines. I just wanted to point out that, yes, indeed, I used sodium borohydride. But the other 14 are prior art, and you can see just quickly scanning through, none of them are using less than 1 molar equivalent of -- of sodium borohydride.

So the standard in the field is actually -- the convention in the field is that you can use in excess, and most people typically do. So the notion that a person of

skill would look at and see the quantity of sodium borohydride in *Kondo* as the critical feature that must be modified runs against what a person's personal experience are.

Yes, Dr. Dichtel found two examples where less than 1 equivalent was used. And, yes, there are examples of that type in the literature. But there's nothing in those examples that Dr. Dichtel provided that would motivate someone to actually do so with -- with the lesser amount.

Q. What, if anything, would these references convey to a person of ordinary skill in the art with respect to the subject we've been talking about today, Doctor?

A. This conveys that it's quite common to use excesses, even up to 10 molar ratios, et cetera, of sodium borohydride. And in the cases summarized here, the quantity of the sodium borohydride is not at all associated with any stated problems in any of the reactions that are summarized in all of these -- these patents or -- or research publications.

Q. Thank you.

MR. MURNANE: Slide 48, please, James.

BY MR. MURNANE:

Q. You've spent some time talking about the motivation. Do you have a view with respect to an expectation of success, Doctor?

A. I don't believe that a person of skill would have a reasonable expectation of success, that the -- the modifications of *Kondo* would -- would be successful. No, I don't.

Q. Okay.

MR. MURNANE: Looking at Slide 30 -- excuse me, 49, please, which we've seen before.

BY MR. MURNANE:

Q. Looking at that in light of what you've just been talking about, why did you consider whether a POSA would have reasonably expected to generate tolvaptan in high purity suitable for industrial scale, even though the asserted claims don't mention this?

A. I'm sorry. I missed that.

Q. I'm sorry. I might have spoken too quickly.

Why did you consider whether a POSA would have reasonably expected to generate tolvaptan with high purity suitable for industrial scale, even though the asserted claims do not reference industrial scale?

A. Well, so you're asking about a POSA or about the inventors?

Q. A POSA.

A. A POSA.

Q. Thinking before the filing date of the application, what they were doing.

A. I'm sorry. Okay. Thank you.

A POSA wouldn't -- again, didn't know of the problems that needed to be solved. The POSA didn't know what the purity or impurity level of prior art of tolvaptan were, so there's nothing in the literature that a POSA, prior to the priority date, would know that there's a problem. So they could have no expectation of success.

With respect to the claims, we know that -- we know now that the -- well, the claims -- while the claims don't indicate a purity level, certainly if the claims -- and I think one must read the claims in the context of the patent as a whole -- we know that the tolvaptan that is being produced by that patent in that claimed process does lead to tolvaptan that's greater than 99 or at -- it meets the standard of at least 99.5 percent purity.

So the claims in context with the entire document and then the -- the inventors are stating that we're actually going to be using this process for industrial application. So I think it all ties together quite nicely.

Q. Thank you. Thank you very much.

If a person of ordinary skill in the art, prior to the filing date of the applications, knew about *Kondo* and knew about tolvaptan from any other source, do you have an opinion, as an expert, whether that person would have wanted to make it in only small-batch scale and/or in an industrial

scale?

Do have you an opinion about that?

A. Well, a person of skill who knew the biology, the potential of tolvaptan as a pharmaceutical agent, would recognize I'm going to need to make this on a large scale. Because, you know, a gram quantity, a small quantity synthesis is not going to suffice.

You need -- you're going to need much larger quantities of the drug substance as we move -- as it is moved into the clinical studies and ultimately commercialization.

Q. And the language you've quoted and highlighted on PDX-49 relate to addressing that very point that you've just made?

A. Absolutely. So the multiple references to high yield, high purity, industrial-scale high -- high purity is really critical, absolutely critical for the drug substance. High yield means -- is to help facilitate doing the work on an industrial scale. So I think in repeated places in these highlighted sections, these concepts are all embodied, yes.

Q. In light of that and in light of what you just said about a person of ordinary skill in the art prior to the filing, is that a reason why, when you were analyzing the prior art, you considered industrial-scale applicability even though the claims don't mention it?

A. Oh, absolutely. Yes. Yes.
Q. Thank you.
MR. MURNANE: Let's look at Slide 50, please. Thank you, James.
BY MR. MURNANE:
Q. This slide indicates that Dr. Dichtel relied on *Kondo* in addition to *Watthey* and *LeClerc*; right?
A. Correct.
Q. Okay. Let's look at Slide 51, please.
Have you considered both *LeClerc* and *Watthey*, and did you create this slide because of that?
A. I -- I did, yes.
Q. Would you like to tell the Court about your views?
A. Well, just briefly. And the arrows, even though they originate, seemingly, from one or other of the documents, these comments all apply to both documents.
Within these documents is no information about tolvaptan. Going in a counterclockwise direction, they fail to disclose processes for synthesizing compounds in high yield or high purities. And by that, there's no comments in either document about the purity of the compounds that are being produced.
Here, in the lower right-hand corner, no information about why *Kondo's* synthesis results in low yield, so there's no teachings in either of these documents

which would help a POSA understand anything about *Kondo*.

And, also importantly, these documents fail to teach that the amount of sodium borohydride affects yields. They give experiments. Each using, yes, less than 1 molar stoichiometry, but it's a one-off. We do this reaction under these conditions and we got a high yield.

There's no evidence, statements in these documents, for example, that if we used 1.5 equivalents, we got a 30 percent yield, but if when we used less than 1 equivalent, it becomes a much better yield. There's nothing like that in these.

So in sum, there's really, in my opinion, nothing in these documents which would motivate a person of skill to select the stoichiometry that's highlighted in these -- in these papers.

Q. Doctor, why have you noted that neither reference discloses tolvaptan?

A. Well, again, a person of skill will look to find information about if a specific compound as -- in the highest priority of the search. You want to find out what is known about the -- the real subject at hand. And that information about tolvaptan is not here in either of these documents.

Q. Does either reference disclose processes for synthesizing compounds on an industrial scale in high purity

and high yield?

A. There's no statement in either patent concerning industrial scale. So I did word searches and -- on these documents, and industrial and scale-up and those sorts of concepts, I could not locate whatsoever in either of those documents.

Q. Does either reference explain why the *Kondo* synthesis is low yielding or results in low-purity tolvaptan?

A. Neither one does, no.

Q. Let's look at Slide 52 briefly, which just sets the table that we're now going to talk about *Watthey*, the '520 patent. And that's JTX-47.

And let's look, if we could, at Slide 53.

Is this a slide you prepared, Doctor?

A. It is; correct.

Q. And would you explain for Judge Andrews, please, why you did this?

A. Well, this is the example on -- Example 12 within *Watthey*. This is the name of the compound that they synthesized, and that is not tolvaptan. They did use -- he did use here -- or these authors did use 0.5 molar stoichiometry. It actually doesn't give a yield, so we don't know what quantity.

I mean, as I read this, the solvent was removed. They triturated residue to get the product. They give the

melting point. The optical rotation. But nowhere does it say how much they got, so I don't know what the yield is. So there's no yield here to say this is a great experiment. And there's nothing in this description about the purity of the compound.

So I put this together then, in sum, just to say that again, there's really nothing here that provides a motivation to pick this stoichiometry because of this reference.

Q. Thank you.

MR. MURNANE: James, could we see Slide 54, please, just to set the table for us that we're now going to be talking about *LeClerc* the '573 patent?

THE WITNESS: Yes, thank you.

MR. MURNANE: And let's look at, if we could, James, please, at Slide 55.

THE WITNESS: Okay.

BY MR. MURNANE:

Q. Is this a slide you prepared, Doctor?

A. Yes.

Q. Okay. Could you explain why, please?

A. So here within *LeClerc* is one example where there's a reduction. Here's the compound being prepared. You've -- you read through and do the arithmetic, which is really pretty easy to perform. It's .76 molar ratio of sodium

11:56:50 borohydride. The yield is 90 percent. That's indicated here. I don't know what line number that is, but there's 8 grams, 90 percent yield. The purity isn't specified.

11:56:53
11:56:57
11:57:04 And there's no information here that the yield was worse if they used more sodium borohydride. There's -- anyway, this is all the information there is on this experiment.

11:57:07
11:57:12
11:57:14
11:57:15 And I just wanted to contrast this result again with *Kondo*, who reported examples where the yields were up to 99 percent, which is even better than 90. So there's no indication from *LeClerc*, in combination with *Kondo*, to suggest that the amount of sodium borohydride is what influences the yield, so...

11:57:19
11:57:24
11:57:29
11:57:34
11:57:36
11:57:38 Q. Thank you.

11:57:39 Does *LeClerc* teach anything about using 0.25 to 0.5 molar ratio hydrogenating agent?

11:57:46
11:57:49 A. There are no experimental results and I don't -- sitting here now, I don't recall if there's any discussion of that at all in *LeClerc*. I think not, but okay.

11:57:54
11:57:56
11:58:02 MR. MURNANE: I invite attention now to Slide 56, please, James.

11:58:05
11:58:05 BY MR. MURNANE:

11:58:06 Q. Is this a slide you prepared, Doctor?

11:58:08 A. It is. And --

11:58:10 Q. Explain why, please.

A. Yeah, I simply wanted to point out as well that neither *Watthey* or *LeClerc* had commented on *Kondo* because they both predate *Kondo* by many, many years, by, you know, at least 9 years in *LeClerc* and almost, my arithmetic, 17 years or something with respect to *Watthey*.

So that's one point. A second point is that if a person of skill did want to work with *Kondo*, since *Kondo* post-dates these other two, one would understand that the inventors or the authors of *Kondo* are well aware of *LeClerc* and *Watthey*.

And *LeClerc* and *Watthey* certainly didn't motivate or prompt -- did not influence, let me say, the decision of the *Kondo* authors as to what stoichiometry they performed. So I don't see any reason why some other POSA, picking up *Kondo*, would then go back in time and pick up a -- some presumed motivation from these earlier patents, which *Kondo* themselves did not pick up.

THE COURT: I'm sorry, Doctor, did you say that something like the authors of *Kondo* were certainly aware of these two earlier patents?

THE WITNESS: I -- I did say that. And it's my belief that persons of skill who is -- and there would be POSAs among those. It's my sense that a POSA is generally aware of the art. So I did say that.

THE COURT: So that's a hypothetical construct

for lawyers. Do you think that the actual -- what I interpreted you as saying, though, was the actual individuals of *Kondo* who wrote *Kondo* -- presumably *Kondo*, would have known about *Watthey* and *LeClerc*, and I'm guessing there's no way to know that one way or the other.

THE WITNESS: You're -- I stand corrected, so thank you, you're right. They could easily have found out about *LeClerc* and *Watthey*. So it's available. It's information that's out there. It's not hard to find this type of information. And so I -- yes, I was making an assumption. Thank you.

THE COURT: All right.

MR. MURNANE: Thank you.

James, can we have Slide 57, please?

BY MR. MURNANE:

Q. Doctor, why did you prepare this slide?

A. This is a summary slide where I took the 16 examples that I found from -- you know, I commented that I found from my search. And I just added to it the two examples that Dr. Dichtel had identified and which we just discussed, just so that -- here, there's 18 citations in the prior art showing this wide range of stoichiometries that are being used.

Q. Thank you.

MR. MURNANE: Let's look at Slide 58, please,

James.

BY MR. MURNANE:

Q. And, Doctor, why did you prepare this slide?

A. Well, the slide, this is just to put into context Dr. Dichtel's statements of what the motivation to modify tolvaptan disclosed in *Kondo* would be. And then -- and to juxtapose that versus what I've already walked through in terms of all the different decisions that a POSA would actually have to make in going through this.

Q. Thank you.

Let's turn now to the subject of secondary considerations.

MR. MURNANE: And Slide 61, please.

BY MR. MURNANE:

Q. Doctor, did you prepare this slide regarding this topic?

A. I did. Yes.

Q. Okay. Explain to the Court, if you would, what you did.

A. Well, I was asked to offer my opinion on three of the objective indicia concerning commercial success, failure of others, and unexpected results.

Q. And before we discuss these objective indicia, do you know whether or not -- and let's look at Slide 62.

Do you know whether or not Otsuka has any other

patents related to tolvaptan?
A. Yes, there are two that are highlighted on the slide. There's the '510 patent, a compound patent that was -- date of patent is this -- it was issued in 1993. And then there is a method of treatment patent, the '677 patent here on the right, which issued in 1998. Both of these are Otsuka patents.
Q. Okay. And that's JTX-43 for the '510 patent and JTX-44 for the '677 patent.
Now, let's look at Slide 63, please, Doctor. Did you put this slide together?
A. I did.
Q. And why did you do that?
A. I put this together to really provide a high-level summary of my opinion that these two patents, the '510 and the '677, would not discourage others from working on developing a synthesis, a means of making tolvaptan.
Q. Okay. And let's look at Slide 64 where you've highlighted the first of your six items. And it says, and I read, "well known that existing methods for synthesizing tolvaptan were insufficient for FDA approval/commercialization."
Does Slide 65 have anything to do with that item that I just read about in Item 1?
A. It does. And so here are the asserted patents, '730,

12:04:28 '735, and within them there's a statement highlighted here.
12:04:32 However, the couple prior art documents, which includes
12:04:40 *Kondo*, those methods are not suitable for producing the
12:04:43 desired here, ketone precursor, on an industrial scale.
12:04:48 So this is a statement, again, within the
12:04:51 asserted patents commenting that the prior syntheses
12:04:56 relevant to tolvaptan were not suitable for work on the
12:05:01 industrial level.
12:05:05 Q. And you've talked about *Zard*?
12:05:09 Right?
12:05:09 A. Yes.
12:05:09 Q. Now we look at Slide 66, which is "others were not
12:05:16 discouraged from investigating methods of synthesizing
12:05:19 tolvaptan."
12:05:21 MR. MURNANE: And let's look at Slide 67.
12:05:21 BY MR. MURNANE:
12:05:23 Q. Did you prepare this slide with respect to that
12:05:25 second point that I just read about?
12:05:27 A. I did. So there's a series of other -- well, patents
12:05:38 that fall into the prior art time frame or are real world
12:05:44 examples that show that in that time period past the, you
12:05:50 know, publication of these two earlier, the '510 and the
12:05:56 method of treatment patent, were in existence, but that
12:06:00 didn't prevent groups like *Zard*, whom we've talked about.
12:06:04 This is, you know, a real world example. There were patent

filings by Galapagos Genomics. Specifically, there's '707 application and then also a '693 application concerning tolvaptan or methods of treatment using tolvaptan.

A company called Hetero published a U.S. patent application in 2013, actually has a priority date of 2010. It has process claims for preparing tolvaptan intermediates, including an example for preparing tolvaptan itself. And they reference in this document the '510 patent application.

A fifth example would be RPG Life Sciences who have a patent -- a U.S. patent application filed in 2014. And quoting from within, it says, "Process for the preparation of a benzazepine derivative." And there's a comment that *Kondo's* method for synthesizing tolvaptan is "industrially non-viable" here at this time point.

*Zhang* in 2004 (sic). If I recall correctly, this is a research publication. I think I won't test my memory as to the journal, but it's a research publication published in 2014, and it involves a development of a new method for synthesizing tolvaptan.

So to -- none of the authors or inventors of these works at all felt blocked or excluded by the presence of the other patents which you had on a preceding slide.

Q. And if I may, this slide indicates that the subject matter you've been speaking about is in PTX-1171, 1172, 1173, PTX-1178, 1179, 1180. PTX-1153, PTX-1181, PTX-1182,

PTX-1175, PTX-1155, and PTX-1184.

MR. MURNANE: Let's look at slide --

THE COURT: Actually, before we do that, Doctor, do you know when the '510 patent and the '677 patents expire?

THE WITNESS: I think the five -- well, certainly, I think the '510 expired. It was an earlier issue. I think it expired earlier. Actually, at this sitting, I don't remember the actual expiration dates of them, but I -- but certainly for some of the older references -- well, by the time the most current of these had -- had appeared, certainly that composition of matter patent, I think, had expired. I think. But I would have to double-check the actual dates on the patent to confirm.

MR. MURNANE: May I speak, Your Honor, on that?

THE COURT: So -- yes.

MR. MURNANE: I believe the '510 expired in 2010 and the '677 in 2020.

THE COURT: I thought they were -- they were obtained in 1993 and 1998? Or, I mean, they issued in 1993 and 1998?

MR. MURNANE: Right.

THE COURT: Okay. Wait. And I'm sorry. So you said the -- you think the '510 expired in 2010?

MR. MURNANE: Yes, Your Honor.

THE COURT: And the one that issued in 1998 expired in 2020?

MR. MURNANE: Yes, Your Honor.

THE COURT: Okay.

MR. MURNANE: James, can we have Slide 68, please?

BY MR. MURNANE:

Q. Doctor, why have you prepared this slide?

A. To -- I was pointing out here on this slide that other companies in this -- this time period were also working on developing processes for manufacturing tolvaptan. And I've seen documents that indicate that Lupin began developing its methods for synthesizing tolvaptan by at least 2017. And Lupin actually submitted a DMF for tolvaptan in May of 2019.

Zhejiang Huahai Pharmaceutical Company began its development of methods for synthesizing tolvaptan in 2010, and they submitted their Drug Master File for tolvaptan in 2013. So these are two other examples of groups who were working on synthesizing tolvaptan that again were not dissuaded by the prior patents, and so it would be the method of treatment patent which would still be valid -- or, yeah, would still be valid at the point in time when the work that I've highlighted on this slide was actually accomplished.

MR. MURNANE: And the citations at the bottom of these slides are JTX-017, JTX-021, PTX-1509, PTX-1524, and PTX-1167.

James, may we see Slide 69, please?

BY MR. MURNANE:

Q. Is this one of your slides, Doctor?

A. It is.

Q. Why did you prepare this?

A. That there were multiple other companies working on developing processes for preparing tolvaptan above and beyond the two that I had on that preceding slide. So it's my understanding that the FDA keeps a list, you know, a database that shows the filings, and there are multiple other companies here that -- at least ten who had submitted Drug Master Files with the FDA for tolvaptan prior to the expiration of the '677 patent.

And I highlighted the second bullet that at least five of these companies have filed ANDAs seeking permission to sell generic versions of Otsuka's Samsca product, which is a product that contains tolvaptan as its active pharmaceutical ingredient. And I don't know that I need to read all of these names, but it's, again, a list of ten companies that includes Lupin and a number of other companies as well.

Q. Thank you.

MR. MURNANE: And the information at the bottom of the slide indicates it's based on PTX-1167, PTX-1519, PTX-1520, PTX-1521, PTX-1522, and PTX-1523.

James, may we look at Slide 70, please?

BY MR. MURNANE:

Q. This is the third item you had on your original list, Doctor. And there it says, "The '677 patent does not cover."

Would you explain what you mean by what you've written there?

A. Yeah. So we've just seen that this list of at least ten companies who are filing documents with the FDA, and I commented that this was all work that was done before the '677 patent had expired. Well, the '677 is a method-of-treatment patent, and it does not have any claims for -- for methods of synthesis of tolvaptan.

So the notion -- so these other companies who were working on developing a synthesis were not, you know, infringing on any, at that point in time, existing claims about a compound for the -- you know, the compound patent had expired. So they weren't in any way conceivably infringing on a compound patent. And the '677 was not a compound patent. So there's no infringement in that respect either.

MR. MURNANE: Let's look at Slide 72, please,

James.

BY MR. MURNANE:

Q. Why did you write Number 4 there on your slide, Doctor?

A. Okay. I understand that there is a safe harbor provision which enables companies to synthesize, in this instance, tolvaptan for the purposes of generating the data that they need to create an FDA or regulatory filing and that under the safe harbor, the act of making the compound for, again, generating the data for filing does not constitute an infringement.

MR. MURNANE: And let's look at Slide 73, please, James.

BY MR. MURNANE:

Q. And why did you write the fifth item you've got there, Doctor?

A. Well, the point here is that when you decide to start making a drug versus when you've -- are in a position to begin commercializing the drug, the process takes many years. Typically, it can be -- it varies from drug to drug. Certainly, it depends very much on the circumstances for each specific compound, but on average it's 10 or 12 years, is my -- is my understanding of what the time from the beginning of a process until, ultimately, you have a commercial, you know, approval, regulatory approval.

Again, the time course will depend -- vary from compound to compound, situation to situation. But it takes a long time. It's not a -- in general, it is not a fast process, meaning that at the point in time that we've been looking at, a company beginning to -- a company could easily begin working on a new process for making the compound tolvaptan before, let's say, the '510 had expired with knowledge that my compound isn't going to be out, available to the market until after the '510 is expired.

And so there's this window of time that, I guess, works to the advantage of the group who are working on making the new synthesis.

Q. Thank you.

MR. MURNANE: Let's look at Slide 74, please, James.

BY MR. MURNANE:

Q. Why did you write the sixth point on this slide, Doctor?

A. We're here considering U.S. patents which govern activities in the United States. It's -- you know it's my understanding that those patents would not in any way prevent any group in any non-United States country from working on developing a new process for making a tolvaptan.

THE COURT: Did these patents have foreign counterparts?

THE WITNESS: I don't -- I don't know.

THE COURT: All right.

BY MR. MURNANE:

Q. Doctor, let's look at Slide 75.

MR. MURNANE: If you would, please, James.

BY MR. MURNANE:

Q. And why did you prepare this slide, Doctor?

A. Yes. So the -- it is the case that the FDA granted orphan drug exclusivity to Otsuka for its -- its product here, and that orphan drug exclusivity was granted in April of 2012, as I've indicated here.

From the standpoint of the obviousness analysis, the question is what was available or known in the prior art as of September 2005, and certainly there was no knowledge about an orphan drug status for the tolvaptan product at that earlier time date.

So my -- I guess my point here is that today's knowledge of the orphan drug status would not have any impact, or did not have an impact, at least in my assessment, on the obviousness at the point of the invention date.

Q. Thank you.

Would it have any impact, as far as you're concerned, with respect to the blocking patent issue that you've heard about?

A. I don't see that it would have an impact on the blocking patent issue because, again, in the -- the time period between -- so the orphan drug exclusivity isn't a patent. And -- and I've already talked about the other patents that were there. So I don't -- and the orphan drug status, my understanding, gives a seven-year -- some period of exclusivity once the drug is marketed. My understanding is that this would extend for tolvaptan product to 2025.

So -- so, anyway, my -- my assessment, no, I don't see that this would impact the orphan -- the blocking patent, or it does not contribute to a blocking patent sort of scenario because there's a large time window when this doesn't exist. And then there's still this time window when you can leapfrog -- begin the development while this is in place and be ready to run once the orphan drug status has expired.

Q. When you say "this is in place," you're gesturing to the screen. Were you referring to the September 2nd, 2005, filing date of the patents, and then on the right where you've highlighted in red the April 6th, 2012, FDA grant date?

A. That is correct.

Q. Okay.

A. Yes.

Q. Okay.

MR. MURNANE: Let's turn to Slide 76, please, James, the commercial success.

BY MR. MURNANE:

Q. In your opinion, Doctor, what is the relationship between the claimed inventions and Jynarque's commercial success?

A. I think they're intrinsically -- they're coupled. They're married at the hip, if you permit me to call it that way.

As we've already seen and as I testified, there was not in the prior art, the *Kondo*, et cetera, literature, there was not methods available that would enable tolvaptan to be synthesized in large scale with high purity suitable for use as a -- as a pharmaceutical agent, such as in Jynarque. And so I view this as absolutely essential.

Earlier we heard testimony from Dr. Dichtel saying that -- that really, you know, the compound that's made by -- he said that the issue is -- the properties are the compound, or the compound is the compound, and that it doesn't matter really whether it's -- it would be a tolvaptan made by *Kondo* or a tolvaptan made now by the Otsuka -- the '735 process because the properties of the molecule are the same.

I think that assessment actually leaves out any appreciation for what really is important in the medicinal

chemistry. In medicinal chemistry and drug discovery, we're not dealing with a one molecule at a time. It's not the properties of a molecule that is important. It's the properties of the -- the group of molecules that make up the drug. You're not administering a single molecule to a patient; you're administering a collection of molecules. And the purity of that collection of molecules is critical to the success -- to -- it's critical both to be able to give -- to allow a patient to take the drug, and it's critical, ultimately, to the -- your ability to get an FDA approval. So, to me, the -- the notion that the -- the claims, the claim process are absolutely essential to achieving that with tolvaptan and then with Jynarque.

And that's why I say, I think, you know, the two are married at the hip. You're not going to have a successful drug without these claims, without these patents, which have facilitated the synthesis of tolvaptan with sufficient purity on a high scale -- a high yield, high purity, and obviously for industrial use as well.

MR. MURNANE: Let's look at Slide 77, if we could, please, James.

BY MR. MURNANE:

Q. Doctor, you've just described purity, which is noted at the top of this slide.

Did you create this slide?

A. I did. Yes.
Q. And so you've talked about purity.
Do you have anything to say about yield with respect to the topic we're considering, commercial success here?
A. Well, yield becomes important here. As is highlighted, there's over 10,000 people who have been prescribed and have taken Jynarque. The quantities -- the patients are typically taking 60 milligrams to 120 milligrams per day. Doing arithmetic under pressure, I understand that comment from Dr. Dichtel earlier, but let's round numbers. Let me try to do this.
Let's assume 100 milligrams a day. So that would mean if every day a single patient would be taking -- would need 300 -- 360 times 100 would be -- would be, what? -- 360 grams a year per patient.
If we're having 10,000 people take -- and I don't know if it's 10,000 per year. Actually, once -- once -- I think the drug has to be taken for the lifetime.
So 10,000 people, each of whom are taking on the order of 300 grams of the drug -- no, 300 can't be right. It's 30 grams per drug.
But still we're talking about -- on a year basis, we're talking about something like 300,000 grams of the drug, if I haven't messed up the arithmetic sitting

here. That's a lot of material. That's a large scale. That's many, many kilos that have to be made.

So having a process that's -- that enables the synthesis on high yield is important, and yield comes into that. The yield influences, ultimately, the economics, the efficiency of the synthesis, and the ability to -- to actually produce that quantity of material.

THE WITNESS: And for the Court, I'm sorry. I apologize if I completely messed up my attempted mental calculation of the total quantity, but the point is still it's a large amount that needs to be made.

BY MR. MURNANE:

Q. Doctor, as we began yesterday, we looked at your CV and briefly talked about your 45-year career.

Based on your experience, do you have an opinion whether Otsuka would have been able to develop and commercialize Jynarque without the claimed inventions?

A. I do have an opinion and I do not think it is at all possible that they would have been able to develop Jynarque without the claimed inventions.

Q. Thank you.

MR. MURNANE: James, can we see Slide 78, please?

BY MR. MURNANE:

Q. Doctor, is this a slide you created?

A. Yes. Yes, it is.
Q. In your opinion, does it relate to whether or not others failed to develop a method to synthesize tolvaptan in high purity and in high yield on an industrial scale?
A. It does, yes.
Q. Please explain.
A. Well, *Zard* himself here -- this is an excerpt from *Zard*, he's referring again to *Kondo* and the *Kondo* -- the *Kondo* method has never turned into an industrial-scale synthesis. And I comment that *Zard*'s method, as well, has never turned into an industrial-scale synthesis, nor have any of the other documents that I -- that I had cited that -- that fall into this time period contemporaneous with *Kondo*.
So over many years, lots of people had tried prior to the, you know, invention date -- or rather the priority date for this -- the '730 and '735. And -- and since then, the only viable commercial synthesis that has been developed and is used is the one that we see here today that was -- was generated by the Otsuka scientists using the claimed processes.
Q. Thank you.
MR. MURNANE: James, could you show the last slide, please, Number 79?
BY MR. MURNANE:

Q. Is this a slide you prepared, Doctor?
A. It is. Yes.
Q. And why did you prepare it?
A. Just to point out that -- that this is a page -- an excerpt taken from the Yukawa declaration where Yukawa and the Otsuka team are pointing out the -- the significance of what they've accomplished -- accomplished in terms of the yield of this reduction. So to read it in such a high yield as 82 to 93 percent, which is much higher than the yield (30 percent) in the process of *Kondo*, *et al.*, using sodium borohydride, using NaBH4 of 1.5 mole to 1 mole of the starting compound.
Q. Dr. Roush, based on everything you've seen in this case, do you have an opinion as to how the inventions of the asserted claims compare to other methods of synthesizing tolvaptan in the prior art?
A. This method is superior. This method works. This method enables tolvaptan to be generated in the purity and in the quantities necessary to support use in the clinic. So it's -- it's -- and it is the only synthesis currently available to accomplish all of those things.
MR. MURNANE: Thank you, Doctor.
Thank you, Your Honor.
THE COURT: All right. Well, since it's 12:30, why don't we break for lunch for an hour until 1:30.

DEPUTY CLERK: All rise.

(Luncheon recess was taken.)

DEPUTY CLERK: All rise.

THE COURT: All right. Are we ready to go?

MR. ZIMMERMAN: Yes, Your Honor.

May I approach?

THE COURT: Yeah.

MR. ZIMMERMAN: May I proceed, Your Honor?

THE COURT: Yes.

CROSS-EXAMINATION

BY MR. ZIMMERMAN:

Q. Good afternoon, Dr. Roush.

A. Good afternoon.

Q. I have a few questions, and I hope most of them are direct and very easy for you.

Impurities A through D, identified in Claim 2 of the '730 patent, none of those are the dechloro impurities, are they?

A. That is correct. They are not.

Q. And the asserted claims don't contain any limitation regarding high yield, do they?

A. There are no stated yield requirements in the asserted claims, no.

Q. If you could look at JTX-005.

A. All right. Thank you.

01:32:55 Q. This is the prior art *Kondo* reference; right?
01:32:57 A. That is correct, yes.
01:33:00 Q. Now, *Kondo* discloses a process for synthesizing
01:33:04 tolvaptan; correct?
01:33:05 A. It does. Correct.
01:33:08 Q. And so tolvaptan was a known compound in the prior
01:33:12 art, prior to the priority date of the asserted patents;
01:33:15 right?
01:33:16 A. I agree. Yes.
01:33:19 Q. Now, the process disclosed in *Kondo* discloses all of
01:33:23 the limitations of the asserted claims of the '735 patent,
01:33:29 the process patent, except the ranges of molar equivalents
01:33:34 of sodium borohydride; right?
01:33:36 A. So, again, you're asking if *Kondo* --
01:33:44 Q. *Kondo* discloses everything but the range of molar
01:33:48 equivalents of hydrogenating agent; right?
01:33:51 A. Well, not in its entirety because I would say some
01:34:00 the claims speak of a highly pure tolvaptan. That's not
01:34:03 disclosed in *Kondo*.
01:34:07 Q. Okay. Let me -- let me go back. I'm just looking at
01:34:09 the '735 patent, the process patent.
01:34:11 A. I'm sorry. My mistake. Sorry.
01:34:13 Q. So if we look at that patent, the process in the
01:34:17 asserted claims of the '735 is the same as the *Kondo*
01:34:21 process, and the only difference is the molar equivalents of

reducing agent; right?
A. Well, the -- the '735 claims cover the very last step of what is disclosed in *Kondo*; that is, the reduction reaction in the presence of a hydrogenating agent.
And, yes, *Kondo* does not disclose the amount of reducing agent, and the '735 does not cover everything else that's in *Kondo*.
Q. And I appreciate that and I'm trying to short-circuit this a little. My question is: If I put the asserted claims of the '735 on the board and I scratched out all the things that *Kondo* teaches, the only thing left would be the molar equivalents of reducing agent; right?
A. I -- I would agree with that, yes.
Q. Okay.
MR. ZIMMERMAN: Now, if we look at your slide, PDX-3040.
BY MR. ZIMMERMAN:
Q. This shows the entirety of the synthesis of *Kondo*; right?
A. It does, yes.
Q. And can we agree that it's only this last step, 29(c) to 30, that is actually what's covered by the claims of the asserted patents? Right?
A. The asserted patents cover a reduction step, which corresponds to 29(c) to 32.

01:35:49 Q. Of *Kondo*; right?
01:35:50 A. Of *Kondo*, correct.
01:35:52 Q. Okay.
01:35:52 A. So I think you said -- I -- at least I heard you say
01:35:55 30 in your question, but I -- it's 32, so...
01:35:59 Q. Just so I'm clear. It's 29(c) to 32 of *Kondo*; right?
01:36:04 A. Yes, that's correct.
01:36:06 Q. Okay. Thank you.
01:36:07 Now, the *Kondo* reference doesn't contain any
01:36:13 statements criticizing or disparaging the disclosed method
01:36:17 of synthesizing tolvaptan, does it?
01:36:20 A. *Kondo* does not criticize its own work, no.
01:36:33 Q. And *Kondo* discloses the synthesis of tolvaptan using
01:36:37 1.5 molar equivalents of sodium borohydride; right?
01:36:41 A. That is correct.
01:36:45 Q. Now, a person of skill in the art could -- would have
01:36:50 understood that you could reduce the amount of sodium
01:36:54 borohydride used in *Kondo's* synthesis to the claimed ranges
01:36:59 and still generate at least some tolvaptan; right?
01:37:02 A. So you're saying a person of skill would have
01:37:07 understood that he or she could reduce the amount of sodium
01:37:12 borohydride and still obtain...
01:37:14 Q. Some tolvaptan.
01:37:15 A. Well, in a very broad general sense, that's
01:37:29 probably -- yeah, I would agree. And one would not know

what the level is. I think the person of skill would expect that the yield would be even lower than in *Kondo*, but I think, yes, the person would expect to obtain some -- at least some, which is undefined in your question.

Q. Prior to the priority date of the asserted patents, a person of skill in the art could have determined the purity of the tolvaptan produced by the *Kondo* process; correct?

A. A person of ordinary skill, if they had access to the analytical equivalent to do so, yes, could have determined the purity.

Q. And prior to the priority date of the asserted patents, a person of skill in the art would have been familiar with purifying organic compounds by recrystallization, wouldn't they?

A. I think it's fair to say that a person of ordinary skill would know about the use of crystallization, yes.

Q. And if we could look at JTX-1 at Page 13, Example II. And we'll put it on the screen for you.

A. I'm sorry. JTX-1?

Q. It's the patent, Dr. Roush.

Is it not in the binder?

I apologize. We'll put it on the screen for you.

A. Thank you.

Q. So, you're familiar with Example II of JTX-1, the

patent; right?
A. I -- I am, yes.
Q. And it reports a synthesis of tolvaptan that yields a product that is more than 99.5 percent pure; right?
A. Yes, that's what -- what is stated in the -- in the patent, the -- I guess at the very end of the second paragraph of Example II.
Q. And the compound isn't 99.5 percent pure right after it comes out of the reaction vessel, is it, in Example II?
A. There's no information provided here about that. But the fact that one does this additional recrystallization which should enhance purity, I think a POSA would expect that probably the purity is less than 99.5. But, again, there's no data to confirm that in the absolute.
Q. So even if the asserted patents that use the claimed ranges of sodium borohydride, they use recrystallization on the product that's obtained from those; right?
A. Well, bear in mind that -- so my answer to your question is yes. And if you permit me to just amplify my answer slightly, that when you obtain a crude product, there can be, let me say, impurities present in it that have nothing to do with the actual reduction. They may be compounds that are solvent derived. Inorganic.

There can be a number of other materials being carried along, if you will, for the ride, that are not

01:40:49 tolvaptan related, but which are separated in that crystallization step.
01:40:55 Q. And in Example II, they use recrystallization to get to the 99.5 percent purity; right?
01:41:03 A. Well, again, the product, after the recrystallization, is 99.5 percent pure. I can't say with certainty that they have started from a lower purity. But because your question was "to get to," it's possible that before it was a lower purity, but I don't know for certain.
01:41:22 Q. That's unlikely, isn't it?
01:41:23 A. I operate in the world of data. I'll concede that it is possible that it's less pure, but I also have to concede that I don't truly know that to be the case.
01:41:40 Q. Why would they have run the recrystallization if there wasn't a need to purify?
01:41:44 A. Standard laboratory organic practice to -- to take a product and crystallize it.
01:41:51 Q. So recrystallizing a product is standard laboratory practice; right?
01:41:56 A. In some contexts, yes, it is.
01:41:58 Q. And in the context of tolvaptan, it is; right?
01:42:01 A. In the context of -- this is, I would say, yes.
01:42:07 Q. And, in fact, *Kondo* recrystallized their tolvaptan as well; right?
01:42:12 A. They isolated their product by recrystallization,

that is correct.

Q. Okay. Now, prior to the priority date, a person of skill in the art would have been familiar with purifying organic compounds through chromatography; right?

A. I would agree with that, yes.

Q. Can we agree that tolvaptan has the same molecular structure, regardless of the scale on which it's produced?

A. Well, the -- so the structure is independent of the scale. The structure is the structure is the structure is the structure. And that's independent of the scale. So the molecule itself, if you're asking me the structure, which is the way it would appear on a slide or the way we would draw it on a computer screen, yes. It's the -- the structure itself is, yes, the same, regardless of the --

Q. Okay. Now, you testified at your deposition that, as a general rule, a person of skill in the art seeking to bring a pharmaceutical compound into the clinic would want the compound to be as pure as possible; correct?

A. I don't recall if that's -- I take it that I did say exactly that. I don't -- and I would say yes, as pure as possible. Certainly there are -- we've seen testimony already in terms of what the recommended purity levels are, et cetera.

So the minimum purity would be those -- the purities that we've already seen presented in -- in court

this week.

Q. Yeah. And it's your view that a person of skill in the art would want it to be as pure as possible; right?

A. Well, I used "as pure as possible" in -- evidently in the deposition. It -- it -- there -- so let me say, I would agree that -- with the -- with the answer. There are contexts where in certain studies that you're doing, you may actually -- let me not go there, because you asked the question about in commercial use.

In commercial use, you do want it to be, I think, as pure as you can. And that's always codified in the -- the -- the ANDA, the new drug application, all the information that the inventors have generated, which is a statement of really how pure that they can make the molecule.

Q. Okay. And you would agree that impurities in a drug substance can affect the safety, efficacy, and tolerability; correct?

A. In a broad general sense, yes. Yes.

Q. And it is your opinion that others in the field would have been encouraged, not discouraged, from developing improved methods for synthesizing tolvaptan; correct?

A. Could I see where -- the context of the question that you asked, where I gave that answer, so I understand what it was I was actually talking about when I gave that answer?

Q. Sure. If we could turn to your sur-reply report.
A. My sur-reply.
Q. It's in your binder that I handed up. The binder I gave you.
A. Okay.
Q. In the front.
A. It's labeled as such?
Q. It's either sur-reply or reply. It's your second declaration. And we'll bring it up on the screen.
MR. ZIMMERMAN: If we can look at Paragraph 18.
THE WITNESS: Sur-reply. Fine. Fine. Thank you, but I missed it initially. Thank you.
BY MR. ZIMMERMAN:
Q. No problem. You'll see you wrote in your report, "Given the circumstances" -- "given these circumstances, I believe that pharmaceutical companies and others in the field would have been encouraged, not discouraged, from developing improved methods for synthesizing tolvaptan that could be licensed to Otsuka."
Is that your opinion?
A. I just want to read the -- just, if you permit me on -- so I think this was a paragraph -- so I do agree with the statement. And this was in the context of questions that I was being asked about.
It was your -- the Lupin theory about blocking

01:46:46 patents. And I was commenting that even if there were a blocking patent, somebody still could develop, and would be encouraged to, to make a new synthesis so that they could license. This is particularly in the context when there's a problem with existing technologies, et cetera.

So I agree. I agree with my statement, yes.

Q. And you testified at your deposition that if a person of skill in the art were motivated to modify the process of *Kondo*, they would not ignore the modification of the reduction step; right?

A. I believe in my test- -- my deposition, yes, I would have said that, because I pointed out that there are quite a number of steps that require improvement. And I -- I, a person of skill, would have, yes. The -- the yield of the reduction step is poor. And a person of skill -- that's one of the many that a person would have attempted to improve.

Q. Okay. I appreciate that.

And, Dr. Roush, I'd like to talk about the *Watthey* patent.

MR. ZIMMERMAN: And if we could bring up PDX-3053.

BY MR. ZIMMERMAN:

Q. I'm going to try to short-circuit it with your demonstrative, but if you'd like to look, it's JTX-47 in your binder.

01:48:16 Can we agree that *Watthey* discloses reducing a 5-oxo-benzazepine, which is a ketone precursor, using a ratio of .5 molar sodium borohydride as part of the reducing agent -- I'm sorry, using .5 molar equivalents of reducing agent per mole of precursor?

01:48:40 A. Yes, I -- I agree with this.

01:48:47 Q. And do you agree that there are no statements in the *Watthey* patent that criticize or disparage the use of .5 molar equivalents of reducing agent per mole of the 5-oxo-benzazepine compound?

01:49:00 A. There are no -- to my recollection, the answer would be no, there are no such statements. No.

01:49:06 Q. And there's no statement in *Watthey* that it's incompatible with industrial-scale synthesis, is there?

01:49:12 A. There are no statements that it's not compatible, but there are no statements that it is compatible. And there are no statements that the intent is that they're going to be applying this on an industrial scale. So there's nothing in the affirmative about industrial applicability.

01:49:29 Q. And there's nothing in the negative either?

01:49:31 A. And there's nothing -- correct.

01:49:33 Q. Okay. If we turn to JTX-48, which is the *LeClerc* patent. And, again, I'll try to do this with your demonstrative, 3055.

01:49:46 *LeClerc* discloses reduction of a

5-oxo-benzazepine compound, which, again, is a ketone precursor, using .76 moles of sodium borohydride per mole of the ketone reactant; correct?
A. That is what is disclosed here in -- I guess it's -- in this specific experimental procedure, yes.
Q. And in this example, there is a 90 percent yield; correct?
A. That is correct. Correct.
Q. Was that a yes?
A. I'm sorry. I said "that is correct," so that's a yes. Thank you.
Q. And there's nothing in *LeClerc* that criticizes or disparages the use of .76 molar equivalents of sodium borohydride in this reduction reaction, is there?
A. There's not.
Q. And there's nothing in *LeClerc* indicating that its reduction reaction is incompatible with use on an industrial scale, is there?
A. Well, if you permit me to repeat the same answer that I gave about *Watthey* a moment ago, there's nothing in the negative about industrial applicability, and there's nothing in the affirmative about industrial applicability of this chemistry in -- that *Watthey* is describing.
Q. Okay. If you could turn to PTX-1479. And this is Japanese patent application laid open Number 9-168396 that

01:51:24 you discussed in your direct testimony; correct?
01:51:26 A. I don't have the patent numbers memorized, but I will
01:51:33 take it that it was in my direct. So...
01:51:38 Q. Well, let me see if I can bring up -- give me one
01:51:51 moment.
01:51:53 MR. ZIMMERMAN: If we could bring up Slide 3038.
01:51:53 BY MR. ZIMMERMAN:
01:52:00 Q. And if you look at the second bullet, Dr. Roush, does
01:52:05 that --
01:52:06 A. That --
01:52:06 Q. JPA9-168396?
01:52:12 A. That is correct. Thank you.
01:52:13 Q. Okay. So can we agree that PTX-1479 is the Japanese
01:52:18 patent application laid open that you discussed in your
01:52:21 direct testimony?
01:52:22 A. It is, yes.
01:52:23 Q. Okay. And this Japanese patent application does not
01:52:27 disclose the purity of its synthesized tolvaptan, does it?
01:52:31 A. I don't think it -- I think your statement is
01:52:35 correct. I would agree with that.
01:52:37 Q. And this Japanese patent application does not
01:52:39 disclose any of the impurities in its synthesized tolvaptan,
01:52:43 does it?
01:52:43 A. To my recollection, no, it does not.
01:52:46 Q. And this Japanese patent application does not

disclose the yield of tolvaptan, does it?

A. That, I don't recall. It would -- do you wish to -- could you -- well, I'm not disputing that it doesn't, I just don't happen to remember if it did or didn't. So...

Q. Okay. And then this Japanese patent application does not disclose the synthesis of tolvaptan on an industrial scale, does it?

A. I don't believe that this -- this application also does not use the industrial term anywhere in it, I believe. Thank you.

Q. Okay. And, Dr. Roush, do you want to take a moment and see if it discloses the yield of tolvaptan? I don't believe it does, but the reference is in front of you.

A. In the element of time, I don't think it's a major issue.

Q. Okay.

A. So I accept your statement. Thank you.

Q. Now, if you could turn to PTX-1153. And this is the *Zard* reference that you discussed in your direct testimony; right?

A. Yeah, this is one of them. Again, there were -- there were -- this is a later submitted and issued U.S. application. There were earlier versions or earlier PCTs, but I -- but this is certainly related to the others that I did.

Q. And can we agree that the *Zard* materials you cited are not prior art?

A. I -- I agree with that. You know, I'm not an attorney. I know that the very first patent filing was before the -- I keep calling it the invention dates, but the priority date. And all the publications were later, and it's my understanding under this context that this is not prior art.

Q. And so you're not asserting that any of the *Zard* references are prior art; right?

A. I've made no such assertion, no.

Q. Okay. And *Zard* doesn't disclose the purity of its synthesized tolvaptan, does it?

A. My recollection is no.

Q. Okay. And *Zard* doesn't disclose synthesis of tolvaptan on an industrial scale, does it?

A. It does -- I would agree with that statement. Yes.

Q. Now, in your testimony earlier today, you referred to tolvaptan DMFs that were filed by various companies in connection with your discussion of secondary considerations; right?

A. I did, yes.

Q. And those were shown on Slide PDX-3069; correct?

MR. ZIMMERMAN: If we could bring that up.

THE WITNESS: Yes. This is the slide that I

presented and, yes, it is 3069. Thank you.

BY MR. ZIMMERMAN:

Q. Okay. And all of these were filed long after the priority date of the asserted patents; right?

A. That is correct.

Q. Okay. And they were --

A. Yes. I -- submission dates, yes, I've listed those, and so my answer yes -- is yes. Thank you.

Q. Okay. And I'd like you to leave Lupin out of the analysis. All of these other ones were filed in connection with generic challenges to a different drug, not Jynarque; right?

A. Jynarque -- well, it's a different ultimate trade name for the drug. The active ingredient in Samsca is identical to the active ingredient in Jynarque. So it's -- while you're correct, it's a different pharmaceutical product; the generic drug in all of these instances are the identical generic drug that we're discussing here today.

Q. And, Dr. Roush, my specific question was: Leaving Lupin out of it, all of these other filings relate to a different drug other than Jynarque; right? They relate to Samsca?

A. Oh. With all due respect, I think I -- I answered that correctly, that all of these others on -- that have to do with Samsca, yes, it's a different trade name for the

drug. But the active ingredient in all these other non-Lupin filings is still tolvaptan, and it's the same tolvaptan as is under discussion in this litigation.
Q. Okay. Let's break this down into pieces. When a generic company files an ANDA, they file it for a specific reference listed drug; right?
A. I'll -- having never filed such a document myself, I'll take your word on that.
Q. Okay.
A. So I don't know that for a fact.
Q. Leaving Lupin aside, all these other people were submitting tolvaptan for Samsca purposes; right?
A. The -- you are correct. They were submitting for Samsca, and within the ANDA would be a description of the active ingredient which is tolvaptan, which is the same tolvaptan as we're discussing here today. So...
Q. Okay. And of this group, Lupin is the only one that's actually filed for Jynarque an ANDA; correct?
A. It's interesting. So I have the column on the far right subject. They all say -- well, they say tolvaptan, which is the drug. So I -- I -- I -- sorry. Would you repeat your question?
Q. Of the group listed on your slide, PDX-3069, Lupin is the only one that's filed an ANDA for Jynarque; right?
A. See, I'm running through my memory to -- to see if I

can confirm that that is true. I think it is true. So I will say -- for the moment, I will say I think that is correct, yes.

Q. Okay. Thank you.

Now, you said that Samsca and Jynarque are the same product; correct?

A. Excuse me. I did not say that Samsca and Jynarque are the same product. I said they both have the same active ingredient. The same therapeutic benefit that Samsca or Jynarque provides is due to the tolvaptan that they both contain.

Q. Okay. And, in fact, the -- three of the strengths of Jynarque are the exact same tablet as Samsca with the matching three strengths; right?

A. That I -- I -- I can't testify to. I haven't looked into that very question.

Q. So you know that tolvaptan is the same. You just don't know that the pills are exactly the same; is that what you're saying?

A. I -- I've not gone back and reviewed all the Samsca documents in great depth. I know that Samsca uses tolvaptan as the active ingredient. Whether the pill sizes are the same or different between Samsca and tolvaptan, I'm not surprised that they may be different, but I'm also not surprised that maybe there are some that could be the same.

Q. Do you know the process that was used to make the clinical trial material that was used to test Samsca for the priority date of these patents?
A. You asked "the process" by which -- I know the process by which the active ingredient tolvaptan was used. But the actual process for making the pills and doing all of -- all of that, I've not looked into that.
Q. No, no. What was the process used to make the tolvaptan?
A. The process used to make tolvaptan, to -- to my knowledge, is the -- I'm certainly aware that the process used to make tolvaptan for the drug at issue in today's case is the -- is the process that's disclosed in the asserted patents. And I -- I have assumed that because I haven't attempted to verify that that is exactly the same process that's used for Samsca, but it's my belief that it would be.
Q. Okay. Do you know what process Otsuka was using to make its tolvaptan before the claimed process?
A. I think they were using this very process and -- well, that's an assumption on my part. I have not seen any documentation that states what route they were or were not using.
But my opinion on this is framed because there were no known methods for manufacture of tolvaptan prior to the filing date of the asserted claims that could be used to

02:02:25 scale up and make material.

02:02:28 So I have always assumed that for the material
02:02:31 that was produced in the clinical studies, that it's again
02:02:34 the claimed process, that Otsuka had the process at hand.
02:02:39 They were making material, and then they in parallel filed
02:02:43 the application and so on.

02:02:44 Q. So you don't know if Otsuka was using *Kondo's* method
02:02:47 before it began using the patented method, do you?

02:02:51 A. Definitively, no, but the liabilities are in *Kondo*.
02:02:58 I -- I could not believe that. No one anywhere -- anywhere
02:03:02 has demonstrated that one can take -- no one has
02:03:05 published -- there's no public record of anybody ever taking
02:03:09 *Kondo* and purifying the tolvaptan to the level that's
02:03:14 appropriate to put it into a human patient. So I -- I do
02:03:20 not believe that the *Kondo* procedure was used to make
02:03:25 clinical trial material.

02:03:27 Q. Okay. So the tolvaptan that Otsuka was making, prior
02:03:32 to discovering the dechloro impurity, what process was that
02:03:38 made by?

02:03:39 A. The dechloro impurity was discovered -- it was
02:03:43 reported in the December 1991 research report on -- the
02:03:50 clinical studies started well after that. And the method
02:03:58 that was used at the 1991 time frame could have been related
02:04:07 to *Kondo*, but the Otsuka team were even at that point in
02:04:12 time working to improve the routes. So I can't say with

certainty today what they were using in 1991.
Q. And it's okay if you don't know.
A. Other than that, I don't think in 1991 they yet had the process which is in the asserted claims.
Q. Okay. Now, you agree that the molecular structure of tolvaptan is what provides its efficacy; right?
A. I do. Yes.
Q. Okay.
MR. ZIMMERMAN: Now, if we could go back to your Slide PDX-3038.
BY MR. ZIMMERMAN:
Q. And this is your exploding prior art chart.
I believe you testified that a POSA would have known that there were two available methods to synthesize tolvaptan; is that right?
A. At that -- at that point in time, that would be -- I guess that is correct. There's *Kondo* and then the Japanese patent application that we looked at a moment ago. So the JA-9 (sic) at the 12 o'clock position on the slide. Those were the two.
Q. The one that's labeled JPA9-168396?
A. Yes, thank you.
Q. And the other two patents related to producing intermediates; right?
A. Intermediates which, yes, that were amenable for use

02:05:44 in a tolvaptan synthesis.
02:05:46 Q. So can we agree that if a person of skill in the art at that time was trying to make tolvaptan, they basically had two choices for the synthesis. *Kondo* and the JPA9-168396 method?
02:06:02 A. No, I wouldn't agree they had two choices because I testified that a person of skill at that point could have come up with an altogether different route. And so...
02:06:14 Q. Okay. Let me --
02:06:15 A. That --
02:06:15 Q. -- rephrase.
02:06:17 If the person of skill in the art had started with one of the available synthesis methods, there were only two at the time of the priority date, *Kondo* and the one in JP-A-9-168396; correct?
02:06:31 A. I'm only reporting -- those are the two that, to my knowledge, were available in that prior art time frame.
02:06:41 Q. Okay. And if we go to your Slide 3041, this is the *Zard* reference that you spent a fair bit of time on; correct?
02:06:58 A. It is, correct. Thank you.
02:07:00 Q. And -- and you said that *Zard* is -- is evidence of what was going on in the real world; right?
02:07:06 A. I -- I -- I've put real-life evidence on the slide, yes.

02:07:13 Q. Yes. And so at the time of *Zard*, you had two synthesis for tolvaptan; right? One from *Kondo* and one from the Japanese application; right?
02:07:24 A. Yes.
02:07:27 Q. And *Zard* tells us -- if we look at the last paragraph, Paragraph 5, "Thus, the method represented in Figure 1" -- and that's *Kondo's* method; right?
02:07:39 A. That is correct.
02:07:41 Q. -- "which corresponds to the synthetic pathway currently used to obtain the OPC-41061 derivative comprises 11 consecutive stages." Right?
02:07:57 A. That -- that is correct.
02:07:58 Q. So *Zard* tells us that the method that was currently being used was *Kondo's*; right?
02:08:06 So of the two available methods, the one in the Japanese application and *Kondo*, the one *Zard* tells us in real life was currently being used is *Kondo*; right?
02:08:17 A. Well, that's the -- the language that is written. And there are two that are out there, and he's specifically -- *Zard* and his team are specifically referring to *Kondo* here.
02:08:34 MR. ZIMMERMAN: I appreciate your time, Dr. Roush.
02:08:35 I have no further questions, Your Honor.
02:08:36 THE COURT: All right.

02:08:37 Any redirect?

02:08:38 MR. MURNANE: No, Your Honor.

02:08:39 If I may, though, if I could trouble the Court, 02:08:44 there were a number of exhibits to be offered. It's a 02:08:48 rather long list, Your Honor. I could do what I did 02:08:51 yesterday, or I could perhaps speak with counsel and we 02:08:54 could agree and then give the list to the court reporter.

02:08:57 THE COURT: Well, I think it should be done on 02:08:59 the record, but it can be done on the record later.

02:09:01 MR. MURNANE: Okay.

02:09:02 THE COURT: Because it seems like everyone is 02:09:04 working cooperatively on this, so...

02:09:08 And I assume, realistically, Dr. Roush isn't 02:09:12 leaving, so if there was a problem we could get him back.

02:09:16 So in any event, Doctor, you're finished. Watch 02:09:20 your step stepping down. Okay.

02:09:21 THE WITNESS: Okay. Thank you.

02:09:23 MR. MURNANE: Thank you, Your Honor.

02:09:24 THE COURT: All right.

02:09:26 MR. GARRETT: Your Honor, we next have some 02:09:32 deposition videos to play. My colleague Becky Steephenson 02:09:37 is going to introduce them.

02:09:39 THE COURT: Okay.

02:09:40 MR. GARRETT: Thank you, Your Honor.

02:09:44 MS. STEEPHENSON: Good afternoon, Your Honor.

02:09:47 We're going to be calling by deposition, Dr. Girij Singh again, but for our arguments on validity.

02:09:53 And as explained yesterday, Dr. Singh is Lupin's 30(b)(6) witness on the DMF.

02:10:00 THE COURT: Okay.

02:10:01 MS. STEEPHENSON: May I approach with some binders and the transcript, Your Honor?

02:10:05 THE COURT: Sure.

02:10:05 MS. STEEPHENSON: Thank you, Your Honor.

01:52:45 (Video played in open court and transcribed as follows:)

02:11:17 MR. GARRETT: Okay. I'm going to mark Exhibit 10, which is a document bearing Bates numbers LTOL 0021901 through LTOL 0022187.

02:11:49 Q. Does this document look familiar to you, Doctor?

02:11:52 A. Yes.

02:11:58 Q. This document describes the potential impurities in the tolvaptan synthesized under Lupin's DMF, correct?

02:12:07 A. Correct.

02:12:13 Q. This is a document that Lupin submitted to the FDA as part of its DMF?

02:12:16 A. Yes.

02:12:20 Q. And in Exhibit 10 I am turning to page LTOL 0021905. And on this page there is a impurity titled TLVRC-1, which has the name deschloro tolvaptan. Do you see that, doctor?

02:12:46 A. Yes.

02:12:49 Q. And then the structure of the deschloro tolvaptan is provided on this page of Exhibit 10?
02:12:58 A. Yes.
02:12:58 Q. So you will agree that Lupin was aware of the deschloro impurity at least as early as April of 2016?
02:13:11 THE DEPONENT: Yes, this document says so.
02:13:12 Q. I am going to mark Exhibit 30, which is a document bearing Bates number LTOL 0032098.
02:13:35 Does this document look familiar?
02:13:36 A. Yes.
02:13:38 Q. And what is it?
02:13:44 THE DEPONENT: Well, an email referenced tolvaptan impurity.
02:13:50 Q. And this is an email from Shailendra in May of 2017, correct?
02:13:57 THE DEPONENT: Correct.
02:14:00 Q. And you are cc'd on this email?
02:14:02 A. Yes.
02:14:07 Q. The first sentence states, "Tolvaptan drug substance has one crucial impurity, VIZ deschloro tolvaptan, which is eluted at 0.65 RRT," correct?
02:14:22 A. Correct.
02:14:24 Q. And tolvaptan has a number of impurities, correct?
02:14:28 A. Correct.
02:14:32 Q. And this email is calling out only one of those

02:14:36 impurities as being crucial, and so I'm asking why is the
02:14:41 deschloro tolvaptan the one crucial impurity?
02:14:49 THE DEPONENT: That's what this document is
02:14:50 saying, it is crucial.
02:14:53 Q. All right. We are looking at Exhibit 30, Page 32098.
02:15:00 Doctor, in this email Shailendra is explaining
02:15:05 that the level of the deschloro tolvaptan is not reducing
02:15:12 during purification, correct?
02:15:14 A. Correct.
02:15:23 Q. This email indicates that Lupin was having difficulty
02:15:33 in reducing the amount of the deschloro tolvaptan impurity,
02:15:42 correct?
02:15:45 THE DEPONENT: Correct.
02:15:46 Q. And Shailendra was seeking the assistance of others
02:15:52 at Lupin to resolve that issue.
02:15:57 A. Yes.
02:15:59 Q. Who is Shailendra?
02:16:13 A. He's a chemist.
02:16:18 Q. And how many years of experience does Shailendra have
02:16:24 as a chemist?
02:16:29 THE DEPONENT: Not sure, but I believe more than
02:16:31 ten years.
02:16:33 Q. And in 2017, did Shailendra have more than ten years
02:16:38 of experience as a chemist?
02:16:41 THE DEPONENT: More than five years, I believe,

02:16:44 in 2017.
02:16:45 Q. But you agree that during the development of
02:16:48 tolvaptan, Lupin struggled with reducing the amount of the
02:16:53 deschloro tolvaptan impurity.
02:16:56 THE DEPONENT: I don't think so. As per this
02:16:59 email, a particular batch they are describing that the level
02:17:04 of this impurity is 0.11 and 0.13. So this is restricted to
02:17:14 the particular experiment.
02:17:15 Q. And the experiments being referenced in this email
02:17:17 were unsuccessful in that the deschloro tolvaptan impurity
02:17:25 amount was above the acceptable limit, correct?
02:17:28 A. Yes.
02:17:34 Q. Right. Did Lupin consider using less sodium
02:17:40 borohydride than 1.2 or 1.3 moles in order to reduce the
02:17:44 amount of the deschloro tolvaptan impurity?
02:17:54 A. I don't think so.
02:17:57 Q. Why not?
02:17:59 A. No, because I am seeing not only this email for one
02:18:05 particular batch there was high levels, but my -- my
02:18:15 understanding that we never have had any problem during
02:18:20 exhibit batches of tolvaptan with respect to this impurity.
02:18:26 Q. I am going to mark Exhibit 31, which is a document
02:18:31 bearing Bates number LTOL 0035105. Does this document look
02:18:39 familiar to you, Doctor?
02:18:40 A. Yes.

Q. What is this document?
A. Well, they talk about deschloro impurity of tolvaptan (inaudible) team member to another team member.
Q. This is an email sent by Shailendra in June of 2017, correct?
A. Correct.
Q. And the subject is deschloro impurity tolvaptan, correct?
A. Correct.
Q. And there are three attachments to this email?
A. Yes.
Q. All right. I'm going to mark as an exhibit one of those attachments. I am marking as Exhibit 32 a document bearing Bates numbers LTOL 0035106 through 35107. Does this document look familiar to you, doctor?
A. I've not seen this before.
Q. Is this a document that was generated at Lupin?
A. Yes.
Q. And the title of the document is Project Initiation Form?
A. Yes.
Q. And the background states, "Tolvaptan API is being developed for Japan market. The API has deschloro as a crucial impurity." Correct?
A. Correct.

02:20:36 Q. And then the comments on Page 35107 state, 02:20:48 "Crystallization method needs to be developed for tolvaptan 02:20:51 free of deschloro impurity," and there is a parenthetical 02:20:56 which states "(below 0.05 percent.)" Correct?
02:21:01 A. Correct.
02:21:03 Q. So this document indicates that Lupin undertook a 02:21:07 project to develop a crystallization method to reduce the 02:21:15 amount of the deschloro impurity, correct?
02:21:19 THE DEPONENT: This document states so.
02:21:29 BY MR. GARRETT:
02:21:31 Q. I'm going to mark Exhibit 33. Okay. So Exhibit 33 02:21:36 was produced to Otsuka by Lupin in its native format which 02:21:42 is an Excel document. It bears Bates number LTOL 0035111. 02:21:52 Doctor, does this document look familiar to you?
02:21:59 THE DEPONENT: Well, I have not seen this 02:22:03 before, best of my knowledge.
02:22:06 Q. Doctor, a moment ago we looked at an email from 02:22:09 Shailendra in June of 2017 that had the subject Deschloro 02:22:16 Impurity Tolvaptan. Do you recall that?
02:22:18 A. Yes.
02:22:23 Q. And one of the attachments to that email was an Excel 02:22:27 document with the file name TLV-IV to tolvaptan data. Do 02:22:34 you recall that?
02:22:34 A. Yes.
02:22:40 Q. The document we are looking at now in Exhibit 33 has

02:22:43 that same file name. Do you have any reason to doubt that Exhibit 33 was an attachment to the Exhibit 31 email from Shailendra?
02:22:56 A. No.
02:23:01 Q. And so the experiments listed in this document are purification experiments from TLV-IV to tolvaptan, correct?
02:23:12 A. Correct.
02:23:18 Q. And this document has 29 different experiments listed?
02:23:28 A. Yes.
02:23:30 Q. And do you see the column which provides details on the deschloro impurity amount?
02:23:40 A. Yes.
02:23:48 Q. And in none of these 25 -- in none of these 29 experiments was Lupin successful in reducing the amounts of the deschloro impurity below the limit of 0.05, correct?
02:24:03 A. Correct.
02:24:11 BY MR. GARRETT:
02:24:12 Q. I am going to mark Exhibit 34 which is a document bearing Bates numbers LTOL 0032088 to LTOL 0032094. Does this document look familiar to you?
02:24:34 A. Yes.
02:24:40 Q. What is it?
02:24:41 A. The purification report on tolvaptan has been generated by our team member.

02:24:51 Q. This was a document generated at Lupin?
02:24:53 A. Yes.
02:24:56 Q. Turning to Page 32089, there is an objective. The objective of this project was to develop a purification process to remove deschloro impurity of tolvaptan to no more than 0.05 percent, correct?
02:25:16 A. Correct.
02:25:24 Q. Turning to the last page, 32094, under conclusions the second bullet point explains that purification to the desired level can be achieved with two rounds of purification; is that right?
02:25:54 A. Yes.
02:26:00 Q. Now, above conclusion -- above the conclusions section there is a yield number provided for one purification which is .7 to .8, correct?
02:26:14 A. Correct.
02:26:19 Q. If the purification was .7 to .8 for one purification, what would the yield have been for two rounds of purification?
02:26:30 A. I do not know. I will have to see this document, what is the yield obtained from the second purification.
02:26:45 Q. It would have been lower than 70 to 80 percent, correct?
02:26:49 A. Obviously.
02:26:58 (Conclusion of video.)

MS. STEEPHENSON: Your Honor, Plaintiffs would like to enter into evidence the following exhibits from Dr. Singh's deposition. Exhibit 30, which is JTX-21. Exhibit 31, which is JTX-22. Exhibit 32, which is JTX-23. Exhibit 33, which is JTX-24. And Exhibit 34, which is JTX-25.

MR. ZIMMERMAN: No objection, Your Honor.

THE COURT: Admitted without objection.

(JTX Nos. 21, 22, 23, 24, and 25 were admitted into evidence.)

MS. STEEPHENSON: Thank you, Your Honor.

MR. GARRETT: Your Honor, Plaintiff calls Dr. Ron Gansevoort. Dr. Gansevoort will offer testimony on ADPKD, long-felt need, and failure of others.

DEPUTY CLERK: Please state and spell your full name for the record.

THE WITNESS: My name is Ron Gansevoort.

DEPUTY CLERK: Do you affirm that the testimony you are about to give to the Court in the case now pending will be the truth, the whole truth, and nothing but the truth, you do so affirm?

THE WITNESS: I promise.

RON GANSEVOORT, the witness herein, after having been duly sworn under oath, was examined and testified as follows:

02:28:51 MR. GARRETT: May I approach, Your Honor?
02:28:53 THE COURT: Yeah.
02:29:38 MR. GARRETT: Your Honor, may I begin?
02:29:40 THE COURT: Yeah.
02:29:40 DIRECT EXAMINATION
02:29:41 BY MR. GARRETT:
02:29:41 Q. Good afternoon. Would you please introduce yourself
02:29:44 to the Court?
02:29:45 A. My name is Dr. Ron Gansevoort.
02:29:47 Q. All right. Dr. Gansevoort --
02:29:53 MR. GARRETT: James, could we show PTX-1554 on
02:29:57 the screen?
02:30:02 BY MR. GARRETT:
02:30:04 Q. Dr. Gansevoort, could you please identify the
02:30:06 document on the screen?
02:30:06 A. That's my CV.
02:30:10 MR. GARRETT: Plaintiff moves to introduce
02:30:12 PTX-1554 into evidence.
02:30:15 MS. PITZEL CRUZ: No objection.
02:30:16 THE COURT: Admitted without objection.
02:30:18 (PTX No. 1554 was admitted into evidence.)
02:30:19 BY MR. GARRETT:
02:30:20 Q. All right. Dr. Gansevoort, where do you currently
02:30:21 live?
02:30:21 A. I live in Groningen, the Netherlands.

02:30:24 Q. And where are you currently employed?
02:30:26 A. I'm employed at the University Medical Center
02:30:30 Groningen, Netherlands.
02:30:32 Q. And how long have you been practicing medicine?
02:30:34 A. Around 20, 23 years.
02:30:39 Q. Do you specialize in any areas?
02:30:41 A. I specialize in internal medicine, and especially in
02:30:46 kidney diseases nephrology.
02:30:49 Q. And how many patients have you treated with ADPKD?
02:30:51 A. During the times that I've specialized, I've treated
02:30:56 around 300 patients with this disease.
02:30:59 Q. And how many publications do you have related to
02:31:03 ADPKD?
02:31:03 A. Specifically to ADPKD, I would say around 200, 250.
02:31:10 And my overall work would be around 700 publications.
02:31:15 Q. Have you conducted any research related to ADPKD?
02:31:19 A. Yes. Quite some work. For instance, clinical
02:31:27 trials. I did the clinical trials sponsored by the
02:31:31 pharmaceutical industry. I was the chair of the committee
02:31:36 on -- university committee, some of these trials were
02:31:41 sponsored by pharmaceutical companies, but I've also done
02:31:44 investigative trials, and some trials that I started them
02:31:47 myself.
02:31:49 Q. Thank you, Doctor.
02:31:51 MR. GARRETT: Plaintiff offers Dr. Gansevoort as

an expert in the treatment of ADPKD.

MS. PITZEL CRUZ: No objection.

THE COURT: And you may proceed.

BY MR. GARRETT:

Q. Doctor, you mentioned doing clinical trials I think with tolvaptan. Have you personally earned any money as a result of your involvement with the tolvaptan clinical trials?

A. No, I did not. You always get a reimbursement for costs that are made during a clinical trial. For instance, to pay study nurses or research doctors, but that reimbursement goes to the institution and not to physicians personally. That's not allowed in the Netherlands.

Q. And, Doctor, what are you here today to discuss?

MR. GARRETT: And, James, if we can go back.

THE WITNESS: I've been asked to provide testimony on autosomal dominant polycystic kidney disease and treatments of this disease. And to provide testimony explaining that Jynarque has fulfilled a long-felt unmet need. And how Otsuka succeeded in producing an effective treatment where others have failed.

BY MR. GARRETT:

Q. Could you briefly describe ADPKD as a disease?

A. ADPKD is an acronym, what's stated there on the slide. It's autosomal dominant polycystic kidney disease.

Autosomal means that it is not X linked, so that it affects both genders in an equal way.

Dominant is that when somebody has the mutated gene, they will give it to their children, there's a 50 percent chance. So boys, girls alike will have a 50 percent chance of getting this disease.

And the disease essentially is that during lifetime, cysts are formed, and these cysts grow. When people are young, they have got only a few cysts. But during lifetime, this increases, and people develop hundreds to thousands of cysts. And these cysts, these compressed fiber kidney tissue leading to a loss of kidney function. And people progress to towards kidney failure. And then they need kidney function replacement treatment, such as dialysis or a kidney transplantation.

Q. Do you have any examples today of literature describing these effects of ADPKD?

A. Yes. Several papers that I have co-authored or written, and here in this slide are two papers shown. One with my colleague Vicente Torres from the Mayo Clinic in Rochester. And the bottom one with Arlene Chapman from Chicago.

And, here, we provide more details on the disease, that the disease not only results in progressive development of kidney cysts, but these cysts can also be

02:34:48 painful. People always have hypertension. And it also
02:34:53 describes that it's the fourth leading cause of end-stage
02:34:56 kidney disease in adults worldwide. And that it affects
02:34:59 approximately 12 and a half million people worldwide.
02:35:04 Q. You've talked a bit about the physical toll that
02:35:07 ADPKD can have. Can it have any other effects on patients?
02:35:12 A. Sure. It has -- and it has especially to do that it
02:35:18 is an inheritable disease and dominant. So most patients
02:35:22 have a parent or grandparent, uncles or aunts that have the
02:35:27 disease. And they have seen these people progressing
02:35:31 towards kidney failure, having to start with dialysis or to
02:35:35 receive a kidney transplant. Lots of these patients have a
02:35:39 lot of morbidity. And, also, decreased life expectancy.
02:35:44 So they know what they are facing. And that
02:35:50 gives them quite some emotional psychological stress,
02:35:54 especially at a young age when they know they have the
02:35:57 disease and they have to face important life choices. For
02:36:03 instance, whether or not to have children when they know
02:36:05 they have a 50 percent chance of giving these children the
02:36:10 same disease they have.
02:36:11 They have to make choices about career and do
02:36:14 they go for the best career possible, the highest education
02:36:20 possible, when you know that there's a chance that you have
02:36:22 a decreased life expectancy and that you have to start
02:36:25 dialysis at a relatively young age. So that gives a lot of

02:36:31 emotional and psychological stress.

02:36:33 It's also been summarized in a paper by one of 02:36:37 my colleagues, Dr. Baker. Fouad Chebib has also written on 02:36:43 this topic. This is showing that the emotional impact of 02:36:47 the diagnosis is devastating. That these patients face an 02:36:51 entity that affect their psychological and emotional state.

02:36:57 Q. Earlier, you referenced ADPKD as a major burden on 02:37:00 the public health. Can you explain what that means?

02:37:04 A. Yes. The disease, of course, is a problem for 02:37:08 patients and their -- and their families, but it's also a 02:37:13 problem for the society at large. The costs related to 02:37:18 kidney function replacement, treatments or dialysis or 02:37:22 transplant are high. In the Netherlands, dialysis costs 02:37:27 $80,000 a year.

02:37:29 But they are not only its cost related to kidney 02:37:33 function treatment, these patients also often have to be 02:37:39 admitted to hospital because they have all kind of 02:37:42 complications. Cysts can burst. Cysts can get infected. 02:37:48 These patients have high blood pressure. And, therefore, 02:37:51 also a high incidence of cardiovascular disease. So they 02:37:55 are often admitted to hospital with related cost.

02:38:00 And it has been estimated by my colleague, Fouad 02:38:03 Chebib, from the Mayo Clinic in Florida, that in the United 02:38:06 States, the cost associated with ADPKD are around $50,000 02:38:12 per individual, making an annual cost estimated at

7.3 billion.

But these are medical costs. There are additional costs; for instance, these patients often cannot work anymore. So they also lose the ability to earn money for themselves but also for society.

Q. Doctor, are there currently any FDA-approved treatments for ADPKD other than Jynarque?

A. Besides Jynarque, there is none at the moment.

Q. And when did Jynarque receive FDA approval?

A. Jynarque received approval by the FDA in 2018 and by the European Medicines Agency in 2015.

Q. Could you tell us a little bit about the treatment landscape of ADPKD prior to the approval of Jynarque?

A. At that moment, we had disease-modifying drugs. So the only thing we could do is symptomatic treatment. So when patients would have hypertension, we would prescribe them blood pressure-lowering agents for cardiovascular disease.

When kidney function deteriorates, these people get deficiency of vitamin D, and we have to prescribe them vitamin D supplements. They don't make the hormone erythropoietin anymore in their kidneys. We have to provide them with injections with erythropoietin.

And these types of treatment we call symptomatic, so treating the symptoms of the disease. But

we were not able to change the course of the disease. So the rate of kidney function declined.
Q. And, Doctor, we're looking at Slide 5 of your demonstrative. Do you have any examples today about the symptomatic treatments you were just describing?
A. Yes. These have been described in these two papers, one by Esther Meijer from my group, and the other one by Vicente Torres. Then, as I told you, working in the Mayo Clinic in Rochester. And there we provide detailed description of the symptomatic treatment of the disease.
Q. As of September 2nd, 2005, was there a long-felt but unmet need for ADPKD treatments?
A. Yes, because we were only able to treat the symptoms of the disease and not to change the course of the disease. So the rate at which patients were losing kidney function or the rate at which cysts are growing, I fully agree that at that moment there was an unmet need that was already long felt, that we would like to have these types of drugs.
Q. And, Doctor, do you have any examples in the literature discussing the long-felt need for ADPKD treatments?
A. Yes. This slide shows you three papers. One, again, by Vicente Torres, one by my own group, by Dr. Niek Casteleijn, and one by Albert Ong from Sheffield, all stating that effective treatment is lacking at that moment

for ADPKD. And that at that time, ADPKD was still regarded an untreatable disease progressing relentlessly towards end-stage kidney disease.

Q. Would you say that Jynarque fulfilled the long-felt need for an ADPKD treatment?

A. Yes. It sure did. I think that's also on the next slide, because when this treatment became available in Europe in 2015 and in the United States in 2018, it really marked a transformation in management of ADPKD. And the second paper was an Otsuka press release. And, of course, Otsuka will be positive about their own products, but here we are citing Andy Betts and -- at that time CEO of the PKD Foundation, so the patient organization.

And when the drug became available and we knew about results of the TEMPO 3:4 trial, the first pivotal trial showing efficacy of the drug, we saw that it was a historic day and for the first time providing real hope for patients with ADPKD that we could come towards a treatment, perhaps even towards a cure.

Q. You mentioned the patient organization. Could you tell as little bit about that?

A. The PKD Foundation is in an organization for patients that tries to influence medical science but also companies to generate attention for the disease, that get people interested to develop treatments for all aspects of the

disease.

Q. Doctor, do you know worldwide how many patients have been prescribed tolvaptan for the treatment of ADPKD?

A. I would not know an exact number, but it will be 10,000s of patients, I think. I did a lecture in Japan in 2016, and Japan was the first country to have marketing authorization for tolvaptan. And there, I saw for the first time the number of patients that were treated. And that was in Japan only in 2016 already 4,000. And thereafter until now, of course, more patients still have been treated in Japan, but also in Europe and in the United States. So that it will be 10,000s of patients.

Q. And what is the daily dose of tolvaptan?

A. We advise a daily dose of 120 milligrams, to be taken as 90 milligram in the morning and 30 milligram in the afternoon. Not everybody can tolerate this dose, so sometimes we have to down-titrate. But I think that on average the dose will be around 100 milligrams.

Q. And how long do patients have to take tolvaptan for?

A. They take it as long as possible. They would like to prescribe it early to patients because the longer you can prescribe a preventative treatment, the more effect you will sort out in the end. And we continue patients on this treatment when kidney function declines, and when patients enter dialysis or have a kidney transplant, we stop the

02:45:44 drug. But treatment will be for many, many years.
02:45:48 Q. Now, in your opinion, Doctor, could Jynarque exist as a pharmaceutical product without the ability to synthesize large amounts of tolvaptan?
02:45:58 A. I guess that when you were to treat 10,000s of patients worldwide that you need large amounts of tolvaptan, of course, to treat all these patients.
02:46:12 Q. And in your opinion, could Jynarque exist as a pharmaceutical treatment without the ability to synthesize tolvaptan in a highly pure form?
02:46:23 A. I -- I've always been told, I've been working also as a rapporteur for the Dutch regulatory authorities, but also as rapporteur for the European Medicines Agency. And I always hear and I have always been told that drugs should be pure. So, yeah, that would be my assumption that the drugs should be pure, yes.
02:46:50 Q. And could you explain what you mean by "rapporteur"?
02:46:54 A. Rapporteur is when new drugs are submitted to receive marketing approval, all the member states in Europe have to write a report about the drug. They see the entire dossier, and they have to summarize the benefit-to-risk ratio, whether they think it is beneficial, yes or no, and come with an advice. And I wrote this type of report for several drugs.
02:47:28 Q. And what is your understanding of why it's important

to have a pure pharmaceutical product?
A. When it's not pure then will be other products contained in a tablet. This is contamination and make all kinds of side effects anticipated.
Q. Prior to the approval of Jynarque, had anyone else tried to develop treatments for the disease?
A. Yes. Many, many pharmaceutical companies. There have been -- a lot of drugs been developed and been tested in the -- in animals. Many of them were working, but when you go from a lower sort of animal to a higher sort of animal -- so, for instance, from zebrafishes to mice or from mice to rats or from rats to monkeys, many of these drugs then were proven not to be effective. And some of these drugs that were effective in animal models were then later on tested in humans.
And, for instance, the mTOR inhibitors, everolimus and sirolimus are the two on the top left that are mTOR inhibitors, they were shown to be efficacious in animal experiments, and then were later on tested in patients in large scale clinical trials but then shown not to be effective. If anything, they show to have less effect on the -- than they did, even impair kidney function compared to controlled treatment. These were drugs that were tested before tolvaptan publications came around. But later on, you also tested the somatostatin analog. Then we

tried octreotide. I myself was the principal investigator of the lanreotide study, but unfortunately also the somatostatin analogs had no effect whatsoever on the rate of kidney function loss.

And just recently, four other trials have been stopped prematurely. I was the lead investigator of the venglustat study and the study of Galapagos compound, GLPG2737, but also the other trials, lixivaptan, tesevatinib that didn't show efficacy with respect to the rate of kidney function loss. Even in two of these -- with two of these compounds, an accelerated loss of kidney function.

Q. Thank you, Doctor.

MR. GARRETT: Your Honor, I have no further questions. As a housekeeping matter, I have about ten exhibits to read into the record, but if it's okay with Your Honor, we'll do it at the same time we do the other ones.

THE COURT: All right.

Cross.

MS. PITZEL CRUZ: May I approach, Your Honor?

THE COURT: Sure.

CROSS-EXAMINATION

BY MS. PITZEL CRUZ:

Q. Good afternoon, Dr. Gansevoort. My name is Carol Pitzel Cruz. I'll be asking you a couple questions this

afternoon.

With respect to your analysis today, I didn't hear you mention anything about the claims of the patents; is that correct?

A. That's correct.

Q. Okay. And you didn't conduct any analysis to compare the asserted claims to Otsuka's process for preparing tolvaptan; is that correct?

A. That's correct.

Q. And you didn't review the claims of the asserted patents in rendering your opinions in this case, did you?

A. Correct.

Q. Okay. And you don't know how Otsuka makes the tolvaptan in Jynarque; is that also correct?

A. Correct.

Q. And, Dr. Gansevoort, would you agree with me that as long as you have the molecule, tolvaptan, you would expect that it would be efficacious in treating ADPKD?

A. I would assume that efficacy of the drug is dependent on the -- on the molecule, yeah.

Q. Okay. And do you recall being deposed in this case?

A. Apologies. I didn't hear the question.

Q. Oh, sure. Do you recall that we took your deposition --

A. Yes.

Q. -- in this case? Okay.
A. Sure.
Q. And do you recall that during that deposition, you didn't have a precise definition of "highly pure" as it relates to tolvaptan?
A. Yes. Correct.
Q. And you didn't have a precise definition of "industrial scale" as it relates to tolvaptan; is that correct?
A. That's also correct.
Q. And at the time of your deposition, you couldn't recall reading any articles that linked the synthetic process of manufacturing tolvaptan to its efficacy; is that correct?
A. I don't know whether we discussed that at my deposition, but I agree.
Q. Okay. And, Dr. Gansevoort, during your testimony, just now in your direct, you -- I believe you testified that in your opinion, there was a long-felt but unmet need for treatment of ADPKD; is that correct?
A. Correct.
Q. Okay. And I believe you said that that need existed as of September 2nd, 2005; is that correct?
A. At that moment it held true, but also before that date, of course.

Q. Okay. And, Dr. Gansevoort, you agree that in 2005, there would not have been a need for a process to manufacture tolvaptan; is that correct?
A. Can you repeat your question?
Q. Sure. Do you agree that in 2005, there would not have been a need for a process to manufacture tolvaptan; is that correct?
A. I think this question has all kinds of consequences that I can't oversee, but I think it's correct.
Q. Okay. And you would agree that even today, despite the approval of tolvaptan for treating ADPKD, there's still a need for additional treatment options for ADPKD; correct?
A. Sure, it is. Yeah.
Q. Okay. And, Dr. Gansevoort, I'd like to just take you back to one of the slides that you used on direct. It was PDX-4002, the second slide.
And I believe you mentioned that 12.5 million people worldwide have ADPKD; is that correct?
A. Yes. Around this number. Yeah.
Q. And I believe that you also testified that there was roughly 10,000 people that had been treated with Jynarque for ADPKD; was that correct?
A. That's not correct because I used the plural. So 10,000s.
Q. Oh, okay. And were you here earlier today when

Dr. Roush testified?
A. Part of the testimony I was here.
Q. Okay. And do you recall hearing Dr. Roush say that 10,000 people have been treated with Jynarque for ADPKD?
A. I saw that number on the slide, yeah.
Q. Okay. And I believe, if we take a look at your Slide 4004, you had mentioned that some of the costs associated with untreated ADPKD were equivalent to roughly $52,000 per year for an individual?
A. Yeah, that's been calculated by my colleague Fouad Chebib to be around this sum of money, yeah.
Q. And -- okay. And do you have an understanding of how much treatment with Jynarque for ADPKD costs in the year -- in a year for a U.S. patient?
A. Not for a U.S. patient. I would know it approximately for the Netherlands, but there are always official costs but there is also kind of reimbursement by pharmaceutical companies and by insurance companies. So what the exact costs are, I -- will be very difficult to estimate.
Q. Do you have a ballpark understanding?
A. Not in United States. But in the Netherlands, the official price would be 20,000 euro per year per patient.
Q. Okay. And would it surprise you to learn that the average costs per year in the United States is roughly

$200,000 per patient?

A. I heard that it was more than in Europe, but this is a high number.

Q. Okay.

MS. PITZEL CRUZ: I have no further questions, Your Honor.

THE COURT: All right. Thank you. Any redirect?

MR. GARRETT: No, Your Honor.

THE COURT: All right.

Dr. Gansevoort, thank you very much. Is this your first time testifying in the United States?

THE WITNESS: It is.

THE COURT: All right. Well, thank you for coming all this way. Watch your step stepping down. Okay?

THE WITNESS: Yeah, I will.

MR. ROTHMAN: Josh Rothman of Venable on behalf of Plaintiff Otsuka. We'd like to call John Jarosz to the stand. John Jarosz will be testifying with regard to the issue of commercial success.

MR. WATKINS: Your Honor, can I grab the rest of the binders?

THE COURT: Sure, yes.

DEPUTY CLERK: Please state and spell your full name for the record.

THE WITNESS: John C. Jarosz. My last name is spelled J-A-R-O-S-Z.

DEPUTY CLERK: Do you affirm that the testimony you are about to give to the Court in the case now pending will be the truth, the whole truth and nothing but the truth, you do so affirm?

THE WITNESS: I do.

JOHN C. JAROSZ, the witness herein, after having been duly sworn under oath, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ROTHMAN:

Q. Good afternoon.

A. Good afternoon.

Q. Please state your name for the record.

A. John C. Jarosz.

Q. What have you been asked to do in this case?

A. I was asked to provide my expert opinion as to whether claimed inventions here have been a commercial success.

Q. Let's start with a little bit of your background. Please describe your education.

A. I have a B.A. in economics and organizational communication from Creighton University, which is in Omaha, Nebraska. After that, I was a fellowship student in the

03:01:13 Ph.D. program in economics at Washington University in St. Louis. There, I completed most of the requirements for my Ph.D. but decided to leave before finishing and was awarded a master's.

03:01:24 After that, I worked for some period and then attended law school and received my JD from the University of Wisconsin, which is in Madison, Wisconsin.

03:01:33 Q. What is the nature of your professional work?

03:01:36 A. I'm an economist. Most of my work has to do with the economics of intellectual property protection, with much of my work having to do with the evaluation of commercial success.

03:01:49 Q. Where do you currently work?

03:01:50 A. I work at Analysis Group, Incorporated, which is a large private economic consulting firm with offices throughout the world. I reside in the Washington, D.C., office.

03:02:02 Q. How do you keep active in the field?

03:02:03 A. I fairly regularly research and publish papers in professional and academic journals. I give speeches and participate in webinars and seminars. And I fairly regularly teach classes.

03:02:19 Q. Have you offered an expert economic opinion in any other cases involving the evaluation of commercial success?

03:02:25 A. Yes, many times.

Q. About how many?

A. Over the years, it's probably something on the order of 50 times at deposition or trial.

Q. Please turn to PTX-1555 in your binder.

What is this document?

A. This is a copy of my CV.

Q. Does your CV accurately reflect your education and experience?

A. Yes.

MR. ROTHMAN: Your Honor, I'm going to move into evidence PTX-1555.

MR. BUNKER: No objection.

THE COURT: Admitted without objection.

(PTX No. 1555 was admitted into evidence.)

MR. ROTHMAN: Your Honor, I offer John Jarosz as an expert in the economics of intellectual property protection, including the evaluation of commercial success.

MR. BUNKER: No objection.

THE COURT: All right. You may proceed.

BY MR. ROTHMAN:

Q. What is your understanding of the commercial embodiment of the asserted claims of the asserted patents?

A. I understand that use of Jynarque is a commercial embodiment.

Q. What is your understanding of the patented

technology?
A. I -- I'm not a scientist or a technical person, but I understand that it teaches methods to synthesize tolvaptan in high-purity and high-yield forms such that it can be produced in industrial scale.
Q. You testified that you were asked to provide your opinion concerning the commercial success of the inventions described in the asserted claims.
Have you reached any conclusions with regard to the commercial success of the asserted claims?
A. Yes, I have. Jynarque, which is a -- use of Jynarque, which is, as I understand it, an embodiment of the claimed inventions, has been a success in the marketplace. An important driver of that success has been the claimed inventions. As a result, the claimed inventions are a commercial success.
Q. All right. We're going to start with some background.
You've been here in court the last couple days; right?
A. Yes.
Q. And so a lot of this may be repeated. But just so we get an understanding of what your understanding is, we're going to go over a couple things.
What is your understanding of Jynarque?

A. Jynarque is a treatment for ADPKD, as I understand it.
Q. Was it your understanding that Jynarque is an orphan drug?
A. Yes.
Q. Are there other treatments for the disease ADPKD?
A. No. As I understand it, Jynarque is the only treatment for the disease. It was as of 2018, and it still is today, the only approved treatment for ADPKD.
Q. Does Jynarque have any competitors, then, in your opinion?
A. It has no direct competitors because no other drug has been approved to treat the disease. There are other things, as Dr. Gansevoort just described, that attempt to deal with the symptoms of ADPKD, things like blood pressure medication, kidney stone removal, dialysis, but those things don't treat the disease. The only thing that treats it is Jynarque.
Q. Okay. Can you please provide a brief overview of your commercial success analysis?
A. Yes. I did it in a two-step fashion. First, I sought to determine whether the product, in this case Jynarque, has been a marketplace success. And then, secondly, I sought to determine the degree to which the patented inventions are causally linked to or drive the

success.

Q. Let's start with marketplace success.

What factors did you consider in evaluating whether Jynarque achieved marketplace success?

A. The five factors that are listed on the screen right now on Slide 5003.

I looked at revealed preferences, which is an important tool for economists. I looked at how important the drug has been to Otsuka. I looked at its marketplace performance using several different metrics. I sought to evaluate how third parties have perceived Jynarque. And I asked myself the question of whether Jynarque faced any obstacles or barriers to adoption that stood in the way of it succeeding in its marketplace.

Q. Let's discuss each of the five factors you considered in your analysis of marketplace success, starting with revealed preferences.

What are revealed preferences?

A. They're behaviors or actions of participants in a business.

Q. Why are revealed preferences relevant to marketplace success?

A. The actions or behaviors tell us about what the thinking is or the preferences are of the people who exhibit those behaviors and actions. In the case of a marketplace

success evaluation, the extent to which participants in the business choose to enter the business and stay in the business gives us economists some indication of how successful they view that business to be.

Q. Okay. At what point in time did you look at those resource allocation decisions?

A. I looked at the point in time before Jynarque was approved and first commercialized, so we generally call that ex-ante investments. I also looked at what has happened since the introduction, we call that ex-post investments.

Q. How heavily did you rely on revealed preferences?

A. It was a factor that I considered. It was somewhat important, as is true in many economic evaluations, but it certainly wasn't the end of the assignment. I considered other evidence of the marketplace success of Jynarque.

Q. Did you evaluate whether Otsuka made a decision to commit resources to Jynarque?

A. Yes. And that's shown on the screen. It made both ex-ante and ex-post investments; that is, it decided before the commercial introduction that this was a worthwhile drug in which to invest in, and one that would solve many problems. The ex-ante investments that it did, that is before Jynarque was rolled out, was a substantial amount of time, money, and effort to develop methods for obtaining tolvaptan in high-purity and high-yield form.

It also undertook fairly substantial clinical trials to test the safety and efficacy of the drug. It undertook TEMPO 3:4, TEMPO 4:4, and REPRISE, as well, even before introduction of the drug. Otsuko -- Otsuka spent $14 million in establishing an infrastructure by which it could market the drug.

Q. Okay. Those were the ex-ante investments; right?

A. Yes, I may have misspoke. I meant to say the ex-ante, before-the-fact investments.

Q. All right. Did Otsuka also make any investments in Jynarque since its launch?

A. Yes. Otsuka's ex-post investments are shown on the right-hand side of the chart. It is currently undertaking two Phase III trials to continue to test and evaluate Jynarque. And over the period 2019 through 2022, it's invested over $245 million in marketing Jynarque in the United States.

Q. Why is Otsuka's decision to continue to support the products so heavily after launch relevant to marketplace success?

A. Otsuka, like any company, has the ability to exit a business at any time. Shareholders would not allow a company like Otsuka to continue to invest in a product that's unlikely to be successful. In fact, Otsuka found that this is a very worthwhile investment, one that could

solve needs in the marketplace, and one in which it should continue to invest. And so it did.

MR. ROTHMAN: Can you pull up PTX-1394?

BY MR. ROTHMAN:

Q. So in the testimony you just gave, did you rely on PTX-1394?

A. I think I did. It does report the REPRISE trial and the TEMPO 3:4 trial, by way of examples.

Q. Okay.

MR. ROTHMAN: And could we pull up PTX-1214, which is a discussion of the TEMPO 4:4 trial.

BY MR. ROTHMAN:

Q. Do you see that?

A. Yes.

Q. Did you rely upon PTX-1214 in your opinions?

A. Yes. And as you just mentioned, it's in the title. It talked about the TEMPO 4:4 trial.

MR. ROTHMAN: And then can you pull up PTX-1223, please?

BY MR. ROTHMAN:

Q. And this exhibit discusses TEMPO 3:4 and the REPRISE trials; right?

A. Exactly.

Q. Did you rely on this exhibit in your testimony?

A. I did.

MR. ROTHMAN: Can you pull up PTX-1358?

BY MR. ROTHMAN:

Q. Does -- did you rely on this exhibit regarding the ongoing research into PKD treatments, including the ongoing clinical trials for tolvaptan?

THE REPORTER: Sorry. Can you repeat that?

THE WITNESS: Yes, I did.

BY MR. ROTHMAN:

Q. Did you rely upon this exhibit concerning the ongoing research into PKD treatments, including ongoing clinical trials for tolvaptan?

A. Yes, I did.

MR. ROTHMAN: And can you pull up PTX-1417.

BY MR. ROTHMAN:

Q. This is an NIH publication about how to treat PKD.

Did you rely upon this exhibit in your testimony?

A. Yes, I did.

Q. Okay.

MR. ROTHMAN: Your Honor, I move into evidence PTX-1394, 1214, 1223, 1358, and 1417.

MR. BUNKER: No objection, Your Honor.

THE COURT: Admitted without objection.

(PTX Nos. 1394, 1214, 1223, 1358, and 1417 were admitted into evidence.)

BY MR. ROTHMAN:
Q. We just talked about Otsuka's decisions to commit resources. Did you evaluate whether defendants also made a decision to commit resources?
A. Yes, I did.
Q. Why is Defendants' decision to -- what did you conclude with regard to whether Defendants made a decision to commit resources?
A. As is the case with Otsuka, Defendants, Lupin, in particular, had the ability to enter or not enter a business. It investigated quite heavily, and is very serious about entering that business, as it is attempting to today. It is, as a result, by its actions, showing that it is of the belief that Jynarque and the generic version of Jynarque are likely to be successes.
Q. You kind of answered this, but why is Defendants' decision to pursue a generic version of Jynarque relevant?
A. Again, they have the ability to enter or not enter. And they have the ability to exit or not exit at any point in time. Shareholders, stakeholders demand that companies undertake worthwhile investments in the case of generic companies that have been increasingly discriminating in the businesses that they enter.
So they are not entering in on all branded drugs. They're attempting to enter in on the high value

ones or the ones that will give adequate returns to their stakeholders. So we see that increasingly, that companies like Lupin are being very cautious with what kind of projects that they will invest in.

Q. Okay. Please turn to PDX-5005. Now, this is an excerpt from PTX-1453. What -- what is this exhibit?

A. It's a very recent U.S. News & World Report article dated 2022 or 2023 that describes the phenomena I just explained. In the case of Teva, which is an Israeli generic company, they have a large portfolio of medicines. And they announced that they were shifting to brand-name drugs and, importantly, high-value generics; in other words, they were being discriminating in their actions.

Q. All right.

MR. ROTHMAN: I move into evidence PTX-1453.

MR. BUNKER: No objection.

THE COURT: All right. Admitted without objection.

(PTX No. 1453 was admitted into evidence.)

BY MR. ROTHMAN:

Q. Did you review evidence that Lupin considered whether to invest in a generic version of Jynarque?

A. Yes. They, over an extended period, took very seriously the study of whether this would be a business into which they should enter. They did a dozen or more

03:15:26 evaluations of the performance that they might realize with a generic Jynarque product.

03:15:34 MR. ROTHMAN: Can you please pull up PDX-5006?

03:15:34 BY MR. ROTHMAN:

03:15:38 Q. Did you create this slide?

03:15:40 A. Yes.

03:15:41 Q. What does this slide show?

03:15:43 A. I believe this is a summary of the last financial evaluation that I had access to from Lupin. And just for its first year of entering the generic Jynarque business, Lupin was forecasting that it would make anywhere from 50.8 million to 148.4 million in year one.

03:16:07 Q. Are the sales of Lupin forecasted significant?

03:16:10 A. I'm sorry, are they what?

03:16:12 Q. Are the sales Lupin forecasted significant?

03:16:15 A. Yes. On the second row of that slide, I reported what Lupin Limited's total revenues were year-ending March 31, 2022, and that was $778 million.

03:16:29 So these additional revenues are anywhere from 6 and a half to 19 percent of total company revenue. So they're very -- this is a very substantial investment for Lupin that gives an economist like me evidence that Lupin views this as a likely marketplace success.

03:16:53 MR. ROTHMAN: Can you please pull up PTX-1256?

03:16:53 BY MR. ROTHMAN:

Q. This says Lupin Limited 2021, 2022 annual report. Did you rely upon this exhibit in forming your opinions?
A. Yes, I did.
MR. ROTHMAN: Can you please pull up PTX-1435?
BY MR. ROTHMAN:
Q. This is the exchange rate between rupees and U.S. dollars that you used. Did you rely upon this exhibit in your testimony?
A. Yes. When I converted the rupees numbers from the integrated report into U.S. dollars, these are the exchange rates I used.
Q. Okay.
MR. ROTHMAN: I move into evidence PTX-1256 and PTX-1435.
MR. BUNKER: No objection.
THE COURT: All right. Admitted without objection.
(PTX Nos. 1256 and 1435 were admitted into evidence.)
BY MR. ROTHMAN:
Q. Did you evaluate whether Jynarque was important to Otsuka?
A. Yes, I did.
Q. How did you evaluate whether Jynarque was important to Otsuka?

A. I looked at the words that it used in describing its experience with Jynarque, and I looked at how important it was to the company. So I looked here, for instance, at the 2018, 2019, and 2021 Otsuka annual reports, and I saw mention of how Jynarque mattered to the company.

So in 2018, it reported to the outside world that Jynarque has been a groundbreaking drug that has been rated highly by patients and medical professionals alike. It went on to say that only -- it's the only single therapeutic drug for an incurable disease.

In 2019, in its annual report, it specifically mentioned its four most established products, with Jynarque being the most recent, and described them to be -- continue to perform well and exceeded sales forecasts.

And in 2021, Otsuka reported that "we will take advantage of this strategic framework to position our four global products" -- the four that are mentioned there, including Jynarque -- "as growth drivers."

So it was telling the outside world that Jynarque has been very important to the company.

Q. Okay.

MR. ROTHMAN: PTX-1253 is the 2018 annual report. PTX-1254 is the 2019 annual report. And PTX-1255 is the 2021 annual report.

We move into evidence PTX-1253, 1254, and 1255.

MR. BUNKER: No objection, Your Honor.

THE COURT: All right. Admitted without objection.

(PTX Nos. 1253, 1254, and 1255 were admitted into evidence.)

BY MR. ROTHMAN:

Q. Did you consider Jynarque's revenue in your analysis of the importance of Jynarque?

A. Yes. I put on a chart here information that I obtained from their integrated report that showed their tolvaptan enterprise. The whole franchise as a percentage of total revenues was 39 percent in the year 2021. If you just drill down on Jynarque, it was about 20 percent of the entire company's worldwide revenues.

Q. You said that you also considered Jynarque's marketplace performance as part of your analysis of its marketplace success. What are the metrics of Jynarque's performance that you considered?

A. Revenues, units shipped, and prices.

Q. What does your analysis of Jynarque's revenues show?

A. As shown on the chart on the screen, from the point at which Jynarque was introduced to the U.S. marketplace, the revenues for the company have grown substantially and steadily over the period May 2018 through March 2023. The company realized revenues of roughly $3.1 billion. In 2023

alone, the number is going to exceed $1 billion, I understand.

Over that time, the annual growth rate has been almost 30 percent. That is, year after year it's grown at a rate of 30 percent.

Q. You said you also considered Jynarque's unit sales. What did the unit sales show?

A. It's charted and shown on the screen right now, a similar kind of experience as revenues; that is, the growth was substantial and steady over the period May 2018 through August 2022. The total units shipped were about 10.9 million. As well, the growth rate has been quite impressive. The compound annual growth rate has been about 26 percent.

Q. You said that Jynarque's price was another element of performance you considered. Why does your analysis of Jynarque -- what does your analysis of Jynarque's prices show?

A. As the screen shows, the price per tablet is shown at about $150 upon introduction, and the price has actually gone up over time such that it's somewhere in the range, for this chart, of about $275.

So in basic economics, we think that there's an opposite correlation between prices and demand. That is, when prices go up, consumers get less willing to buy a

product. In fact, we see that the prices have gone up, yet at the same time, the volumes have gone up, showing that Jynarque must be something special.

Q. Did you evaluate Jynarque's performance against forecasts, and if so, how was that relevant here?

A. I did. Most pharmaceutical companies do not, in fact, meet early forecasts. Usually marketing people at pharmaceutical companies are overly optimistic. It appears that wasn't the case here. And, in fact, in looking at the forecasts that the company made over time, the actual performance has, in all instances, exceeded its forecasted performance.

I have a chart on that.

MR. ROTHMAN: Okay. Can you please pull up PDX-5012?

BY MR. ROTHMAN:

Q. How did Jynarque perform relative to Otsuka's own pre-launch expectations for the drug?

A. It's had forecasts continuously from August 2018 through October 2021, at least I had access to that information. And those are the dashed lines.

What I did is I charted each one of those forecasts over time, and then I overlaid on that the actual performance, which is the dark or bolded red line. You see that the actual performance exceeded the forecast

performance during this entire period.

Q. All right.

MR. ROTHMAN: Can you please pull up PDX-5014?

BY MR. ROTHMAN:

Q. Let's talk about third-party perceptions, another factor you considered in your analysis of marketplace success.

How are third-party perceptions relevant to marketplace success?

A. They are the views of people that don't have a stake in this litigation. They are unbiased third parties talking about the drug. And I have some examples of what I found in the public domain on the screen.

Q. What did your review of third-party perceptions about Jynarque indicate?

A. It indicated that the third -- that the outside world is -- has been quite excited about Jynarque. PKD Foundation, upon the rollout of Jynarque, said, "Today is a historic day in providing hope to patients with polycystic kidney disease."

A short while later, the National Kidney Foundation awarded the Corporate Innovator Award to Otsuka because of its work on Jynarque, and that award is given to advances in the field of nephrology that address an unmet medical need or improve upon an existing practice,

therapeutic, or technology.

MR. ROTHMAN: Okay. PTX-1352 is the PKD Foundation article and PTX-1400 is the National Kidney Foundation article.

We move into evidence PTX-1352 and PTX-1400.

MR. BUNKER: No objection, Your Honor.

THE COURT: Admitted without objection.

(PTX Nos. 1352 and 1400 were admitted into evidence.)

BY MR. ROTHMAN:

Q. Let's talk about barriers to adoption, another factor you considered in your analysis of marketplace success. What are barriers to adoption?

A. They are impediments to success. So one needs to evaluate -- or I thought it was important to evaluate whether the success was in the light of an easy or difficult marketplace. And there were several things that suggested it would be difficult to succeed. And those impediments were overcome.

There was a lack of awareness among health care providers about treatments for the disease. This was the first and is still the only treatment. And so health care providers have had to learn about it. Not surprisingly there was also lack of awareness among patients. Patients weren't aware that there was a drug that they could take or

even that they should consider going to a physician to get a prescription.

There were -- have been challenges associated with access. It can only be accessed through REMs, or risk evaluation, and only available through certain retail outlets.

And, finally, COVID has impacted all of us, no question about that. But it certainly impacted people with diseases in the sense that people have been, for some period, less willing and less likely to go to the doctor and get treatment. That certainly impacted Jynarque, but it has not had a -- an effect that is noticeable such that the total revenues have been over $3 billion in spite of this and the other barriers to adoption.

Q. Okay. PTX-1391 is information on Jynarque's website about accessing Jynarque through a specialty pharmacy. Did you rely upon 1391 for your opinions?

A. Yes, I did.

MR. ROTHMAN: I move into evidence PTX-1391.

MR. BUNKER: No objection, Your Honor.

THE COURT: Admitted without objection.

(PTX No. 1391 was admitted into evidence.)

BY MR. ROTHMAN:

Q. Can you please summarize your opinions on whether Jynarque has been a marketplace success?

A. It appears that it has. From the time it was introduced through today, the acceptance and sales have been substantial and growing such that the revenues through the early part of this year were over 3 billion and will soon be over 4 billion, as far as I understand it. It has achieved that success in the face of barriers to adoption or impediment. The product has been well accepted and is a marketplace success.

THE COURT: So, Mr. Rothman, why don't we take an afternoon break. I understand there's a little more, but we'll take a break for 15 minutes and then you can come back and finish up. Okay?

MR. ROTHMAN: Thank you, Your Honor.

DEPUTY CLERK: All rise.

(Recess was taken.)

DEPUTY CLERK: All rise.

THE COURT: All right. Please be seated.

And let's continue.

MR. ROTHMAN: Thank you, Your Honor.

BY MR. ROTHMAN:

Q. We just finished the discussion of marketplace success.

What is the second part of the commercial success analysis?

A. It's the causal linkage or causation analysis, and

that is to assess the -- whether there's a relationship between the claimed inventions and the success of the product and the degree of that relationship.

Q. How do the patented inventions relate to the product's success?

A. As I understand it, they are a prerequisite. I think Dr. Roush talked about this, that there would not be a commercialized Jynarque if it were not for the claimed inventions.

Q. Are you aware of any other methods other than the patented inventions that can be used to synthesize tolvaptan in high purity and high yield on a commercially acceptable scale?

A. I'm not aware of any, and I believe Dr. Roush said he's not aware of any.

Q. How many sales of Jynarque would occur if Jynarque could not be manufactured with high purity on an industrial scale?

A. As I understand it, zero.

Q. Aside from the patented inventions, are there other factors that drive the marketplace success of Jynarque?

A. Yes, that's true of any product. We economists have learned through years of study and application of principles that all purchase decisions are multifaceted. That is, there's lots of factors that impact a purchase decision.

Q. Does the existence of these factors negate a showing of commercial success?

A. No. For this evaluation we're trying to determine how important the claimed inventions are. That does not mean to suggest that they have to be the only drivers of demand or even the most important, but they certainly do have to be important contributors.

MR. ROTHMAN: Now, with regard to some of these objective indicia, Your Honor, because we're going first, we're anticipating what we may hear from Mr. Hofmann with regard to his objective indicia. So some of these are what we think we may hear.

THE WITNESS: Yeah.

BY MR. ROTHMAN:

Q. Mr. Hofmann discusses Jynarque's orphan drug exclusivity status. When was Jynarque granted orphan drug exclusivity?

A. In April 2018.

Q. Did Jynarque's orphan drug exclusivity prevent others from developing competing treatments for ADPKD?

A. No. In fact, others have been working on those. I think Dr. Gansevoort spoke about this topic. There have been a dozen or more entities trying to work with different agents to address the disease of ADPKD.

Q. All right. We touched on this briefly before, but I

want to consider pricing a bit more. Has Jynarque succeeded on the basis of its low pricing?

A. No. It has not -- it doesn't offer itself as a low-price alternative. In fact, one sees that prices have gone up over time. It has never attempted to buy market share through low prices.

Q. Can marketing and promotion be a factor that drives the marketplace success of a product?

A. Sure. And that's why companies in this space and in any space invest in marketing and promotional activities, but it's important to understand what those activities are surrounding what's the message in those activities. But the fact that a company supports a product through marketing and promotion doesn't undermine the significance of the technical features of that product.

Q. So can marketing promotion alone drive demand for prescription drugs?

A. No. Certainly not in this space. Drugs are typically thought of as "experience goods." Consumers, meaning patients and physicians, need to be exposed to the drug to determine whether it is, in fact, a good solution for the problem that they face. It is an important decision and one that takes time.

Experience goods like this may benefit from learning about the options through marketing and promotional

expenses, but that does not keep patients and physicians coming back; because the drug needs to work, not just be supported through promotional efforts.

Q. How do Jynarque's promotional expenditures compare to industry norms?

A. They are consistent with industry norms, in fact, in some dimensions a bit on the low end. Sales and marketing as a percent of revenues over the last seven years has been between 10 and 11 percent at Otsuka. For pharmaceutical companies in general, the median ratio is about 8 percent, and the average ratio is about 25 percent. So Otsuka is within that range and toward the -- and much lower than the average.

Q. What is your opinion, then, about the role of promotion on Jynarque's marketplace success?

A. They matter, but they alone -- that is, marketing and promotion -- are not the most important drivers. They add to the franchise, but they certainly don't overwhelm the significance of the technical value of the product. Moreover, one has to be mindful of the fact that the marketing and promotion sends out messages of what the clinical benefits are of Jynarque. That is, what's talked about is what is facilitated by the claimed inventions.

Q. All right. Let's turn to the blocking patent issue. Are you aware that Defendants assert that the claims of the

patents are not a commercial success because of alleged blocking patents, the '510 patent and the '677 patent?
A. Yes. I have seen that representation in Mr. Hofmann's report and his deposition testimony.
MR. ROTHMAN: Can you please put up PDX-5016?
BY MR. ROTHMAN:
Q. What does this chart show?
A. This is one of the charts that Mr. Hofmann had in his report. On the top he's showing these two presumed blocking patents, the '510 patent and the '677 patent, which were owned by Otsuka. And he says because of the existence of these patents, no one has attempted to do effective -- no one can do effective discovery and commercialization. They stand in the way.
So Jynarque has not succeeded because of the claimed inventions, but because these two patents have blocked effective competition.
Q. All right. The Court had a question earlier today about the expiration dates of the patents. Looking at this chart, can you see on the top what the expiration date is for the '510 patent?
A. The '510 patent's expiration date is 2010.
Q. Okay. And the '677 patent expiration date?
A. That's 2020.
Q. Okay. Great.

Defendants argue that the asserted blocking patents disincentivize others from discovering the inventions and then commercializing the patented inventions.

Do you agree with that argument?

A. No. In fact, there has been attempts to discover and attempts at commercialization. It has not -- these two patents have not blocked effective competition.

Q. Okay. Now, we've heard some of this testimony already, but we may go over this ground again in the context of your analysis.

MR. ROTHMAN: Can you please turn to Slide PDX-5017?

BY MR. ROTHMAN:

Q. What does this slide show?

A. This shows what has been talked about a little bit earlier today, the *Zard* work that was done in 2004 and 2005. There were patent applications filed in the U.S. and overseas having to do with synthesization of tolvaptan, and *Zard* and his colleagues were working on that before 2005, as I understand it.

Q. Okay. So if we break down the blocking patent argument by Defendants, one argument is that the asserted blocking patents prevented others from working on the synthesis of tolvaptan before the priority date of 2005; is that right?

03:59:04 A. I believe that's the argument, yes.
03:59:07 Q. All right. How does *Zard*'s work relate to that argument?
03:59:11 A. *Zard* was doing work in spite of the existence of the '510 and '677 patents, and that work was done before 2005, the priority date of the claimed inventions here. So there was no block.
03:59:25 Q. So we know that people were working on the synthesis of tolvaptan before the priority date of the patents-in-suit; correct?
03:59:38 A. Yes, that's my understanding.
03:59:41 Q. And the asserted blocking patents didn't prevent that from happening; right?
03:59:46 A. Apparently not, correct.
03:59:52 Q. All right. And did you hear Dr. Roush testify that the work was done in France?
03:59:57 A. Yes.
03:59:58 Q. Were you here for that testimony?
03:59:59 A. Yes.
04:00:03 Q. And Dr. Roush testified about what impact that would have on a U.S. patent; right?
04:00:07 A. Yes.
04:00:12 Q. And Dr. Roush also talked about the FDA exception to infringement in the U.S.; right?
04:00:18 A. Yes, the so-called safe harbor, yes.

Q. All right. So now I want to turn to the second part of the blocking patent analysis, whether the blocking patents, asserted blocking patents prevented the commercialization of the synthesis for tolvaptan.

Did you evaluate whether others thought to commercialize a process to synthesize tolvaptan after 2005?

A. Yes, I did, and the chart on the screen shows some of what I found. Some of that is duplicative of what either Dr. Gansevoort or Dr. Roush presented. But you'll see from 2010 onward, various entities have been working on potential commercialization: Hetero in 2010, Zhejiang in 2011, and 10 DMFs, Drug Master Files, were submitted between 2013 and 2020 for use of tolvaptan.

So, once again, it appears that the '510 and '677 patents did not block continued work on synthesizing tolvaptan.

Q. And did you hear Dr. Roush testify about how long it would take for a drug product to receive approval?

A. Yes. He said it would be something -- every case is different, of course, but on average it takes 10 to 12 years. So if one expects that a drug might be rolled out, say, in 2010, it would not at all be unusual for a company or set of individuals to begin working on that in the year 2000.

It takes many years before the fruits of

04:02:15 development efforts are realized.
04:02:18 Q. And did you hear Dr. Roush testify about whether practicing a process for synthesizing tolvaptan would infringe the '677 method of treatment patent?
04:02:34 A. No. Because the '677 --
04:02:36 Q. I'm sorry. Let me ask the question again.
04:02:38 The question was whether you heard Dr. Roush testify about whether a process for synthesizing tolvaptan would infringe the '677 method of treatment patent?
04:02:49 A. Thank you.
04:02:49 I did hear him say that and I was going to paraphrase his testimony, but there's absolutely no need to do that.
04:02:54 Q. Okay. Aside from selling a -- a product commercializing a patented invention, are there other ways a party can commercialize their invention?
04:03:12 A. Absolutely. Many parties do work in drug development with the thought of selling some of their work or themselves to another entity, of spinning out a company, of licensing their inventions, or cross-licensing their inventions. So making and selling a product is not the only way to commercialize an invention.
04:03:35 Q. All right. Were you here during the cross-examination of Dr. Roush about the ten DMFs?
04:03:44 A. Yes.

MR. ROTHMAN: And can you please pull up slide PDX-3069.

BY MR. ROTHMAN:

Q. And you rely upon the list of DMFs in your analysis; right?

A. Yes, I do talk about them.

Q. But to be clear, you offered no opinion on whether those DMFs applied to only Samsca or only Jynarque or both; right?

A. Correct. That's outside my area of expertise.

Q. Right. Are you aware that that information is not even publicly available?

A. I think I've heard that.

Q. Okay. So even if I asked to you provide an opinion on whether those DMFs applied to just Samsca, you couldn't provide it?

A. I could not.

Q. Unless there's publicly available information that discloses that; right?

A. Exactly right.

Q. Okay.

MR. ROTHMAN: And if we turn back to your slide PDX-5018 -- sorry. Let's go back to the PDX-3069.

BY MR. ROTHMAN:

Q. You see the -- the second DMF file there, I have a

tough time pronouncing it. I'll call it Zhejiang Huahai.

A. I'm probably going to mispronounce it as well. I would say Zhejiang, but I'm probably wrong as well.

Q. As long as the court reporter can see it, we should get the spelling right.

A. Yes.

Q. Okay.

MR. ROTHMAN: And now I want to turn back to your slide PDX-5018.

BY MR. ROTHMAN:

Q. And do you see that name on your slide?

A. Yes. It's the very bottom box, Zhejiang Huahai in 2011.

Q. All right. So you rely upon the work that Zhejiang Huahai did in 2011 to support your opinions; right?

A. Yes.

Q. All right.

MR. ROTHMAN: I apologize, Your Honor. This exhibit is not in the books, so I'm just going to ask that it be brought up. It's PTX-1524.

I've given counsel notice of this.

PTX-1524.

BY MR. ROTHMAN:

Q. This is the document you rely upon for that assertion that Huahai was doing work in 2011.

04:06:21 MR. ROTHMAN: If you can turn to the -- to Page Number 2, which is actually PTX-1524-0006.

04:06:25 BY MR. ROTHMAN:

04:06:35 Q. And you look at the last paragraph, it begins, "Teva's statement that it has produced 'the portions of the DMF and its amendment that pertain to the final synthetic step in Huahai's manufacture of tolvaptan' is wrong."

04:06:52 Do you see that?

04:06:53 A. I do. Yes.

04:06:54 Q. So in this -- in this document, it shows that Huahai's DMF is related to Teva; right?

04:07:02 A. That appears to be the case, yes.

04:07:04 Q. Okay. And if you go to the first page of the document, this is actually a brief in the litigation between Otsuka and Teva; right?

04:07:14 A. Yes, it is.

04:07:17 THE COURT: Before Judge Andrews; right?

04:07:23 THE WITNESS: Yes, I believe it is.

04:07:24 BY MR. ROTHMAN:

04:07:24 Q. And this is -- this document was dated July 19th, 2023; right?

04:07:31 A. I don't recall the date.

04:07:33 Q. If you look --

04:07:33 A. I have no reason to --

04:07:35 Q. If you look at the top of the first page, there's a

date filed. July 19th, '23.

Do you see that?

A. Yes, that appears to be the date.

Q. Are you aware of any litigation going on related to Otsuka's Samsca product?

A. Currently?

Q. Right.

A. I don't think I'm aware of any. No.

Q. So we know from --

MR. ROTHMAN: If we go back to Slide PDX-3069.

BY MR. ROTHMAN:

Q. So from this list of DMF filers, we see Lupin there; right? One, two, three, four, five -- five up from the bottom?

A. Yes, I see it.

Q. And we know Lupin's DMF is related to Jynarque; right?

A. Yes.

Q. And now we know that Zhejiang Huahai is related to Jynarque; right?

A. That appears to be the case, yes.

Q. But we still don't know what the other DMF filers relate to, do we?

A. Not for sure, that's correct.

Q. And the Zhejiang Huahai DMF was submitted back in

04:08:50 2013; right?
04:08:52 A. Yes.
04:08:52 Q. That's ten years ago?
04:08:55 A. I'm sorry?
04:08:55 Q. That was ten years ago?
04:08:56 A. Yes.
04:08:57 Q. All right. I'm getting -- in anticipation from what we're going to hear from the other side, what are the factors that Mr. Hofmann analyzed in determining whether the '510 patent and '677 patent are, in fact, blocking?
04:09:21 A. He looked at factors that emanate from a Court case that has become fairly prominent called the *Acorda* case. So they're called the *Acorda* factors.
04:09:31 Q. Do we need to look at the *Acorda* factors?
04:09:34 A. No, because we've seen that there was development and commercialization -- or attempts to commercialize over the entire presumed blocking period. The '510 and the '677 have not, in fact, blocked activity or blocked competition with Jynarque.
04:09:50 Q. So we don't need to ask why wasn't anyone else working on this; right?
04:09:54 A. Exactly.
04:09:55 Q. All right. Can you please summarize your opinions?
04:09:57 A. As I understand it, use of Jynarque is a commercial embodiment of the claimed inventions. Jynarque has been a

marketplace success. The patents have been important contributors to that success. As a result, the claims of the patents have been a commercial success.

MR. ROTHMAN: Thank you very much.

That's all, Your Honor.

THE COURT: All right.

Cross-examination.

MR. BUNKER: May I approach, Your Honor?

THE COURT: Yeah.

CROSS-EXAMINATION

BY MR. BUNKER:

Q. Good afternoon, Mr. Jarosz.

A. Good afternoon.

Q. In your binder, could you please turn to JTX-043.

A. Okay. I'm there.

Q. And this is the '510 patent that you mentioned during your direct testimony; is that correct?

A. Yes.

Q. And this was owned by Otsuka; is that right?

A. They were the assignee, and I believe for many years the owner. Yes.

Q. And you understand the '510 patent covered the compound tolvaptan?

A. That's my understanding. Though I'm not a technical person, I understand that to be the case.

Q. And you also understand that the '510 patent issued in November 1993 and it expired in November 2010?
A. Yes.
Q. Do you agree that while it was pending, between November 1993 and November 2010, the '510 patent would have disincentivized pharmaceutical companies to some extent from researching and developing methods of synthesizing tolvaptan?
A. Maybe, maybe not. I haven't seen any evidence that a company has been disincentivized, but companies should honor patents.
Q. And do you agree that while it was pending, between November 1993 and November 2010, the '510 patent would have disincentivized pharmaceutical companies, at least to some extent, from developing a highly pure tolvaptan?
A. Again, I haven't seen any evidence that any company or individual was, in fact, disincentivized. I do believe in general terms that patents should be respected.
Q. And so, in your experience, based on your experience studying these issues, do you believe that pharmaceutical companies would have had no disincentive by this patent from investigating methods of developing a highly pure tolvaptan?
A. I don't know that I've drawn that conclusion. I think companies should be aware of the existence of patents, but I haven't seen any evidence that the '510 has

04:13:23 disincentivized a party.
04:13:23 Q. While the '510 patent was pending, between November 1993 and November 19- -- November 2010, do you agree that pharmaceutical companies would have recognized that synthesizing, using, and selling tolvaptan in the United States would have been an infringement of the '510 patent?
04:13:48 A. I understand that certain activities would have represented infringement.
04:13:52 Q. Let me ask it this way: While the '510 patent was pending between November 1993 and November 2010, pharmaceutical companies would have recognized that other than research and development work necessary for FDA approval of a pharmaceutical, that synthesizing, using, and selling tolvaptan in the United States would have been an infringement of the claims of the '510 patent?
04:14:18 A. I'm not a technical or infringement person, but I believe that there are bounds within which activity could not occur. That is what's covered by the '510 patent.
04:14:28 Q. And in your experience, a pharmaceutical company would have been aware of those boundaries; correct?
04:14:34 A. I think there is a presumption that the world is aware of the boundaries of a patent. I believe there's often disputes about what those boundaries are.
04:14:54 Q. You are not aware of any legal proceeding in which

04:14:57 the validity of the '510 patent was challenged. Are you?
04:15:02 A. I believe that's correct, yes.
04:15:04 Q. In forming your opinion that the marketplace performance of Jynarque supports the non-obviousness of these asserted patents here, you did not consider the '510 patent, did you?
04:15:20 A. Not initially, Mr. Hofmann talked about it quite a bit. I think that I was generally aware that there might be other patents out there, but I did not do an evaluation of other patents in my first report.
04:15:34 Q. So just to clarify. It was not until Lupin's economics expert, Mr. Hofmann, raised it in his expert report that you addressed the '510 patent; is that correct?
04:15:45 A. That's the first time that I addressed it in written form. That's correct.
04:15:51 Q. And your expert report was where you outlined the summary and the bases for your opinion in this matter; correct?
04:15:56 A. Yes.
04:15:58 Q. Could you please turn in your binder to JTX-044?
04:16:09 A. All right. I'm there.
04:16:10 Q. And this is the '677 -- the '677 patent that you discussed during your direct testimony?
04:16:15 A. Yes, it appears to be.
04:16:17 Q. And this was also owned by Otsuka?

A. Yes. For some number of years, it was.

Q. And are you aware that Otsuka told the FDA that the -- this '677 patent covers methods of using tolvaptan to treat ADPKD?

A. That's generally consistent with my understanding. I don't know that I've seen the specific representations, but I have absolutely no reason to dispute your representation.

Q. And you understand that the '677 patent issued in May 1998 and expired in May 2020?

A. That's my understanding.

Q. Do you agree that while it was pending, the '677 patent, between May 1998 and May 2020, it would have disincentivized pharmaceutical companies to some extent from researching and developing methods of synthesizing tolvaptan?

A. I don't know that I've seen any evidence that any company or individual has been disincentivized. I do believe that in general people should respect patent rights.

Q. And that would include the patent rights of the '677 patent?

A. Generally, that's correct.

I believe there are disputes about whether the '677 patent is valid, enforceable, and infringed, which is true of many patents.

Q. And when you formed your opinion that the marketplace

04:17:44 performance of Jynarque supports the non-obviousness of the asserted patents in this case, you did not consider the '677 patent either; is that correct?

04:17:52 A. Again, I was generally aware that there were other patents that Otsuka owned. I did not address those in my first written report. I did address those in my second report.

04:18:04 Q. And your first written report is where you outlined your opinion that the marketplace performance of Jynarque supports the non-obviousness of asserted patents; correct?

04:18:14 A. Yes.

04:18:17 Q. I'd like to look at one of your slides.

04:18:19 MR. BUNKER: Could we go to PDX-5018?

04:18:19 BY MR. BUNKER:

04:18:27 Q. And this is your Slide 5018 that you discussed during your direct examination, Mr. Jarosz?

04:18:34 A. Yes.

04:18:35 Q. And during your direct testimony, you pointed out DMFs -- you discussed DMFs here, that are shown here, ten DMFs submitted in 2013 to 2020; correct?

04:18:47 A. Yes.

04:18:48 Q. And a work by Zhejiang, I don't -- in 2011, and work by Hetero in 2010; correct?

04:18:59 A. Yes.

04:19:00 Q. Now, we can agree that those are all dated after the

04:19:03 priority date of the asserted patents; correct?
04:19:06 A. Those dates in the boxes are, but the work may have
04:19:10 begun before that.
04:19:11 Q. Do you have any evidence that the work from these
04:19:14 examples that you're highlighting here began before the
04:19:16 asserted priority dates of -- the priority dates of the
04:19:19 asserted patent in this matter?
04:19:21 A. I can't point to particular evidence, but I'm
04:19:23 generally aware, as Dr. Roush said, that pharmaceutical
04:19:28 development occurs over a multi-year period. And that it's
04:19:33 very possible that work was done well in advance of these
04:19:37 dates.
04:19:37 Q. Did you see Dr. Roush point to any evidence to
04:19:39 support that opinion?
04:19:40 A. Not that I recall. No.
04:19:45 Q. Do you agree that these DMFs, the Zhejiang work and
04:19:50 the Hetero work, all relate to companies -- all are -- these
04:19:54 relate to companies working to launch a generic tolvaptan
04:19:57 pharmaceutical product?
04:19:58 A. I don't have reason to dispute that.
04:20:07 MR. BUNKER: Can we go to your Slide 5016,
04:20:10 please?
04:20:10 BY MR. BUNKER:
04:20:13 Q. This is Slide 5016 from your direct testimony;
04:20:16 correct?

A. Yes.
Q. At the bottom, it refers to May 2009, Samsca FDA approval. Do you see that?
A. Yes. But just to be clear, this is Mr. Hofmann's chart. This doesn't include any work that I've done on top of this.
Q. Understood.
Now, Otsuka sells a drug called Samsca; correct?
A. Yes.
Q. And you understand that the API in Samsca is also tolvaptan; correct?
A. Yes.
Q. Otsuka received FDA approval for Samsca in 2009; correct?
A. Yes, I believe so.
Q. And Otsuka started selling Samsca in 2009; is that correct?
A. I don't have reason to dispute that.
Q. In fact, Otsuka is still selling Samsca today; is that correct?
A. I believe that's correct, yes.
Q. Now, are there generic versions of Samsca commercially available today?
A. I think there are.
Q. Are you aware of any generic tolvaptan pharmaceutical

that launched before the expiration of the '510 patent and the '677 patent?

A. I don't know when all the generics launched. It's -- you're saying before the date of issuance of those? Let me make sure that I understand your question.

Q. Let me break it down.

A. Which date are we talking about?

Q. Sure. Are you aware of any generic tolvaptan pharmaceutical that launched before the expiration of the '510 patent?

A. I don't think I am.

Q. Are you aware of any generic tolvaptan pharmaceutical that launched before the expiration of the '677 patent?

A. I'd have to investigate that. I don't recall, sitting here today.

Q. You have not performed any analysis to determine whether Otsuka would have taken a license from a third party if the third party were to have discovered the claimed inventions, have you?

A. I don't know what analysis you have in mind, but I think Dr. Roush talked about that point in one of his reports. I have applied economic logic, but I can't point to particular evidence of Otsuka wanting to take a license. But it makes some sense because it was difficult to effectively synthesize tolvaptan.

04:22:57 Q. You did not do any investigation to determine whether Otsuka has ever taken a license from a third party with respect to a product it has in development; correct?
04:23:08 A. I don't recall doing that. At least not in the context of this matter.
04:23:12 Q. And you are not aware of a single instance in which Otsuka took a license from a third party on a patent covering a method of synthesizing a compound that Otsuka had already patented and was developing as a pharmaceutical product, do you?
04:23:29 A. I don't recall undertaking that investigation, correct, at least not with regard to this matter.
04:23:35 Q. Not only did you not undertake that investigation, you are not aware of such an instance; is that correct?
04:23:40 A. Sitting here right now, I think that's correct.
04:23:46 Q. On direct testimony, you mentioned orphan drug status; correct?
04:23:51 A. Yes.
04:23:53 Q. You acknowledged that Jynarque's orphan drug status has contributed to Jynarque's marketplace performance; correct?
04:24:01 A. I don't know if I acknowledged that, but remember the orphan drug exclusivity wasn't granted until 2018.
04:24:11 Q. Since it was granted in 2018, in your view, has the orphan drug exclusivity -- orphan drug status contributed to

Jynarque's marketplace performance?
A. I don't know. I don't recall seeing evidence on that. Orphan drug exclusivity does not mean that other companies can't get orphan drug exclusivity as well, or that there cannot be other agents investigated. So I'm not -- I'm not quite sure that I did what you're suggesting, but it's important to understand what orphan drug exclusivity does and does not do.
Q. You agree that Jynarque's orphan drug status may have contributed to its success; correct?
A. I think it's possible as a theoretical matter. I haven't seen evidence supporting that.
Companies get orphan drug status often because they get financial incentives to continue to do research in an area.
Q. You acknowledge that the marketing efforts for Jynarque have contributed to Jynarque's marketplace performance; correct?
A. I think they probably have. I haven't quantified that. But companies invest in marketing and promotion with the hopes and expectations that they will enhance product performance. It's important to realize, however, marketing is a two-way street. Those products that are successful often get marketing support. And the flip side, marketing support often enhances the success of products.

Q. Between 2019 and 2022, Otsuka spent $240.13 million in marketing Jynarque; correct?

A. I think it was 245, but I think you're roughly correct.

Q. I'll ask that again. I apologize if I misread it. Between 2019 and 2022, Otsuka spent $245.13 million in marketing Jynarque; correct?

A. Did you say between 2019 and 2022?

Q. I did.

A. Yes, I agree -- I think I agree with that.

Q. In addition to the asserted '730 patent, you acknowledge that Otsuka has listed other patents in the *Orange Book* as covering Jynarque?

A. I think I wasn't certain at my deposition. I don't recall investigating that since.

Q. Are you aware that Otsuka listed the '677 patent that we have discussed in the *Orange Book* as covering Jynarque?

A. I don't recall right now, but I don't have reason to dispute it.

Q. So I take it that you, in forming your opinion, that the marketplace performance of Jynarque contributed to the non-obviousness of the asserted patents, you did not consider the contribution of the '677 to that marketplace performance?

A. I considered it in the sense that I was aware that

there were other patents. I didn't understand any of those being blocking patents. And I did a further evaluation in my second report.

I don't have reason to categorically say that the '677 patent had no impact, but I haven't seen evidence that it has had an impact.

Q. In your binder, would you please turn to DTX-2003.

And do you recognize this as U.S. Patent Number 10,905,694 belonging to Otsuka?

A. Yes, that appears to be the case.

Q. And do you acknowledge that Otsuka has listed this '694 patent in the *Orange Book* as covering Jynarque?

A. Your colleague asked me that at deposition. I didn't have reason to dispute it then; I don't have reason to dispute it now.

Q. So to be clear, you did not consider the '694 patent in forming your opinion that the marketplace performance of Jynarque supports the non-obviousness of the asserted patents in this case?

A. Again, I was aware of the concept that Otsuka had other patents that may have contributed to the success, but I haven't seen evidence that they, in fact, did. I can't categorically say that there was no contribution to success, but the product was doing quite well before this patent issued.

04:29:10 Q. Mr. Jarosz, you acknowledge that there is no dispute that tolvaptan, the compound, leads to the efficacy, safety, and tolerability of Jynarque; correct?
04:29:19 A. That's my understanding from the testimony of Dr. Roush.
04:29:27 Q. And you acknowledge that the tolvaptan compound was known in the prior art; correct?
04:29:31 A. I think that's generally true. I am certainly not a prior art expert.
04:29:43 Q. Are you aware of any promotional messages for Jynarque that feature how Jynarque or the tolvaptan API are made?
04:29:52 A. Sitting here right now, I don't recall seeing those. I can't categorically say that I've never seen that, but I don't recall it right now.
04:30:11 Q. Do you know how much gross revenue Samsca has generated for Otsuka?
04:30:16 A. I don't know the dollar amount, but I know it's a fair amount less than Jynarque.
04:30:23 Q. And what do you mean by "a fair amount"?
04:30:25 A. It's a -- on an annual basis, I think Jynarque now is multiples of Samsca in terms of revenues for the company. But I very well could be wrong. I've not done a separate investigation of Samsca.
04:30:44 Q. Now, you reviewed the expert report of -- that

Mr. Hofmann submitted in this matter?

A. Yes.

Q. And you reviewed the documents that Mr. Hofmann cited in his report?

A. I don't know that I reviewed every single one, but I certainly reviewed some of them.

Q. In your binder, could you please turn to DTX-2168.

And can you confirm that this is the Quality Overall Summary Introduction for Otsuka's regulatory application for Jynarque?

A. I see the title of the document being Quality Overall Summary Introduction. I don't know what it's an introduction to with certainty.

Q. And do you recall reviewing this document as part of reviewing Mr. Hofmann's materials?

A. Sitting here right now, I do not.

Q. If we could look at the first paragraph. I'd like to ask you a couple questions related to what's mentioned here.

It says here, "Tolvaptan is a new chemical entity discovered by Otsuka Pharmaceutical Company, Limited. It has a novel vasopressin antagonist activity. The immediate release formulation of Samsca (tolvaptan) 15-, 30-, and 60-milligram tablets was approved on 19 May 2009 in NDA 22-275 for the treatment of hyponatremia."

Do you see that?

A. I do. Yes.

Q. Do you understand that NDA 22-275 refers to Otsuka's new drug application for Samsca?

A. That makes sense to me. Yes.

Q. Let's look at the second paragraph.

Reading the first sentence, "Otsuka has been investigating autosomal dominant polycystic kidney disease (ADPKD) as an additional indication."

Skipping to the third sentence. "This new drug application (NDA) for ADPKD provides for five strengths of tablets covering 15-, 30-, 45-, 60-, and 90-milligram strengths."

Skipping to the fifth sentence. "Since 15-, 30-, and 60-milligram tablets are identical as those approved in NDA 22-275, all the information on 15-, 30-, and 60-milligram tablets are cross-referred to NDA 22-275."

Do you see those sentences?

A. Yes. I'm sorry. I do see those.

Q. Okay. Do you understand that the three dosage strengths for Jynarque, the 15-, the 30-, and the 60-milligram tablets are identical to the Samsca tablets?

A. That's what's written here.

Q. I'd like to look at the third paragraph, and I'm going to read the first sentence.

"The drug substance used for 45- and

04:33:55 90-milligram tablets is the same as that for the currently approved tablets."

04:34:01 Jumping to the third sentence, "All the information on tolvaptan drug substance remains unchanged from that approved in NDA 22-275."

04:34:12 Fourth sentence. "All other information, including manufacturing site, route of synthesis, in-process controls, specifications, and analytical procedures are the same as those approved in NDA 22-275."

04:34:27 Do you see those sentences?

04:34:28 A. Yes.

04:34:29 Q. Now, do you understand that the tolvaptan drug substance or API and the other two dosage strengths for Jynarque, the 45- and the 60-mill- -- the 45- and the 90-milligram tablets are made the same way as the API in Samsca?

04:34:43 A. That appears to be the suggestion here.

04:34:50 Q. In your binder, would you please turn to DTX-2093?

04:34:54 This is an Otsuka 2023 Jynarque integrated asset plan presentation; correct?

04:35:09 A. Yes. You left out the term, the ELT. I don't know the significance of that. Or maybe you didn't and I just -- I just didn't hear it very well.

04:35:19 Q. I might have. I might have left that out.

04:35:22 And you reviewed this as part of preparing your

04:35:25 expert report?

04:35:25 A. I don't recall. We'd have to look at my Tab 2 or my additional Tab 2 to see if I did. It would make some sense to me, but I don't have a perfect recollection of that.

04:35:38 Q. Do you recall reviewing the deposition and exhibits taken -- marked in the deposition of Andrew Terzella, Otsuka senior director and brand lead for Jynarque marketing?

04:35:49 A. I don't have a perfect recollection of that. Again, we could look at my Tab 2 to refresh my memory.

04:35:54 Q. If you'd like to, your report is -- should be in the front there, Mr. Jarosz. If you'd like to look at your Tab 2 just to confirm that you did, in fact, review the deposition and exhibits of -- at the deposition of Andrew Terzella.

04:36:14 A. If you're referring to the April 21, 2023, deposition, we did.

04:36:18 Q. Thank you.

04:36:19 And this presentation is dated June 29th, 2022; correct?

04:36:26 A. Yes.

04:36:28 Q. Could you please turn to Page 2.

04:36:33 At the top this says -- or near the top it says 2022 Year-to-Date Asset Performance Summary; correct?

04:36:41 A. Yes.

04:36:43 Q. And in the third bullet, it says, "11,872 patients

04:36:48 have been prescribed, 9,792 received a dispense, and approximately 5,478 are active patients."

04:37:03 Do you see that?

04:37:03 A. Yes, I do.

04:37:04 Q. Do you have any reason to dispute that as of the date of this presentation, June 29th, 2022, there were approximately 5,478 patients actively taking Jynarque?

04:37:16 A. I -- I hesitate a little bit because there's a footnote on that, and I don't know what that footnote says.

04:37:27 Q. If you'd like to take your time and look at the document exhibit in that footnote, and I can ask my question again.

04:37:35 A. I just don't know where to find the footnote. I see Footnote 1. If you remember in a way that I don't.

04:37:43 Q. If I recall, it is towards the back of the --

04:37:46 THE COURT: The last page, I think. And it says Prometrics.

04:37:51 THE WITNESS: Okay. Thank you, Your Honor.

04:37:53 BY MR. BUNKER:

04:37:55 Q. I'll just ask my question again: Do you have any reason to dispute that as of the date of this presentation, June 29th, 2022, there were approximately 5,478 patients actively taking Jynarque?

04:38:07 A. I think that's probably right, probably as estimated by Prometrics, whatever that is.

04:38:15 Q. Do you know how many patients are actively taking Jynarque today?
04:38:19 A. No.
04:38:22 Q. From May of 2018 through March of 2023, Jynarque generated $3.6 billion in gross revenues; correct?
04:38:34 A. That sounds right.
04:38:35 Q. And during that same time period, May 2018 through March 2, 2023, it generated $3.1 billion in net revenues for Otsuka; correct?
04:38:46 A. Yes. Did you say through March? Is that what you said?
04:38:49 Q. I did.
04:38:49 A. Yes, I believe that's correct.
04:38:51 Q. In your expert report, you describe the price of Jynarque as "relatively high." Correct?
04:38:58 A. Yes, in relation to other orphan drugs.
04:39:01 Q. In fact, as you mentioned, Jynarque's prices are higher than the average cost for many orphan drugs; correct?
04:39:07 A. Slightly higher than the average of the -- the portfolio that I looked at.
04:39:13 Q. The wholesaler acquisition cost per Jynarque tablet as of April 2023 was $326.84; correct?
04:39:25 A. According to Mr. Greene, that's correct.
04:39:27 Q. That's per tablet; correct?
04:39:29 A. Yes, but that's also wholesale acquisition cost.

04:39:32 Q. And Jynarque is administered twice a day; correct?
04:39:35 A. I think it's often prescribed that way, yes.
04:39:39 Q. The annual gross costs for a patient taking Jynarque in 2021, two years ago, was $208,000 -- $208,812; correct?
04:39:54 A. That sounds right, but you seem to be looking at something very specific. And it might be the number I calculated, but I certainly haven't committed that to memory.
04:40:04 Q. Correct. If you'd like to look in your opening report at paragraph 133.
04:40:21 A. Yes. You quote that correctly.
04:40:25 Q. And the annual gross cost for a patient taking Jynarque this year, 2023, is even higher. Correct?
04:40:31 A. I don't know if that's correct. That would make sense to me, but I don't know for sure. I don't think I have the data right now to be able to do that calculation.
04:40:49 MR. BUNKER: Thank you for your time, Mr. Jarosz. I have no further questions.
04:40:52 Your Honor, we'd like to move into evidence DTX-2003, DTX-2093, DTX-2168, JTX-043, JTX-044.
04:41:09 MR. ROTHMAN: No objection, Your Honor.
04:41:09 THE COURT: All right. They're admitted without objection.
04:41:12 (DTX Nos. 2003, 2093, and 2168 were admitted into evidence.)

(JTX Nos. 043 and 044 were admitted into evidence.)

THE COURT: Is there any redirect?

MR. ROTHMAN: Just one or two questions, please.

REDIRECT EXAMINATION

BY MR. ROTHMAN:

Q. Do you recall in your testimony you were asked about whether you were aware whether the asserted blocking patents were challenged in a court proceeding? Do you remember that testimony?

A. I think I was asked with regard to the '510 patent. I wasn't asked with regard to the '677.

Q. Okay.

MR. ROTHMAN: Then I have nothing further, Your Honor. Thank you.

THE COURT: All right.

Mr. Jarosz, you're done. You can step down. Watch your step. Okay?

THE WITNESS: Thank you.

THE COURT: You don't have to carry the things away.

MR. WATKINS: I've got them.

MR. GARRETT: Your Honor, Plaintiff has no further witnesses on validity.

THE COURT: Okay.

MR. GARRETT: Thank you, Your Honor.

MR. BUNKER: Your Honor, Lupin calls as its next witness Mr. Ivan Hofmann.

THE COURT: Okay.

DEPUTY CLERK: Please state and spell your full name for the record.

THE WITNESS: Ivan T. Hofmann, H-O-F-M-A-N-N.

DEPUTY CLERK: Do you affirm that the testimony you are about to give to the Court in the case now pending will be the truth, the whole truth, and nothing but the truth, you do so affirm?

THE WITNESS: I do.

IVAN T. HOFMANN, the witness herein, after having been duly affirmed under oath, was examined and testified as follows:

MR. BUNKER: May I approach, Your Honor?

THE COURT: Yeah.

Okay. If you want to take some, start with that pack.

DIRECT EXAMINATION

BY MR. BUNKER:

Q. Good afternoon, Mr. Hofmann. Can you please state your full name for the record?

A. Sure. It's Ivan T. Hofmann, H-O-F-M-A-N-N.

Q. And could you briefly summarize your qualifications

and experience in pharmaceutical economics?
A. Sure. So I graduated magna cum laude from the University of Notre Dame with two majors, one in economics and one in accounting. I'm currently vice president and managing director of Gleason IP, which is an economic, accounting, and financial consulting firm where I'm the leader of the intellectual property practice.
I'm regularly called upon to analyze economic issues involving intellectual property, sometimes in a dispute setting such as this or other dispute settings, and sometimes outside the dispute setting.
I've been qualified as an expert in courts throughout the country and throughout the world as an expert in pharmaceutical economics.
Q. In your binder, could you please turn to DTX-2165? And would you please identify this document for us?
A. Yes. This is my list of my summary CV and then testimony over the past four years as of the date I issued my report. It hasn't been updated for some testimony I've given since then.
Q. Does DTX-2165 accurately list your educational and professional background?
A. It does.
MR. BUNKER: Your Honor, defendants offer Mr. Hofmann as an expert witness in economic analysis of

pharmaceutical products.

MR. MURNANE: No objection, Your Honor.

THE COURT: All right. You may proceed.

BY MR. BUNKER:

Q. Mr. Hofmann, what were you asked to do in this matter?

A. I was asked to review and respond to Plaintiff's assertion of alleged commercial success as set forth by Mr. Jarosz, who we just heard from, and provide my own independent analysis of that.

Q. And were you also in the courtroom to hear Dr. Roush's testimony today and yesterday?

A. I was.

Q. And were you also present in the Court to hear Dr. Dichtel's testimony from today and yesterday?

A. Yes, sir.

Q. Now, in the context of a commercial success analysis, what would it mean if the marketplace performance of a product were not attributable to the novel features of the claimed invention?

A. That's -- that's a critical question and something that I expect to talk about.

One has to study whether there were gating issues, things like the existence of blocking patents that explain -- that would have deterred or provided economic

disincentives to people, other than the patents at issue, in the matter where one is studying those economic questions.

One also has to look at whether there were things that were previously known, things that were in the prior art, and whether there was other intellectual property or other patents that cover the prior art, and assess and analyze the role that all of that plays, in addition to what role, if any, the alleged novelty of the patents at issue is in order to -- to make a determination as to whether there's potential commercial success.

Q. What is the relevant dates for assessing non-obviousness?

A. This is critically important. It's the priority date of the patents at issue. And in this case, we have the '735 and '730 patent, which I understand the earliest priority date is September 2nd, 2005. That's the critical date for assessing what the landscape was and whether there were those issues I just mentioned.

Q. Do you have slides prepared to aid in understanding your testimony today?

A. I do.

MR. BUNKER: If we could turn those -- turn the screen on and go to Slide DDX-4.2, please.

BY MR. BUNKER:

Q. Could you briefly summarize your opinions in this

matter?

A. Yes. It's my opinion that Otsuka held blocking patents that disincentivized others from developing the claimed subject matter of the asserted patents in this case.

I also am of the belief that Mr. Jarosz failed to address the effect on marketplace performance of things that were known in the prior art, such as the tolvaptan compound.

And then I also believe that Mr. Jarosz failed to address other *Orange Book* listed patents as part of his assessment of finding alleged commercial success.

Q. Did you hear Mr. Jarosz's testimony regarding the sales levels of Jynarque?

A. I did.

Q. And do you dispute the sales levels of Jynarque?

A. No, I think he -- he, you know, mathematically summarized the information based on the underlying data sets as presented.

Q. And do you believe that's the end of the inquiry here that we're here to talk about?

A. Absolutely not. One -- just because a product maybe has had even billions of dollars in sales over many years doesn't mean it's necessarily commercial success as a term of art in an obviousness inquiry. One has to study some of these other issues that are on screen, as I'll explain in

further detail.

Q. Yes. Let's -- let's turn to the blocking patent concept.

Before we do, what is your understanding of the subject matter of the asserted claims?

A. I think we've heard about that from some other technical experts already this week, you know, that basically the '735 patent claims certain methods of synthesizing tolvaptan. And then the '730 covers certain purity levels. Both include using certain hydrogenating agents.

MR. BUNKER: If we could go to your next slide, DDX-4.3.

BY MR. BUNKER:

Q. Based on your analysis, have you determined that the concepts of economic disincentives and blocking patents are relevant to your opinions on commercial success as a secondary consideration of non-obviousness in this case?

A. I have.

Q. Can you explain that a little bit more?

A. Sure. So the '510 patent, I think every witness I've heard from this week acknowledges that that covers the tolvaptan compound. It's a classic compound patent. And that issued in 1993, and that was owned by Otsuka. And that was in existence until November 2010, which critically,

importantly covers the period of time for the priority date of the patents at issue in this case, which was as of September 2005.

Q. And how does the scope of the claims in the '510 patent compare to the scope of the asserted claims?

A. So as I understand, and as I explained what my understanding is of the asserted claims, is that the tolvaptan compound encompasses essentially any uses of that compound in any commercial way.

And so the particular methods of synthesis or particular methods of purity levels, as I think we've heard, and I think having read the Parker report, as well, and we'll hear from maybe tomorrow, is that these are all within the scope -- within the scope of the '510 compound patent.

Q. So just to confirm, is it your understanding that practicing the asserted claims would have been entirely within the scope of the '510 patent?

A. That's correct.

Q. And could you please explain again what is your understanding of when the '510 patent issued and when it expired?

A. These are reflected on the timeline on the screen. November 1993, the '510 patent issued. And then it expired in November 2010.

Q. And, again, how do those dates relate to the priority

date of the asserted patents?
A. So Otsuka held the exclusive rights to the '510 patent during this entire period. And the -- the priority date of the '735 and '730 patents fall within that time period.
Q. Could you explain, in your assessment, what is the significance of this conclusion that the priority date of the asserted patents falls within this blocking period?
A. It's kind of a classic compound patent blocking patent case that others would be facing significant economic disincentives to pursue R&D as of September 2005 with respect to synthesizing or doing different things with tolvaptan because they wouldn't be able to recoup those investments with respect to the fact that -- that Otsuka had the rights to the compound.
Q. Now, Mr. Jarosz, in his testimony, mentioned the *Acorda* factors.
Do you recall that?
A. I do.
Q. And for your blocking patent analysis relating to the '510 patent, did you examine the factors -- these *Acorda* factors?
A. Yes. As -- as I think is appropriate, based on recent Federal Circuit guidance, yes.
MR. BUNKER: Let's turn to your next slide,

DDX-4.4.

BY MR. BUNKER:

Q. Please explain what the first *Acorda* factor is and what your analysis showed with respect to the '510 patent.

A. So the first factor on the screen there is the likelihood of successful challenge. And with respect to the '510 patent, I think -- I have not seen anything that suggests that anybody has challenged the '510 compound patent. And I didn't hear anything from any witness that has said otherwise.

MR. BUNKER: Let's turn to your next slide, DDX-4.5.

BY MR. BUNKER:

Q. What is the second *Acorda* factor, and what did your analysis show with respect to the '510 patent?

A. So this relates to the cost of the project and the risk of research failure. And what that means is the way pharma products typically work is you invest up front in R&D, and then you hope to eventually commercialize in such a way that you can recover those costs.

But if blocking patents exist, then there's an economic disincentive to invest in this those up-front costs because you may never be able to recoup those investments. So this weighs in favor of a blocking patent.

Q. Okay. And just to clarify, how do those

principles -- how did those -- when you analyzed those principles with respect to the '510 patent, what did you conclude?

A. I concluded that these -- both of these factors weigh in favor of '510 being a blocking patent.

MR. BUNKER: Let's turn to your next slide, DDX-4.6.

BY MR. BUNKER:

Q. What is the third *Acorda* factor, and what did your analysis show with respect to the '510 patent?

A. We kind of touched on it at a high level, but it's related to the nature of improvements and whether they're entirely covered by the blocking patent, in this case the '510 patent.

And like I said, my understanding is that the alleged novelty of the '735 and '730 would be entirely subsumed within the compound '510 patent.

MR. BUNKER: Let's turn to your next slide, DDX-4.7.

BY MR. BUNKER:

Q. What is the fourth *Acorda* factor, and what did your analysis show with respect to the '510 patent?

A. This relates to kind of a temporal issue, sometimes referred to as head start. It's the risk of losing the invention race. And in this case, the '510 patent issued

04:55:58 more than a decade before the priority date of the '735 and '730 patent and Otsuka, as a multinational global pharmaceutical company, had a significant head start that would have created an economic disincentive for anyone other than Otsuka to develop patents for synthesizing that, the tolvaptan compound.

04:56:24 MR. BUNKER: Let's turn to your next slide, DDX-4.8.

04:56:27 BY MR. BUNKER:

04:56:28 Q. What is the fifth *Acorda* factor, and what did your analysis show with respect to the '510 patent?

04:56:34 A. What this relates to is whether or not the patent owner would be likely to license or refuse to license the blocking patent. Sometimes, like say a university or an institution will be interested in not licensing because they can't commercialize. But in the case of Otsuka, they have the manufacturing and marketing capacity, had -- have multiple products in their portfolio, and so they would be unlikely to out-license or in-license anything related to the tolvaptan compound because they have the wherewithal and means to do it all themselves.

04:57:14 Q. Are you aware of any evidence that Otsuka licensed the '510 patent?

04:57:18 A. I have seen nothing.

04:57:21 Q. Thank you, Mr. Hofmann.

MR. BUNKER: Can we go to your next slide, DDX-4.9?

BY MR. BUNKER:

Q. How is this timeline different from the previous one?

A. So what I've done in this timeline is layered on the '677 patent, its dates on top of the '510 patent.

Q. And what is your understanding of what is claimed by the '677 patent?

A. It's, as I understand it, a method of using tolvaptan -- tolvaptan to treat ADPKD.

Q. And you understand that Otsuka owns the '677 patent?

A. Correct.

Q. And what is your understanding of when the '677 patent issued and when it expired?

A. So that's reflected at the top of the screen. I understand that it issued in May of 1998, and then it expired in May of 2020.

Q. And how do the issuance and expiration dates of the '677 patent compare to the priority date of the asserted patents?

A. The priority date of September 2005 falls within the period that the '677 patent was in effect.

Q. In your assessment, what is the significance of the conclusion that the priority date of the asserted patents fall within this blocking period?

A. So the '510 patent is a block in and of itself. What the '677 patent does is create additional economic disincentives because now we have not only the compound as of the priority date of the patents at issue, but we also have the method of using that compound for treating AP -- or ADPKD as of the priority date. And so this is just layers of economic disincentives in the form of blocking patents that exist as of the priority date.

Q. Why would the '677 patent, as a method of use patent, disincentivize others from developing a process for synthesizing tolvaptan and synthesizing tolvaptan with certain purities as recited in the asserted claims here?

A. Because if you, say, undertook that work -- so here it's important to again note that Otsuka owns '510, owns '677, owns '735, and owns '730, nobody -- or it's unlikely that anyone else would be economically motivated or, said differently, they would be economically disincentivized to come up with a process of synthesizing or come up with certain purity levels because they wouldn't be able to commercialize it, at least until after the blocking period here.

Q. Did you also examine the Acorda Factors with respect to the '677 patent?

A. I did.

Q. And what did you find?

A. I found that similar to the '510 patent, they applied. There's certain differences, but by and large, the significant head start, the significant likelihood of not being able to challenge the patent in a way that has transpired, because although there have been some lawsuits, nobody has prevailed against the '677.

And then the -- there was really no incentive for Otsuka to license, in or out, the '677 patent.

MR. BUNKER: Your Honor, I have a few more -- some more questions. I want to be mindful of the time. May I continue or --

THE COURT: Yeah. No. No. You're going to finish.

MR. BUNKER: Understood.

BY MR. BUNKER:

Q. In -- Mr. Hofmann, in your summary of opinions, you mentioned that Mr. Jarosz failed to appropriately address what was known in the prior art.

What did you mean by that?

A. So, yeah, that was the second point in my summary of opinions, that essentially if what's driving the sales is something that was previously known and is not attributable to the alleged novelty of the claimed invention, then that undermines any potential claim of nexus or the finding of commercial success.

Q. And why is it relevant to commercial success for an expert to analyze what was known in the prior art?
A. For just that reason, because even if a product has done decent in the marketplace, if there isn't a demonstration that that performance is due to the alleged novelty of the claimed inventions, then there's no nexus and there's no ability to find commercial success.
Q. And based on your analysis, are the efficacy and the acceptable safety and tolerability of Jynarque key drivers of its marketplace performance?
A. I think every witness I've heard from this week has acknowledged that the compound itself is due -- explains or can be attributed to the efficacy, tolerability, and safety of the tolvaptan product.
Q. Now, on this slide that you're showing here, you were in the courtroom to hear Mr. Jarosz comment on your opinions and your demonstrative regarding blocking patents; correct?
A. I was.
Q. And he had included references to DMFs and Hetero and things of that nature. Do you recall that?
A. I do.
Q. And what is your response to Mr. Jarosz's testimony?
A. I think it's -- it's -- I don't know what the right word is. It's somewhat misleading, because I understand that there are regulatory -- regulatory safe harbors, and

that ANDA filers and others are encouraged to conduct research before the expiration of patents. But they can't commercialize it.

I mean, that's the intended result of the Hatch-Waxman Act was to get people doing a little bit of legwork before the expiration of the patents, but they can't commercialize until thereafter.

I also think that just about everybody he pointed to are ANDA filers. And that, to me, is not a comparable to what we're studying with respect to as of the priority date, would a POSA working either on their own or in -- for a -- for a potential NDA filer have had the economic incentive to conceive of the alleged inventions of the '735 and the '730 patent.

Q. Going back to your summary of opinions, you also mention that Mr. Jarosz failed to appropriately address other patents and whether they drive the marketplace performance of Jynarque.

What did you mean by that?

A. Well, so Otsuka themselves have represented to the FDA that multiple patents other than '735 and '730 cover the Jynarque product. And he didn't do anything to attribute anything to those other patents.

Q. And you understand those are the '677 and '694 patents?

05:04:34 A. Correct.
05:04:36 Q. Overall, what did you conclude regarding the failure of Mr. Jarosz to appropriately address other patents relative to the commercial success inquiries of Jynarque?
05:04:46 A. Essentially, it leads to an economically unsound result. He's taking a hundred percent credit or a hundred percent of the sales of Jynarque and attributing them all to the '735 and '730 patent, and doesn't attribute anything to the other *Orange*-listed patents that Otsuka reported to the FDA to cover the Jynarque product.
05:05:15 MR. BUNKER: Thank you, Mr. Hofmann. I have no further questions.
05:05:18 We move to admit DTX-2165, Mr. Hofmann's CV, into evidence.
05:05:25 MR. MURNANE: No objection, Your Honor.
05:05:26 THE COURT: All right. Admitted without objection.
05:05:28 (DTX No. 2165 was admitted into evidence.)
05:05:29 THE COURT: All right. So I've lost track of how long we've been sitting in court, but it seems like it's been a pretty long time. Do you want to finish -- do you want to do your cross tonight or do you want to do it tomorrow morning?
05:05:47 MR. MURNANE: I can do it tonight if Your Honor would like. It won't be long. It's up to Your Honor.

05:05:50 THE COURT: Yeah, I'm just trying to remember. How long has it been since we had a break? Anyone keeping track? I know someone is.

05:06:00 DEPUTY CLERK: We took a break at 3:50.

05:06:00 THE COURT: Oh, 3:50, so it's not that long. Yeah, okay. Yeah, I mean, let's -- is it all right with everyone? I know you have plans.

05:06:09 MR. BUNKER: It's fine with us, Your Honor.

05:06:10 THE COURT: It's fine. Okay.

05:06:12 Let's go ahead.

05:06:14 MR. MURNANE: Thank you, Your Honor.

05:06:48 CROSS-EXAMINATION

05:06:48 BY MR. MURNANE:

05:06:54 Q. Good afternoon, Mr. Hofmann.

05:06:55 A. Good afternoon.

05:06:57 Q. You are a certified licensing professional; correct?

05:07:01 A. I am.

05:07:02 Q. As a licensing professional, you have helped companies, universities, and not-for-profit organizations negotiate licenses for patents; correct?

05:07:11 A. I have.

05:07:12 Q. Your experience includes both in-licensing and out-licensing patents; correct?

05:07:17 A. That's correct.

05:07:18 Q. In fact, you have helped dozens and dozens of

pharmaceutical companies negotiate licenses for patents; correct?
A. As well as other industries, yes.
Q. Thank you.
At least some of the many licenses you have helped negotiate were in licenses between a pharmaceutical company and a third party, correct?
A. Yes.
Q. And under certain circumstances, a pharmaceutical company may in-license a patent from a university; correct?
A. Depending on the facts and circumstances, yes.
Q. When determining whether a product is a marketplace success, you consider how that product performed in the relevant market; correct?
A. Agreed.
Q. And in determining how a pharmaceutical product performed in the relevant market, you may consider the product's growth in sales and prescriptions; correct?
A. Among other metrics, yes.
Q. Likewise, you might also consider a pharmaceutical product's net revenues; correct?
A. Yes.
Q. And you do not dispute that based on the available data, Jynarque's net revenue has grown every year since its launch; correct?

A. I think there was a little step back in 2020 due to COVID. But generally, the longitudinal numbers are growth -- reflect growth.

Q. Thank you, sir.

In a marketplace success inquiry, you may also consider the pharmaceutical product's sales in terms of both dollars and prescriptions; correct?

A. I would agree with that.

Q. Just so the record is clear, you do not dispute the numbers and data that Mr. Jarosz used to calculate net revenue, gross revenue, and number of tablets sold in his expert reports; correct?

A. That's correct.

Q. And you do not dispute the figures that Mr. Jarosz generated in his report based on these data; correct?

A. No.

Q. Okay. Jynarque first received orphan drug designation on April 6th, 2012; correct?

A. I think that's correct.

Q. And Jynarque eventually received orphan drug exclusivity as of its FDA approval on April 23rd, 2018; correct?

A. That's correct.

Q. And you will agree that there was no orphan drug designation or orphan drug exclusivity for tolvaptan as of

the priority date of the asserted patents-in-suit; correct?
A. I think that's temporally correct.
Q. Thank you. In fact, there were no exclusivities, market or regulatory, for tolvaptan as of the priority date of the asserted patents; correct?
A. I guess I'm struggling with saying "market or regulatory." I mean, they had the '510 patent, they had the '677 patent, so those were issued by USPTO and were held by Otsuka. There wasn't like an NCEX exclusivity or a orphan drug exclusivity at that time, but they had the blocking patents.
Q. Thank you for your answer, sir.
When Otsuka obtained orphan drug designation for tolvaptan as an ADPKD treatment in 2012, that designation would not have prevented a third party from obtaining its own orphan drug designation for tolvaptan as a treatment for a different disease; correct?
A. I would say it this way: Technically, I think that is correct, but when you have Otsuka with all the ownership that they had on tolvaptan, as a prominent pharmaceutical company in this space, and a very, very small ultra-orphan patient population, it's unlikely that anyone else would do that. But it's possible.
Q. Likewise, the orphan drug designation for tolvaptan to treat ADPKD would not have prevented a third party from

obtaining orphan drug exclusivity for tolvaptan as a treatment for a different disease; correct?

A. I think -- again, I'm not a regulatory expert, but technically I think that's correct. I think that the additional disincentives that I discussed on direct would suggest that's unlikely.

Q. Thank you.

When Jynarque eventually -- excuse me. When Jynarque eventually obtained orphan drug exclusivity in 2018, that would not have prevented -- excuse me, that exclusivity would not have prevented a third party from developing a synthetic route for tolvaptan; correct?

A. Well, I think once they get the exclusivity, someone else could do what you described, but they have to show that it's an improvement over the drug that already has obtained exclusivity, as I understand it.

Q. As far as you know, there wouldn't have been a prevention?

A. But there would be a bar that they would have to meet to show that what they've come up with is an improvement over the holder of ODE.

Q. The '510 patent expired by the time Jynarque received its orphan drug designation in 2012; correct?

A. Correct.

Q. You testified this afternoon that the '510 patent

claims and discloses the substance tolvaptan.

To your knowledge, does the '677 patent cover methods of using tolvaptan to treat ADPKD?

A. That's what I said, yes.

Q. Okay. Did you undertake an independent analysis to confirm whether the '510 and '677 patents, respectively, cover tolvaptan or the use of tolvaptan to treat ADPKD?

A. I relied on technical experts who -- I'm not a patent lawyer and I'm not a technical expert. But their expert reports is where I got that basis.

BY MR. MURNANE:

Q. I invite your attention -- and, please, if we would, James, put up on the screen JTX-051.

BY MR. MURNANE:

Q. In your expert report, you relied on JTX-051 to show that the '510 patent covers tolvaptan; correct?

A. Correct. As well as references, I think, to Dr. Parker.

Q. And Dr. Parker also relied -- we went over this at your deposition. He also relied on JTX-051; correct?

A. Correct.

Q. Okay. Thank you.

Otsuka submitted this NDA document JTX-051 to the FDA in 2007; correct?

A. I'm just trying to find the dates. I don't have it

committed to memory.

Q. I invite your attention to Page 7 of this document. And you'll see there's --

MR. MURNANE: If you could, James.

BY MR. MURNANE:

Q. -- by the signature, there's a date of October 11th, 2007?

Do you see that?

A. Yes.

Q. In your expert report, as we've just said, you relied on JTX-051. And take a look, please, at DTX-2103. And you relied on that in your expert report to show that the '677 patent covers a method of treating ADPKD using tolvaptan; correct?

A. As well as my reference to Dr. Parker and maybe Dr. Dichtel, too.

Q. Right. And as we discussed in your deposition, both of them also relied on these two documents; correct?

A. I believe they do make reference to them, yes.

Q. Thank you. Thank you.

And Otsuka submitted this NDA document to the FDA on September 13th; 2017; correct?

I invite attention to Page 4, which is highlighted. You see that date?

A. I do.

Q. Okay. Since these documents were submitted to the FDA in October of 2007 and September of 2017, would you agree that they were submitted at least two years after the priority date of the patents-in-suit, September 2005?
A. Well, that's the date of these documents.
Q. Right. That's what I'm asking, sir.
A. There's also --
Q. That's what I'm asking, sir. I'm asking about these documents.
A. Okay. Those are the dates that appear on these documents.
Q. Okay. Thank you. And these are the documents that you and your colleagues cite in your reports as your basis for asserting that the '510 and the '677 patents were blocking patents?
A. As well as the patents themselves.
Q. No. You did not cite the patents themselves, sir. In your report you cited these documents, and I asked you about that at your deposition.
A. I mean, I cite the '510 and '677 patent over and over, and I refer to Drs. Dichtel and Dr. Parker over and over. Maybe it's not in the particular footnote to which you're referring, but I definitely had an understanding based on that that the '510 and '677 are what I described on direct from the technical experts.

Q. But you don't disagree that the only citation in your report to support your contention with respect to the '510 and the '677 in the footnote where these two reports --
A. I -- I think we debated this a little bit because I said my footnotes are exemplary. I definitely cited '510 and '677 and understood the claimed scope from the technical experts and cited that throughout my report.
Q. Right. I bring this up, sir, not to be arguing with you, but I just heard criticism of Mr. Jarosz for not considering the prior art. And we do know that in your report and in your colleague's report, Dr. Parker's and Dr. Dichtel's reports, the only citations in those reports -- and I went through them all paragraph by paragraph, footnote by footnote -- the only citations are these two; correct?
A. I just -- I can't agree with that. I -- I think that it's very clear in both my report as well as their reports that they cite regularly the '510 and '677.
Q. So you're representing that your reports and their reports cite something more than what's in those footnotes?
A. Maybe in those particular exemplary footnotes that's what's cited, but there's a whole build-up in the report that includes discussion of '510 and '677. And I think in -- I think all of our reports.
MR. MURNANE: No further questions, Your Honor.

05:18:28 THE COURT: All right. Thank you. Any redirect?

05:18:30 MR. BUNKER: No. No, Your Honor.

05:18:31 THE COURT: All right.

05:18:33 Mr. Hofmann, thank you. You may step down. Watch your step.

05:18:36 THE WITNESS: All right. Thank you, sir. Your Honor.

05:18:39 THE COURT: Okay. So I guess we have one witness left for tomorrow?

05:18:46 MR. ZIMMERMAN: I -- I -- I believe we have two witnesses left, Your Honor.

05:18:48 THE COURT: Oh, and who's -- so one of them is this Dr. Parker; right?

05:18:52 MR. ZIMMERMAN: Dr. Parker and Dr. Dichtel.

05:18:54 THE COURT: Oh.

05:18:55 MR. ZIMMERMAN: And they will be short.

05:18:56 THE COURT: Okay. All right. Well, let's start tomorrow at 9:00 o'clock.

05:19:03 MR. ZIMMERMAN: Your Honor, I do have one logistical issue.

05:19:05 THE COURT: Yes.

05:19:06 MR. ZIMMERMAN: If I can have your indulgence, the parties have agreed on a briefing schedule that would conclude briefing by March 15th. I wanted to make sure that

end date was acceptable to the Court because if we have to discuss tonight, we should.

THE COURT: No, I think it's okay because, as I recall, the earliest possible FDA approval is like in 2025; right?

MR. ZIMMERMAN: That's correct, Your Honor.

THE COURT: Yeah. So -- our time is not of the essence here.

Yeah, so you want to brief it through to March 15th. That's fine. Okay.

So, good night. See you tomorrow. 9:15 -- 9:00 o'clock.

DEPUTY CLERK: All rise.

ALL COUNSEL: Thank you, Your Honor.

(Court was recessed at 5:19 p.m.)

I hereby certify the foregoing is a true and accurate transcript from my stenographic notes in the proceeding.

/s/ Heather M. Triozzi
Certified Merit and Real-Time Reporter
U.S. District Court